```
 1                IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                        EASTERN DIVISION

 3   UNITED STATES OF AMERICA,        )  Docket No. 16 CR 109
                                      )
 4                   Plaintiff,       )  Chicago, Illinois
                                      )  March 5, 2019
 5            v.                      )  10:40 a.m.
                                      )
 6   RALPH GARCIA,                    )
                                      )
 7                   Defendant.       )

 8                          VOLUME 1-A

 9            TRANSCRIPT OF PROCEEDINGS - BENCH TRIAL
             BEFORE THE HONORABLE ROBERT M. DOW, JR.
10

11   APPEARANCES:

12   For the Plaintiff:      HON. JOHN R. LAUSCH, JR.
                             UNITED STATES ATTORNEY
13                           BY:  MR. TIMOTHY J. STORINO
                                  MR. CORNELIUS A. VANDENBERG
14                                ASSISTANT UNITED STATES ATTORNEYS
                             219 South Dearborn Street, Suite 500
15                           Chicago, Illinois  60604
                             tim.storino@usdoj.gov
16                           cornelius.vandenberg@usdoj.gov

17   For the Defendant:      LAW OFFICES OF JOHN LEGUTKI
                             BY:  MR. JOHN C. LEGUTKI
18                           53 West Jackson Boulevard, Suite 920
                             Chicago, Illinois  60604
19                           jclegutki@sbcglobal.net

20

21

22

23   Court Reporter:         KRISTIN M. ASHENHURST, CSR, RDR, CRR
                             Official Court Reporter
24                           219 S. Dearborn Street, Room 2304-A
                             Chicago, IL 60604
25                           (312) 818-6549
                             kristin_ashenhurst@ilnd.uscourts.gov
```

1           (The following proceedings were had in open court.)

2           THE CLERK:  16 CR 109-1, United States of America

3    versus Ralph Garcia.  This is for a bench trial.

4           THE COURT:  Good morning, everybody.

5           MR. LEGUTKI:  Good morning, sir.

6           MR. VANDENBERG:  Good morning, your Honor.

7           THE COURT:  There's a motion, Mr. Legutki --  I will

8    let you guys state for the record your names, too, so Kris has

9    this all in one place.

10          MR. VANDENBERG:  Yes, your Honor.  Cornelius

11   Vandenberg and Tim Storino on behalf of the United States.

12          MR. LEGUTKI:  Good morning, Judge.  My name is John

13   Legutki, last name L-e-g-u-t-k-i.  I represent Ralph Garcia,

14   who is to my immediate right.

15          THE COURT:  Good morning, everybody.  Nice to see you,

16   Mr. Garcia.

17          Before today, I know Mr. Legutki filed a motion last

18   week seeking disclosure of whatever else you guys needed to

19   give him, it looked like.  Has that been taken care of?

20          MR. VANDENBERG:  Yes, your Honor.  We have been

21   producing things throughout the lead up to trial, including up

22   until this morning.  Just to point out on the record the fact

23   that the CS made $59,000, the CS's criminal history, the CS's

24   past drug trafficking.  We're aware of our *Giglio* obligations,

25   and we would argue that the motion is moot to that extent, as

1    we believe that we adhered to those.

2         THE COURT:  I expected that you would.  And,

3    Mr. Legutki, I know this morning you got some further

4    documents.  Do you feel satisfied you have everything that

5    you're entitled to?

6         MR. LEGUTKI:  I received documents, Judge.  I have

7    been in constant communications with both prosecutors.  I think

8    they give me information as they receive it or at least

9    discovered it, so if there is anything else, I'm confident they

10   will give it to me.

11        THE COURT:  And then the government had filed, I guess

12   it's an intent to provide testimony of a witness who will be

13   given immunity.  You've seen that as well?

14        MR. LEGUTKI:  I saw that last night, yes, Judge.

15        THE COURT:  They have given me a proposed order, which

16   I've left in back, but I understand that witness will be your

17   last witness.

18        MR. VANDENBERG:  Yes, your Honor.

19        THE COURT:  So we can deal with that this afternoon,

20   then, or tomorrow morning, depending on how well we do today.

21        MR. VANDENBERG:  Yes, your Honor.

22        THE COURT:  Okay.  Very good.  Is there anything else

23   you guys needed me to go over with you before we start?

