| | |
|---|---|
| 1 | IN THE UNITED STATES DISTRICT COURT |
| | FOR THE NORTHERN DISTRICT OF ILLINOIS |
| 2 | EASTERN DIVISION |

```
 3   UNITED STATES OF AMERICA,        )  Docket No. 16 CR 109
                                      )
 4                   Plaintiff,       )  Chicago, Illinois
                                      )  March 5, 2019
 5           v.                       )  12:25 P.M.
                                      )
 6   RALPH GARCIA,                    )
                                      )
 7                   Defendant.       )

 8                       VOLUME 1-B

 9            TRANSCRIPT OF PROCEEDINGS - BENCH TRIAL
            BEFORE THE HONORABLE ROBERT M. DOW, JR.
10

11   APPEARANCES:

12   For the Plaintiff:       HON. JOHN R. LAUSCH, JR.
                              UNITED STATES ATTORNEY
13                            BY:  MR. TIMOTHY J. STORINO
                                   MR. CORNELIUS A. VANDENBERG
14                                 ASSISTANT UNITED STATES ATTORNEYS
                              219 South Dearborn Street, Suite 500
15                            Chicago, Illinois  60604
                              tim.storino@usdoj.gov
16                            cornelius.vandenberg@usdoj.gov

17   For the Defendant:       LAW OFFICES OF JOHN LEGUTKI
                              BY:  MR. JOHN C. LEGUTKI
18                            53 West Jackson Boulevard, Suite 920
                              Chicago, Illinois  60604
19                            jclegutki@sbcglobal.net

20

21

22

23   Court Reporter:          KRISTIN M. ASHENHURST, CSR, RDR, CRR
                              Official Court Reporter
24                            219 S. Dearborn Street, Room 2304-A
                              Chicago, IL 60604
25                            (312) 818-6549
                              kristin_ashenhurst@ilnd.uscourts.gov
```

1    (The following proceedings were had in open court.)

2         THE COURT:  Good afternoon, everybody.

3         MR. LEGUTKI:  Good morning, your Honor.  Your Honor, I

4    think the government has an issue it would like to raise with

5    the Court on a sidebar or however you want to do this.

6         MR. VANDENBERG:  Yes, your Honor.  With regards to the

7    standing objection to foundation.

8         THE COURT:  To what?

9         MR. VANDENBERG:  With regards to the defendant's

10   standing objection as to the foundation of the exhibits.

11        THE COURT:  Mm-hmm.

12        MR. VANDENBERG:  The government would request that if

13   the defendant maintains that objection to foundation, that we

14   do address those exhibit by exhibit.  Because if we go to

15   post-trial briefings, we're not going to have any ability to

16   rehabilitate that, or we would have to be extremely over

17   cautious in laying foundation.

18        THE COURT:  Yeah.  That's fine.  So hum me a few more

19   bars about what the foundation objection is.

20        MR. LEGUTKI:  Your Honor, what the foundation -- is

21   what was recorded, was it properly put on the CDs, with the

22   transfers, okay?  I know there's -- it's kind of like the old

23   days when we had tape machines recording voicemails.  Is it

24   truly and accurately -- was it -- what was on the recordings

25   put on the CDs; that's one of them.

1           I have an objection as to hearsay, but I think

2    that --

3           THE COURT:  But hearsay you can sort that out later.

4    It's either -- I mean it's --

5           MR. LEGUTKI:  It's a statement against interests,

6    Judge, I get it.  And Mr. Munoz is here to verify what he said.

7    So that's not going to be much of an objection.

8           If -- I have seen the videos numerous times.  And if

9    the government can relay that is what's on this video was

10   transferred from that phone to the CD, I'm good with that.

11          THE COURT:  Okay.

12          MR. LEGUTKI:  You know, technology is different than

13   the old transference of the voicemail to the audio.

14          THE COURT:  So is the question who burned the disks?

15          MR. LEGUTKI:  Does that disk truly and accurately

16   reflect what was on the original source document.  If that's

17   established, I'm okay with it.

18          THE COURT:  Right.  And that could either be -- I

19   don't know if it's this witness or some paralegal in the U.S.

20   Attorney's office who did that; do you know?

21          MR. VANDENBERG:  With regards to burning on the disk?

22          THE COURT:  Yes.

23          MR. VANDENBERG:  That could have been either, your

24   Honor.  But I know that regardless of who burned it, after it

25   was burned, the defendant reviewed it.  So it could be for this

1   particular --

2           THE COURT:  The witness.

3           MR. VANDENBERG:  Oh, I'm sorry.  The witness reviewed

4   it and verified it.  I know I have established with regards to

5   the first two exhibits that are in that, he reviewed and

6   determined that it fairly and accurately represented what was

7   recorded, so I believe that foundation has been laid for those.

8   I am happy to lay that foundation for additional exhibits.

9           MR. LEGUTKI:  And I think we can tailor that

10  foundation to the officer saying, "Yes, I saw what was on the

11  original source document, I saw what's on the video, and

12  they're are the same."

13          THE COURT:  They're the same.  Yeah.

14          MR. LEGUTKI:  Oh, good.

15          THE COURT:  So you would like them to do that for each

16  thing that they admit into evidence?

17          MR. LEGUTKI:  I think we can tailor that, Judge.  I

18  understand their point -- sorry to interrupt you, sir.

19          THE COURT:  No.  That's fine.

20          MR. LEGUTKI:  I understand their point, but it's on

21  the original source.  It's on the CD, it's true and accurate.

22  I am fine.  So they can tailor it that way.

23          THE COURT:  So as long as you do that with each disk,

24  there won't be an objection.  So there won't be any need for a

25  standing objection.  And if you don't do that for each disk,

1    then Mr. Legutki can point that out that you didn't do it, and

2    then he'll have a objection going forward.

3         So we agree to withdraw the standing objection and

4    instead the government will lay the foundation disk by disk and

5    as long as you do what Mr. Legutki just laid out, then he won't

6    have an objection.  And if you don't, he will have an

7    objection.  Then, presumably, you can cure it.  And if you

8    can't, then you have a problem.

9         MR. VANDENBERG:  Yes, your Honor.

10        THE COURT:  Thank you, guys.  Appreciate it.  So with

11   that, we will resume the testimony of Agent -- I'm going to

12   pronounce this right -- Karceski.  Right?

13        THE WITNESS:  Don't feel bad.  I don't think any

14   teacher in my career got it right.

15        THE COURT:  There's lots of ways to spell Karceski,

16   and this is not the one I expected, but if it gets the job

17   done, it gets the job done.  All right.  Thank you.

18        You can go ahead and continue, sir.

19        MR. VANDENBERG:  During the break the government had

20   retrieved Government Exhibits 1, 2 and Government Exhibit 2

21   Transcript.  Permission to re-approach the witness to do the

22   same.

23        THE COURT:  Yes.  All counsel can approach witnesses

24   to their heart's content.

25        MR. VANDENBERG:  Thank you, your Honor.

1    THE COURT:  Thank you.

2    ANDREW KARCESKI, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

3    DIRECT EXAMINATION (Continued)

4  BY MR. VANDENBERG:

5  Q   Agent Karceski, I would like to draw your attention to what

6  has previously been marked as Government Exhibit 1.  Did you

7  view the original recording that was obtained of the

8  conversation on November 15th between the defendant and the CS?

9  A   View it?

10  Q   Sorry.  Did you listen to it?

11  A   I listened to it, yes.

12  Q   And have you listened to that disk in Government Exhibit 1?

13  A   I did.

14  Q   And are they the same?

15  A   It is.

16  Q   In that the Government Exhibit 1 fairly and accurately

17  represents what was in the original recording?

18  A   It does.

19  Q   With regards to Government Exhibit 2, did you view the

20  recording that was captured originally from the recording

21  device that the CS was wearing on November 15, 2014?

22  A   Yes.

23  Q   And did you review the recording on that disk?

24  A   Yes.

25  Q   And does it fairly and accurately represent what was on the

1  original recording?

2  A    It does.

3  MR. VANDENBERG:  At this time, your Honor, I move once

4  again to admit Government Exhibit 1, 2, and Government Exhibit

5  2 Transcript?

6  THE COURT:  Without objection?

7  MR. LEGUTKI:  Without objection, sir.

8  THE COURT:  Okay.  So all three of those exhibits will

9  be received in evidence.

10  BY MR. VANDENBERG:

11  Q    Agent Karceski, I would like to back up for just a minute.

12  Could you share with the Court how the investigation into the

13  defendant began?

14  A    It began as a general investigation into the Joliet faction

15  of the Latin Kings.  Mr. Garcia was part of that gang, and so

16  that is how he became part of the investigation.

17  Q    And how did the CS become involved in the investigation of

18  this defendant?

19  A    The way it would go, at some point the CS would call me if

20  he bumped into somebody or ran into somebody and tell me, "I

21  ran into so-and-so and they told me they could sell me this,"

22  or "So-and-so has this."  So he would inform me --

23  MR. LEGUTKI:  Your Honor, objection, as a real

24  generalized statement as to "a CI would call me."  He spoke

25  with someone in some unspecified period of time.  And, also, I

1    object to the -- a little bit more specificity as to this

2    investigation into the Joliet Latin Kings.  Who was involved,

3    what time frame are we talking about.  This is all a little

4    generalized, your Honor.  It's hard to see how to reply other

5    than tangentially.

6         THE COURT:  I suppose this is the kind of things you

7    could bring out on cross too.  Some of this you could bring out

8    on cross.

9         MR. LEGUTKI:  Yes, sir.

10        THE COURT:  I mean, obviously the higher the level of

11   generality, probably the less probative the evidence is and the

12   less persuasive it is at the end of the day.  But it doesn't

13   sound like it's objectionable in the sense that it's completely

14   irrelevant, it just doesn't get me very far.

15        MR. LEGUTKI:  Very well, sir.

16        THE COURT:  So I'm going to overrule the objection,

17   but obviously you have cross-examination, and as I said, the

18   weight of the evidence, that's for me to decide in the end.

19        MR. LEGUTKI:  Okay.

20        THE COURT:  Thank you.

21   BY MR. VANDENBERG:

22   Q   So, specifically, with regard to this defendant and the CS,

23   how did the CS become involved in the investigation of this

24   defendant?

25   A   He had informed me that he ran into Mr. Garcia in the last

1    few days and knew Mr. Garcia was selling drugs.

2    Q    And approximately when did that occur?

3    A    Right around November 15th.  That week of November 15th.

4    Q    And what year is that?

5    A    2014.

6           MR. VANDENBERG:  Your Honor, permission for the

7    government to publish excerpts of Government Exhibit 2, and the

8    accompanying transcripts.

9           THE COURT:  And this is the 10 minutes you were going

10   to play for me.  Were you going to give me a transcript?

11          MR. VANDENBERG:  We have the binder.  It's contained

12   in there.  So for the Government Exhibit 2 Transcript should be

13   in there.

14          THE COURT:  Oh, look at that.  It's right behind all

15   of the binders.  Okay.  Got it.

16          MR. VANDENBERG:  And I do anticipate that the

17   Government 2 transcript will show up on the recording synched

18   up with the recording.

19          THE COURT:  Very good.  Thank you.  And Mr. Legutki,

20   your monitor is working.  You'll be able to watch this with

21   Mr. Garcia as well.

22          MR. LEGUTKI:  I do have the same thing that the

23   government has with the little bar at the bottom.

24          THE COURT:  I just wanted to ask for the first time.

25   And if you have any issues with it, just raise your hand.

1       MR. LEGUTKI:  Thank you, sir.

2       THE COURT:  All right.  Okay.  Mr. Vandenberg, play

3  away.

4       MR. VANDENBERG:  Just going to start at the very

5  beginning here.

6  BY MR. VANDENBERG:

7  Q   All right.  Agent Karceski, on the monitor, do you see an

8  image from Government Exhibit 2?

9  A   Mine is not working.  I'm sorry.

10  Q   Glad I asked.

11       THE COURT:  That's the one that must work the best.

12       Let's see if Kris can work to solve the problem here.

13     (Recess taken.)

14       THE COURT:  Mr. Legutki, are you fine with proceeding?

15       MR. LEGUTKI:  I'm fine, sir.

16       THE COURT:  That's perfect.  Then the witness will

17  have a different witness stand until we get the witness

18  computer working, but we'll keep it rolling here.  Okay?

19       All right.  Mr. Karceski, are you good over there?

20       THE WITNESS:  I am, if you can hear me.

21       THE COURT:  Yes, good.  Done, fantastic.

22  BY MR. VANDENBERG:

23  Q   Agent Karceski, on the monitor do you see an exhibit from

24  Government Exhibit 2?

25  A   I do.

1   Q   And below it do you see an excerpt of a transcript from

2   Government Exhibit 2 Transcript?

3   A   I do.

4   Q   Do you understand that as I play the government's exhibit,

5   the corresponding part of the transcript will be displayed?

6   A   Okay.

7   Q   Let the record reflect that I'm starting Government Exhibit

8   2, starting at approximately the 38-second mark, line 45.

9           THE COURT:  She is not going to transcribe this since

10  we already have a transcription.

11          MR. VANDENBERG:  Yes, your, Honor.

12      (Government Exhibit 2 played.)

13          MR. VANDENBERG:  Let the record reflect I'm pausing

14  Government Exhibit 2.

15      (Government Exhibit 2 paused.)

16  BY MR. VANDENBERG:

17  Q   Based on your training and experience, when Garcia said

18  that his guy had "the White," what does "the White" refer to?

19  A   Heroin.

20  Q   What type of heroin?

21  A   China White heroin.  That's why they call it "White."

22  Q   And what is -- when he refers to the mud -- when he says --

23  the defendant says, "It's not the mud.  They want the mud."

24  What does "the mud" refer to?

25  A   Black Tar heroin.

1  Q   And what does -- when they say, "Oh they want the tar?"

2  And the defendant responds, "Yeah, the tar."  What does "the

3  tar" refer to?

4  A   They are referring to a type of heroin.

5          MR. VANDENBERG:  Let the record reflect that I am now

6  unpausing Government Exhibit 2.

7      (Government Exhibit 2 played.)

8          MR. VANDENBERG:  Pausing there.

9      (Government Exhibit 2 paused.)

10 BY MR. VANDENBERG:

11 Q   Based on your training and experience, when Garcia said,

12 "This guy had a boatload," what is he referring to?

13 A   Basically he has a lot of it.  He has a lot of heroin.

14 Q   And when he says, "It was like I couldn't sell it nowhere."

15 What -- what does that mean?

16 A   Basically, he didn't have enough customers to get rid of

17 it.

18 Q   All right.  Moving forward to 1 minute 43 seconds in, line

19 85.

20     (Government Exhibit 2 video played.)

21 BY MR. VANDENBERG:

22 Q   All right.  When the defendant said that his source was

23 "cutting it with some shit," what does that refer to?

24 A   Cutting the narcotics.  Basically, you take the heroin and

25 then you would mix something in.  So if I bought a kilo of

Kareceski - direct by Vandenberg

1  heroin, if I was a dealer, I would take maybe a kilo or half a

2  kilo of some cut and mix it in, and I would basically be

3  creating 2 kilos of product that I could sell, thus doubling my

4  money.  So when he's talking about cut, he means cutting it

5  with some substance.

6  Q   The defendant said that he wanted $100 a gram.  Based on

7  your training and experience, is there a substance that costs

8  about $100 per gram?

9  A   Yeah.  At that time, heroin was about $100 per gram on the

10  street.

11  Q   So when he says that "He gave me, like, 10 grams."  What

12  does that 10 grams refer to?

13  A   10 grams of heroin.

14  Q   And when defendant states that he took it to him and said

15  "He ain't getting no $100," what is your understanding as to

16  why he would pay his source a get $100, based on this

17  recording?

18  A   I am sorry.  Where are you at?

19  Q   He says, "So, you know, ain't getting no $100."  What is

20  that $100 that he is referring to?

21  A   No one is paying $100 a gram for it.

22          MR. VANDENBERG:  Unpausing.

23      (Government Exhibit 2 played.)

24      (Government Exhibit 2 paused.)

25

Kareceski - direct by Vandenberg

1  BY MR. VANDENBERG:

2  Q   When defendant refers -- when defendant refers to "street

3  prices," what is that referring to?

4  A   Basically, that people will pay for it on the street.

5  There's no set price.  It all depends on the quantity and the

6  quality, how good of a customer you are.

7  Q   And, again, when defendant says "It's $100 a gram," what

8  did you understand that to be referring to?

9  A   Again, paying $100 a gram for heroin.

10 Q   What does it mean when the defendant references, "Coming

11 down to, like, 50 or 60 a gram"?

12 A   So if you buy higher quantities of drugs, he's talking if

13 you buy 50 grams of it, the supplier is only going to charge

14 you 50 or $60 a gram as opposed to a hundred.  So if you buy a

15 larger quantity, then you can sell it and make more money.

16 Q   And when the CS says, "The 25 grams was an ounce."  What

17 does that mean?

18 A   That's common with heroin.  Normally an ounce of cocaine --

19 or anything else -- it's normally 28 grams per ounce.  With

20 heroin it's 25 grams.  It's 25, 50, in increments of 25 when

21 you sell heroin.

22 Q   And when the defendant says, "On the dope," what does that

23 mean?

24 A   Dope is a street name for heroin.

25 Q   And when the CS asks about "two zones," what does that

Kareceski - direct by Vandenberg

1    refer to?

2    A    A zone is a street term for an ounce.

3    Q    All right.  Moving forward to 1 minutes and 53 seconds in

4    the recording, line 34 in the transcript.

5         (Government Exhibit 2 played.)

6         (Government Exhibit 2 paused.)

7    BY MR. VANDENBERG:

8    Q    When the CS refers -- or asks the defendant if he has got

9    "them things," what did you understand "them things," to refer

10   to?

11   A    In reference to this conversation, firearms.

12   Q    Based on your training and experience, do people in the

13   trafficking of firearms ever use vague language in referring to

14   firearms?

15   A    They do.

16   Q    And why do they do that?

17   A    Just because they don't want to get caught on recordings or

18   in case their phones are being recorded, they don't speak in

19   general terms.  They are committing an illegal act.

20   Q    All right.  Unpausing the video there.

21        (Government Exhibit 2 played.)

22        THE COURT:  I think the witness can retake the witness

23   stand.  It looks like the video is up and running there.

24        MR. LEGUTKI:  Judge, I'm sorry.  Is the transcript

25   supposed to be contemporaneous?  I mean, I am looking at the

1    transcript in the binder.  It's not what I'm seeing on the

2    screen.

3              THE COURT:  Yeah. the numbers don't line up because --

4    so this is line 21 --

5              MR. LEGUTKI:  I have got 21 through 25.

6              MR. VANDENBERG:  Correct.  I am trying to notify the

7    Court as to what line I'm going to each time I begin.  So we

8    should be -- the excerpt I just played should be 139 to 175 in

9    your transcripts there.

10             For the purpose of synching, the numbers on the screen

11   do not correspond.  They were just used to synch up the video.

12   So I am trying to say before what the line within the

13   transcript, but it's not meant to correspond to these -- you

14   know, these loop constantly through 25 line sets.

15             THE COURT:  Yes.  Okay.  So Mr. Legutki, as long as

16   you are on the same page, I think we are good.

17             MR. LEGUTKI:  Thank you.  I appreciate that.

18   BY MR. VANDENBERG:

19   Q    And just to make sure, do you see the recording before you

20   now?

21   A    I do see it.

22   Q    In the excerpt we just played, when the defendant talks

23   about his brother coming on the train, what did you

24   understand -- given the context in the ensuing conversation,

25   what did you understand him to be referring to?

1  A   We understood that he had a brother living down south

2  somewhere that was bringing firearms up to the Joliet area, and

3  he was transporting them on the train.

4  Q   And when the defendant said he has a friend who has a whole

5  house full of them, what did you understand that to mean?

6  A   That he has got a friend who has a whole house full of

7  guns.

8  Q   And when he says that, "When they came this time, they got

9  metal detectored and shit," what did you understand that to

10  mean?

11  A   That when they were attempting to get on the train wherever

12  they were down south, that law enforcement had set up metal

13  detectors or were wanding people getting on the train.

14         MR. VANDENBERG:  All right.  Now, unpausing from

15  there -- let the record reflect I'm unpausing from there.  We

16  are now at line 177 or so of the transcript.

17     (Government Exhibit 2 played.)

18     (Government Exhibit 2 paused.)

19  BY MR. VANDENBERG:

20  Q   All right.  Defendant mentions someone is "a Stone."  What

21  do you understand "a Stone" to mean?

22  A   P. Stone street gang member, P. Stone Nation.

23  Q   And when he says that he wants "200 for, like, a .357,"

24  what did you understand that to mean?

25  A   That someone was selling a .357 firearm for $200.

1          MR. VANDENBERG:  Moving forward now to 5 minutes, 50

2    seconds into the recording, line 287 in the transcript.

3          MR. LEGUTKI:  200 what, please?

4          MR. VANDENBERG:  287.

5          MR. LEGUTKI:  Thank you.

6          MR. VANDENBERG:  I'm sorry.  It will be down in

7    line 298.  Slightly further.

8        (Government Exhibit 2 was played.)

9    BY MR. VANDENBERG:

10   Q    When defendant refers to "the yay," what do you understand

11   that to be a reference to?

12   A    Street term for cocaine.

13   Q    And when he says that "someone is coming regular," what do

14   you understand that to mean?

15   A    That someone has it -- that they get it all of the time.

16   They're never out of it.  It's a pretty reliable source.

17   Q    Sorry.  That they are getting what regularly?

18   A    Cocaine.

19   Q    And when he says that, "Yesterday we go to sell the shit."

20   What do you understand him to be referring to then?

21   A    That yesterday he was selling cocaine.

22          I lost my screen again.  My screen went out.

23          THE COURT:  All right.  Back to the jury box.  Is that

24   still working over there, in the jury box?

25          THE WITNESS:  Yeah.  This one is working.

Kareceski - direct by Vandenberg

1      THE COURT:  All right.  We will leave you there then.

2  All right.

3      MR. VANDENBERG:  Unpausing from there.

4      (Government Exhibit 2 played.)

5  BY MR. VANDENBERG:

6  Q   When the CS -- oh, sorry.

7      MR. VANDENBERG:  Pausing there for the record.

8      (Government Exhibit 2 paused.)