24        MR. VANDENBERG:  Just a couple of brief things, your

25   Honor.  First of all, outside of the *Giglio* area, in terms of

1    *Jencks* material, just to put on the record that we produced

2    *Jencks* material to defense counsel this morning, namely the

3    grand jury testimony of the case agent who will be testifying

4    in the case.

5                    THE COURT:  Mm-hmm.

6                    MR. VANDENBERG:  The other couple of things that we

7    wanted to raise are just logistical issues.

8                    THE COURT:  Sure.

9                    MR. VANDENBERG:  Namely -- first of all, the

10   defendants indicated they intend to assert a defense of

11   entrapment, and the government does plan to introduce evidence

12   in its case in chief that rebuts that defense.  Primarily in

13   the form of statements made by the defendant that show his

14   predisposition toward relevant criminal conduct.  So, the

15   question, your Honor, anticipating the defense will object to

16   some of that material coming in, is just since this is a bench

17   trial, and given the defense, is that something where you would

18   like us to argue through the objections in the order of time,

19   or you would like us to address in post-trial briefing.

20                   THE COURT:  I will tell you my inclination -- you guys

21   can tell me if you disagree -- is in the interest of

22   efficiency.  Ordinarily in a bench trial I just have the

23   objection made contemporaneously the evidence received subject

24   to the objection and then you guys can brief after the trial

25   with a transcript.  You know, in the interest of accuracy

1  you'll know exactly what was said, and you guys can apply the

2  case law exactly to what was said in post-trial briefing.  And,

3  you know, as a Judge, I have learned that if I strike the

4  testimony, I just cross it out and I decide it based on the

5  rest of the testimony.  And that's hard for a jury to do, but

6  I'm confident I can do that.

7       Do you all have any objection to proceeding in that

8  fashion?

9       MR. LEGUTKI:  No, your Honor.  I think that months ago

10  when we initially discussed a bench trial, that

11  Mr. Storino -- I don't think Mr. Vandenberg was in on the

12  case -- but I think that's how we agreed to proceed.

13       THE COURT:  That's my recollection and that's the way

14  I would do it -- I would prefer to do it -- only -- the

15  accuracy is higher if instead of trying to guess what the

16  testimony is going to be, you actually have it on hard copy,

17  black and white, and then you can go ahead and apply the law to

18  what was actually said.  And, then, as I said, if it's a motion

19  to strike certain evidence or to, you know, brief your

20  objection, basically, that we can do in the calm light of day

21  with a transcript and then I can make a very accurate decision.

22       Everybody's good with that?

23       MR. VANDENBERG:  Yes, your Honor.  The government has

24  no objection.

25       THE COURT:  And you're good with that as well?

1          MR. LEGUTKI:  Fine, sir.

2          THE COURT:  If there are things that you hear that are

3    objectionable, just say, "I object for the record," and we'll

4    just take the objection with the post-trial briefing.  Okay?

5          MR. LEGUTKI:  Very good, sir.

6          THE COURT:  Okay.  Anything else for the government

7    before we start?

8          MR. VANDENBERG:  Yes, your Honor.  We intend during

9    the course of the trial to show recordings that were made

10   during the course of the investigation, and we intend to

11   project transcripts of those recordings while they're playing.

12   However, we also have a physical binder, if you would like

13   that, just to have the transcripts.

14         THE COURT:  I'm sure it would help for me to follow

15   along if you do have it, and I will just apply the normal jury

16   instruction to my reading and hearing of the transcript.  So if

17   what I hear is different from what I read, what I hear is what

18   counts.

19         MR. LEGUTKI:  That would probably be my objection,

20   your Honor, to those.  I will just say it now for the record.

21         THE COURT:  Have you seen the transcripts before?

22         MR. LEGUTKI:  I have seen the transcripts.  There were

23   a couple of versions of the transcripts along the way, I do

24   believe, and I have seen them.  I have reviewed them, Judge.

25         THE COURT:  Okay.  And are you aware of any

1    discrepancies that -- between what you think you hear and

2    what's transcribed?