9  BY MR. VANDENBERG:

10  Q   What does the CS mean when he asks the price for a quarter

11  key?

12  A   A quarter kilo of cocaine.

13  Q   And what does the defendant mean when he references raw?

14  A   Raw means that nobody has cut into it.  Like, it's still in

15  its pure form.  It hasn't been mixed with any kind of cut.

16  Q   And then when the defendant later said, "They get rid of it

17  a little chop at a time," what is he referring to there?

18  A   He's talking about the supplier is only selling off a

19  little at a time.  He doesn't want to flood the streets with a

20  lot of it.  Therefore, it's kind of a supply and demand, the

21  price would go down.  So by only selling a little bit at a

22  time, it would keep the demand high and the price would be

23  higher.

24      MR. VANDENBERG:  Unpausing now.

25      (Government Exhibit 2 played.)

Kareceski - direct by Vandenberg

1     (Government Exhibit 2 paused.)

BY MR. VANDENBERG:

3   Q   What do you understand defendant to mean when he said,

4   "Demar cut that shit up so bad, it's like chuck"?

5   A   He added so much cut to it, or another substance, that it

6   became a poor quality, like ground meat or chuck.  He is

7   referring to like a bad quality of meat.  So it's become a bad

8   quality of cocaine.

9   Q   Okay.  So he's referring to cocaine when he is referring to

10  that?

11  A   Yes.

12  Q   And you're talking about inserting cutting agents into that

13  cocaine for distribution?

14  A   Yes.

15  Q   When the CS and the defendant are discussing the price for

16  balls, what do you understand that to be in reference to?

17  A   The ball is an eight ball.  It's an eighth of an ounce of

18  cocaine.

19        MR. VANDENBERG:  Unpausing now.

20     (Government Exhibit 2 played.)

21     (Government Exhibit 2 paused.)

22  BY MR. VANDENBERG:

23  Q   Do you understand what the defendant is referring to by

24  "The Spanish"?

25  A   The Spanish is a bar in Joliet, on the east side of Joliet.

1   Q   And what does he say when he means that "He didn't want to

2   buy none because there is only one person buying at The

3   Spanish"?

4   A   There weren't a lot of customers in the bar, so he didn't

5   want to get stuck with anything.

6        MR. VANDENBERG:  Unpause it.

7     (Government Exhibit 2 played.)

8     (Government Exhibit 2 paused.)

9   BY MR. VANDENBERG:

10  Q   What does the CS mean by a quarter?

11  A   Again, a quarter kilo.

12       MR. VANDENBERG:  Unpausing there.

13    (Government Exhibit 2 played.)

14       MR. VANDENBERG:  Pausing there.

15    (Government Exhibit 2 paused.)

16  BY MR. VANDENBERG:

17  Q   When defendant says that he makes "like, nice bags and

18  everything," what does that refer to?

19  A   When re-bagging cocaine into saleable amounts on the

20  street, a nice bag is the weight is right, or it might even be

21  heavy for what he is selling.  If he is selling grams, it might

22  be a little heavier than a gram.  A nice bag so customers can

23  come back to him.

24  Q   So if the defendant is talking about the fact that he was

25  making "nice bags," what do you understand that to mean as to

1    what the defendant was doing?

2    A    He was selling cocaine and he was making the bags that he

3    sold on the street good ones.

4         MR. VANDENBERG:  Unpausing there.

5         (Government Exhibit 2 played.)

6    BY MR. VANDENBERG:

7    Q    Based on your training and experience, what is "ice"?

8    A    "Ice" is a street slang for methamphetamine.

9    Q    And based on the context, why was the defendant bringing up

10   "ice"?

11   A    It appears he had methamphetamine to sell and needed

12   someone to help him sell it, to get rid of it.

13   Q    And at this point, to your knowledge, at any point in the

14   investigation, had the CS asked to buy crystal methamphetamine

15   from the defendant?

16   A    No.

17   Q    And at this point, had you and the CS discussed crystal

18   methamphetamine in any context?

19   A    No.

20   Q    So who was the person that first brought up the sale of

21   crystal methamphetamine?

22   A    Mr. Garcia.

23         MR. VANDENBERG:  Unpausing there.

24         (Government Exhibit 2 played.)

25

1    MR. VANDENBERG:  Pausing that.

2        (Government Exhibit 2 paused.)

3    BY MR. VANDENBERG:

4    Q    What does the defendant mean when he says, "nine deep"?

5    A    It's 900 for an ounce of crystal meth.

6    Q    And when the defendant says that "They getting 'em, like,

7    250 an eight ball," what does that mean?

8    A    So if you broke it down into eighth-ounce quantities, and

9    sold them for -- or sell them for $250 for an eight-ball, you

10   could technically make $2,000 on that same $900 ounce.

11   Q    So who is he talking about when he says that "They are

12   getting them, like, 250 an eight-ball"?

13   A    Whoever is selling them, that's the street price that

14   they're going for on the street.

15       MR. VANDENBERG:  Unpausing now.

16       (Government Exhibit 2 played.)

17       (Government Exhibit 2 paused.)

18   BY MR. VANDENBERG:

19   Q    When the defendant confirms that he can get "that ASAP,"

20   what is "that" referring to?

21   A    The crystal methamphetamine.

22   Q    Moving now to 10 minutes 49 seconds into the video.  That

23   should be line number transcripts 523.

24       (Government Exhibit 2 played.)

25       (Government Exhibit 2 paused.)

1    BY MR. VANDENBERG:

2    Q    What does the CS mean by "them things"?

3    A    Again, he is going back to referring to firearms.

4            MR. VANDENBERG:  Unpausing.

5        (Government Exhibit 2 played.)

6            MR. VANDENBERG:  Pausing there.

7        (Government Exhibit 2 paused.)

8    BY MR. VANDENBERG:

9    Q    When the defendant said, "Last time they brought it up like

10   nothing," what did you understand that to refer to?

11   A    That the last time whoever the source of the firearms was

12   down south brought them up to Joliet no problem.

13           MR. VANDENBERG:  Unpausing.

14       (Government Exhibit 2 played.)

15           MR. VANDENBERG:  Pausing there.

16       (Government Exhibit 2 paused.)

17   BY MR. VANDENBERG:

18   Q    When the defendant says, "When I had all that shit, I was

19   passing it out."  What did you understand that to refer to?

20   A    That he had a bunch of firearms and he was passing them out

21   to different people on the street.

22       (Government Exhibit 2 played.)

23           MR. VANDENBERG:  Pausing there.

24       (Government Exhibit 2 paused.)

25

1   BY MR. VANDENBERG:

2   Q   When he said, "They got two of them," what is he referring

3   to there?

4   A   I think he's referring to two CIs listed in, I believe it

5   was possibly a search warrant that they executed on his

6   residence.

7         MR. VANDENBERG:  Unpausing.

8     (Government Exhibit 2 played.)

9         MR. VANDENBERG:  Pausing there.

10     (Government Exhibit 2 paused.)

11   BY MR. VANDENBERG:

12   Q   What does defendant mean when he says, "They popped a gun

13   off upstairs"?

14   A   That means the police recovered a gun in the upstairs of

15   his residence.

16         MR. VANDENBERG:  Unpause there.

17     (Government Exhibit 2 played.)

18         MR. VANDENBERG:  Pausing there.

19     (Government Exhibit 2 paused.)

20   BY MR. VANDENBERG:

21   Q   What pistol is the defendant referring to there?

22   A   The same one the police recovered when they entered his

23   house.

24         MR. VANDENBERG:  All right.  Moving now to an excerpt

25   beginning at 12 minutes 34 seconds.  That should be transcript

1    line 614.

2         MR. LEGUTKI:  May I have that page number again?

3         MR. VANDENBERG:  614.

4         MR. LEGUTKI:  Thank you.

5         MR. VANDENBERG:  Unpausing.

6    (Government Exhibit 2 played.)

7         MR. VANDENBERG:  Pausing there.

8    (Government Exhibit 2 paused.)

9    BY MR. VANDENBERG:

10   Q    What does "9 for that Ice" mean?

11   A    $900 for that ounce of crystal methamphetamine.

12        MR. VANDENBERG:  Unpausing.

13   (Government Exhibit 2 played.)

14        MR. VANDENBERG:  Pausing there.

15   (Government Exhibit 2 paused.)

16   BY MR. VANDENBERG:

17   Q    What is the CS referring to about here in reference to the

18   "things"?

19   A    Firearms.

20        MR. VANDENBERG:  Unpausing there.

21   (Government Exhibit 2 was played.)

22        MR. VANDENBERG:  Pausing there.

23   (Government Exhibit 2 paused.)

24   BY MR. VANDENBERG:

25   Q    What does the CS mean in reference to "those things that

1  was out there"?

2  A    Firearms being out on the street for the Latin King gang

3  members to use.

4          MR. VANDENBERG:  Unpausing.

5      (Government Exhibit 2 was played.)

6          MR. VANDENBERG:  Pausing there.

7      (Government Exhibit 2 paused.)

8  BY MR. VANDENBERG:

9  Q    Based on your training and experience, are you familiar

10 with how street gangs stash guns?

11 A    Yes.

12 Q    And, generally speaking, how does that work?

13 A    Gang members will have a territory or certain blocks they

14 hang out on.  And instead of having firearms on their persons,

15 where the police will arrive in the neighborhood and can catch

16 them on their person, street gangs will now hide guns in a

17 specific spot, in the bushes, under a garbage can, where they

18 are easily accessible, but they're not directly on their

19 person.

20 Q    So when defendant says he was told -- or he was asked to

21 "Leave one over here," what's he referring to there?

22 A    Apparently someone in the gang asked him to leave a gun

23 over in this area.

24 Q    And what does the defendant mean when he refers to "a

25 hiding spot" later on?

1    A    A certain place that the gun is usually kept.

2    Q    And when he says that, "We used to just have them

3    anchored," what's he referring to there?

4    A    That they would be in a certain spot, and would always be

5    there.  No one would take it, or if they did, they would

6    replace it right away and put it back there, so you always know

7    where it was.

8    Q    Moving now to 14 minutes 55 seconds in the video.

9    Transcript line 707.

10        (Government Exhibit 2 played.)

11            MR. VANDENBERG:  All right.  Stopping there.

12        (Government Exhibit 2 paused.)

13   BY MR. VANDENBERG:

14   Q    What does it mean when the CS asks about "How much per zone

15   for the shit he is getting?"

16   A    How much for an ounce of cocaine.

17   Q    And when defendant responds, "He got 2.  He got 15 and he

18   got the eight," what does that mean?

19   A    He's got two types -- two different qualities of cocaine.

20   One is $1,500 an ounce, and the other is $800 an ounce.

21   Obviously, the higher quality is more expensive and the lower

22   quality is cheaper.

23   Q    Let the record reflect that I'm approaching the witness

24   with what has previously been marked as Government Exhibit 3,

25   and the Government Exhibit 3 Transcript.

1    Turning your attention to Government Exhibit 3.  Do

2  you recognize what this is?

3  A   Yes.  A copy of text messages sent between the confidential

4  informant and Mr. Garcia.

5  Q   And when are these from, what dates?

6  A   November 15th and November 17th.

7  Q   Okay.  So November 15th, that was the date of the meeting

8  we just discussed, right?

9  A   Yes.

10 Q   November 17th would be two days later?

11 A   Yes.

12 Q   And how are you familiar with these text messages?

13 A   I reviewed them prior to trial.

14 Q   And how did you first come into possession of these text

15 messages?

16 A   Oh, I took photos of the text messages off of the

17 confidential informant's phone.

18 Q   And how are you able to recognize these specific text

19 messages?

20 A   Again, I reviewed them prior to trial.

21 Q   And how do you know that these text messages are between

22 the CS and the defendant?

23 A   Due to the phone call -- the phone numbers.  The phone

24 numbers will tell me who sent what message and who received

25 them.

Kareceski - direct by Vandenberg

1  Q   Does Government Exhibit 3 contain a fair and accurate

2  depiction of the text messages between the CS and the defendant

3  on November 15th and 17th, 2014?

4  A   They do.

5  Q   Turning your attention now to the Government Exhibit 3

6  Transcript.  Have you reviewed this transcript?

7  A   I have.

8  Q   Have you compared it to the text messages in Government

9  Exhibit 3?

10 A   I did.

11 Q   Does the transcript accurately identify the texts sent

12 between the CS and the defendant?

13 A   It does.

14      MR. VANDENBERG:  At this point, your Honor, I will

15 move to admit Government Exhibit 3 and the Government Exhibit 3

16 Transcript.

17      THE COURT:  Any objection?

18      MR. LEGUTKI:  No, sir.

19      THE COURT:  Okay.  Without objection, we'll receive in

20 evidence Government Exhibit 3 and 3 Transcript.

21      MR. VANDENBERG:  May I publish excerpts of the same?

22      THE COURT:  Sure.

23   (Government Exhibit 3 and Government Exhibit 3 Transcript

24      were received in evidence).

25

1  BY MR. VANDENBERG:

2  Q   Directing you -- directing you to the 10:15 a.m. text from

3  the CS on November 17th.  Could you please read what that text

4  says?

5  A   On the 17th?

6  Q   Yes.

7  A   It says, "Give me a call."

8  Q   And the next text?

9  A   "Got my guy in town.  He wants to grab one of those yellow

10  ones."

11  Q   What does the CS mean here by "my guy"?

12  A   His customer that he's purportedly going to sell the

13  narcotics to.

14  Q   And what does "those yellow ones" mean?

15  A   An ounce of crystal meth.

16  Q   Could you read the text from the CS at 10:39 a.m.?

17  A   "Just one.  And if he likes he be back for more.  Let's

18  make this happen by 5:00 p.m. because he don't want to leave

19  too late, and I'll be off by 4:00 p.m.  It's for sure."

20  Q   When he says just one, what does that refer to?

21  A   Just 1 ounce.

22  Q   How does the defendant, Mr. Garcia, respond to that?

23  A   He says, "I'm back at the house now.  Let me know what's

24  up."

25  Q   And going to defendant's text at 3:28 p.m.  What does he

1  text there?

2  A    3:27?  Sorry.

3  Q    No.  Just skipping ahead to the 3:28 p.m. text from the

4  defendant.

5  A    He says, "That's what I'm telling you.  I'm ready now."

6  Q    Did you meet with the CS on November 17, 2014?

7  A    I did.

8  Q    And what did you do at that meeting?

9  A    I prepared for a controlled purchase of methamphetamine.

10  Q    How did you do that?

11  A    We met with the confidential informant at a location.  His

12  vehicle was searched.  His person was searched.

13  Q    What were the results of that search?

14  A    I'm sorry?

15  Q    What were the results of that search?

16  A    Nothing was located.

17  Q    Okay.  What else did you do?

18  A    At that point we would place the recorders in the vehicle

19  or on his person, and then he would -- provided him with United

20  States currency -- buy money -- and then he would be followed

21  to the location.

22  Q    And do you recall approximately how much money you gave him

23  for this purchase?

24  A    $900.

25  Q    Let the record reflect that I'm handing the witness what

1   has been marked for identification as Government Exhibit 4 and

2   Government Exhibit 4 Transcript.

3           Turning your attention to Government Exhibit 4.  Do

4   you recognize this?

5   A   I do.

6   Q   What is it?

7   A   It's a phone call between the CI, Mr. Garcia, on

8   November 17th, 2014.

9   Q   And how are you able to recognize it?

10  A   I reviewed it and I initialed it.

11  Q   Have you listened to this recording?

12  A   I have.

13  Q   Did you listen to the originally captured recording from

14  the phone call?

15  A   I did.

16  Q   Okay.  And does the recording on this disk, does that match

17  the originally captured recording?

18  A   It does.

19  Q   Did you recognize the voices on this recorded call?

20  A   I did.

21  Q   Whose voices were you able to recognize?

22  A   Again, the confidential informant and Mr. Garcia's.

23  Q   Does Government Exhibit 4 contain a fair and accurate

24  recording of the phone conversation between the CS and the

25  defendant on November 17, 2014?

Kareceski - direct by Vandenberg

1   A   It does.

2   Q   Turning your attention to Government Exhibit 4 Transcript.

3   Have you reviewed this transcript while listening to Government

4   Exhibit 4?

5   A   I did.

6   Q   And are the statements attributed to the CS and Garcia in

7   this transcript accurate representations?

8   A   They are.

9           MR. VANDENBERG:  At this point, I would move to admit

10  Government Exhibit 4 and Government Exhibit 4 Transcript.

11          MR. LEGUTKI:  No objection, sir.

12          THE COURT:  Okay.  Without objection, we'll receive in

13  evidence Government's Exhibits 4 and 4 Transcript.

14          MR. VANDENBERG:  May I publish?

15          THE COURT:  Sure.

16      (Government Exhibit 4 and Government Exhibit 4 Transcript

17      received in evidence.)

18          MR. VANDENBERG:  Starting 19 seconds into the

19  recording.

20      (Government Exhibit 4 played.)

21  BY MR. VANDENBERG:

22  Q   What did you do after meeting with the CS?  After meeting

23  with the CS prior to the buy?

24  A   Again, he was searched, his vehicle was searched.

25  Q   I'm sorry.  What did you do after you prepared him for the

1  buy?

2  A   Oh, I'm sorry.  Then I would follow him from the meet

3  location, again, to 702 Vista -- or to the 700 block of Vista.

4  Q   Okay.  As we discussed earlier, did you park in a street

5  just off of Vista?

6  A   I did.

7  Q   And as with the previous meeting, were you able to hear

8  what was going on during the course of the meeting?

9  A   I could.

10 Q   And who did you hear the CS meet with?

11 A   Again, Mr. Garcia.

12 Q   What did you do when that meeting ended?

13 A   When the meeting ended, the agent that was conducting

14 surveillance would say, "The CS is leaving."  At that point, I

15 would wait at the end of the block and then follow the CS back

16 to the original location.

17 Q   And what did you do when you got to that original location?

18 A   Same thing.  His vehicle was searched.  His person was

19 searched.  The recording was shut off.  And then obtain any

20 evidence that he may have gotten during the meeting.

21 Q   Putting aside that evidence, did you find anything during

22 the course of your search of him or his vehicle?

23 A   No.

24 Q   Turning now to that evidence.  Did you receive any evidence

25 from the CS at that time?

Kareceski - direct by Vandenberg

1    A    I did.

2    Q    And what did you receive?

3    A    A plastic bag that contained opaque, rock-like substance

4    that was purported methamphetamine.

5    Q    Based on your training and experience, were you able to

6    identify it?

7    A    Yes.

8    Q    Okay.  And based on your training and experience, what did

9    you identify it to be?

10   A    It appeared to be crystal methamphetamine.

11   Q    Okay.  Let the record reflect that I'm approaching the

12   witness with what has previously been marked as Government

13   Exhibit 5.  Do you recognize this?

14   A    I do.

15   Q    What is it?

16   A    It's an evidence bag with a substance -- the purported

17   methamphetamine that was received that day.

18   Q    Okay.  And how are you able to recognize this exhibit as

19   the substance that you received from the CS that day?

20   A    I had marked it.  I had sealed it, initialed it.  And it

21   still has those marks.  I see them.

22   Q    Okay.  We're going to be introducing a few exhibits of this

23   nature during the course of your testimony.  So I just want to

24   walk you through once what your process is.  When you received

25   this package from the CS, what did you do?

1    A    When I receive it at the meet location, I will take the

2    substance.  I will secure it in my vehicle, whether that be my

3    trunk safe or my glove compartment.  It will stay there until

4    we are finished debriefing.  I will then go back to the ATF

5    office where it will be processed.  I will weigh it.  I will

6    field test it, and then place it in this evidence bag, seal it,

7    date it, and place it in a temporary evidence locker for the

8    evidence technician to place in the vault.

9    Q    And how do you label it when you label it?

10   A    We print out a label, which lists what it is, the exhibit

11   number, the date, the case number.  I will sign it and date it,

12   as well as sign and seal, once it's sealed.

13   Q    And what happens to that evidence bag after you place it

14   into the temporary evidence block?

15   A    It stays there until the vault custodian will retrieve it

16   out of the temporary locker and enter it into the main vault.

17   Q    And what happens next?

18   A    At some point, items are taken to the lab for processing.

19   Drugs go to the DEA Lab.  The guns usually go to the ATF lab.

20   So at some point it will be checked out and it will be driven

21   down to the DEA lab.

22   Q    Now the procedure you just described, is that your standard

23   procedure when you receive physical evidence?

24   A    Yes.

25   Q    And is it the procedure that you used throughout the course

1  of this investigation?

2  A   It is.

3       MR. VANDENBERG:  At this time I would move to admit

4  Government Exhibit 5 in evidence.

5       MR. LEGUTKI:  No objection.

6       THE COURT:  Very well.  We'll receive in evidence

7  Government Exhibit 5.

8       (Government Exhibit 5 was received in evidence.)

9  BY MR. VANDENBERG:

10  Q   Let the record show that I am handing the agent what has

11  previously been marked as Government Exhibit 6 and Government

12  Exhibit 6 Transcript.  Are you able to identify Government

13  Exhibit 6?

14  A   I am.

15  Q   What is it?

16  A   It was a meeting -- a video recording of a meeting between

17  Mr. Garcia and the CI on November 17, 2014.

18  Q   And how are you able to identify it as such?

19  A   I had reviewed it prior to trial and I had initialed it.

20  Q   Did you review the original recording of the meeting

21  between the CS and the defendant?

22  A   I did.

23  Q   And is the video of that meeting on this disk the same fair

24  and accurate representation of what that original video was

25  that you reviewed?

Kareceski - direct by Vandenberg

1    A    It is.

2    Q    And were you able to -- did you recognize who the two

3    individuals were in this recording?

4    A    I did.

5    Q    Who were they?

6    A    Confidential informant and Mr. Garcia.

7    Q    Does Government Exhibit 6 contain a fair and accurate

8    recording of the meeting between the CS and the defendant on

9    November 17th, 2014?

10   A    Does it?

11   Q    You stated that it was the same as the original one.

12   A    Yes, yes.  Sorry about that.  Yes.

13   Q    That recording, the same or not, were both of those, and

14   was this in particular, a fair and accurate representation of

15   the meeting between the two?