3              MR. LEGUTKI:  No, Judge.  I think -- at least some of

4    the videos, some of the videos are more clear than others.  The

5    video is better on some than the others.  But I think

6    especially when -- well -- this is a bench.  The actual

7    relevant part, the relevant, relevant part of the transaction

8    is only a few minutes, if not more than a few -- it's not long

9    at all.

10             THE COURT:  Mm-hmm.

11             MR. LEGUTKI:  I have focused on that and it seems to

12   be consistent, Judge.

13             THE COURT:  Well, if you don't mind, then, as long as

14   I promise you to apply the rule that I just read to my jury

15   last week, that the transcript is just an aid to following

16   along, and if what you hear is different than what you see in

17   the transcript, what you hear is what counts.

18             MR. LEGUTKI:  Fine.

19             THE COURT:  Okay.  Then I will go ahead and take it.

20             Oh, my.  That's a big binder.

21             Okay.  So if you hand it to Carolyn.

22             THE CLERK:  I will take it.

23             THE COURT:  All right.  Thank you.  And I just

24   realized that I had a -- started a page of notes and I left it

25   in back.  So if you don't mind, I'm going to go grab my other

1  notepad and then we'll be ready to go.

2          MR. LEGUTKI:  Fine.

3          MR. STORINO:  Yes, your Honor.

4          MR. VANDENBERG:  Yes, your Honor.

5          THE COURT:  Okay.  And your first witness is going to

6  take us through lunch and well into the afternoon, right?

7          MR. VANDENBERG:  I think that's correct, yes.

8          THE COURT:  So what I thought we could do --

9  obviously -- I have a jury deliberating in back.  If they have

10  a note or a verdict, we'll take a break.  And if they don't,

11  how do you guys feel about going til maybe 12:15?  About an

12  hour and a half, especially for a bench, is probably the limits

13  of a court reporter reasonable being trapped in the seat with

14  her hands on the keyboard; does that sound all right for

15  everybody?

16          MR. VANDENBERG:  Yes.

17          MR. LEGUTKI:  Yes --

18          THE COURT:  We will just take an hour break and come

19  back at 1:15, then.  All right.  Beautiful.  Thank you.  Just

20  give me one second to grab my other notebook.

21          THE CLERK:  All rise.  Please be seated.

22      (Brief recess.)

23          THE COURT:  All right, folks.  So the government

24  will -- I think we agreed that you guys are not going to bother

25  with openings or closings.  You're just going to brief it all,

1    right?

2           MR. VANDENBERG:  That is correct.  That's right,

3    Judge.

4           THE COURT:  Okay.  So I guess we're ready for the

5    first witness.

6           MR. LEGUTKI:  Motion to exclude, Judge.  I don't see

7    any other witnesses here, but just a motion to exclude

8    witnesses during the pendency of trial, and no discussion with

9    any witnesses once the trial starts.

10          THE COURT:  All right.  Standard procedure.  No

11   objection?

12          MR. VANDENBERG:  No.

13          THE COURT:  Okay.  Very well.  After they're done

14   testifying, they can sit around, though, if they want.  Okay.

15          And I think two of the witnesses, Mr. Legutki, as I

16   understand it are 702 expert witnesses.

17          MR. LEGUTKI:  Yes.

18          THE COURT:  Okay.  Thank you.  If the government would

19   call the first witness, please.

20          MR. VANDENBERG:  Yes, your Honor.  The government

21   calls Andrew Karceski to the stand.

22          THE COURT:  Mr. Karceski, you are a special agent; is

23   that right?

24          SPECIAL AGENT KARCESKI:  I am.

25          THE COURT:  Remain standing when you get there and

1  Carolyn will give you the oath.

2      (Witness sworn.)

3          ANDREW KARCESKI, PLAINTIFF'S WITNESS, SWORN

4                  DIRECT EXAMINATION

5  BY MR. VANDENBERG:

6  Q    Would you please state your name for the record, spelling

7  your last name?

8  A    It's Andrew Karceski, K-a-r-c-e-s-k-i.

9  Q    Where are you employed?

10 A    I'm employed as a special agent with the Bureau of Alcohol,

11 Tobacco and Firearms.

12 Q    How long have you been there?

13 A    Approximately 10 years.

14 Q    Prior to working at the ATF, what did you do?

15 A    I've been in law enforcement pretty much my whole

16 professional life.  I started out at the Village of Willowbrook

17 as a police officer.  And then I was a police officer in the

18 Village of Bolingbrook for approximately 10 years.  I then

19 became a special agent with the Federal Bureau of

20 Investigation.  For a short time I was with the City of Elgin,

21 and now I am with the Bureau of Alcohol, Tobacco and Firearms.