16   A    It is.

17   Q    At this point -- sorry.  Turning your attention now to

18   Government Exhibit 6 Transcript.  Did you review that

19   transcript while watching Government Exhibit 6?

20   A    I did.

21   Q    And are the statements attributed to the CS and Garcia in

22   the transcript fair and accurate?

23   A    Yes.

24        MR. VANDENBERG:  At this point, I would like to admit

25   Government Exhibit 6 and Government Exhibit 6 Transcript.

1      THE COURT:  Okay.  Very well.  We'll receive in

2  evidence Government Exhibit 6 and 6 Transcript, and you can

3  publish them.

4      (Government Exhibit 6 and 6 Transcript received in

5      evidence.)

6          MR. VANDENBERG:  Thank you.

7          THE COURT:  Thank you.

8          MR. VANDENBERG:  Let the record reflect that I am

9  playing Government Exhibit 6, starting from the beginning.

10     (Government Exhibit 6 played.)

11         MR. VANDENBERG:  Pausing there.

12     (Government Exhibit 6 paused.)

13  BY MR. VANDENBERG:

14  Q    In your experience, when the defendant says, "This is

15  fire."  What does that mean?

16  A    It is high quality.  That it's good.

17  Q    And what is that?

18  A    The crystal meth.

19  Q    And what crystal meth?

20  A    The ounce that the confidential source was purchasing.

21         MR. VANDENBERG:  Unpausing.

22     (Government Exhibit 6 played.)

23         MR. VANDENBERG:  Pausing there.

24     (Government Exhibit 6 paused.)

25

Kareceski - direct by Vandenberg

1  BY MR. VANDENBERG:

2  Q   When the defendant tells the CS to "not let the shit touch

3  your skin," what is he referring to?

4  A   The crystal methamphetamine.

5  Q   And based on your experience, what happens when crystal

6  methamphetamine comes into contact with your skin?

7  A   The crystal meth when it's smoked or the residue of crystal

8  meth can be absorbed through your skin, and you will feel the

9  same effects as if you ingested it or smoked it.

10 Q   Is that consistent with the defendant saying that the CS

11 "would get high"?

12 A   Yes.

13 Q   The defendant mentions using two bags; is that a technique

14 used by drug dealers -- dealers of methamphetamine?

15 A   Yeah.  They would double bag it and put it in a different

16 quality bag or canvas bag, just so you wouldn't absorb it

17 through the skin.  The residue would be on the first bag.

18        MR. VANDENBERG:  Unpausing there.

19     (Government Exhibit 6 played.)

20        MR. VANDENBERG:  Pausing there.

21 BY MR. VANDENBERG:

22 Q   Are you familiar with putting drugs in bleach?

23 A   It's a street test for crystal methamphetamine to get a

24 glass of bleach, and you drop a shard -- they look like shards

25 of glass, and if you drop one in the glass, purportedly if the

1    quality is good or it's real, it will float.  If it's fake

2    substance or a look-a-like or poor quality, it should sink to

3    the bottom.

4    Q    And is that a testing, a street testing unique to

5    methamphetamine?

6    A    It is.

7    Q    And when the defendant tells the CS to put it in bleach,

8    and the one that floats to the top is good, is that consistent

9    with your understanding of that street test for the quality of

10   methamphetamine?

11   A    Yes.

12           MR. VANDENBERG:  Unpausing there.

13       (Government Exhibit 6 played.)

14           MR. VANDENBERG:  What is it -- pausing there.

15       (Government Exhibit 6 paused.)

16   MR. VANDENBERG:

17   Q    What is the CS counting here?

18   A    The $900 that I provided for the buy money.

19           MR. VANDENBERG:  Unpausing.

20       (Government Exhibit 6 played.)

21           MR. VANDENBERG:  Pausing there.

22       (Government Exhibit 6 paused.)

23   BY MR. VANDENBERG:

24   Q    When the defendant recommends or tells the CS to "give it

25   to him for, like, 12, 15, as opposed to 9," what does that

1  mean?

2  A   He is telling the CS to sell it for a larger profit.  Don't

3  sell it to him for the 900 he paid for it.  Sell it to him for

4  1200 or 1500, and that way he'll make a quick profit of 3 to

5  $500 or $600.

6          MR. VANDENBERG:  Unpausing there.

7      (Government Exhibit 6 played.)

8          MR. VANDENBERG:  Pausing there.

9      (Government Exhibit 6 paused.)

10 BY MR. VANDENBERG:

11 Q   Who is "the dude" the defendant is referring to here?

12 A   The purported customer that the CS is going to sell the

13 narcotics to.

14 Q   And why is the defendant telling the CS to take a picture

15 of that supposed buyer?

16 A   He wants a picture of him in case --

17         MR. LEGUTKI:  Objection, your Honor.  That calls for

18 speculation.  That is not part of nomenclature or drug

19 transaction.  It happens, but that's really a speculative -- it

20 calls for speculation.

21         THE COURT:  All right.  I will note the objection and

22 I will listen to the answer, and when I sort this out after

23 trial, I will decide if it's speculative or entitled to some

24 weight, but that remains to be seen.

25         MR. LEGUTKI:  Thank you, sir.

1    THE COURT:  Okay.  Thank you.

2    So you can go ahead and answer.

3    MR. VANDENBERG:  If I may restate or rephrase, your

4  Honor.

5    THE COURT:  Yes, go ahead.

6  BY MR. VANDENBERG:

7  Q   What is your interpretation as to when the defendant says,

8  "To take a picture of the dude so in case we have to chase his

9  ass down," what is your interpretation as to what that means?

10 A   Get a picture of his driver's license or a picture of him.

11 That way if the deal goes bad and the guy rips the CS off, or

12 the money is bad, they know what he looks like to go find him

13 and recover the money or get some street justice to j-- I don't

14 know how to say it, but to be able to find the subject that

15 ripped them off.

16    MR. VANDENBERG:  Unpausing.

17    (Government Exhibit 5 played.)

18    MR. VANDENBERG:  Stopping there.

19 BY MR. VANDENBERG:

20 Q   When the defendant says, "If he smokes that, he will be up

21 for days," what is he referring to?

22 A   If he smokes the crystal methamphetamine, he'll be up for

23 days.  Crystal methamphetamine is a stimulant, so it will keep

24 you awake for a while.

25 Q   Let the record reflect that I am handing the witness what

Kareceski - direct by Vandenberg

1    has been previously marked for identification as Government

2    Exhibit 7, and the Government Exhibit 7 Transcript.

3         Are you able to identify Government Exhibit 7?

4    A    I am.

5    Q    What is it?

6    A    It's a phone call that occurred on November 14, 2014,

7    between the CI and Mr. Garcia.

8    Q    So this is about one week after the deal we just discussed?

9    A    Yes.

10   Q    And how did you obtain this recording during the course of

11   your investigation?

12   A    I don't recall if it was recorded on the recorder or if by

13   this time we had the app on his phone.  But I think it was just

14   by a manual recorder -- recording device that we use.

15   Q    Is that consistent with the way you would have obtained

16   recordings from CSs at that time?

17   A    Yes.

18   Q    And how are you able to identify this as a

19   conversation -- a phone conversation from November 24, 2014,

20   between the CS and the defendant?

21   A    Again, I reviewed it prior to trial.  I placed my initials

22   on it and marked it.

23   Q    When you reviewed it prior to trial, were you able to

24   recognize the voices on the recorded call?

25   A    I was.

Kareceski - direct by Vandenberg

1    Q    And who were they?

2    A    The CS and Mr. Garcia.

3    Q    And were you able to compare the recording that you made to

4    the recording that was -- sorry.  Were you able to compare this

5    recording to the recording that was made at the time that you

6    first obtained the recording?

7    A    I was.

8    Q    Okay.  And is this a fair and accurate recording of the

9    phone conversation between the CS and the defendant on

10   November 24, 2014?

11   A    It is.

12   Q    Have you reviewed the Government Exhibit 7 Transcript while

13   listening to Government Exhibit 7?

14   A    Yes.

15   Q    Are the statements attributed to the CS and Garcia in this

16   transcript fair and accurate?

17   A    They are.

18         MR. VANDENBERG:  At this time the government would

19   move to admit Government Exhibit 7 and Government Exhibit 7

20   transcript.

21         MR. LEGUTKI:  Subject to cross-examination, no

22   objection, sir.

23         THE COURT:  Okay.  Very well.  We'll receive in

24   evidence Government Exhibit 7 and 7 Transcript, and you can use

25   those with the witness as you please.

1    (Government Exhibit 7 and 7 Transcript received in

2    evidence.)

3         MR. VANDENBERG:  Thank you, your Honor.  Let the

4    record reflect that I am playing Government Exhibit 7, starting

5    from the beginning.

6    (Government Exhibit 7 played.)

7         MR. VANDENBERG:  Pausing there.

8    (Government Exhibit 7 paused.)

9    BY MR. VANDENBERG:

10   Q   What is your understanding of what the defendant is

11   agreeing to during this portion of the call?

12   A   The CS is asking for 2 ounces of crystal meth.  He's saying

13   the same thing, but probably not sure if he can get 2 ounces.

14   Q   And when the defendant says, "All right," what do you

15   understand that to mean?

16   A   He's agreeing to it, saying, "Okay.  I can get that."

17   Q   Fast forwarding now to a minute and 24 seconds of the call.

18   Line 79 of the transcript.

19   (Government Exhibit 7 played.)

20        MR. VANDENBERG:  Pausing there.

21   (Government Exhibit 7 paused.)

22   BY MR. VANDENBERG:

23   Q   What is your understanding of who the defendant is

24   referring to as "they," when he says, "they don't get off until

25   3:00"?

1  A    His source, whoever he is receiving his methamphetamine

2  from.

3        MR. VANDENBERG:  Unpausing there.

4        (Government Exhibit 7 played.)

5  BY MR. VANDENBERG:

6  Q    And, again, what is your understanding of who the defendant

7  is waiting to get off work?

8  A    His source of methamphetamine.

9        MR. VANDENBERG:  Let the record reflect that I am

10  approaching the witness with what has previously been marked

11  for identification Government Exhibit 8 and the Government

12  Exhibit 8 Transcript.

13  BY MR. VANDENBERG:

14  Q    Turning your attention to Government Exhibit 8.  Are you

15  able to identify this?

16  A    I am.

17  Q    What is this?

18  A    Photographs of the text messages between Mr. Garcia and the

19  confidential informant on November 24, 2014.

20  Q    So it's the same day as the phone call we just played?

21  A    Yes.

22  Q    And how are you able to recognize it as such?

23  A    I took the photographs of the text messages and, again, I

24  reviewed it prior to trial.

25  Q    And how did you obtain these text messages initially during

1   the course of your investigation?

2   A   I physically would meet with the confidential informant,

3   take actual photographs of the text messages on the phone.

4   Q   And how do you know that these text messages are with the

5   defendant?

6   A   Again, it was his phone, and that's where I got them from.

7   Q   Sorry.  I understand that as to how you understand the text

8   messages are from the CS.  What about they are with the

9   defendant?

10  A   Again, the phone numbers that they are between.  One I

11  identified as Mr. Garcia's phone number.

12  Q   Does Government Exhibit 8 contain a fair and accurate

13  depiction of text messages between the CS and the defendant on

14  November 24, 2014?

15  A   They do.

16  Q   Have you reviewed Government Exhibit 8 Transcript and

17  compared it to the text messages in Government Exhibit 8?

18  A   I have.

19  Q   Does that transcript accurately and fairly identify the

20  texts between the CS and the defendant?

21  A   They do.

22          MR. VANDENBERG:  At this point the government moves to

23  admit Government Exhibit 8 and the Government Exhibit 8

24  Transcript.

25          MR. LEGUTKI:  Subject to cross-examination, no

Kareceski - direct by Vandenberg

1    objection.

2         THE COURT:  Okay.  Very well.  So we'll receive in

3    evidence Government Exhibit 8 and Transcript 8, and you can

4    publish them as well.

5         (Government Exhibit 8 and Transcript 8 were received in

6         evidence.)

7    BY MR. VANDENBERG:

8    Q    Turning your attention to the text at 6:28 p.m., where the

9    defendant says, "On my way back to the house.  I will meet you

10   over there."  What do you understand him to be telling the CS

11   in that text?

12   A    He is telling the CS he has possession of the drugs and he

13   is headed back to his house.

14   Q    Could you please read the text from the CS at 3:42 p.m.?

15   A    "What time exactly, so I can be there?"

16   Q    And Garcia's response at 3:43 p.m.?

17   A    "I'm here now."

18   Q    All right.  Skipping down to the text at 4:13 p.m. from the

19   CS, what does the CS text him?

20   A    He says, "Outside."

21   Q    Did you meet with the CS on November 24, 2014?

22   A    I did.

23   Q    What did you do at that meeting?

24   A    Again, the CI's vehicle was searched.  The CI was searched.

25   Q    Did you find anything in that search?

1  A    No.

2  Q    What else did you do?

3  A    I'm sorry?

4  Q    What else did you do?

5  A    The recording devices were then placed in the vehicle or on

6  the CI.  The CI was then provided with $1,800 in buy money, and

7  then he was followed to the 700 block of Vista.

8            MR. VANDENBERG:  Let the record reflect that I'm

9  approaching the witness with what has been previously marked as

10  Government Exhibit 9 and the Government Exhibit 9 Transcript.

11            THE COURT:  Okay.

12  BY MR. VANDENBERG:

13  Q    Do you recognize Government Exhibit 9?

14  A    I do.

15  Q    What is it?

16  A    It's a phone call between the CI and Mr. Garcia on

17  November 24, 2014, at approximately 4:03 p.m.

18  Q    So is it still the same day as the last two exhibits we

19  looked at?

20  A    It is.

21  Q    And how are you able to recognize this as a call between

22  the CS and the defendant?

23  A    Again, I reviewed the disk prior to trial and I initialed

24  it after I listened to it.

25  Q    And is this the same as the original recording

1   that you -- is this a fair and accurate representation of the

2   original recording you received between the two of them?

3   A    It is.

4   Q    Have you -- were you able to identify the voices on this

5   recorded call?

6   A    I was.

7   Q    And whose voices were they?

8   A    Again, the CI and Mr. Garcia.

9   Q    Turning your attention to Government Exhibit 9 Transcript,

10  did you review that while listening to Government Exhibit 9?

11  A    I did.

12  Q    And are the statements attributed to the CS and Garcia in

13  this transcript fair and accurate?

14  A    They are.  My guys got cut off, but I think they're saying

15  what's on this copy, so...

16            MR. VANDENBERG:  Permission to retrieve.

17            THE COURT:  Sure.

18  BY MR. VANDENBERG:

19  Q    Does the transcript accurately state the words that were

20  spoken during the course of this recorded call?

21  A    They do.

22  Q    However, does the transcript omit who said each thing?

23  A    It is omitted on here, yes.

24            MR. VANDENBERG:  At this point, your Honor, I would

25  move to enter Government Exhibit 9 in evidence and Government

Kareceski - direct by Vandenberg

1    Exhibit 9 Transcript in evidence, with the acknowledgment that

2    the Government Exhibit 9 just repeats what was spoken during

3    the call and does not contain attributions for each person

4    speaking.

5              THE COURT:  So am I to understand that there's

6    four -- well, there's one line that goes into the second line,

7    but there's four statements here.  They weren't all made by

8    Mr. Garcia according to --

9              MR. VANDENBERG:  And, your Honor, I can play the

10   actual calls so that we can determine --

11             THE COURT:  Yeah.  I think at this point I could

12   probably fill this in myself.

13             MR. VANDENBERG:  Yes, your Honor.

14             THE COURT:  Very good.  So I'll just listen along.

15   And, of course, my ears are the ones that matter for this, so I

16   will make whatever notes I feel like making on my own

17   transcript here.

18             MR. VANDENBERG:  And is Government Exhibit 9 in

19   evidence then?

20             THE COURT:  Without objection, right, subject to

21   cross-examination?

22             MR. LEGUTKI:  Without objection.  Hopefully, we'll get

23   that clarification.

24             THE COURT:  Right.  So after you play this, if you

25   stop for a second, I'll see if we can all agree on whose voice

Kareceski - direct by Vandenberg

1   it was, and if we can, then all will be well and good.

2       (Government Exhibit 9 and Government Exhibit 9 Transcript

3       were received in evidence.)

4          MR. VANDENBERG:  Starting from the beginning.

5       (Government Exhibit 9 played.)

6       (Government Exhibit 9 paused.)

7   BY MR. VANDENBERG:

8   Q    The statement beginning with, "Shit, I'm about to," and

9   ending with "in about 15," who do you understand to be saying

10  that?

11  A    The confidential source.

12      (Government Exhibit 9 played.)

13      (Government Exhibit 9 paused.)

14  BY MR. VANDENBERG:

15  Q    The person saying, "I will be here.  I am in now."  Whose

16  voice do understand that to be?

17  A    Mr. Garcia's.

18  Q    And the person saying, "All right.  Cool," whose voice do

19  you understand that to be?

20  A    The confidential source.

21         THE COURT:  Okay.  Mr. Legutki, do you concur that

22  that's how we would fill this out if we wanted to be accurate?

23         MR. LEGUTKI:  I so concur.

24         THE COURT:  Okay.  We're good then.

25  MR. VANDENBERG:

1  Q   After meeting with the CS on November 24, 2014, what did
2  you do?
3  A   After meeting with the CS, he was followed.  I followed him
4  from the original meet location to the 700 block of Vista.
5  When he turned down the block, I would radio to the agent who
6  had -- who was observing the front of the residence and then he
7  would pick up the CI's vehicle.  I drove around to the parking
8  lot on the other side of the school and listened as the
9  conversation was occurring.
10  Q   And were you able to hear the CS meet with anyone?
11  A   I was.
12  Q   Who were you able to hear him meet with?
13  A   Mr. Garcia.
14  Q   And what did you do when that meeting ended?
15  A   When the meeting ended, the agent or officer on the street
16  radioed me, telling me the CI was leaving.  I would then
17  position myself at the end of the block and then follow him
18  back to the original meet location.
19  Q   And what did you do when you arrived at that meet location?
20  A   I retrieved the purported methamphetamine from the
21  confidential source.  The recordings were turned off, and,
22  again, the confidential source and his vehicle were searched.
23  Q   Aside from the substance you received from the CS, which
24  we'll get into in a minute, did you find anything else in the
25  search of the CS and his vehicle?

1    A    No.

2    Q    Okay.  You mentioned that the CS provided you with

3    something.  What did he provide you with at this time?

4    A    Again, it was a plastic bag that contained crystal

5    methamphetamine.

6    Q    And is -- when you say "contained crystal methamphetamine,"

7    what is your basis for that?

8    A    Just from its texture and its appearance and the

9    conversation about the deal.

10   Q    Approaching -- let the record reflect I'm approaching the

11   witness with what has previously been marked as Government

12   Exhibit 10.  Do you recognize Government Exhibit 10?

13   A    I do.

14   Q    What do you recognize it to be?

15   A    Again, this is the methamphetamine that was purchased on

16   November 24th from Mr. Garcia.

17   Q    And is this the -- what you received from the CS on that

18   date?

19   A    I'm sorry?

20   Q    You stated earlier that you received what you believed to

21   be crystal methamphetamine from the CS on November 24th.  Is

22   that -- is this that -- that substance that you received from

23   the CS?

24   A    It is.

25   Q    How are you able to recognize it as such?

Kareceski - direct by Vandenberg

1    A    Again, from the packaging of the evidence bag.  I would

2    label it, number it, mark it, sign it, seal it, and place it in

3    the evidence locker.  My initials and badge number, as well as

4    the label and the date are on there.

5              MR. VANDENBERG:  At this time the government moves to

6    admit Government Exhibit 10 in evidence.

7              MR. LEGUTKI:  Subject to cross, no objection.

8              THE COURT:  Okay.  Very well, received in evidence

9    Government Exhibit 10, then.

10       (Government Exhibit 10 received in evidence.)

11   BY MR. VANDENBERG:

12   Q    Let the record reflect that I'm approaching the witness

13   with what is marked Government Exhibit 11 and the Government

14   Exhibit 11 Transcript.

15             Drawing your attention to Government Exhibit 11, do

16   you recognize this?

17   A    I do.

18   Q    What do you recognize it to be?

19   A    This is a recording of the buy of 2 ounces of crystal

20   methamphetamine from Mr. Garcia on November 24, 2014,

21   approximately 5:09 p.m.

22   Q    And how are you able to recognize it as such?

23   A    I viewed it prior to trial, and I initialed and marked it.

24   Q    Have you watched this recording?

25   A    I have.

1  Q   Did you watch the original recording that was obtained from
2  this meeting?

3  A   I did.

4  Q   Is this recording a fair and accurate depiction of that
5  recording?

6  A   It is.

7  Q   And is it a fair and accurate depiction of the meeting
8  between the CS and the defendant on November 24, 2014?

9  A   It is.

10  Q   Turning your attention to Government Exhibit 11 Transcript.
11  Have you reviewed that transcript while watching the Government
12  Exhibit 11?

13  A   Yes.

14  Q   And are the statements attributed to the CS and Garcia in
15  this transcript accurate and fair?

16  A   They are.

17  Q   Move to admit Government Exhibit 11 and the Government
18  Exhibit 11 Transcript.

19        THE COURT:  Same, subject to cross-examination?

20        MR. LEGUTKI:  Yes, sir.

21        THE COURT:  Okay.  Very well.  We'll receive into
22  evidence Government Exhibits 11 and 11 Transcript as well.  And
23  then I think, Mr. Vandenberg, when we get to Government Exhibit
24  13, we'll take our afternoon break after that one is in.  Okay?

25        MR. VANDENBERG:  Yes, sir.

1    THE COURT:  Well, yes.  That sounds about right.

2    MR. VANDENBERG:  Yes, your Honor.

3    THE COURT:  Thank you.

4    MR. VANDENBERG:  Let the record reflect that I am

5  starting the recording at the beginning.

6    (Government Exhibit 11 played.)

7    MR. VANDENBERG:  Pausing there.

8    (Government Exhibit 11 paused.)

9  BY MR. VANDENBERG:

10  Q   Are you able to identify the person in the passenger seat

11  of the car?