22 Q    And what is your educational background?

23 A    I have a bachelor's degree from Bradley University and I

24 have a law degree from Loyola University.

25 Q    How long have you been in law enforcement, did you say?

Karceski - direct by Vandenberg

1    A    Over 25 years.

2    Q    In your current position, what types of crime do you

3    investigate?

4    A    Firearms, narcotics, street gangs, violent crime.

5    Q    What type of training have you gone through with respect to

6    narcotics investigation?

7    A    Narcotics, I went through the Cook County Police Academy

8    when I first became a law enforcement officer, and that academy

9    had a block on narcotics identification, street terms, that

10   sort of stuff.  I then went through Quantico for the FBI.

11   Again, they have a block on narcotics identification,

12   everything that comes along with narcotics.  Also, when I went

13   through the ATF academy, same thing, a block of instruction on

14   narcotics.

15          I also worked for an undercover unit with the Illinois

16   State Police for approximately six years when I was with

17   Bolingbrook and I went to a two-week Drug Enforcement

18   Administration class put on in Springfield.  I've been a

19   member -- or I was a member of the Illinois Drug Enforcement

20   Officers Association, which holds a four-day conference every

21   year, and I have been to a number of those, as well as yearly

22   training with the ATF for undercover work that deals with

23   narcotics.

24   Q    And what type of training have you gone through with

25   respect to firearms investigations?

1   A    Firearms, again, at each academy would have a separate

2   block on firearms.  With the ATF, it is pretty specific.  Most

3   of the academy is dedicated to firearm law, identification,

4   that sort of thing.  And, then, different conferences and

5   training throughout the years.

6   Q    And with respect to street gang involvement with narcotics

7   trafficking and firearms trafficking, what sort of training

8   have you gone through for that?

9   A    Very similar.  Again, the three usually go together.  So at

10  each academy there's a block on street gangs.  The conferences

11  all address street gangs, narcotics, and guns are usually all

12  taught together, so pretty much the same scenario as the other

13  two.

14  Q    Have you ever given training to any other law enforcement

15  agents or officers?

16  A    I have.

17  Q    And what kind of training did you do?

18  A    I worked for the University of Illinois Police Training

19  Institute teaching firefighters who were then being -- gaining

20  peace officer status to become arson investigators.  So I

21  taught them criminal law, Fourth Amendment search and seizure,

22  things like that.  I also teach at the ATF Academy in Glencoe,

23  Georgia, a couple times a year, a two-week block dealing with

24  operational planning, undercover buys, controlled buys.

25          I teach an undercover school -- a week-long undercover

1  school to ATF agents -- younger ATF agents and also local law

2  enforcement agencies throughout the country.  And then I also

3  have taught internationally for the Federal Law Enforcement

4  Training Center on firearms, firearms trafficking, firearms

5  identification.

6  Q   Over the course of your 25 years-plus in law enforcement,

7  if you had to estimate, how many narcotics-related

8  investigations have you worked on?

9  A   It's hard to put a number on it.  A lot.  Hundreds and

10  hundreds and hundreds.  I couldn't estimate a specific number.

11  But it's -- I wouldn't say a thousand is out of the question.

12  Q   And approximately how many of these cases were you the lead

13  agent or officer?

14  A   I would estimate around 25 percent I would be the case

15  agent on, around that, if I had to guess.

16  Q   What about narcotics investigations?  How many of those

17  have you been involved with during your career in law

18  enforcement?

19  A   It would be the same, hundreds and hundreds.  I worked

20  undercover in narcotics with the State Police Task Force for

21  six or seven years, and that was based -- strictly narcotics

22  investigations.  With the FBI, I dealt with narcotics

23  investigations as well as working undercover for the ATF, a big

24  bulk of it is narcotics investigations.

25  Q   And, approximately, on how many of those were you the lead

1   case agent or officer?

2   A   Usually about the same, about 25 percent, I would say.

3   Q   And, finally, related to street gang investigations,

4   approximately how many of those have you worked on?