12  A   I am.

13  Q   And who is that?

14  A   Mr. Garcia.

15  Q   Do you see the man that met with the CS on November 24,

16  2014, here in this courtroom?

17  A   I do.

18  Q   Could you please identify him by his location in the

19  courtroom and an article of clothing?

20  A   He has got the orange jumpsuit, and he is sitting at that

21  table.

22    MR. VANDENBERG:  Let the record reflect that the

23  witness has accurately identified the defendant.

24    THE COURT:  The record will so reflect.

25

Kareceski - direct by Vandenberg

1  BY MR. VANDENBERG:

2  Q   Agent Karceski, can you the characterize the handshake the

3  defendant and the CS did when the defendant entered the car?

4  A   That's the Latin Kings' handshake.

5         MR. VANDENBERG:  Unpausing the recording.

6      (Government Exhibit 11 played.)

7         MR. VANDENBERG:  Pausing there.  Sorry.  Returning to

8  play.

9      (Government Exhibit 11 played.)

10     (Government Exhibit 11 paused.)

11  BY MR. VANDENBERG:

12  Q   When the defendant says, "It will stop you in your tracks,"

13  what do you understand that to be in reference to?

14  A   The crystal methamphetamine that he sold him on the

15  November 17th, that it was of high quality.

16         MR. VANDENBERG:  Unpausing here.  And I'm drawing your

17  attention to the defendant's left hand in the video.

18     (Government's Exhibit 11 paused.)

19  BY MR. VANDENBERG:

20  Q   All right.  During that clip, what does the defendant do

21  with his left hand?

22  A   He appears to be sticking it in his pocket.

23  Q   And what does he do after that?

24  A   Removes a bag of crystal methamphetamine.

25  Q   Okay.  And from that video -- plastic -- I'm sorry.  What

1  do you actually see him retrieving from his pocket.

2          MR. LEGUTKI:  Your Honor, I object to that.  I think

3  the video would speak for itself as to what transpired there,

4  without suggesting that it was a bag of crystal meth.  The

5  video was cut off at some point.  It doesn't go that far back.

6          THE COURT:  If I were to play this video, would it

7  look exactly like this or would it have no transcript?

8          MR. VANDENBERG:  It will have no transcript if you

9  play the version off the disk.

10         THE COURT:  So I will be able to see what's blocked?

11         MR. VANDENBERG:  No, nothing is blocked by the

12 transcript.  That is correct because that is the end of it.

13 The transcript is not covering anything.

14         THE COURT:  Okay.  I've got you, very good.  Well,

15 again, I'll be happy to note the objection, and then if it

16 turns out that what was testified to isn't borne out by the

17 video, the video will control, since I can see the video with

18 my own eyes.  So I will note your objection for the record,

19 and, obviously, any objections that you want to elaborate on

20 when you get to brief this, you're more than welcome to.

21         MR. LEGUTKI:  Thank you, sir.

22         THE COURT:  Sure.

23 BY MR. VANDENBERG:

24 Q    Turning your attention to the plastic bag in the video, is

25 that -- to the extent you were able to see it, is it consistent

1   in appearance with the plastic bag you received from the CS on

2   November 24, 2014?

3   A   Yes, as far as being a plastic bag.

4   Q   And when the defendant, in the course of that clip,

5   confirms that "It is the same shit," what do you understand

6   "the same shit," to be in reference to?

7   A   It's the same quality -- it's out of the same batch that he

8   sold him a week ago.

9        MR. VANDENBERG:  Okay.  Unpausing.

10       (Government Exhibit 11 played.)

11  BY MR. VANDENBERG:

12  Q   What does defendant mean when he says, "Put another bag on

13  there so you don't get sick"?

14  A   Again, he double bagged it, so if you touched it, the

15  substance wouldn't absorb into your skin.

16       MR. VANDENBERG:  Unpausing there.

17       (Government Exhibit 11 played.)

18       MR. VANDENBERG:  Pausing there.

19       (Government Exhibit 11 paused.)

20  BY MR. VANDENBERG:

21  Q   During this clip, what do you see the defendant doing?

22  A   Taking money, the CI -- the confidential source is counting

23  money and he hands it over to Mr. Garcia.

24  Q   Where I stopped that clip they had -- they counted up to

25  18.  What was the price of the methamphetamine for this deal?

Kareceski - direct by Vandenberg

1    A    It was $1,800.

2        (Government Exhibit 11 played.)

3            MR. VANDENBERG:  Pausing there.

4        (Government Exhibit 11 paused.)

5    BY MR. VANDENBERG:

6    Q    After defendant says, "An old man has all kinds of guns,"

7    what does the defendant mean by saying "just get 'em and go"?

8    A    He is talking about taking the guns from the old man.

9    Q    And when the defendant says, "We'll sell off half of them,"

10   what does that mean?

11   A    Meaning, "Depending on how many we get, we'll sell half of

12   them and keep the rest."

13           MR. VANDENBERG:  Unpausing.

14       (Government Exhibit 11 played.)

15           MR. VANDENBERG:  Pausing there.

16       (Government Exhibit 11 paused.)

17   BY MR. VANDENBERG:

18   Q    What is the defendant talking about when he says he can get

19   the other one that's white?

20   A    I believe he is referring to the heroin, but it's going to

21   be the China White not the black heroin.

22   Q    And is that why he says, "But it's white, not like that."

23   A    Yes.

24   Q    And what does the defendant mean when he refers to "that

25   one unit"?

1  A    I don't know what he's talking about there.

2  Q    When the defendant says, "Tell him I got it," what is he

3  saying he has?

4  A    That he has got the heroin.

5       MR. VANDENBERG:  Unpause.

6  (Government Exhibit 11 played.)

7       MR. VANDENBERG:  Pausing there.

8  (Government Exhibit 11 paused.)

9  BY MR. VANDENBERG:

10 Q    What does defendant mean when he says that he has got a guy

11 "who got me ounces on the white"?

12 A    He's got a guy who's selling ounces of white heroin.

13 Q    And what does defendant mean when he tells us that it's

14 "18,000 for a 9"?

15 A    It's 18,000 for nine ounces, about 27,000 for a kilo.

16 Q    And what does the defendant mean when he asks, "How are we

17 supposed to make any money on that?"

18 A    That the price is so high, that if your broke it down and

19 sell it, you won't make anything.

20 Q    And when the defendant confirms the CS's statement that "A

21 bird is maybe 35."  What does "a bird" refer to?

22 A    That's a term for kilogram.

23 (Government Exhibit 11 played.)

24      MR. VANDENBERG:  Pausing there.

25 (Government Exhibit 11 paused.)

Kareceski - direct by Vandenberg

BY MR. VANDENBERG:

Q   What does the defendant mean when he says, "Kiki is a board member"?

A   When he's talking about Kiki, he's obviously a gang member of Latin Kings, and their range structure.  It sounds like he is talking about when he was in Pontiac, he held a ranking position in the Latin Kings.

MR. VANDENBERG:  Unpausing there.

(Government Exhibit 11 played.)

BY MR. VANDENBERG:

Q   When defendant says that, "he tried to get me to go over there," what does that refer to?

A   They were trying to get Mr. Garcia to go over to the north side to take this position of whoever Kiki is, take his position as running that faction of the gang.

Q   And when they say that they mainly do heroin, "what they mainly do over there is the heroin," what is that in reference to?

A   That their main source of income is selling heroin.

Q   And when the defendant says, "Any one of them who will" -- I'm sorry -- when the defendant says that he could put the CS's brother out there where they're doing heroin, what does he mean by that?

A   That Garcia could place the CS's brother or someone into that position.

1    Q    And what does he mean by saying, "Any one of them who will

2    sell"?

3    A    Basically anybody who knows the business and will go out

4    there and sell with this crew on the north side.

5    Q    Selling what, in that context?

6    A    Apparently, heroin.

7            MR. VANDENBERG:  Unpausing there.

8        (Government Exhibit 11 played.)

9        (Government Exhibit 11 paused.)

10   BY MR. VANDENBERG:

11   Q    When defendant says, "That way we can make that money," how

12   is he proposing making money?

13   A    If they have someone in that position selling heroin on the

14   north side, they'll get a cut of that.  So they are going to

15   make money by doing that.

16   Q    All right.  Moving forward now to 8 minutes 25 seconds into

17   the Exhibit.  That's transcript line, approximately, 376.

18       (Government Exhibit 11 played)

19           MR. VANDENBERG:  Stopping there.

20   BY MR. VANDENBERG:

21   Q    What does the defendant mean when he says, "This guy got

22   everything."

23   A    "He has got all types of firearms."

24   Q    What does the defendant mean when he says, "The guy has

25   AKs"?

1   A    AK-47, it's an assault-type rifle.

2   Q    This excerpt, what is the defendant proposing to do to

3   obtain those guns?

4   A    He is saying, "We can go grab the older gentleman's son to

5   get to the house.  Tell him the old man -- his father is sick,

6   and then when they get over to the house, they will basically

7   commit a home invasion, tie the two subjects up, to steal the

8   weapons.

9   BY MR. VANDENBERG:

10  Q    Let the record reflect that I'm handing the witness what

11  has been previously marked for identification as Government

12  Exhibit 12 and the Government Exhibit 12 Transcript.  Do you

13  recognize Government Exhibit 12?

14  A    I do.

15  Q    What is it?

16  A    It's text messages between the confidential source and

17  Mr. Garcia.

18  Q    And how did you obtain these text messages?

19  A    I believe by this time off of a computer program that we

20  were now using on the confidential source's phone.

21  Q    And how are you able to recognize these as the text

22  messages between the CS and defendant?

23  A    I was the one who downloaded them.  As well as a

24  spreadsheet comes attached to the download with the numbers

25  that were exchanging the text messages.

1   Q   And what did you say the date was of these text messages?

2   A   December 15th.

3   Q   And --

4   A   There's one from December 13th, and then December 15th.

5   Q   And how do you know these are between the CS and the

6   defendant?

7   A   The telephone numbers.

8   Q   Does Government Exhibit 12 contain a fair and accurate

9   depiction of text messages between the CS and the defendant

10  between December 13, 2014, and December 15, 2014?

11  A   It does.

12  Q   Have you reviewed the Government Exhibit 12 Transcript and

13  compared it to the text messages in Government Exhibit 12?

14  A   I have.

15  Q   And does the transcript accurately identify the texts sent

16  by the CS and the defendant?

17  A   It does.

18          MR. VANDENBERG:  At this point, the government moves

19  to admit Government Exhibit 12 and Government Exhibit 12

20  Transcript.

21          THE COURT:  Subject to the usual understanding?

22          MR. LEGUTKI:  Yes, sir.

23          THE COURT:  Okay.  Very well.  We'll receive into

24  evidence Government Exhibit 12 and 12 Transcript.

25          (Government Exhibit 12 and 12 Transcript were received in

1    evidence).

2   BY MR. VANDENBERG:

3   Q   You say that these text messages were sent around

4   November 15, 2014.  So were these sent about three weeks after

5   the last buy we just discussed?

6   A   They were.

7   Q   Publishing Government Exhibit 12.  Turning your attention

8   to the December 5, 2014, text at 11:37, could you read what the

9   CS texted at that time?

10  A   He stated, "My guy is in town trying to do something.  Can

11  I get the same as last time?"

12  Q   And how does the defendant respond?

13  A   "Okay.  Let me know what time."

14  Q   All right.  Drawing your attention now to the text at

15  2:08 p.m. from the CS.  What is the CS text?

16  A   "I'm home early.  Can we handle that now?"

17  Q   And how does the defendant respond?

18  A   "Yeah, I am ready."

19  Q   Drawing your attention down to the 3:06 p.m. text from the

20  CS.  What does the CS text at that time?

21  A   "Be there in five minutes."

22  Q   And how does the defendant respond?

23  A   "Cool."

24  Q   Did you meet with the CS on December 15, 2015?

25  A   I did.

Kareceski - direct by Vandenberg

1    Q    And what did you do during that meeting?

2    A    Same thing.  CI's vehicle, CI's person was searched.

3    Nothing was located.  Recorders were placed either in his

4    vehicle or on his person.  He was presented with $1,800 of buy

5    money.  And then he was followed over by myself to the 700

6    block of Vista.

7    Q    Let me direct your attention back to the Government Exhibit

8    12.  The text starting at 2:08 p.m., for those texts sent

9    during the course of your meeting.

10   A    Um, I'd have to see my report what time we actually met

11   with him.

12           MR. VANDENBERG:  I will strike that question, your

13   Honor.

14           THE COURT:  Okay.  Fair enough.

15   BY MR. VANDENBERG:

16   Q    You said that after that meeting you -- what did you do

17   after meeting with the defendant -- or with the CS on that day?

18   A    Again, I would follow him to the 700 block of Vista and the

19   CI would turn on to that block.  I would radio to whatever

20   agent or officer had surveillance on the residence.  And he

21   would then pick up surveillance and I would park in the parking

22   lot on the other side of the school and listen to the

23   conversation or meeting.

24   Q    And did you hear the CS meet with anyone?

25   A    I did.

1  Q   And who did you hear the CS meet with?

2  A   Mr. Garcia.

3  Q   What did you do when that meeting ended?

4  A   Again, I was radioed.  I went to the other end of the 700

5  block of Vista.  I would then follow the confidential source

6  back to the original meet location.

7  Q   And what would you do when you arrived there?  I'm sorry.

8  What did you do when you arrived there?

9  A   I turned off the recording devices, retrieved the purported

10  methamphetamine, and then searched the confidential informant

11  and his vehicle.

12  Q   Putting aside the purported methamphetamine, did you find

13  anything on the CS or in his vehicle during that search?

14  A   No.

15  Q   And you said you received purported methamphetamine, who

16  did you receive that from?

17  A   From the confidential source.

18  Q   And when you say it was "purported methamphetamine," what

19  did you base that on?

20  A   The texture, the appearance, and the conversation.

21  Q   Let the record reflect that I am approaching the witness

22  with what has been previously marked as Government Exhibit 13.

23          Agent Karceski, do you recognize this exhibit?

24  A   I do.

25  Q   And what is it?

Manney - direct by Vandenberg

1  A   It's the methamphetamine that was purchased by the

2  confidential source from Mr. Garcia on December 15, 2014.

3  Q   And just to clarify for the record because I believe I may

4  have misstated earlier, this all occurred on December 15, 2014,

5  not December 15, 2015; is that correct?

6  A   Yes.

7  Q   How are you able to recognize this exhibit as what you

8  received from the CS on December 15, 2014?

9  A   Again, on that day I packaged it.  I would have tested it,

10  weighed it.  Placed it in the evidence bag.  Put this label on

11  it.  Signed it.  Signed the seal when I sealed it, and

12  initialed it, and then placed it in the evidence vault.

13          MR. VANDENBERG:  At this time the government moves to

14  admit Government Exhibit 13 in evidence.

15          MR. LEGUTKI:  Same objection.

16          THE COURT:  Okay.  Very good.  Subject to the

17  cross-examination, we'll receive it in evidence.  And with

18  that, we can take a break.

19          MR. VANDENBERG:  Yes, sir.

20          THE COURT:  Okay.  Thank you.

21          What do you guys think about maybe 20 minutes?  I have

22  to go through tomorrow morning's call and see what I can

23  unload.  And we can go off the record for this conversation.

24      (Recess taken.)

25          MR. VANDENBERG:  Is it all right if I proceed, your

Manney - direct by Vandenberg

1  Honor.

2  THE COURT:  Yes, please.  Thank you.

3  SARAH MANNEY, PLAINTIFF'S WITNESS, SWORN

4  DIRECT EXAMINATION

5  BY MR. VANDENBERG:

6  Q    Can you please state your name for the record, spelling the

7  last?

8  A    My name is Sarah Manney.  Last name is spelled M-A-N-N-E-Y.

9  Q    And could you state and spell your maiden name?

10 A    My maiden name is Costello.  That's spelled

11 C-o-s-t-e-l-l-o.

12 Q    And where are you currently employed?

13 A    I'm currently employed by the Drug Enforcement

14 Administration, or DEA, at their western laboratory, located in

15 Pleasanton, California.

16 Q    What is your job title there?

17 A    I'm a forensic scientist chemist.

18 Q    How long have you been at the current location?

19 A    I have been at the western laboratory for just under three

20 years.

21 Q    Prior to that where were you assigned?

22 A    I was previously assigned to the north-central laboratory

23 located in Chicago, Illinois.

24 Q    And how long did you work there?

25 A    Approximately one and a half years.

1  Q   Prior to working for DEA, where did you work?

2  A   I worked at the University of Illinois in Chicago at their

3  animal forensic toxicology laboratory.

4  Q   And what sort of work did you do there?

5  A   I worked in their laboratory performing the post-race drug

6  testing on winning race horses from Illinois race tracks.

7  Q   And what is your educational background?

8  A   I have a bachelor of science in chemistry from Illinois

9  Wesleyan University.  That was received in 2010.  I also have a

10 masters of science in forensic science from the University of

11 Illinois in Chicago, and that was received in 2012.

12 Q   Aside from your education, what sort of training have you

13 received as a forensic chemist with respect to controlled

14 substances?

15 A   When I entered on duty with DEA, I reported to the DEA

16 Training Academy in Quantico, Virginia, and I participated and

17 completed the basic forensic chemist training program there.

18 Q   Aside from that initial training, did you receive any

19 additional training while you were at DEA?

20 A   Yes.  We receive continuing education in various analytical

21 techniques.  I also received my clandestine laboratory

22 certification.

23 Q   In total, how long have you worked as a forensic chemist?

24 A   I have worked as a forensic chemist for the DEA for

25 approximately four and a half years.

Manney - direct by Vandenberg

1    Q    What are your duties as a forensic chemist for the DEA?

2    A    My primary duty as a forensic chemist is to analyze

3    evidence submitted to the laboratory for the presence or

4    absence of controlled and noncontrolled substances.  I also

5    prepare reports based on my findings, and testify in court when

6    necessary.

7    Q    While employed with the DEA, approximately how many times

8    have you analyzed evidence for the presence or absence of

9    controlled substances?

10   A    I've analyzed approximately 900 exhibits.

11   Q    Have you previously been qualified in court as an expert

12   witness in the analysis of controlled substances?

13   A    Yes, I have.

14        MR. VANDENBERG:  At this time, the government would

15   tender the witness as an expert in the analysis of controlled

16   substances.

17        THE COURT:  Okay.  Reserved for cross?  No objection,

18   you can do cross-examination if you like.

19        MR. LEGUTKI:  She is going to testify as to the

20   substance.

21        THE COURT:  Yes.

22        MR. LEGUTKI:  I will hold off.

23        THE COURT:  Okay.  Great.

24        MR. LEGUTKI:  So nothing that has to do with her

25   qualifications, sir.

Manney - direct by Vandenberg

1    THE COURT:  Exactly.  So without objection, we'll

2    accept Ms. Manney as an expert for this case.

3    BY MR. VANDENBERG:

4    Q    Let the record reflect that I am handing the witness what

5    has been previously marked as Government Exhibit 36, 37, 38 and

6    39, as well as Exhibits 5, 10 and 13, and what has been

7    previously marked as Government Exhibit 25.

8         Drawing your attention to Exhibits 5, 10, 13 and

9    Government Exhibit 25.  Are you able to recognize each of these

10   exhibits?

11   A    Yes, I do.

12   Q    And broadly speaking, what are they?

13   A    These exhibits are the containers of evidence that were

14   submitted to the laboratory that I analyzed.

15   Q    And how are you able to recognize them?

16   A    I recognize them by looking at the case number and

17   comparing that with my laboratory report.  I also notice my

18   handwriting and markings on the outside of the envelope, the

19   seal, the packages within.

20   Q    How did you receive each of these pieces of evidence?

21   A    I receive evidence from an evidence specialist in the

22   laboratory's main vault.

23   Q    And what do you do after receiving each of these pieces of

24   evidence?

25   A    After receiving a piece of evidence, I would take it back

1    to my bench at the laboratory.

2    Q    Is that what you did in this case?

3    A    Yes, that's generally what I do when I am ready to begin

4    analysis.

5    Q    And what did you do after bringing it back to your bench

6    for analysis?

7    A    The first thing -- the first test that I perform is take a

8    gross weight, and that's just the weight of the entire intact

9    envelope and everything contained within it.

10   Q    What would you do after that?

11   A    After that I would open the package and inventory the

12   contents.

13   Q    And after that?

14   A    After that I would obtain a net weight, which is just the

15   weight of the substance in question without any of the

16   packaging.

17   Q    After obtaining a net weight, what would you do?

18   A    Then I would begin my analysis of the substance.

19   Q    And what does your analysis consist of?

20   A    I perform a variety of analytical techniques to determine

21   the identity of the substance.

22   Q    After determining the identity of the substance, do you do

23   any additional tests?

24   A    I would obtain a reserve weight, which is the remaining

25   weight of the substance, and then begin to finalize my report.

1    Q    And in what situations, if any, do you determine the purity

2    of the substance?

3    A    Per DEA policy, we determine purity for exhibits that are

4    found to contain amphetamine, methamphetamine, hydrocodone,

5    Oxycodone, and PCP.

6    Q    Are the tests you use recognized by the forensic community

7    as suitable for the identification of controlled substances?

8    A    Yes, they are.

9    Q    Do each of the exhibits that I handed you, specifically

10   Government Exhibits -- sorry -- Exhibits 5, 10, 13 and

11   Government Exhibit 25, do each of these appear the same as when

12   you last had possession of them?

13   A    Yes, they do.  My seal at the bottom is intact.

14   Q    After testing suspected narcotics in your role as a DEA

15   forensic chemist, do you keep a record of your findings?

16   A    Yes, we do.

17   Q    And what does that record include?

18   A    It would include a final report, a document summarizing

19   any notes, and the results of any analytical tests.

20   Q    And what does that final report include?

21   A    The final report includes a summary of any substances

22   identified, as well as the techniques used.

23   Q    In addition to the nature of substances, does it contain

24   anything else?

25   A    It would also describe the purity, if it was determined.

Manney - direct by Vandenberg

1  Q   Drawing your attention to Government Exhibits 36, 37, 38

2  and 39, are you able to identify those documents?

3          MR. LEGUTKI:  Excuse me.  Would you read those numbers

4  again please?