5   A   Most of our work with the narcotics and the firearms,

6   there's a street gang element involved in it, so it would be

7   the same.

8   Q   Through your training and experience, would it be fair to

9   say that you're familiar with the general practices of

10  narcotics and firearm distribution in the Chicago area during

11  the course of 2014 to 2015?

12  A   Yes.

13  Q   And are you familiar with the pricing of narcotics and

14  firearms?

15  A   Yes.

16  Q   Are you familiar with the use of code words or other

17  methods to avoid detection by law enforcement?

18  A   I am.

19  Q   Are you familiar with the methods used to pay for drugs and

20  firearms?

21  A   Yes.

22  Q   Are you familiar with the methods used by street gangs in

23  trafficking drugs and firearms?

24  A   Yes.

25  Q   Are you familiar with the methods used to protect drugs and

1    drug proceeds in the course of trafficking?

2    A    Yes.

3          MR. VANDENBERG:  At this point the United States moves

4    to tender Agent Karceski as an expert on drug and firearm

5    trafficking, as well as street gang involvement in that

6    trafficking.

7          THE COURT:  Mr. Legutki?

8          MR. LEGUTKI:  I will reserve for cross, Judge.

9          THE COURT:  Okay.  Very good. Thank you.

10         I should tell you, that was a note from my jury.

11         MR. VANDENBERG:  Yes.

12         THE COURT:  And when the lawyers come in from that

13   case, we will have to take a break because I have to deal with

14   the note.

15         MR. VANDENBERG:  Yes, your Honor.

16         THE COURT:  Okay.  Great.  Thank you.

17   BY MR. VANDENBERG:

18   Q    Agent Karceski, are you familiar with the investigation of

19   the defendant, Ralph Garcia?

20   A    I am.

21   Q    What was your role in that investigation?

22   A    I was the case agent on that case.

23   Q    And broadly speaking, what were your duties as the case

24   agent?

25   A    As the case agent you're main duties are -- you're almost

1   like the quarterback of the team.  You kind of dictate which

2   way the investigation is going.  You control the informants.

3   You deal with the U.S. Attorney's office.  You organize the

4   controlled buys, or the undercover buys, that sort of thing.

5   Q   And was a confidential source, or CS, used during the

6   course of this investigation?

7   A   Yes.

8   Q   What was the role of the CS during the course of this

9   investigation, broadly speaking?

10  A   The CS in this investigation recorded conversations,

11  recorded meetings, made controlled purchases.  The overall

12  broader investigation introduced undercovers, that sort of

13  thing.

14          MR. LEGUTKI:  I'm sorry. I didn't hear that last

15  sentence.

16          THE WITNESS:  Introduced undercover agents.  Not

17  specifically to Mr. Garcia, but I don't know, are we talking

18  about the overall investigation that was involved?

19  BY MR. VANDENBERG:

20  Q   In regards to the investigation of Mr. Garcia, what did the

21  CS do?

22  A   Okay.  So recorded conversations, made controlled

23  purchases.

24  Q   When you say "controlled purchases," what does that mean?

25  A   A controlled purchase is where a confidential informant

1  will make a purchase of either narcotics or firearms from a

2  specific person, and we will take precautions to make sure that

3  that's what's taking place.  We will record the incident.  We

4  will search the informant prior to and after the deal.  We will

5  follow them to the location, follow them from the location,

6  that sort of thing.

7  Q  Prior to his involvement in this investigation, was the CS

8  under investigation by law enforcement?

9  A  The CS?

10  Q  Yes.

11  A  Yes.

12  Q  Do you recall approximately when you approached the CS for

13  the purpose of cooperating?

14  A  I believe it was in the spring of 2014.

15  Q  And during the course of his cooperation, at any point was

16  the CS paid for his corporation?

17  A  He was.

18  Q  And approximately how much was he paid?

19  A  Approximately $59,000; that's inclusive of relocation

20  expenses and...

21  Q  And was that $59,000 just for the investigation of

22  Mr. Garcia, or did it involve any additional investigations?

23  A  No, it involved a much larger investigation.

24  Q  All right.  I would like to draw your attention to

25  November 15, 2014.  Do you recall that date?

1    A    I do.

2    Q    Did you meet with the CS on that date?

3    A    I did.

4    Q    And did the CS make any phone calls in your presence?

5    A    He did.

6    Q    What number did the CS call?

7              MR. LEGUTKI:  Excuse me.  I didn't catch that first

8    date.