5          MR. VANDENBERG:  36, 37, 38 and 39.

6          MR. LEGUTKI:  Thank you.

7  THE WITNESS:

8  A   Yes, I am.

9  BY MR. VANDENBERG:

10 Q   And what do you recognize them to be?

11 A   I recognize them as the final laboratory report.

12 Q   Who created each of these reports?

13 A   I did.

14 Q   Does your name appear on the reports?

15 A   Yes, it does --

16 Q   Government Exhibit 36, what sample does that correspond to?

17 A   This corresponds to the investigating agency Exhibit No. 8,

18 which is marked as the evidence envelope for which it is marked

19 as Government's Exhibit 5.

20 Q   And how can you tell that Government Exhibit 36 matches

21 with what has been marked as Government Exhibit 5?

22 A   I am comparing the investigating agency case number and

23 exhibit number that are on the laboratory report with the

24 corresponding numbers on the piece of evidence, as well as the

25 laboratory-assigned identification number.

1  Q    Turning to Government Exhibit 37.  What sample does that

2  report correspond to?

3  A    Government's Exhibit 37 is the laboratory report that

4  corresponds to the piece of evidence marked Government's

5  Exhibit 10.

6  Q    How can you tell that Government Exhibit 37 corresponds to

7  Government Exhibit 10?

8  A    Again, by comparing the investigating agency case number

9  and the exhibit number that are marked on the laboratory report

10  to the corresponding numbers on the piece of evidence itself,

11  as well as the laboratory-identification number.

12  Q    Turning now to Government Exhibit 38.  What sample does

13  that correspond to?

14  A    Government's Exhibit 38 is the laboratory report that

15  corresponds to the piece of evidence that is marked

16  Government's Exhibit 13.

17  Q    And how are you able to determine that those two correspond

18  to each other?

19  A    I am comparing the investigating agency case number and

20  exhibit number, as well as the laboratory-assigned exhibit

21  number on the laboratory report to the corresponding numbers on

22  the piece of evidence.

23  Q    And, finally, Government Exhibit 39, what sample does that

24  report correspond to?

25  A    Government's Exhibit 39 is the report that corresponds to

Manney - direct by Vandenberg

1    the piece of evidence that is marked Government Exhibit 25.

2    Q    And how can you tell that Government Exhibit 39 corresponds

3    to Government Exhibit 25?

4    A    I am comparing the investigating agency case number and

5    exhibit number, as well as the laboratory-assigned number that

6    are located on the laboratory report to the corresponding

7    numbers on the pieces of evidence itself.

8    Q    Are you the person who generated the final reports that are

9    marked Government Exhibits 36, 37, 38 and 39?

10   A    Yes, I am.

11   Q    Were each of these reports made around the time you

12   determined the nature, weight and purity of the corresponding

13   samples we just discussed?

14   A    Yes, they were.

15   Q    Were these reports generated and kept in the regular course

16   of business?

17   A    Yes.

18        MR. VANDENBERG:  At this time, your Honor, the

19   government would move to enter Government Exhibits 36, 37, 38

20   and 39 into evidence.

21        MR. LEGUTKI:  Your Honor, I do have some objection in

22   that I believe before we broke, there were foundations laid for

23   Government Exhibits 5 though 13.  I assume that the government

24   is going to lay a foundation for Government Exhibit 25 when we

25   resume with the ATF agent, correct?

Manney - direct by Vandenberg

1      MR. VANDENBERG:  Correct.  The government is not

2  seeking to enter Government Exhibit 25 in evidence at this

3  time.  We are seeking only to enter the report whether or

4  not -- and we've established that corresponds to Government

5  Exhibit 25, but we would plan to enter Government Exhibit 25

6  when we recall Agent Karceski.

7      THE COURT:  So, Mr. Legutki, I can give you a

8  objection for the minute that you might withdraw after hearing

9  foundation for Exhibit 25 .

10     MR. LEGUTKI:  Yes, sir.  Exactly.

11     THE COURT:   Okay.  And we'll reserve the record in

12  that fashion.

13     MR. LEGUTKI:  And the only other matter -- if I can --

14  what she wants in that -- I could ask the government attorney

15  something about this so I can maybe not make an objection about

16  it.

17     THE COURT:  Oh, sure.  You guys can have a

18  conversation.  Sure.

19  (Off-the-record conversation between the attorneys.)

20     MR. LEGUTKI:  Thank you.  No objection, sir.

21     THE COURT:  Very good.  So 36 through 39 will be

22  provisionally received in evidence, subject to the objection

23  Mr. Legutki has placed on the record that he may withdraw after

24  25 actually gets run through the prior witness.

25     MR. VANDENBERG:  Yes, your Honor.

Manney - direct by Vandenberg

1          THE COURT:  Okay.  Very well.

2    BY MR. VANDENBERG:

3    Q    During the course of your testing, were you able to form an

4    opinion as to whether Government Exhibit 5 was a controlled

5    substance?

6    A    Yes I was.

7    Q    And what substance did you identify it to be?

8    A    I identified d-methamphetamine hydrochloride.

9    Q    And what was the net weight of this methamphetamine at the

10   time of testing?

11   A    The net weight of this exhibit was 27.4 grams.

12   Q    And what was the purity of this methamphetamine?

13   A    The purity was 100 percent.

14   Q    Based on that purity, what amount of the substance is

15   actual methamphetamine hydrochloride?

16   A    27.4 grams.

17   Q    Turning now to Government Exhibit 13 -- sorry.  Turning now

18   to Government Exhibit 10.  Were you able to form an opinion

19   during the course of your testing, as to whether Government

20   Exhibit 10 was a controlled substance?

21   A    Yes, I was.

22   Q    What substance did you identify it to be?

23   A    I identified d-methamphetamine hydrochloride.

24   Q    And what was the net weight of this methamphetamine at the

25   time of testing?

Manney - direct by Vandenberg

1   A   The net weight of this exhibit was 56.3 grams.

2   Q   What was the purity of this methamphetamine?

3   A   The purity was 100 percent.

4   Q   Based on that purity, what amount of the substance is

5   actual methamphetamine hydrochloride?

6   A   56.3 grams.

7   Q   Turning now to Government Exhibit 13.  During the course of

8   your testing, were you able to form an opinion as to whether

9   Government Exhibit 13 was a controlled substance?

10  A   Yes, I was.

11  Q   What substance did you identify it to be?

12  A   I identified d-methamphetamine hydrochloride.

13  Q   What was the net weight of this methamphetamine at the time

14  of testing?

15  A   The net weight of this exhibit was 55.6 grams.

16  Q   What was the purity of this methamphetamine?

17  A   The purity was 100 percent.

18  Q   Based on that purity, what amount of the substance is

19  actual methamphetamine hydrochloride?

20  A   55.6 grams.

21  Q   Finally, during the course of your testing, were you able

22  to form an opinion as to whether Government Exhibit 5 was a

23  controlled substance?

24  A   Yes, I was.

25  Q   And what substance did you identify it to be?

Manney - cross by Legutki

1    A    I identified d-methamphetamine hydrochloride.

2    Q    What was the net weight of this methamphetamine at the time

3    of testing?

4    A    The net weight of the substance was 57.4 grams.

5    Q    What was the purity of this methamphetamine?

6    A    The purity was 100 percent.

7    Q    Based on that purity, what amount of the substance is

8    actual methamphetamine hydrochloride?

9    A    57.4 grams.

10            MR. VANDENBERG:  If I may take a second, your Honor.

11            THE COURT:  Sure.

12            MR. VANDENBERG:  The government has no further

13    questions.

14            THE COURT:  Okay.  Very good.  Thank you.

15            Mr. Legutki?

16            MR. LEGUTKI:  Yes.  Thank you.

17                        CROSS-EXAMINATION

18    BY MR. LEGUTKI:

19    Q    Good afternoon, Ms. Manney.

20    A    Good afternoon.

21    Q    Now, with Government Exhibit No. 36 -- excuse me, please.

22    Just to clarify, the amount of pure substance would be plus or

23    minus 1 gram, correct?  Is that what your report states?

24    A    That is correct.

25    Q    And same sort of question with Government Exhibit No. 37,

1    that's plus or minus 2.1 grams, correct?

2    A    Yes, that is correct.

3    Q    And with both exhibits, No. 36 and 37, there's -- there's a

4    variance in the purity of plus or minus 3.7 percent, both for

5    36 and for 37, correct?

6    A    Correct.

7    Q    And that somehow there's a mathematical correlation between

8    the substance's purity and the amount of pure substance that is

9    derived at, correct?

10   A    Correct.  You can calculate that based on those two

11   numbers.

12   Q    In other words, if the purity is minus 3.7 percent, there

13   will be some mathematical correlation to the amount, the net

14   weight, correct?

15   A    Yes.

16   Q    And is it fair to say that it's also correct when looking

17   at Government Exhibit No. 38, there's an amount of pure

18   substance variance of plus or minus 2 grams, correct?

19   A    Yes, that is correct.

20   Q    And, again, it has to do with the purity, plus or minus

21   3.7 percent?

22   A    Yes, correct.

23   Q    And Exhibit No. -- excuse me -- Government Exhibit No. 39,

24   there's a purity plus or minus 3.7 percent, and an amount of

25   pure substance plus or minus 2.1 grams.  And, again, there's

1  some sort of mathematical correlation?

2  A   Yes.

3  Q   Ms. Manney, do you know where -- well, excuse me.  So

4  methamphetamine you found positive for each of the Government

5  Exhibits 36, 37, 38 and 39, correct?

6  A   That is correct.  I confirmed methamphetamine in all four

7  exhibits.

8  Q   Do you know where that methamphetamine was manufactured?

9  A   No, that is not part of my normal testing.

10 Q   So you don't know where it was manufactured?

11 A   No, I do not.

12 Q   Okay.  It could have been in Illinois or out-of-state or a

13 foreign country, you just don't know?

14 A   I do not know.

15 Q   And that is true for 36, 37, 38 and 39?  Your findings

16 reflected, excuse me, in Exhibits 36, 37, 38 and 39, correct?

17 A   That is correct.  That is not part of the normal testing I

18 perform.

19         MR. LEGUTKI:  Okay.  Thank you.  No further questions.

20         THE COURT:  Okay.  Very well.  Any redirect?

21         MR. VANDENBERG:  No, your Honor.

22         THE COURT:  Okay.  Thank you so much for coming in.

23         THE WITNESS:  Thank you.

24         THE COURT:  Have a safe trip back to California.  You

25 won't be sad to be leaving here.

1    (Witness excused.)

2         MR. VANDENBERG:  And, your Honor, we would seek leave

3    to call Robert Holbrook to the stand.

4         THE COURT:  Very well.

5         MR. LEGUTKI:  Your Honor, we did have an agreement on

6    exclusion of witnesses, but I don't think that really matters

7    with this.

8         THE COURT:  Well, it doesn't matter with experts, but

9    he is not in here.

10        MR. VANDENBERG:  He is considered as an expert as

11   well.  I think he is referring to the case agent being present

12   during the course of -- I think that's what the objection -- is

13   that an objection?

14        THE COURT:  The case agent and the defendant in my

15   experience are here for every trial and they don't get

16   excluded.

17        MR. LEGUTKI:  Okay.

18        THE COURT:  But an expert -- actually, all three of

19   the other -- the CS isn't an expert, but the other two

20   witnesses are experts.

21        MR. LEGUTKI:  Right.

22        THE COURT:  I have never excluded them either because

23   their opinion isn't factual, it's opinion-based.

24        Okay.  Very good.  So, sir, you can go to the front

25   there and Kris will give you the oath.  Okay, sir?

1    (Witness sworn.)

2         ROBERT JAMES HOLBROOK, PLAINTIFF'S WITNESS

3              DIRECT EXAMINATION

4  BY MR. VANDENBERG:

5  Q   Could you please state your name for the court, spelling

6  the last?

7  A   My name is Robert James Holbrook.  It is spelled

8  H-o-l-b-r-o-o-k.

9  Q   And where are you currently employed?

10 A   Currently employed at Husch Blackwell.

11 Q   What is your job title there?

12 A   Scientific adviser.

13 Q   Prior to your current job, where were you employed?

14 A   The Drug Enforcement Administration.

15 Q   When did you work there until?

16 A   I worked there until May of 2017.

17 Q   What was your title there?

18 A   Forensic chemist.

19 Q   And what office did you work?

20 A   I worked at the north-central laboratory in Chicago,

21 Illinois.

22 Q   And how long did you work there?

23 A   I worked there for approximately -- approximately a year

24 and a half.

25 Q   Prior to working for DEA, where did you work?

1    A    I had a short-term contract position at Abbot Laboratories.

2    Q    What roles did you have there?

3    A    I was a bio-analytical chemist.

4    Q    What is your educational background?

5    A    I have a PhD in chemistry from Northwestern University, and

6    I also have a bachelor's of science at Duke University as well.

7    Q    What sort of training have you received as a forensic

8    chemist with respect to controlled substances?

9    A    There is a training program in Quantico, Virginia.  It is

10   called Basic Chemist Training.  It's a 16-week residential

11   program, and following that there's a continuation of

12   approximately three months of training at the Chicago

13   laboratory as well.

14   Q    What were your duties as a forensic chemist for the DEA?

15   A    Main duty is analyzing exhibits for the presence of

16   controlled substance, drafting reports on those findings, and

17   then testifying in court when subpoenaed.

18   Q    While employed with the DEA, approximately how many times

19   did you analyze evidence for the presence or absence of a

20   controlled substance?

21   A    I did approximately 200 to 250 exhibits.

22   Q    Have you been previously qualified in court as an expert

23   witness in the analysis of controlled substance?

24   A    Yes, sir.

25        MR. VANDENBERG:  At this time, your Honor, the

1   government would move to tender the witness as an expert in the

2   analysis of controlled substances.

3           THE COURT:  Okay.

4           MR. LEGUTKI:  No objection as to qualifications.

5           THE COURT:  Okay.  Very well.  So we'll receive

6   testimony of Dr. Holbrook under Rule 702.

7   BY MR. VANDENBERG:

8   Q   Let the record reflect that I am handing the witness what

9   has previously been marked as Government Exhibit 40 and

10  Government Exhibit 32.

11          Drawing your attention to Exhibit 32, are you able to

12  recognize this exhibit?

13  A   Yes.  Yes, sir.

14  Q   And what is it?

15  A   It's a drug evidence envelope, containing an exhibit that I

16  have analyzed.

17  Q   And how are you able to recognize it as one that you

18  analyzed?

19  A   I can see that I've written my name on the label.  I've

20  dated what I have opened with this particular exhibit.  I've

21  also signed and dated when I re-sealed this envelope, and also

22  have marked the seal that I've created on the envelope.

23  Q   And how did you first receive this first particular piece

24  of evidence?

25  A   I received this evidence from the main vault in our lab.

1    This particular exhibit was assigned to me by my supervisor.

2    Q    And what did you do after receiving that piece of evidence?

3    A    Well, the first thing we do -- well, with this piece of

4    evidence, I weighed the entire package as received.  That's

5    called a gross weight.

6    Q    And what do you do after that?

7    A    After that, I open the envelope on the opposite side of the

8    agent's signature here, on the bottom side, and then I record

9    the contents of the bag.

10   Q    What do you do after that?

11   A    After that I go ahead and proceed with weighing the

12   contents, and it's called a net weight.

13   Q    After determining the net weight, what would you do?

14   A    I begin my analysis of the substance.

15   Q    And did you perform an analysis of this substance in this

16   case?

17   A    Yes, sir.

18   Q    And what did that analysis consist of.

19   A    The analysis was the presence of d-methamphetamine

20   hydrochloride, with a purity of 99 percent.

21   Q    The tests that you use to determine that, are these

22   recognized by the forensic community as suitable for the

23   identification of a controlled substance?

24   A    Yes, sir.

25   Q    And does this evidence appear the same as when you last had

1  possession of it?

2  A    Yes.

3  Q    After testing suspected narcotics in your role as a DEA

4  forensic chemist, would you keep a record of your findings?

5  A    Yes, sir.

6  Q    And what do those records include?

7  A    It would include a case details report on what is

8  Government Exhibit 40.

9  Q    All right.  Drawing your attention to Government Exhibit

10 40.  Are you able to identify that as a case details report as

11 you just stated?

12 A    Yes.

13 Q    And who created this particular case details report?

14 A    I did.

15 Q    Does your name appear on the report?

16 A    Yes, sir.

17 Q    And what is the relationship between Government Exhibit 40

18 and Government Exhibit 32?

19 A    This is the report on my analysis of -- I'm sorry.

20 Government Exhibit 40 is the report that I wrote of my analysis

21 of Government Exhibit 32.

22 Q    And how can you tell that this case details report matches

23 Government Exhibit 32?

24 A    I look at the LIMS case number, which is the laboratory

25 information management system case number, and the numbers

1  match.

2  Q   Was this case details report made by you around the time

3  you determined the nature, weight, and purity of the

4  corresponding sample?

5  A   Yes.

6  Q   Was this generated and kept in the regular course of

7  business?

8  A   Yes.

9       MR. VANDENBERG:  At this time the government moves to

10  enter Government Exhibit 40 in evidence.

11       MR. LEGUTKI:  Just subject to cross-examination, sir.

12       THE COURT:  Very well.  So we'll receive in evidence

13  Government Exhibit 40.

14     (Government Exhibit 40 was received in evidence.)

15  BY MR. VANDENBERG:

16  Q   During the course of your testing, were you able to form an

17  opinion as to whether Exhibit 32 was a controlled substance?

18  A   Yes.

19  Q   And what substance did you identify it to be?

20  A   I identified d-methamphetamine hydrochloride.

21  Q   And what was the net weight of the methamphetamine at the

22  time of testing?

23  A   The net weight is 27.9 grams.

24  Q   And is there any variance in that net weight?

25  A   Yes.  It's plus/minus .02 grams.

Holbrook - cross by Legutki

1   Q   And what was the purity of this methamphetamine?

2   A   It's 99 percent.

3   Q   And is there any variance in that purity?

4   A   Yes.  Plus/minus 4 percent.

5   Q   Based on that purity, what amount of this substance is

6   actual methamphetamine hydrochloride?

7   A   27.6 grams.

8   Q   And is there any variance in that amount?

9   A   Yes.  Plus/minus 1 gram, 1.0 grams.

10          MR. VANDENBERG:  Nothing further, your Honor.

11          MR. LEGUTKI:  May I?

12          THE COURT:  Okay.  Thank you.

13                      CROSS-EXAMINATION

14  BY MR. LEGUTKI:

15  Q   Good afternoon, Mr. Holbrook.  My name is John Legutki.

16  I'm Mr. Garcia's attorney.  Thank you for coming in today.

17          Mr. Holbrook, with the sample that you examined do you

18  know where it was manufactured?

19  A   No.

20  Q   You have no way of knowing?

21  A   No, it's not a part of my analysis.

22  Q   So you don't know if it is manufactured in Illinois,

23  another state, or another forensic country?

24  A   I do not, sir.

25  Q   Thank you, sir.

1           THE COURT:  Okay.  Thank you.

2           Any redirect?

3           MR. VANDENBERG:  No, your Honor.

4           THE COURT:  Okay.  Dr. Holbrook, thanks for coming in.

5           THE WITNESS:  Thank you.

6       (Witness excused.)

7           THE COURT:  Okay.  Are you going to return to Agent

8  Karceski, then?

9           MR. VANDENBERG:  Yes, your Honor.  We would ask for

10  permission to recall him.

11          THE COURT:  We'll just put him back in the jury box

12  since we don't have the monitor working.  Okay.  Thank you.

13  All right.

14          MR. VANDENBERG:  Your Honor, permission to retrieve

15  the exhibit from the last witness?

16          THE COURT:  Yes, thank you.

17          ANDREW KARCESKI, PLAINTIFF'S WITNESS, SWORN

18                  DIRECT EXAMINATION (Resumed)

19  BY MR. VANDENBERG:

20  Q   All right.  Let the record reflect that I'm approaching the

21  witness with what has been previously marked as Government

22  Exhibit 14 and the Government Exhibit 14 Transcript.

23          Drawing your attention to Government Exhibit 14, are

24  you able to determine what this is?

25  A   Yes.  It's a video recording of a purchase of

1  methamphetamine on December 15, 2014, between the confidential

2  informant and Mr. Garcia.

3  Q   And how are you able to recognize it as such?

4  A   I had viewed it previous to trial and marked it with my

5  initials.

6  Q   Did you review -- how did you first obtain the recording of

7  the meeting between the CS and the defendant on that date?

8  A   Subsequent to the deal I would have taken possession of the

9  recording device and taken it back to the ATF office and

10 downloaded it.

11 Q   And did you review it at that time?

12 A   I did.

13 Q   And you stated that you reviewed this exhibit.  Is it a

14 fair and accurate representation of the video you initially

15 reviewed of the meeting between the CS and the defendant on

16 December 15, 2014?

17 A   It is.

18 Q   Have you reviewed Government Exhibit 14 Transcript?

19 A   I have.

20 Q   Did you review it while watching Government Exhibit 14?

21 A   I did.

22 Q   Are the statements attributed to the CS and the defendant

23 in this transcript fair and accurate?

24 A   They are.

25         MR. VANDENBERG:  At this time your Honor the

1　government would move to admit Government Exhibit 14 and the

2　Government Exhibit 14 Transcript.

3　　　　　　MR. LEGUTKI:  Same objection as before.

4　　　　　　THE COURT:  Okay.  Very well.  So we will

5　provisionally receive in evidence Government Exhibits 14 and 14

6　Transcript.

7　　　　　　MR. VANDENBERG:  I apologize, your Honor.  I thought

8　that there was no longer a standing objection.  What is the

9　referring objection?

10　　　　　　THE COURT:  It's just subject to cross-examination.

11　　　　　　MR. LEGUTKI:  That's correct.

12　　　　　　THE COURT:  That goes without saying, really.  So,

13　this, you know, I don't think anything is going to happen in

14　cross-examination that's going to cause me not to consider this

15　as evidence.

16　　　　　　MR. VANDENBERG:  Yes, your Honor.

17　　　　　　THE COURT:  Okay.  Very well.

18　　　　(Government's Exhibit 14 and Government Exhibit 14

19　　　　　Transcript received in evidence.)

20　　　　　　MR. VANDENBERG:  Permission to publish Government

21　Exhibit 14?

22　　　　　　THE COURT:  Sure.

23　BY MR. VANDENBERG:

24　Q　Let the record reflect that I am starting this from -- I am

25　playing this from the start of the recording.  And Officer

1  Karceski, I'd ask you to pay attention to -- well -- I'm sorry.

2  Let the record reflect that I am playing this from the start of

3  the recording.