9              MR. VANDENBERG:  November 15, 2014.

10             MR. LEGUTKI:  Thank you.

11   BY MR. VANDENBERG:

12   Q    What number was it that the CS called in your presence?

13   A    The number was 815-641-1437.

14   Q    And was this call recorded?

15   A    It was.

16   Q    How was the call recorded?

17   A    Back then we were just -- we had a mini-tape recorder and

18   it just had an ear piece and it would literally be a subject

19   would put the phone up to their ear and it would record it on

20   the tape recorder.

21   Q    Throughout the investigation of this, did you use any other

22   methods to record calls made by the CS?

23   A    We did.

24   Q    What sort of methods did you use?

25   A    Technology improved and there's apps now available where we

1    can download an app on to a defendant's phone and it will

2    automatically record the calls incoming and outgoing.

3    Q    And was that method used in the course of this

4    investigation?

5    A    It was.

6         MR. VANDENBERG:  Permission to approach the witness,

7    your Honor?

8         THE COURT:  Sure.  I will give you all standing

9    permission to approach the witnesses, as long as you promise

10   not to hit them.

11        MR. VANDENBERG:  Thank you, your Honor.

12   BY MR. VANDENBERG:

13   Q    Let the record reflect that I'm handing the witness what

14   has been previously been marked for identification as

15   Government Exhibit 1.  Do you recognize the Exhibit I just

16   handed you?

17   A    I do.

18   Q    What is it?

19   A    It's a recording of the phone call on November 15, 2014.

20   Q    And how are you able to recognize it as a recording of that

21   call?

22   A    I had reviewed it prior to trial and I had

23   initialed -- initialed -- put my initials on it.

24   Q    Have you listened to that recorded call?

25   A    I have.

1   Q   Did you recognize the voices on the recorded call?

2   A   I did.

3   Q   Whose voices were you able to recognize?

4   A   The confidential informant's and Mr. Garcia.

5   Q   How were you able to identify the voice of the CS, the

6   confidential informant?

7   A   I had worked with him for a number of years.

8   Q   And how were you able to identify the voice of Ralph

9   Garcia?

10   A   Over the course of the investigation I had heard numerous

11   recordings and observed videos of him, as well as I interviewed

12   him and took him into custody and heard him speak then.

13   Q   Now, was that the conclusion of the investigation?

14   A   It was.

15   Q   Does Government Exhibit 1 contain a fair and accurate

16   recording of the recorded call the CS made to the defendant on

17   November 15, 2014?

18   A   It does.

19        MR. VANDENBERG:  The government moves to admit what is

20   marked as Government Exhibit 1.

21        MR. LEGUTKI:  Your Honor, I'll object on foundation

22   and hearsay during the course of the recording.  And, also, I

23   believe the Officer Karceski said going forward he had heard

24   Mr. Garcia's voice, but there's nothing previous to that time

25   to indicate that he was aware of who Mr. Garcia was.

1      THE COURT:  Okay.  Do you want to spell out any

2  detail in your objections in the writings after the trial?

3      MR. LEGUTKI:  That would be great.  I appreciate that,

4  Judge.  Yes, that would be appropriate.

5      THE COURT:  I think you can just make your

6  contemporaneous objection.  I will provisionally admit the

7  evidence so you can hear the testimony, subject to being

8  stricken later if Mr. Legutki turns out to be right in his

9  objections.  All right?

10      MR. VANDENBERG:  Yes, your Honor.  If I may have just

11  a second.

12      THE COURT:  Sure.

13      MR. VANDENBERG:  Your Honor, if I may continue?

14      THE COURT:  Oh, certainly.

15  BY MR. VANDENBERG:

16  Q    Agent Karceski, broadly speaking, what was it that occurred

17  during the course of that call?

18  A    I think it was just to set a up a meet.  The informant

19  saying he was going to stop over and visit Mr. Garcia.

20  Q    What, if anything, did you do in preparation for that

21  meeting between the CS and the defendant?