4      (Government Exhibit 14 played.)

5  BY MR. VANDENBERG:

6  Q   Agent Karceski -- pausing there.

7      (Government Exhibit 14 paused.)

8  BY MR. VANDENBERG:

9  Q   Agent Karceski, are you able to identify the two persons

10  reflected in Government Exhibit 14?

11  A   I am.

12  Q   And who are they?

13  A   Confidential source and Mr. Garcia.

14  Q   And what -- it is currently frozen -- sorry.  The exhibit

15  is currently paused.  What are the defendant and the CS doing

16  at this point?

17  A   It's the Latin King handshake.

18  Q   All right.  I am going to unpause it, and I am going to ask

19  you to pay attention to the defendant's left hand.

20      (Government Exhibit 14 played.)

21          MR. VANDENBERG:  Pausing there.

22      (Government Exhibit 14 paused.)

23  BY MR. VANDENBERG:

24  Q   Were you able to identify what the defendant was doing with

25  his left hand during that clip?

1  A   Yeah, it appeared he pulled something out of his right-hand

2  pocket and passed it to his left hand, and passed it either to

3  the center of the car or to the CS.

4        MR. VANDENBERG:  Unpausing.

5     (Government Exhibit 14 played.)

6        MR. VANDENBERG:  Pausing that.

7     (Government Exhibit 14 paused.)

8  BY MR. VANDENBERG:

9  Q   During this clip, what is the defendant doing?

10  A   He's receiving money from the confidential informant.

11  Q   And how much was the cost of the methamphetamine for this

12  buy?

13  A   $1,800.

14  Q   Is that consistent with the CS counting to 18 during the

15  course of this clip?

16  A   Yes.

17        MR. VANDENBERG:  Unpausing.

18     (Government Exhibit 14 played.)

19     (Government Exhibit 14 paused.)

20  BY MR. VANDENBERG:

21  Q   What does defendant mean when he is saying, "I am trying to

22  get it together right"?

23  A   To get more structure of organization in the Joliet faction

24  of the Latin Kings.

25  Q   What does he me when he's saying, "Aaron keep running over

Karceski - direct by Vandenberg

1  here to me"?

2  A   At that time Aaron is -- Aaron Bowers, who was holding a

3  spot as the Inca in the Latin Joliet Kings.

4  Q   So what does he mean when "Aaron keeps running over here to

5  me"?

6  A   Apparently Aaron had questions about stuff when people were

7  disrespectful or not listening to Aaron, so he was running over

8  to Mr. Garcia for that.

9          MR. LEGUTKI:  Your Honor, I am going to object to this

10  line of questioning.  It's speculation within speculation, and

11  we don't know who Aaron is.  Aaron does not seem to be a party

12  to this particular litigation, and to suggest -- to suggest

13  what Aaron is thinking and attribute it to Mr. Garcia, I ask

14  that this whole line of questioning be stricken.

15         THE COURT:  Well, I will consider your objection in

16  light of the testimony that will come in in the case, and if

17  nothing further comes in on Aaron, then you're probably right.

18         MR. LEGUTKI:  Okay.

19         THE COURT:  Okay.

20  BY MR. VANDENBERG:

21  Q   When you state -- your interpretation of this excerpt, what

22  is that based on?

23  A   My investigation of this faction of the Joliet Latin Kings

24  lasted for approximately two years.

25  Q   What two years were those?

1    A    From 2014 through 2016.

2    Q    What did that investigation consist of, broadly speaking?

3    A    Numerous controlled buys, numerous recorded conversations,

4    recorded gang meetings, intelligence gathering.  A number of

5    confidential sources that were debriefed about the gang.

6    Q    When -- when the defendant says, "Every time Mike starts

7    acting up," what do you understand that to mean?

8    A    I know "Mike" to be Mike Cobe.  He was the enforcer of the

9    gang.  He was very wild.  Drank a lot and got into a lot of

10   fights.

11   Q    Okay.  Moving forward to 4 minutes 4 seconds in the

12   recording, specifically line 149 of the transcript.

13       (Government Exhibit 14 resumed playing.)

14       (Government Exhibit 14 paused.)

15   BY MR. VANDENBERG:

16   Q    What is your interpretation of what a "tre five" means?

17   A    A .357 handgun.

18   Q    And what is your understanding what a ".38" means?

19   A    A .38 caliber handgun.

20   Q    And when defendant responds to CS's questioning about a tre

21   five and a .38 by saying, "Let me holler at this guy," what do

22   you understand him to be saying?

23   A    He is going to be calling someone he knows that, obviously,

24   has access to firearms.

25              MR. VANDENBERG:  Unpause it, please.

1    (Government Exhibit 14 resumed playing.)

2        MR. VANDENBERG:  Pausing there.

3    (Government Exhibit 14 paused.)

4  BY MR. VANDENBERG:

5  Q   Given the context, what does the defendant mean when he

6  says his sister's boyfriend has good shit?

7  A   High quality firearms.

8  Q   Moving forward now to 5 minutes and 24 seconds, line 208 in

9  the transcript.

10   (Government Exhibit 14 played.)

11       MR. VANDENBERG:  Pausing there.

12   (Government Exhibit 14 paused.)

13 BY MR. VANDENBERG:

14 Q   When defendant said he had a .40 cal and had used it to put

15 bullet holes in a sign, what does a .40 caliber refer to?

16 A   .40 caliber handgun.

17       MR. VANDENBERG:  Unpause.

18   (Government Exhibit 14 played.)

19       MR. VANDENBERG:  Pausing there.

20   (Government Exhibit 14 paused.)

21 BY MR. VANDENBERG:

22 Q   When the defendant says, "I'm going to grab it," what is he

23 referring to?

24 A   He will just buy the firearm and then have it so he can

25 sell it.

1    MR. VANDENBERG:  Okay.  Unpausing.

2       (Government Exhibit 14 played in open court.)

3    MR. VANDENBERG:  Pausing there.

4       (Government Exhibit 14 paused.)

5  BY MR. VANDENBERG:

6  Q    Defendant complains about "everybody ready to party,

7  telling me to give them this"?

8  A    Mr. Garcia is giving members of the gang either drugs or

9  guns he is providing free of costs.

10 Q    And when defendant says that his response is to ask, "How

11 many times am I going to keep giving it to you?"  What is he

12 referring to?

13 A    He's talking about members of the gang.  You know, I can't

14 keep giving you stuff for free.  You have to get it or pay for

15 it.

16 Q    Moving forward now to seven minutes and 22 seconds back

17 into the recording.  Transcript line 295.

18      (Government Exhibit 14 played.)

19      (Government Exhibit 14 paused.)

20 BY MR. VANDENBERG:

21 Q    What does the defendant mean in that excerpt where he says,

22 "I'll probably hang on to it"?

23 A    If he picks up a gun, he'll hold on to it.  He will keep it

24 in his position.

25    MR. VANDENBERG:  Unpausing there.

1    (Government Exhibit 14 played.)

2        MR. VANDENBERG:  All right.  Stopping there.

3    (Government Exhibit 14 paused.)

4  BY MR. VANDENBERG:

5  Q   What does the defendant mean when he says he double-bagged

6  it?

7  A   He put an extra bag on it so he wouldn't get the residue on

8  his fingers.

9  Q   Double bag on what?

10 A   On the methamphetamine.

11 Q   And what does he mean when he said he pulled it out of

12 there with my hand because it was a chunk?

13 A   It sounds like he grabbed the methamphetamine with his hand

14 to bag it up.

15 Q   And what does the defendant mean when he tells the CS to

16 look at his eyeball and says, "That shit got me, too"?

17 A   He says he touched his eyeball -- or rubbed his eye with

18 his hands, which had the residue on his hands.

19 Q   Let the record reflect that I'm handing the witness what

20 has been previously marked for evidence as Government Exhibit

21 Evidence -- Government Exhibit 15 and Government Exhibit 15

22 Transcript.

23        Drawing your attention to Government Exhibit 15.  What

24 is this?

25 A   This is a phone call between the CI and Mr. Garcia on

1   December 15th at approximately 4:51 p.m.

2   Q   And how are you able to recognize it as that?

3   A   I reviewed it prior to trial, listened to it, and initialed

4   it.

5   Q   How did you initially obtain this recording?

6   A   With the phone call, we either recorded it on a manual

7   recorder or it was recorded on the app.  I don't remember at

8   this point.

9   Q   And did you review that recording when you first took

10  possession of that recording?

11  A   I did.

12  Q   And have you reviewed the recording on this disk?

13  A   I have.

14  Q   And is it a fair and accurate representation of the initial

15  recording and the phone call between the CS and the defendant

16  on December 15, 2014?

17  A   It is.

18  Q   December 2014 -- that's the 15th, 2014, that's the same

19  date as the transaction we just reviewed; is that correct?

20  A   It is.

21  Q   Were you able to recognize -- you said that this was a

22  phone call between the CS and Ralph Garcia.  How are you able

23  to identify those as the -- those people as the people speaking

24  on this call?

25  A   Through the phone numbers and also through the voices.

1    Q    Have you reviewed the Government Exhibit 15 Transcript

2    while listening to Government Exhibit 15?

3    A    I have.

4    Q    And are the statements attributed to the CS and Garcia in

5    that transcript fair and accurate?

6    A    They are.

7    Q    At this time the government moves to admit Government

8    Exhibit 15 and Government Exhibit 15 Transcript.

9              MR. LEGUTKI:  No objection.

10             THE COURT:  Okay.  We'll receive in evidence

11   Government Exhibits 15 and 15 Transcript, and you can play

12   those if you like.

13        (Government Exhibits 15 and 15 Transcript received in

14        evidence.)

15        (Government Exhibit 15 played.)

16             MR. VANDENBERG:  Let the record reflect that I am

17   playing the transcript starting at the 30-second mark.  I am

18   just going to play it from the beginning.

19        (Government Exhibit 15 played.)

20             MR. VANDENBERG:  Pausing there.

21        (Government Exhibit 15 paused.)

22   BY MR. VANDENBERG:

23   Q    What is your understanding as to what the defendant means

24   when he said he forgot about the "one over there by Mario's"?

25   A    He has a firearm over by Mario Antero's house.

1  Q   And what does defendant mean when he says, "I ain't trying

2  to get rid of it.  Just leave it over there in case I need it"?

3  A   Again, he is not trying to sell it.  He keeps it so he has

4  access to it, but he doesn't have it in his physical

5  possession.

6  Q   Let the record reflect that I'm approaching the witness

7  with what has been previously marked as Government Exhibit 16

8  and the Government Exhibit 16 Transcript.

9         Drawing your attention to Government Exhibit 16.  Do

10 you recognize this?

11 A   Yes.

12 Q   And what is it?

13 A   Text messages between the CS and Mr. Garcia.

14 Q   And what's the date of those text messages?

15 A   December 15, 2014.

16 Q   And how are you able to recognize it as such?

17 A   Again, the phone numbers -- the phone numbers of Mr. Garcia

18 and the confidential informant.

19 Q   And this is from the same date of the transaction, the

20 phone call we just discussed?

21 A   It is.

22 Q   How did you initially obtain these text messages?

23 A   I downloaded them from my computer.

24 Q   And how do you know these are between the CS and the

25 defendant?

1    A    The download includes a spreadsheet listing the phone

2    numbers.

3    Q    Did you originally read these text messages when you

4    downloaded them?

5    A    I did.

6    Q    And does the Government Exhibit 16 contain a fair and

7    accurate depiction of text messages between the CS and the

8    defendant on December 16, 2014?

9    A    They do.

10   Q    Have you reviewed the Government Exhibit 16 Transcript and

11   compared it to the text messages in Government Exhibit 16?

12   A    Yes.

13   Q    And does the transcript accurately identify the texts sent

14   by the CS and the defendant?

15   A    They do.

16          MR. VANDENBERG:  At this point the government moves to

17   admit Government Exhibit 16 and the Government Exhibit 16

18   Transcript.

19          MR. LEGUTKI:  No objection, sir.

20          THE COURT:  Okay.  Very well.  We'll receive in

21   evidence Government Exhibit 16 and 16 Transcript.

22      (Government Exhibits 16 and 16 Transcript received in

23      evidence.)

24          MR. VANDENBERG:  May I publish?

25          THE COURT:  Sure.

1   BY MR. VANDENBERG:

2   Q   Turning your attention to the Government Exhibit 16

3   Transcript.  Could you please read what the defendant sent at

4   9:46 p.m. on December 15, 2014?

5   A   "He has a couple of nice ones, but he wants top dollar and

6   someone with a card."

7   Q   What does defendant mean when he says, "He has a couple of

8   nice ones"?

9   A   Whoever he is talking about has a couple nice guns.

10  Q   And when he says that "He wants someone with a card," what

11  does a card refer to in that context?

12  A   Illinois Firearms Owner Identification card, a FOID card.

13  Q   And how does the CS respond?

14  A   "I can give him top dollar as long as they're decent, but I

15  don't have a card."

16  Q   And how does the defendant respond?

17  A   "They are almost brand new."

18  Q   What does the defendant say after that?

19  A   "What about that shorty?  Don't one of them have one?"

20  Q   When he said, "They're almost brand new," what's your

21  understanding of what he is referring to?

22  A   The guns are in good condition.

23  Q   And when he says that a "shorty has one of them," what is

24  he referring to?

25  A   He is asking if there's a younger member in the gang that

1  might have a FOID card.

2  Q   Okay.  And how does the CS respond?

3  A   "I can give the money, but I don't have the card.  I'll see

4  if I can find someone, but see if he'll do it if I pay a little

5  extra."

6  Q   And how did the defendant respond?

7  A   "I think one shorty has got one -- that card.  I'm not sure

8  which one, though."

9  Q   And, again, what is your understanding as to what that

10  means?

11  A   That one of the younger members of the gang has a Firearms

12  Owner Identification card.

13  Q   Let the record reflect that I am approaching the witness

14  with what has been previously marked as Government Exhibit 17

15  and Government Exhibit 17 Transcript.

16          Drawing your attention to Government Exhibit 17.  Do

17  you recognize this?

18  A   Yes.

19  Q   And what do you recognize it to be?

20  A   Again, it's text messages between the CI and Mr. Garcia.

21  Q   And how are you able to recognize it as such?

22  A   I downloaded it from my computer.

23  Q   And what's the date of these text messages?

24  A   December 17, 2014.

25  Q   So it's about two days after the transaction, the text

Karceski - direct by Vandenberg

1   messages we just discussed?

2   A   Yes, it is.

3   Q   How did you obtain -- did you read these text messages when

4   you first downloaded them?

5   A   I did.

6   Q   And how do you know they're between the CS and the

7   defendant?

8   A   From the telephone numbers and what the CI told me.

9   Q   Based on your initial reading of those texts and your

10  reading of this exhibit, does Government Exhibit 17 contain a

11  fair and accurate depiction of text messages between the CS and

12  the defendant on December 17, 2014?

13  A   It does.

14  Q   Have you reviewed Government Exhibit 17 Transcript and

15  compared them to the text messages in Government Exhibit 17?

16  A   Yes.

17  Q   Does the transcript accurately identify the texts sent

18  between the CS and the defendant on December 17, 2014?

19  A   They do.

20  Q   At this point the government moves to admit Government

21  Exhibit 17 and the Government Exhibit 17 Transcript.

22          MR. LEGUTKI:  No objection, sir.

23          THE COURT:  Okay.  We'll receive in evidence

24  Government Exhibits 17 and 17 Transcript, and you can publish

25  the transcript if you like.

1    (Government Exhibits 17 and 17 Transcript received in

2    evidence.)

3  BY MR. VANDENBERG:

4  Q   Drawing your attention to the text sent at 7:30 a.m --

5  drawing your attention to the first text in the transcript.

6  Could you read what that text says?

7  A   It says, "I went over there last night.  And now this guy

8  mom died, so he didn't want to talk."

9  Q   And are you -- based on your review of the text messages

10  you initially received in Government Exhibit 17, who was it

11  that sent that text?

12  A   When I did it, it was Garcia -- Mr. Garcia was the one who

13  sent that text.

14  Q   So is this inaccurately -- does this inaccurately reflect

15  that the CS sent that text?

16  A   Yes.

17  Q   Was that a text, in fact, sent by Garcia?

18  A   It was.

19  Q   Referring to the second and third text in this

20  transcript, who actually sent those texts?

21  A   The CS -- sorry.

22  Q   Let's go text by text.  The second text on this transcript,

23  who said that?

24  A   The CS.

25  Q   And what does that read?

1    A    It says, "That's crazy.  I will be off work early today.  I

2    will hit you up."

3    Q    Turning now to the third text.  Who sent that?

4    A    Mr. Garcia.

5    Q    So that is accurately represented?

6    A    Yes.

7    Q    And what does that text state?

8    A    "Yeah.  Now you see what kind of luck I got, but I'm

9    working on something else right now."

10   Q    And what's your understanding as to what the defendant

11   meant when he said, "I'm working on something else right now"?

12   A    He's trying to find another source for firearms.

13   Q    Let the record reflect that I'm approaching the witness

14   with what has been previously marked as Exhibit 18

15   and -- Government Exhibit 18 and the Government Exhibit 18

16   Transcript.

17           Drawing your attention to Government Exhibit 18.  Are

18   you able to identify this?

19   A    I am.

20   Q    And what do you recognize it to be?

21   A    It's a phone call between the CS and Mr. Garcia from

22   December 18th, 2014, at approximately 10:52 a.m.

23   Q    And how are you able to recognize it as such?

24   A    I reviewed it prior to trial and I initialed the disk.

25   Q    You said it's from December 18, 2014.  That's the day after

1    the last text messages we discussed; is that right?

2    A    Yes.

3    Q    Did you listen to this recording when you first obtained

4    it?

5    A    I did.

6    Q    And did you recognize the voices on the call?

7    A    I did.

8    Q    Who did you recognize them to be?

9    A    The confidential informant and Mr. Garcia.

10   Q    Does Government Exhibit 18 contain a fair and accurate

11   recording of the phone conversation between the CS and the

12   defendant on December 18, 2014?

13   A    It does.

14   Q    And does it match that recording that you initially

15   listened to when you obtained that recording?

16   A    Yes.

17   Q    Turning your attention to Government Exhibit 18 Transcript.

18   Did you review that transcript while listening to Government

19   Exhibit 18?

20   A    I did.

21   Q    And are the statements attributed to the CS and Garcia

22   accurate in that transcript?

23   A    They are.

24        MR. VANDENBERG:  At this point the government moves to

25   admit Government Exhibit 18 and the Government Exhibit 18

1    Transcript.

2          MR. LEGUTKI:  No objection.

3          THE COURT:  Very well.  We'll receive those exhibits

4    in evidence.  And if you would like to publish 18, that would

5    be fine.

6          (Government Exhibit 18 and Government Exhibit 18 Transcript

7          were received in evidence.)

8    Q    Let the record reflect that I am starting the government

9    Exhibit 18 at 18 seconds in, around line 28 of the transcript.

10         (Government Exhibit 18 played.)

11         MR. VANDENBERG:  Pausing there.

12         (Government Exhibit 18 paused.)

13   BY MR. VANDENBERG:

14   Q    What does defendant mean when he says he knows someone that

15   has a card?

16   A    He knows someone who has a FOID card.

17         MR. VANDENBERG:  Unpausing there.

18         (Government Exhibit 18 played.)

19         MR. VANDENBERG:  Pausing there.

20         (Government Exhibit 18 paused.)

21   BY MR. VANDENBERG:

22   Q    Are you familiar with the practice of straw purchasing

23   guns?

24   A    Yes.

25   Q    Generally speaking, how does that work?

A    Someone who can legally obtain a firearm will go and
purchase that firearm for someone who cannot legally purchase
it.  Commonly, a girlfriend for a subject -- for someone who is
a convicted felon that cannot obtain it, they will go in and
buy the gun and give it to the person who cannot purchase it.
Q    So what is your interpretation as to what the defendant
means when he suggests having someone with a card go get it and
play like she lost it?
A    Talking about having the girl go in and buy the gun and
they commonly report it as stolen after that, and give it to
the person that it was originally intended for.
          MR. VANDENBERG:  Unpause it.
     (Government Exhibit 18 audio played in open court.)
          MR. VANDENBERG:  Pausing there.
     (Government Exhibit 18 paused.)
BY MR. VANDENBERG:
Q    What does defendant mean when he says, "Later on we'll get
one." at the end of that excerpt?
A    He's saying, If you buy the nice one from the gun store --
the girl will buy it from the gun store.  The nice one you can
get for yourself.  Later on we can get a cheaper one, either to
sell or keep it for the gang.
          MR. VANDENBERG:  Unpausing.
     (Government Exhibit 18 played.)
          MR. VANDENBERG:  Pausing there.

1     (Government Exhibit 18 paused.)

2   BY MR. VANDENBERG:

3   Q   What does the defendant mean when he talks about what

4   they'll do if "they come"?

5   A   He's referring to the police.

6   Q   What is he talking about when he says, "We'll open up the

7   case and be, like, 'Oh, my God, it's gone"?

8   A   Having the person who purchased the gun act surprised when

9   the police come asking where the gun is.  They act surprised

10  like the gun was stolen.

11          MR. VANDENBERG:  Unpausing.

12      (Government Exhibit 18 played.)

13          MR. VANDENBERG:  Pausing there.

14      (Government Exhibit 18 paused.)

15  BY MR. VANDENBERG:

16  Q   What does the defendant mean when he says, "I am going to

17  pay this guy"?

18  A   He is talking about another gentleman who obviously has

19  some firearms for sale.

20  Q   What does he mean when, "His guy want, like, four?"

21  A   $400 for a gun.

22          MR. VANDENBERG:  Unpausing.

23      (Government Exhibit 18 played.)

24          MR. VANDENBERG:  Pausing there.

25      (Government Exhibit 18 paused.)

Karceski - direct by Vandenberg

1   BY MR. VANDENBERG:

2   Q   What does the defendant mean when he says, "They're brand

3   new."