22  A    Again, what we normally do is I would search the informant.

23  If he was taking his own vehicle, I would search the

24  informant's vehicle to make sure there was nothing -- no

25  contraband.

1   Q   And just to be clear, with regards to what you normally do,

2   is that what you did in this case?

3   A   Yes.

4   Q   And what else did you do?

5   A   Subsequently to searching him, I would place and activate

6   the recording devices, whether it would be on the informant or

7   inside the informant's vehicle.

8   Q   And what did you do after you did that?

9   A   Once we did that, then I would follow the informant from

10  the location we were meeting at to the location of the meet.

11  Q   And do you recall where the location of the meet was in

12  this instance?

13  A   I do.

14  Q   And where was that?

15  A   702 Vista Lane, Joliet, Illinois.

16  Q   And what was located at that address?

17  A   That was Mr. Garcia's residence.

18  Q   And how do you know that?

19  A   Through law enforcement databases, as well as throughout

20  the case, conversations that took place there.

21  Q   What did you do as you arrived in the vicinity of 702 Vista

22  Lane?

23  A   The way it worked out, 702 was kind of a hard block to

24  surveil on.  So my role would be to follow the informant from

25  the original meet location until he was turning onto Vista

1    Lane.  We would have another agent or officer already placed on

2    Vista Lane to observe once the informant pulled on to the

3    block.  I then -- in this case, there was a Catholic school

4    across the street, and I would park on the other side of the

5    Catholic school, so I could hear what was going on, but not be

6    seen.

7    Q    And how were you able to hear what was going on?

8    A    The devices we use, you are able to hear in real time

9    transmitting from inside the vehicle or on the confidential

10   informant.

11   Q    Okay.  So what did you do when that meeting ended?

12   A    Once the meeting was over, I was in a position as the

13   informant would leave Vista Lane, I would then -- the other

14   agent would tell me he was leaving Vista Lane.  I would then

15   get behind and follow the informant back to the original meet

16   location.

17   Q    When you arrived at that original location, what did you

18   do?

19   A    Again, I would shut off the recordings.  Again search the

20   confidential informant and the vehicle.

21   Q    And when you searched the confidential informant and the

22   vehicle, did you find anything?

23   A    No.

24   Q    What did you do with the recording device at that time?

25   A    The recording device would be secured in my vehicle, later

1  driven to our office, and then I would download it and place it

2  on a disk, which was then placed into evidence.

3        THE COURT:  We don't have defense counsel yet, so you

4  can keep on going.

5        MR. VANDENBERG:  Yes, your Honor.

6        THE COURT:  Thank you.

7  BY MR. VANDENBERG:

8  Q    Let the record reflect that I'm approaching the witness

9  with what has been previously marked as Government Exhibit 2

10 and Government Exhibit 2 Transcript.

11        Do you recognize Government Exhibit 2, the disk that I

12 handed you?

13 A    I do.

14 Q    And what is it?

15 A    It appears to be a recording of the meet on November 15th

16 between the confidential informant and Mr. Garcia.

17 Q    And how are you able to recognize it as such?

18 A    Again, I reviewed it prior to trial and I initialed the

19 disk.

20 Q    Have you watched that recording?

21 A    I did.

22 Q    Did you recognize the voices on the recording -- on the

23 recording?

24 A    I did.

25 Q    And whose voices were those?

1   A    Again, it was the confidential informant and Mr. Garcia.

2   Q    Does Government Exhibit 2 contain a fair and accurate

3   recording between the CS and the defendant on November 15,

4   2014?

5   A    It does.

6   Q    Have you reviewed the Government Exhibit 2 Transcript while

7   watching Government Exhibit 2?

8   A    I did.

9   Q    And did you assign the speaker designations for Government

10  Exhibit 2 Transcript?

11  A    I did.

12          MR. LEGUTKI:  Your Honor, objection.  We clarified

13  this in pretrial regarding the transcripts and the actual

14  tapes, what they say.  Your Honor made a finding that he would

15  follow the jury instruction.  I am just making an objection for

16  the record in case this goes somewhere else.

17          THE COURT:  Would you like me to give you a standing

18  objection on the transcripts?