4   A   "If we're going to spend top dollar, at least if we buy it

5   from the store, we know it's brand new.  The gun is brand new."

6   Q   What is the defendant referring to when he says, "I can get

7   two of them"?

8   A   He is talking about a gun he previously had that somebody

9   traded away from him, and he's saying he can buy two of those.

10  Q   Is that in reference to "the one old boy traded on me"?

11  A   Yes.

12  Q   Stopping there and moving forward to 4 minutes and 19

13  seconds, line 203 in the transcripts.

14      (Government Exhibit 18 audio played in open court.)

15          MR. VANDENBERG:  Pausing right there.

16      (Government Exhibit 18 paused.)

17  BY MR. VANDENBERG:

18  Q   When the defendant talks about "paying 400 bucks," what is

19  he referring to?

20  A   He's saying, If you are going to pay a high price like 400,

21  you might as well get the gun you want.

22          MR. VANDENBERG:  Unpausing.

23      (Government Exhibit 18 audio played in open court.)

24          MR. VANDENBERG:  Pausing there.

25      (Government Exhibit 18 paused.)

Karceski - direct by Vandenberg

1   BY MR. VANDENBERG:

2   Q   When defendant says he had a .40 cal, what is he referring

3   to?

4   A   Previously owned a .40 caliber firearm.

5       (Government Exhibit 18 played.)

6           MR. VANDENBERG:  Pausing there and stopping.

7       (Government exhibit 18 paused.)

8   BY MR. VANDENBERG:

9   Q   What is defendant referring to when he says, "You could

10  slide it into the side of your pants"?

11  A   The gun was compact.  It is small and you could hide it.

12  You could put it in your pants and hide it.

13  Q   All right.  Let the record reflect that I'm handing the

14  witness what has been previously marked Government Exhibit 19

15  and the Government Exhibit 19 Transcript.  Drawing your

16  attention to Government Exhibit 19.  Are you able to recognize

17  this?

18  A   I am.

19  Q   What is it?

20  A   Text messages between the confidential informant and

21  Mr. Garcia.

22  Q   And how are you able to recognize it as such?

23  A   I downloaded it.

24  Q   And what's the date of this transcript?

25  A   December 31st, 2014.

Karceski - direct by Vandenberg

1   Q   So these text messages, these are from about two weeks

2   after the last call we just played?

3   A   Yes.

4   Q   You said you downloaded the text messages initially.  Did

5   you read them at that time?

6   A   I did.

7   Q   And how do you know these are between the CS and the

8   defendant?

9   A   From the phone numbers and from what the confidential

10  informant told me.

11  Q   Does Government Exhibit 19 contain a fair and accurate

12  depiction of text messages between the defendant and CS on

13  December 31st, 2014?

14  A   They do.

15  Q   Drawing your attention to Government Exhibit 19 Transcript.

16  Did you review that and compare it to the text messages in

17  Government Exhibit 19?

18  A   I did.

19  Q   Does the transcript accurately identify the texts sent by

20  the CS and the defendant?

21  A   It does.

22       MR. VANDENBERG:  At this time, we move to admit

23  Government Exhibit 19 and the Government Exhibit 19 Transcript.

24       MR. LEGUTKI:  No foundation -- I'm sorry.  No

25  foundation.  Objection, your Honor.

Karceski - direct by Vandenberg

1    THE COURT:  Okay.  Very well.

2    Then we'll receive it in evidence without objection on

3  No. 19.  So you can go ahead and publish that if you like.

4    (Government Exhibits 19 and 19 Transcript received in

5    evidence.)

6  BY MR. VANDENBERG:

7  Q   Drawing your attention to the text message sent by -- at

8  8:51 a.m. by the CS on the Government Exhibit 19 Transcript.

9  What did the CS write at that time?

10  A   "Anything pop-up?"

11  Q   And based on the investigation to date, what did you

12  understand that to mean?

13  A   He's asking if any guns came up.

14  Q   And how did the defendant respond?

15  A   "I'm waiting on an answer from two different people.  One

16  is Aaron's guy.  The other one is in jail and his wife is

17  supposed to let me know something today."

18  Q   And what is the defendant referring to when he is saying he

19  is waiting on an answer from two different people?

20  A   He's got two different people out there that might be able

21  to get him firearms, and he's just waiting to hear.

22  Q   Let the record reflect that I'm approaching the witness

23  with what has been previously marked as Government Exhibit 20

24  and Government Exhibit 20 Transcript.

25    Drawing your attention to Government Exhibit 20.  Do

1  you recognize this?

2  A    I do.

3  Q    And what do you recognize it to be?

4  A    They are text messages between the CS and Mr. Garcia.

5  Q    And what is the date of those text messages?

6  A    January 12, 2015.

7  Q    And how are you able to recognize it as such?

8  A    Again, between the phone numbers and what the CS informed

9  me of.

10  Q    Okay.  And how did you first obtain these text messages?

11  A    I downloaded them.

12  Q    Okay.  And did you review them when you downloaded them?

13  A    I did.

14  Q    And Government Exhibit 20, does that match the text that

15  you downloaded?

16  A    It does.

17  Q    You mentioned that they were from January 12, 2015.  So

18  this is about 12 days after the last text messages we looked

19  at?

20  A    Yes.

21  Q    Does Government Exhibit 20 contain a fair and accurate

22  depiction of text messages between the CS and the defendant on

23  January 12, 2015?

24  A    It does.

25  Q    Did you review the Government Exhibit 20 transcript and

1  compare it to the text messages in Government Exhibit 20?

2  A   I did.

3  Q   And does that transcript accurately identify the text sent

4  by the CS and the defendant?

5  A   It does.

6       MR. VANDENBERG:  At this point the government moves to

7  admit Government Exhibit 20 and the Government Exhibit 20

8  Transcript into evidence.

9       MR. LEGUTKI:  No objection to foundation.

10       THE COURT:  Okay.  Very well.  So we'll receive into

11  evidence Government Exhibits 20 and 20 Transcript.  You can

12  publish those as if you like.

13  BY MR. VANDENBERG:

14  Q   Drawing your attention to the first text message at

15  10:02 a.m. from the CS.  What does that read?

16  A   "You want to get rid of that old dirty Harry that you were

17  telling me about?"

18  Q   And what's your understanding of what the "old dirty Harry"

19  is in reference to?

20  A   A large gun that Mr. Garcia had.

21  Q   And how does the defendant respond to that question?

22  A   "No.  I am going to hang on to it until I get something

23  else."

24  Q   And what did you understand that to mean that the defendant

25  was saying he was going to hang on to it?

1  A    He was going to keep the gun for himself.  He didn't really

2  want to sell it.

3  Q    Let the record reflect that I'm approaching the witness

4  with what has been previously marked as Government Exhibits 21

5  and 21 Transcript.

6          Drawing your attention to Government Exhibit 21.  Do

7  you recognize this?

8  A    Yes.

9  Q    What is it?

10  A    It's a text message from January 21st, 2015.

11  Q    And who is it from?

12  A    It's from Mr. Garcia to the confidential informant.

13  Q    How are you able to recognize it as such?

14  A    I downloaded it, and then also from phone numbers that were

15  involved.

16  Q    And when you downloaded it, did you review that text

17  message?

18  A    I did.

19  Q    And did you compare that text message to the text message

20  in Government Exhibit 21?

21  A    I did.

22  Q    And does Government Exhibit 21 contain a fair and accurate

23  depiction of the text message from the defendant to the CS on

24  January 21st, 2015?

25  A    It does.

1    MR. VANDENBERG:  At this point the government would

2  move to admit Government Exhibit 21 and its transcript.

3    THE COURT:  Is 21 okay there, Mr. Legutki?

4    MR. LEGUTKI:  That is one text message?

5    THE COURT:  It is.

6    MR. LEGUTKI:  No.  No foundation objection.

7    THE COURT:  Okay.  Very well.  So we'll receive in

8  evidence Government Exhibit 21 and 21 Transcript, and you may

9  publish those five words if you would like.

10    MR. VANDENBERG:  All right.

11  BY MR. VANDENBERG:

12  Q   Could you please read the text message sent on January

13  21st, 2015, at 12:39 p.m. by the defendant?

14  A   It says, "I found one, maybe two."

15  Q   What is the defendant referring to in that text?

16  A   That he found a firearm, maybe a couple firearms.

17  Q   At this point, let the record reflect that I'm approaching

18  the witness and handing him what has previously been marked for

19  identification as Government Exhibit 22 and the Government

20  Exhibit 22 Transcript.

21    Turning your attention to Government Exhibit 22.  What

22  is this?

23  A   Twenty-two is a recording of a phone call on January 23rd,

24  2015, between the CI and Mr. Garcia at approximately 12:28 p.m.

25  Q   And how are you able to recognize it as such?

Karceski - direct by Vandenberg

1   A    I reviewed it prior to trial and I put my initials on it.

2   Q    So this is -- you said January 23rd, 2015.  So this is two

3   days after the text, "I found one, maybe two"?

4   A    Yes.

5   Q    And how did you obtain this recording?

6   A    I believe I either recorded it on the recorder or I

7   downloaded it.

8   Q    Did you listen to the recording at that time?

9   A    I did.

10  Q    Did you recognize the voices on the recorded call?

11  A    I did.

12  Q    And who did you recognize them to be?

13  A    Mr. Garcia and the confidential source.

14  Q    You said that you reviewed -- listened to Government

15  Exhibit 22 and you listened to the phone recording at the time

16  that you obtained it.  Does Government Exhibit 22 contain a

17  fair and accurate recording of the phone conversation between

18  the CS and the defendant on January 23rd, 2015?

19  A    It does.

20  Q    Drawing your attention to Government Exhibit 22 Transcript.

21  Have you reviewed that transcript while listening to Government

22  Exhibit 22?

23  A    I have.

24  Q    And the same is attributed to the CS and Mr. Garcia, and is

25  the transcript accurate?

1    A    It is.

2              MR. VANDENBERG:  At this time, your Honor, I move to

3    admit into evidence government Exhibit 22 and Government

4    Exhibit 22 Transcript.

5              MR. LEGUTKI:  No objection.  Foundation.

6              THE COURT:  Very well.  We'll receive in evidence

7    Government Exhibit 22 and 22 Transcript.  You can play that if

8    you would like.

9         (Government Exhibits 22 and 22 Transcript received in

10            evidence.)

11             MR. VANDENBERG:  Let the record reflect I'm starting

12   the recording approximately 17 seconds in at line 28.

13        (Government Exhibit 22 played in open court)

14             MR. VANDENBERG:  Pausing there.  Apologize for the

15   volume.

16        (Government Exhibit 22 paused.)

17   BY MR. VANDENBERG:

18   Q    What's your understanding as to what the CS means by "just

19   probably one"?

20   A    1 ounce of crystal methamphetamine.

21   Q    And when the CS says, "If you got that, what we talked

22   about yesterday," what do you understand that to be in

23   reference to?

24   A    Talking about a gun.

25   Q    And when defendant says that he has to wait until "ole boy

1   get off work," what's your understanding as to what means?

2   A   When his source of crystal methamphetamine gets off work so

3   he can obtain the meth to sell to the informant.

4           MR. VANDENBERG:  Unpausing.

5       (Government Exhibit 22 played in open court.)

6           MR. VANDENBERG:  All right.  Stopping there.

7       (Government Exhibit 22 paused.)

8   BY MR. VANDENBERG:

9   Q   During the course of this conversation, the CS and the

10  defendant talk about just one, and then the thing two.  What do

11  you understand these two things to be referring to?

12  A   An ounce of crystal methamphetamine and then the gun.

13  Q   And when the defendant says, "All right.  I am going to try

14  and do it right now," what do you understand that to mean?

15  A   That he was going to go and put everything together, the

16  methamphetamine and the gun.

17  Q   All right.  Let the record reflect that I'm approaching the

18  witness with the Government Exhibit 23 and the Government

19  Exhibit 23 Transcript.

20          Drawing your attention to Government Exhibit 23, what

21  do you recognize this to be?

22  A   It's just containing a phone call between the CI and

23  Mr. Garcia that occurred on January 23rd, 2015, at

24  approximately 2:40 p.m.

25  Q   How are you able to recognize as such?

1    A    I reviewed it prior to trial.

2    Q    January 23rd, 2015, is that the same day as the call we

3    just listened to?

4    A    It is.

5    Q    How did you get this recording during the course of the

6    investigation?

7    A    I either manually recorded it on the recorder or it was

8    downloaded.

9    Q    And did you listen to the recording at that time?

10    A    I did.

11    Q    And does the recording on Government Exhibit 23, does that

12    match the recording that you listened to at that time?

13    A    It does.

14    Q    Do you listen to -- did you recognize the voices on the

15    recorded call?

16    A    I did.

17    Q    And whose voices were they?

18    A    It was Mr. Garcia and the confidential informant.

19    Q    Does government Exhibit 23 contain a fair and accurate

20    recording of the phone conversation between the CS and the

21    defendant on January 23rd, 2015?

22    A    It does.

23    Q    Have you reviewed the Government Exhibit 23 Transcript

24    while listening to Government Exhibit 23?

25    A    I did.

1   Q   Are the statements attributed to the CS and Mr. Garcia

2   accurate?

3   A   Yes.

4           MR. VANDENBERG:  At this point, your Honor, I move to

5   admit Government Exhibit 23 and the Government Exhibit 23

6   Transcript.

7           MR. LEGUTKI:  No objection for foundation purposes.

8           THE COURT:  Okay.  Very well.  So we can admit

9   Exhibits 23 and 23 Transcript, and you can publish it if you

10  like.

11          MR. VANDENBERG:  Let the report reflect that I am

12  starting at the beginning of this recorded call.

13      (Government Exhibit 23 played.)

14          MR. VANDENBERG:  Pausing there.

15      (Government Exhibit 23 paused.)

16  BY MR. VANDENBERG:

17  Q   What does the defendant mean when he says that he is

18  getting it together?

19  A   Getting the gun and the ounce of crystal methamphetamine.

20          MR. VANDENBERG:  Unpausing.

21      (Government Exhibit 23 audio played in open court.)

22          MR. VANDENBERG:  Pausing there.

23      (Government Exhibit 23 paused.)

24  BY MR. VANDENBERG:

25

1  Q   What does the defendant mean when he confirms that he

2  wanted "four for that thing"?

3  A   He wants $400 for the firearm.

4        MR. VANDENBERG:  Unpausing.

5      (Government Exhibit 23 audio played in open court.)

6        MR. VANDENBERG:  Pausing there.

7      (Government Exhibit 23 paused.)

8  BY MR. VANDENBERG:

9  Q   What is the defendant agreeing to when he agrees to two of

10  the other things?

11  A   The CS is asking him now instead of one ounce, he would

12  like 2 ounces of crystal methamphetamine.

13  Q   And how does the defendant respond to that request?

14  A   He says, "All right.  Two of those other things."  And then

15  he says, "Give me an hour."

16  Q   You said that this call was on January 23rd, 2015.  Did you

17  meet with the defendant on that date -- sorry -- did you meet

18  with the CS on that date?

19  A   I did.

20  Q   And what did you do at that meeting?

21  A   Again, at that meeting the CS and his vehicle were

22  searched.  Recording devices were placed either in the vehicle

23  or on his person.  He was then provided $2,200 in buy money.

24  Subsequent to that meeting he was followed over to the 700

25  block of Vista.

1  Q   You mentioned he was searched and his vehicle.  What was

2  the result of that search?

3  A   Nothing.

4  Q   And you said that you provided him -- he was provided with

5  $2,200.  Why $2,200?

6  A   It was $1,800 for the 2 ounces of crystal methamphetamine

7  and then $400 for the gun.

8  Q   Let the record reflect that I'm approaching the defendant

9  with what has been previously marked as Government Exhibit 24

10  and the Government Exhibit 24 Transcript.

11          Do you recognize Government Exhibit 24?

12  A   I do.

13  Q   What do you recognize it to be?

14  A   They're pictures of the CI's telephone -- text messages

15  between the CI and Mr. Garcia.

16  Q   On what date?

17  A   They occurred on January 23rd.

18  Q   Is that the same date we've been talking about?

19  A   It is.

20  Q   And how are you able to recognize these text messages?

21  A   I took the pictures.

22  Q   And did you review the text messages when you took the

23  pictures?

24  A   I did.

25  Q   And are these that are set forth in Government Exhibit 24,

Karceski - direct by Vandenberg

1    the same as the ones you reviewed?

2    A    Yes.

3    Q    How do you know that these are between the CS and the

4    defendant?

5    A    Telephone numbers.

6    Q    And does Government Exhibit 24 contain a fair and accurate

7    depiction of text messages between the CS and the defendant on

8    January 23rd, 2015?

9    A    It does.

10   Q    Have you reviewed Government Exhibit 24 Transcript and

11   compared it to Government Exhibit 24?

12   A    I have.

13   Q    Has the transcript accurately identified the texts sent by

14   the CS and the defendant?

15   A    It does.

16        MR. VANDENBERG:  At this time the government moves to

17   admit Government Exhibit 24 and the Government Exhibit 24

18   Transcript.

19        MR. LEGUTKI:  No objection.

20        THE COURT:  All right.  Very well.  We'll receive

21   Government Exhibit 24 and the Government Exhibit 24 Transcript

22   and you can publish it if you like.

23        (Government Exhibit 24 and Government Exhibit 24 Transcript

24        received in evidence.)

25

1  BY MR. VANDENBERG:

2  Q    In regard to the Government Exhibit 24 Transcript, could

3  you please read what the CS texted to the defendant 3:29 p.m.?

4  A.   "How long?"

5  Q    Okay.  And how did the defendant respond?

6  A    "Five minutes."

7  Q    And then what did the CS text?

8  A    I believe that one was from Garcia.  It says, "I'm on my

9  way back to the house."

10 Q    Okay.  Going back to the last text message in this chain.

11 What does that last text message state?

12 A    "Be there in two minutes," -- or "two min."

13 Q    You said that you met with the CS on January 23rd, 2015.

14 What did you do after that meeting?

15 A    I followed the CS to the 700 block of Vista.  You know, as

16 he was turning on the block, I contacted the agent who had set

17 up surveillance.  And then I moved to the other side of the

18 school and set up in the parking lot and listened in on the

19 meeting as it happened.

20 Q    And then did you hear the CS meet with anyone?

21 A    I did.

22 Q    Who did you hear him meet with?

23 A    Mr. Garcia.

24 Q    And what did you do after that meeting?

25 A    Once the meeting was over and I was told over the radio

1  that the CS was pulling away, I positioned myself at the end of

2  the block and followed the CS back to the meeting location.

3  Q   And when you arrived back at the meeting location, what did

4  you do?

5  A   Shut off the recording devices.  Searched the CS, the CS's

6  vehicles.  Nothing was located.  And then I took possession of

7  the evidence.

8  Q   And when you say you took possession of the evidence, what

9  did you take possession of?

10 A   A bag of crystal methamphetamine -- what was purported to

11 be crystal meth at that time -- and then a, there was a --

12 like, there a plastic Jewel bag -- I don't know if it was from

13 Jewel -- but a plastic grocery bag that contained a gun and a

14 gun box and some gun accessories.

15 Q   And who did you -- how did you obtain these?

16 A   Either the CI -- they might have been right on the front

17 seat.  I don't recall.  I think there was different --

18        MR. VANDENBERG:  All right.  Permission to approach

19 the witness with what has been previously marked as Government

20 Exhibit 25.

21        THE COURT:  Okay.

22 Q   Handing you what has been marked as Government Exhibit 25.

23 Do you recognize this?

24 A   I do.

25 Q   And what is this?

Karceski - direct by Vandenberg

1  A    It was the two ounces of crystal methamphetamine that had

2  been purchased on January 23rd, 2015, from Mr. Garcia.

3  Q    How are you able to recognize this exhibit?

4  A    The markings on the bag.  I placed the evidence tag, signed

5  it, dated it, sealed it.

6          MR. VANDENBERG:  At this time the government would

7  move to admit Government Exhibit 25 into evidence.

8          MR. LEGUTKI:  No objection.

9          THE COURT:  Okay.  Without objection, receive into

10  evidence Government Exhibit 25.

11      (Government Exhibit 25 was received in evidence.)

12          MR. VANDENBERG:  Let the record reflect that I am

13  approaching the defendant with what has been previously marked

14  as Government Exhibits 26 and 27.

15  BY MR. VANDENBERG:

16  Q    All right.  Turning your attention to Government Exhibit

17  26.  Are you able to identify that?

18  A    Yeah.  It's a box that contains the firearm that was

19  purchased from Mr. Garcia on January 23rd, 2015.

20  Q    How are you able to recognize it?

21  A    I'm the one that placed the label on the box, signed it,

22  initialed it, and then sealed it.

23          MR. VANDENBERG:  At this point the government moves to

24  admit Government Exhibit 26 into evidence.

25          MR. LEGUTKI:  No objection.

1    THE COURT:  Okay.  Without objection, we'll receive in

2  evidence Government Exhibit 26.

3    (Government Exhibit 26 was received in evidence.)

4  BY MR. VANDENBERG:

5  Q   And are you able to identify -- if I could have a moment,

6  your Honor?

7    THE COURT:  Sure.

8    MR. VANDENBERG:  May I proceed, your Honor?

9    THE COURT:  Sure.

10  BY MR. VANDENBERG:

11  Q   Drawing your attention back to Government Exhibit 26.  Are

12  you able to identify the make and model of the firearm?

13  A   I am.

14  Q   And what is it?

15  A   It's a Taurus .38 caliber revolver.  The model is a .38

16  Special.

17  Q   And what is the serial number.

18  A   The serial number D, David, W, William, 62612.

19  Q   Drawing your attention to Government Exhibit 27.  Are you

20  able to identify that?

21  A   Yes.

22  Q   And what is that?

23  A   It's an evidence bag that contained the other items that

24  were contained in that plastic grocery bag.

25  Q   Okay.  And how are you able to identify it?

1   A   Again, I placed a label on.  I named it -- numbered it,

2   initialed it, dated it, and sealed it.

3           MR. VANDENBERG:  At this point, the government would

4   move to enter Government Exhibit 27 into evidence.