19          MR. LEGUTKI:  Yes, sir.

20          THE COURT:  The standing objection will be that the

21  transcripts from the exhibit list here says they're

22  demonstrative, which is consistent with the rules.  And as I

23  said before, I will just read myself the same instruction I

24  read my jury last week about how to handle these, and we will

25  just give you a standing objection to all of the transcripts on

Karceski - direct by Vandenberg

1   that basis.

2           MR. VANDENBERG:  Sorry, your Honor.  If I may address

3   that briefly.  In the exhibit list we did list it as

4   demonstrative.  However, we did discuss with defense counsel

5   prior to trial if they would be okay with it being entered into

6   evidence, with the understanding, of course, that the evidence

7   was -- the best evidence was the recording itself, and they

8   indicated at that time that they were willing to do that.

9           MR. LEGUTKI:  And that is absolutely correct, sir, but

10  I just wanted to make a record.

11          THE COURT:  Perfect.  I will just treat it like I tell

12  my juries to treat it.  Very good.

13          MR. LEGUTKI:  Thank you, sir.

14          THE COURT:  Thank you.

15  BY MR. VANDENBERG:

16  Q   In that Government Exhibit 2 transcript, does the

17  designation "CS" refer to when the CS was speaking?

18  A   It does.

19  Q   And does the designation "Garcia" refer to -- accurately

20  reflect portions of the meeting where the defendant was

21  speaking?

22  A   It does.

23          MR. VANDENBERG:  At this point, your Honor, subject to

24  the standing objection, the government would move to admit

25  Government Exhibit 2 and the Government Exhibit 2 transcript.

1      THE COURT:  Okay.  And do you want a standing

2   objection as well on the witness's identification of Mr. Garcia

3   on the same grounds you raised the first time?

4      MR. LEGUTKI:  Yes, sir.  That would apply to this one

5   and all of the other transcripts and videos and audio that will

6   come in.  Yes, sir.

7      THE COURT:  I was just assuming.  I'm looking at my

8   list here, it looks like we are going to have a lot of the

9   same.  So if I give you a standing objection here, I can save

10  you some time there, too.

11     So with that -- are you going to play -- you're not

12  going to play 1, but you're going to play 2.

13     How long is 2?

14     MR. VANDENBERG:  2 goes on for a fair amount.

15     THE COURT:  How many minutes is a fair amount?

16     MR. VANDENBERG:  I think it was about a 15, 20-minute

17  meeting.  We don't intend to play all of it that.

18     THE COURT:  How much do you intend to play?

19     MR. VANDENBERG:  I would say about ten minutes of it,

20  maybe.

21     THE COURT:  Okay.  Let me ask you this.  I am

22  expecting -- and there they are.  The next door opened and it's

23  defense counsel.  So let me ask you this.  So I have got a jury

24  note here, and it may take -- the question for counsel is do we

25  want to do our lunch break now, or do you want to take half an

1   hour, because I think it's probably going to be half an hour

2   before I can get back to you guys.  If you want to take a lunch

3   break now, you can take a full hour.  I just don't know how you

4   guys feel about -- we will take a break in the afternoon for

5   long enough to get some more nourishment, too, if this turns

6   out too early for lunch.  But if you take a whole hour, then I

7   promise I won't hold you up.

8         MR. LEGUTKI:  Whatever is best for the Court is fine

9   with me.

10        THE COURT:  Well, yeah.  It's going to take probably

11   half hour, an hour to get through the next bit I have for this

12   trial.  So why don't I say we will resume at 12:15, and we will

13   call this an early lunch break, but I will give you more than

14   ten minutes in the afternoon to refresh yourselves, if you need

15   to.  So 12:15, we will see you then.

16        MR. LEGUTKI:  Can we leave our stuff here?

17        THE COURT:  It's very safe here.  Okay.  Thank you.

18   We'll see you at 12:15.  Thank you, everybody.

19        MR. VANDENBERG:  Should I retrieve the --

20        THE COURT:  Yeah.  You might as well.  Yeah.

21   (Proceedings concluded.)

22           * * * * * * * * * *

C E R T I F I C A T E

23     I certify that the foregoing is a correct transcript from
the record of proceedings in the above-entitled matter.

24

/s/Kristin M. Ashenhurst, CSR, RDR, CRR  August 10, 2019

25   Kristin M. Ashenhurst, CSR, RDR, CRR      Date
Federal Official Court Reporter