5           THE COURT:  Okay.

6           MR. LEGUTKI:  It is sub-parts.  No objection.

7           THE COURT:  Very well.  We'll receive in evidence

8   Government Exhibit 27, then, which is a multi-part exhibit.

9           MR. VANDENBERG:  Yes, your Honor.

10          (Government Exhibit 27 was received in evidence.)

11  BY MR. VANDENBERG:

12  Q   Drawing your attention to Government Exhibit 27.  What are

13  all of the parts of this -- what are all of the things that you

14  received from the CS on January 23rd, 2015, in addition to the

15  suspected methamphetamine we discussed and the firearm itself?

16  A   There's a leather holster that's still in the actual

17  manufacturer's packaging.  There's a black gun box that has

18  Taurus .38 Special written on it.  The original bag that the

19  items came in, and then there's some small canvas bag and some

20  earplugs.  And that's about it.  Some paperwork.  That's it.

21  Q   Sorry.  Is there anything else you received from the CS?

22  A   Yes.  There is a speed loader inside the leather holster.

23  Q   Okay.  And what is a speed loader?

24  A   A speed loader is an item -- since a revolver has to be

25  loaded one bullet at a time, a speed loader you can load with

1  the six rounds and then slide it over the chambers and it will

2  load six rounds at one time, so they call it a speed loader.

3       MR. VANDENBERG:  Permission to retrieve Government

4  Exhibit 27 because of the awkwardness of it.

5       THE COURT:  Sure.

6  BY MR. VANDENBERG:

7  Q   Let the record reflect that I'm approaching the witness

8  with what has previously been marked as Government Exhibit 28

9  and the Government Exhibit 28 Transcript.

10      Are you able to recognize Government Exhibit 28?

11 A   I am.

12 Q   And what do you recognize it to be?

13 A   It's a recording -- a video recording of the

14 meet, -- January 23rd, 2015, between the CS and Mr. Garcia.

15 Q   And how are you able to recognize it as such?

16 A   I reviewed it prior to trial and I initialed it after I

17 reviewed it.

18 Q   And how did you first obtain this recording?

19 A   I downloaded it from the recording devices that were

20 located in the confidential source's vehicle.

21 Q   And did you watch it at that time?

22 A   I did.

23 Q   And did you watch the recording in Government Exhibit 28?

24 A   I did.

25 Q   And does it match what you first downloaded?

1    A    It does.

2    Q    Who are the two individuals involved in the meeting in that

3    recording?

4    A    Confidential source and Mr. Garcia.

5    Q    Does Government Exhibit 28 contain a fair and accurate

6    recording of the meeting between the CS and the defendant on

7    January 23rd, 2015?

8    A    It does.

9    Q    Have you reviewed Government Exhibit 28 Transcript while

10   watching the Government Exhibit 2018?

11   A    I did.

12   Q    And are the statements attributed to the CS and Garcia in

13   that transcript accurate?

14   A    They are.

15        MR. VANDENBERG:  At this time, the government moves to

16   admit Government Exhibit 28 and the Government Exhibit 28

17   Transcript.

18        MR. LEGUTKI:  No objection to foundation.

19        THE COURT:  Okay.  Very well.  We'll receive

20   Government Exhibits 28 and 28 Transcript, and you can go ahead

21   and play that.

22        (Government Exhibits 28 and 28 Transcript received in

23        evidence.)

24        MR. VANDENBERG:  Let the record reflect that I'm

25   starting the recording at the beginning.

1       (Government Exhibit 28 played.)

2              MR. VANDENBERG:  Pausing there.

3       (Government Exhibit 28 paused.)

4    BY MR. VANDENBERG:

5    Q   At the start of the video, can you identify the one person

6    present in the car?

7    A   The confidential source.

8    Q   And what is he doing at the start of the video?

9    A   He is parked in front of 702 Vista, Mr. Garcia's residence.

10   Q   And what is he doing while he is inside the car?

11   A   Sitting.  Nothing.  Sitting there.

12   Q   What is the defendant doing at the start of the

13   vehicle -- at the start of the video?

14   A   You can't see him.  He is standing outside the driver's

15   side window.

16   Q   What are you able to see while he is out of the screen?

17   A   An item comes in the window, some sort of a plastic bag.

18   Q   And does that plastic bag match the general appearance of

19   the plastic bag that the CS gave you containing the firearm and

20   the firearm accessories that we discussed?

21   A   Yes.  From what I can see, it is definitely a plastic

22   grocery bag.

23   Q   When the defendant says, "Look at it before you get rid of

24   it," what is he referring to?

25   A   To look at the gun before you sell it.

Karceski - direct by Vandenberg

1    Q    And at some point does defendant enter the car?

2    A    He does.

3    Q    And defendant says, "I didn't know that one was that nice."

4    What is he referring to?

5    A    The firearm.  He didn't know that the gun was that high of

6    a quality, I guess.

7    Q    When the defendant said it's a "bad boy," what is he

8    referring to?

9    A    It's nice one.  It's high quality.

10   Q    What is a nice quality?

11   A    The firearm.

12            MR. VANDENBERG:  Unpausing.

13        (Government Exhibit 28 video played in open court.)

14            MR. VANDENBERG:  Pausing there.

15   BY MR. VANDENBERG:

16   Q    What does the defendant mean by, "We'll switch it with the

17   other one"?

18   A    Another firearm -- another nation firearm that's out there.

19            MR. VANDENBERG:  Unpausing.

20        (Government Exhibit 28 played.)

21        (Government Exhibit 28 paused.)

22   BY MR. VANDENBERG:

23   Q    When he says he wants the speed loader and case, what is he

24   referring to?

25   A    The gun box and the speed loader that was in there.

1          MR. VANDENBERG:  Unpausing.

2       (Government Exhibit 28 played.)

3          MR. VANDENBERG:  Pausing there.

4       (Government Exhibit 28 paused.)

5    BY MR. VANDENBERG:

6    Q    When defendant confirms that he has those -- "those two,"

7    what are they referring to?

8    A    The 2 ounces of crystal methamphetamine.

9          MR. VANDENBERG:  Unpausing.

10      (Government Exhibit 28 played.)

11         MR. VANDENBERG:  Pausing there.

12      (Government Exhibit 28 paused.)

13   BY MR. VANDENBERG:

14   Q    What is the defendant doing during the course of this clip?

15   A    He is receiving money from the confidential source.

16         MR. VANDENBERG:  Unpausing.

17      (Government Exhibit 28 played.)

18         MR. VANDENBERG:  Pausing there.

19      (Government Exhibit 28 paused.)

20   BY MR. VANDENBERG:

21   Q    What does the defendant mean that he is trying to get ahold

22   of him?

23   A    Apparently he knows someone that has 10 guns.

24   Q    And when he says -- the defendant says, "That's what I'm

25   going to use this for."  What does that mean?

1    A    He's talking about the money he just made on this deal. he

2    is going to turn around and buy more guns with that money.

3    Q    All right.  Moving forward to 3 minutes 15 seconds in this

4    recording.  Line Transcript No. 129.

5         (Government Exhibit 28 played.)

6             MR. VANDENBERG:  Pausing there.

7         (Government Exhibit 28 paused.)

8    BY MR. VANDENBERG:

9    Q    When the defendant says he is trying to get rid of this

10   weed, what is he talking about?

11   A    He is selling cannabis.

12            MR. VANDENBERG:  Unpausing.

13        (Government Exhibit 28 played.)

14            MR. VANDENBERG:  Pausing there.

15        (Government Exhibit 28 paused.)

16   BY MR. VANDENBERG:

17   Q    Can you describe what the defendant does during the course

18   of this clip?

19   A    With his right hand he reaches into his shirt pocket and

20   removes an item and hands it over to the confidential

21   informant.

22   Q    And when the defendant and Garcia -- I'm sorry -- when the

23   defendant and the CS are talking about "those two," what do you

24   understand that to be in reference to?

25   A    The 2 ounces of crystal methamphetamine.

1    (Government Exhibit 28 played.)

2    (Government Exhibit 28 paused.)

3  BY MR. VANDENBERG:

4  Q    We covered this before, but what does it mean when the

5  defendant said he put two bags on there?

6  A    He put two bags so if any residue of the crystal

7  methamphetamine on the first bag, it won't absorb into the CS's

8  skin, which he is holding on to.

9        MR. VANDENBERG:  Unpausing.

10    (Government Exhibit 28 played.)

11        MR. VANDENBERG:  Pausing there.

12    (Government Exhibit 28 paused.)

13  BY MR. VANDENBERG:

14  Q    What does K-love mean?

15  A    It's just a greeting between Latin King gang members.

16  Q    Can you describe the handshake defendant and CS do in this

17  clip?

18  A    That's the Latin King handshake.

19  Q    The defendant offers to split it if the CS wants to hang on

20  to it.  What's he talking about?

21  A    He is saying if he's not to going to sell the gun because

22  it is so nice, he'll pay half of it and they will just keep it.

23  Q    All right.  Moving the final deal now.  Let the record show

24  that I'm handing to the witness what has been previously marked

25  as Government Exhibit 29 and Government Exhibit 29 Transcript.

1    MR. VANDENBERG:  Your Honor, you had mentioned 4:15 as

2  a stopping point.  We're about to go into a new deal.  Would

3  you like to stop there.

4    THE COURT:  Well, I thought -- the marshals told me

5  4:30 would be okay.  They're just going to rev up the engine.

6  So I think we can probably get this done in 15 minutes and then

7  we'll break there and Mr. Legutki can have the night to think

8  about his cross.

9    MR. VANDENBERG:  Yes, your Honor.

10    THE COURT:  Okay?

11  BY MR. VANDENBERG:

12  Q   Let the record reflect that I'm approaching the witness

13  with what has been previously marked as Government Exhibit 29

14  and the Government Exhibit 29 Transcript.

15    Are you able to identify Government Exhibit 29?

16  A   I am.

17  Q   And what is it?

18  A   It's a phone call between the confidential source and

19  Mr. Garcia that occurred on March 4th, 2015.

20  Q   And how are you able to recognize it as such?

21  A   I reviewed it prior to trial and I put my initials on it.

22  Q   And how did you first obtain this recording?

23  A   I downloaded it.

24  Q   Did you listen to it at the time of the downloading?

25  A   I did.

Karceski - direct by Vandenberg

1    Q    And Government Exhibit 29, does that match the recording

2    that you listened to at that time?

3    A    It does.

4    Q    Do you recognize the voices on the call, on the recorded

5    call?

6    A    I did.

7    Q    And whose voices were they?

8    A    The confidential source and Mr. Garcia.

9    Q    Does Government Exhibit 29 contain a fair and accurate

10   recording of a phone conversation between the CS and defendant

11   on March 4, 2015?

12   A    It does.

13   Q    Have you reviewed Government Exhibit 29 Transcript while

14   listening to Government Exhibit 29?

15   A    I did.

16   Q    And are the statements attributed to the CS and the

17   defendant in the transcript accurate?

18   A    They are.

19        MR. VANDENBERG:  At this point move to admit -- the

20   government moves to admit Government Exhibit 29 and Government

21   Exhibit 29 Transcript.

22        MR. LEGUTKI:  No objection to foundation, sir.

23        COURT SECURITY OFFICER:  Okay.  Very well.  We'll

24   receive into evidence Government Exhibit 29 and the Transcript.

25   You can publish if you would like.

1    (Government Exhibits 29 and 29 Transcript received in

2    evidence.)

3        MR. VANDENBERG:  Yes, your Honor.  Let the record

4    reflect that I am starting the recording 14 seconds in.

5    (Government Exhibit 29 played.)

6        MR. VANDENBERG:  Stopping there.

7    (Government Exhibit 29 paused.)

8    BY MR. VANDENBERG:

9    Q    Based on your review of Government Exhibit 29, that

10   excerpt, what's your understanding as to what the defendant was

11   agreeing to do?

12   A    The confidential source had asked for another ounce of

13   methamphetamine and Mr. Garcia said he just had to wait until

14   his source got home at approximately 3:15 to get it.

15   Q    You said that this call happened on March 4th, 2015.  Did

16   you meet with the CS on that date?

17   A    I did.

18   Q    And what did you do during the course of that meeting?

19   A    Again, after meeting with him I would search the CI's

20   vehicle and the CI's person.  Did not locate anything.  I would

21   then place the recording devices inside the vehicle or on the

22   CI.  I then provided him $900 of buy money, and subsequently

23   followed him to the 700 block of Vista.

24   Q    And what did you do once you arrived in the vicinity of 702

25   Vista?

1  A   Again, I handed off the surveillance to an agent that was

2  parked on the block.  I parked on the other side of the school

3  and I listened in as the meeting took place.

4  Q   And did you hear the CS meet with anyone?

5  A   I did.

6  Q   And who did you hear him meet with?

7  A   Mr. Garcia.

8  Q   What did you do when the meeting ended?

9  A   Again, once it was called out, I would place myself at the

10  end of the block and then follow the confidential source back

11  to the original meet location.

12  Q   And what did you do when you arrived at the original meet

13  location?

14  A   Again, the CI's vehicle and his person were searched.

15  Recording devices were turned off and then I took possession of

16  the purported methamphetamine.

17  Q   Aside from the purported methamphetamine, did you find

18  anything in the search of the CS's vehicle?

19  A   I did not.

20  Q   Let the record reflect that I am approaching the witness

21  with what has been previously marked as Government Exhibit 32.

22        THE COURT:  32?

23        MR. VANDENBERG:  Yes, your Honor.

24        THE COURT:  Okay.  Gotcha.

25

1  BY MR. VANDENBERG:

2  Q    Do you recognize this?

3  A    I do.

4  Q    What do you recognize it to be?

5  A    It's an ounce -- I'm sorry.  It was approximately an ounce

6  of methamphetamine that was purchased from Mr. Garcia on

7  March 4, 2015.

8  Q    And how do you recognize it as that?

9  A    I recognize my signature, the label I placed on it, and the

10  date and the seal.

11      MR. VANDENBERG:  At this point the government would

12  move to admit Government Exhibit 32 in evidence.

13      MR. LEGUTKI:  I'm sorry. I didn't hear the date that

14  you mentioned, officer.

15      THE WITNESS:  The date?

16      MR. LEGUTKI:  Yes, sir.  Please.

17      THE WITNESS:  March 4, 2015.

18      MR. LEGUTKI:  No objection.

19      THE COURT:  Okay.  Very well.  Received in evidence

20  Government Exhibit 32.

21      (Government Exhibit 32 was received in evidence.)

22  BY MR. VANDENBERG:

23  Q    Let the record reflect that I'm approaching the witness

24  with what has been previously marked as Government Exhibit 33

25  and Government Exhibit 33 Transcript.

1          Are you able to identify Government Exhibit 33?

2    A    I am.

3    Q    What do you recognize it to be?

4    A    It's a recording of the meet between the confidential

5    source and Mr. Garcia that occurred on March 4th, 2015, at

6    approximately 3:37 p.m.

7    Q    How are you able to recognize it as such?

8    A    I reviewed it prior to trial and I initialed it.

9    Q    How did you first obtain the recording of this meeting?

10   A    I downloaded it from the recording devices.

11   Q    Did you watch it at that time?

12   A    I did.

13   Q    Have you watched Government Exhibit 33?

14   A    Yes.

15   Q    And does that Government Exhibit 33 match the original

16   recording you downloaded?

17   A    Yes.

18   Q    And were you able to recognize the individuals in the

19   recording?

20   A    I was.

21   Q    And who were they?

22   A    Mr. Garcia and the confidential source.

23   Q    Does Government Exhibit 33 contain a fair and accurate

24   recording of the meeting between the CS and the defendant on

25   March 14, 2015?

1   A   It does.

2   Q   Have you reviewed Government Exhibit 33 Transcript while

3   watching Government Exhibit 33?

4   A   I have.

5   Q   And are the statements attributed to the CS and Garcia in

6   this transcript fair and accurate?

7   A   It is.

8        MR. VANDENBERG:  At this point the government would

9   move to admit Government Exhibit 33 and the Government Exhibit

10  33 Transcript.

11       MR. LEGUTKI:  No foundation objection.

12       THE COURT:  Okay.  Very well.  So we'll receive in

13  evidence Government Exhibits 33 and 33 Transcript.  You can

14  publish it if you like.

15       (Government Exhibits 33 and Exhibit 33 Transcript received

16       in evidence.)

17  BY MR. VANDENBERG:

18  Q   Let the record reflect that I'm playing the Government

19  Exhibit 33 starting at about 35 seconds in, line 39 of the

20  transcripts.

21       (Government Exhibit 33 played.)

22       MR. VANDENBERG:  Pausing there.

23       (Government Exhibit 33 paused.)

24  BY MR. VANDENBERG:

25  Q   What does the CS mean when he asks if "nine still, right"?

1   A   He is asking if the price is still $900.

2   Q   Okay.  And what is your understanding as to what the CS

3   means when he says, "Put it in that glove"?

4   A   He had, like, a work glove on the floor of the van, and he

5   is telling him just to put it in there.

6   Q   When you recovered Government Exhibit 32, where was it

7   located?

8   A   It was in a glove in the passenger side of the car.

9   Q   Moving now to -- sorry -- and just to clarify.  Who are the

10   two individuals who are depicted here?

11   A   CS and Mr. Garcia.

12   Q   Okay.  Moving to 50 seconds in, line 53 of the transcript.

13   (Government Exhibit 33 video was played in open court.)

14   MR. VANDENBERG:  Pausing there.

15   (Government Exhibit 33 paused.)

16  BY MR. VANDENBERG:

17   Q   What's the defendant doing during this clip?

18   A   The CS is counting out money and handing it to defendant,

19   who is putting it in his pocket.

20   Q   All right.  Moving now to 4 minutes and 26 seconds into the

21   recording, transcript line 207.

22   (Government Exhibit 33 played.)

23   MR. VANDENBERG:  Pausing there.

24   (Government Exhibit 33 paused.)

25

1    BY MR. VANDENBERG:

2    Q    In this excerpt, the defendant references someone at "Long

3    Shots who sells weed for me."  What does that mean?

4    A    Long Shots is a bar in Joliet that apparently has somebody

5    that's selling cannabis for him.

6    Q    The defendant talks about Vice Lords?  What are the Vice

7    Lords?

8    A    The Vice Lords are another street gang.  There a faction

9    in Joliet that don't get along with the Latin Kings.

10   Q    The defendant says that one of the Vice Lords took a half

11   ounce from the guy who sells weed for the defendant.  What is

12   he referring to by a half ounce in that context?

13   A    He stole a half ounce of cannabis from him.

14   Q    And what does he mean when he says that he saw some Vice

15   Lords who must have "fucked ole boy up"?

16   A    I'm sorry.  Where are you at?

17   Q    Going back approximately six paragraphs or so from where we

18   stopped.

19            THE COURT:  Line 259, are you talking about?

20            MR. VANDENBERG:  I believe so.

21            THE WITNESS:  Oh, I got it.  Sorry.

22   BY MR. VANDENBERG:

23   Q    What's your interpretation as to what the defendant means

24   when he saw some Vice Lords who must have "fucked old boy up"?

25   A    They beat somebody up.

1    Q    What does he mean when he says he told Tino, "They talking

2    about they doing the blocks"?

3    A    Tino is another Latin King gang member, and he called him

4    to let him know whatever Latin Kings were doing the blocks,

5    providing security, driving around, providing security in the

6    neighborhood.

7    Q    And what does the defendant mean when he says he saw two of

8    them call Tino and told them "They're free"?

9    A    He's talking about two of the Vice Lords that stole the

10   marijuana.  Mr. Garcia must have saw them in a location in

11   Joliet.  They were all drunk and they were by themselves, so

12   they were free.  It's an easy target for the Latin Kings.

13   Q    Moving now to 6 minutes and 37 seconds into the recording

14   at line 301 of the transcripts.

15        (Government Exhibit 33 video played.)

16        (Government Exhibit 33 paused.)

17   BY MR. VANDENBERG:

18   Q    All right.  Defendant mentions "the Spanish," what is that

19   again?

20   A    The Spanish American Club.  It's a bar in Joliet.

21        (Government Exhibit 33 video played.)

22            MR. VANDENBERG:  Pausing there.

23        (Government Exhibit 33 paused.)

24   BY MR. VANDENBERG:

25   Q    When he says that "This was for the brothers," what does

1 that mean?

2 A    The Spanish is a Latin King bar and only Latin Kings are

3 allowed to sell narcotics in there.

4 Q    Moving to 8 minutes and 8 seconds into the recording.  Line

5 369 of the transcript.

6        (Government Exhibit 33 video played.)

7        (Government Exhibit 33 paused.)

8 BY MR. VANDENBERG:

9 Q    When the defendant said, "This one guy, he'll go.  He just

10 wants some extra money," what's he talking about here?

11 A    The guy will sell his guns, but he is just going to want a

12 lot of money for them.

13 Q    And what does the defendant mean when he says, "This guy is

14 willing to back date them"?

15 A    The bill of sale, basically saying he sold the gun a couple

16 of years earlier than he actually did.  That way if the gun

17 turns up at a crime, he can say "I sold that gun years ago."

18        MR. VANDENBERG:  If I can have just one minute, your

19 Honor.

20        THE COURT:  Sure.

21        MR. VANDENBERG:  Your Honor, it's 4:32 at this point.

22 Could we have an opportunity to overnight review our notes and

23 see if we there is anything else we need to ask him?

24        THE COURT:  That's fine.  We'll hold this witness

25 over, and they will clean him up in the morning if they have

1    anything to clean up, and then you will have him.  Okay?

2            MR. LEGUTKI:  Thank you.

3            THE COURT:  All right.  So we're going to let

4    Mr. Garcia go because I think his ride is ready.  And we'll see

5    you in the morning, Mr. Garcia.  And then if you guys can just

6    give me two more minutes to go over tomorrow, that would be

7    great.  Okay?

8            MR. VANDENBERG:  Yes, Judge.

9            THE COURT:  All right.  Thank you.

10       (Proceedings concluded at 4:33 p.m.)

11                    * * * * * * * * * *

12                   C E R T I F I C A T E

13       I certify that the foregoing is a correct transcript from

14   the record of proceedings in the above-entitled matter.

15

16
     /s/Kristin M. Ashenhurst, CSR, RDR, CRR  August 20, 2019
17   Kristin M. Ashenhurst, CSR, RDR, CRR      Date
     Federal Official Court Reporter
18

19

20

21

22

23

24

25