IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Docket No. 16 CR 109 |
| | ) | |
| Plaintiff, | ) | Chicago, Illinois |
| | ) | March 6, 2019 |
| v. | ) | 10:48 A.M. |
| | ) | |
| RALPH GARCIA, | ) | |
| | ) | |
| Defendant. | ) | |

VOLUME 2-A

TRANSCRIPT OF PROCEEDINGS - BENCH TRIAL
BEFORE THE HONORABLE ROBERT M. DOW, JR.

APPEARANCES:

For the Plaintiff:      HON. JOHN R. LAUSCH, JR.
                        UNITED STATES ATTORNEY
                        BY:  MR. TIMOTHY J. STORINO
                             MR. CORNELIUS A. VANDENBERG
                             ASSISTANT UNITED STATES ATTORNEYS
                        219 South Dearborn Street, Suite 500
                        Chicago, Illinois  60604
                        tim.storino@usdoj.gov
                        cornelius.vandenberg@usdoj.gov

For the Defendant:      LAW OFFICES OF JOHN LEGUTKI
                        BY:  MR. JOHN C. LEGUTKI
                        53 West Jackson Boulevard, Suite 920
                        Chicago, Illinois  60604
                        jclegutki@sbcglobal.net

Court Reporter:         KRISTIN M. ASHENHURST, CSR, RDR, CRR
                        Official Court Reporter
                        219 S. Dearborn Street, Room 2304-A
                        Chicago, IL 60604
                        (312) 818-6549
                        kristin_ashenhurst@ilnd.uscourts.gov

1      (The following proceedings were had in open court:)

2           THE CLERK:  16 CR 109, United States of America versus

3  Ralph Garcia.

4           THE COURT:  We have one more witness coming, right?

5           MR. VANDENBERG:  That's correct.  We're continuing the

6  witness who was on the stand yesterday, but we will have one

7  more witness.

8           Your Honor, Cornelius Vandenberg --

9           THE COURT:  Good morning, Mr. Garcia.  How are you

10  today?

11           Good morning, everybody.

12           MR. VANDENBERG:  Good morning.  Cornelius Vandenberg

13  and Tim Storino on behalf of the United States.

14           MR. LEGUTKI:  John Legutki, L-e-g-u-t-k-i, on behalf

15  of Ralph Garcia, who is in custody, standing to my right.

16           THE COURT:  Okay.  Very good.  Good morning,

17  everybody.

18           So I understand you guys are done with the agent --

19           MR. VANDENBERG:  That's correct.

20           THE COURT:  But he's going to go back for Mr. Legutki

21  to have his shots at him, right?

22           MR. VANDENBERG:  That's correct.

23           THE COURT:  Okay.  Sounds good.

24           So, Agent Karceski, if you would like to resume your

25  spot, I believe that everything is in working order today.

1     I walked in this morning and I almost ran over three

2  people who were on the floor there underneath the desk working

3  on it.  But they said it was done, so I think we are good to go

4  today.

5     Okay.  And the government, you folks have moved into

6  evidence everything you wanted in?  Because I was going over my

7  own notes, and it appears that you guys did not use a couple of

8  exhibits.

9     MR. VANDENBERG:  Yes, your Honor.  Exhibits 30 and 31.

10  The government has no intention to introduce those in evidence.

11     THE COURT:  Okay.  Very good.  And then I have the CV

12  and the certified copies of the conviction.  Are those coming

13  in separately?

14     MR. VANDENBERG:  We'll read in the stipulation.  Those

15  cover the certified convictions.

16     THE COURT:  Okay.

17     MR. VANDENBERG:  So we do not intend to enter any of

18  those, no, your Honor.

19     THE COURT:  Very good.  Perfect.  We are all set,

20  then.

21     Okay, Mr. Legutki.  Your witness, sir.

22                    CROSS-EXAMINATION

23  BY MR. LEGUTKI:

24  Q   Good morning, Officer -- Agent Karceski.

25     Officer -- if I say Officer --

Karceski - cross by Legutki

1  A   It's all the same.

2  Q   -- I don't mean any disrespect.

3  A   It's all the same.

4  Q   You had previous encounters or observations of the CI prior

5  to 2014; isn't that correct?

6  A   Yes.

7  Q   Dating back to 2009, you had a chance to observe a blue

8  Volvo semi that was registered to Overhaul Transportation;

9  isn't that correct?

10  A   Correct.

11  Q   And Overhaul Transportation, the registered agent was a

12  Jose Muñoz?

13  A   It was.

14  Q   And now Jose Muñoz is the confidential informant in this

15  case, correct?

16  A   Right.

17  Q   Or sometimes known as Joey Muñoz, correct?

18  A   Yes.

19  Q   And in -- excuse me.  In January of 2010, you

20  observed -- or you were part of a team of law enforcement that

21  observed that van belonging to Overhaul Transportation leaving

22  Shorewood, Illinois; isn't that correct?

23  A   Yes.

24  Q   And Joey Muñoz was the driver of that van, correct?

25  A   The semi, yes.

Karceski - cross by Legutki

1    Q    Thank you.  Of the semi.  Because it's a big

2    tractor-trailer.  It's not a cargo van; it's a truck and a

3    trailer separate, correct?

4    A    Right.

5    Q    And in January 2010, Mr. Muñoz drove to Edinburg, Texas; is

6    that correct?

7    A    I think that's how you pronounce it.  Edinburg, maybe.

8    Q    Edinburg.  And then he went to a checkpoint in Texas called

9    Falfurrias, Texas, if I'm pronouncing that correct?

10   A    That's the town it's located in, yes.

11   Q    And that town is unique because it's a border town -- it's

12   a checkpoint between the United States and Mexico, correct?

13   A    It's in the States.  It's off the border.

14   Q    And that truck actually went into Mexico at some point,

15   correct?

16   A    No, that's not correct.

17   Q    All right.  And after being at the border town of

18   Falfurrias, Texas, Mr. Muñoz drove back to Shorewood, Illinois,

19   and there was an exchange of a duffle bag between some other

20   individuals; is that correct?

21   A    I believe he got into a vehicle with a duffle bag and left

22   the truck there.

23   Q    And he exited the vehicle without the duffle bag?

24   A    That's possible.  I'd have to review my report.

25   Q    All right.  And then a few days later, about two weeks

1    later on January 18, 2010, Mr. Muñoz made a repeat trip down to

2    Edinburg or Edinburg, Texas, correct?

3    A    Correct.

4    Q    And on January 23rd, he made the return trip to Shorewood,

5    and he backed his truck into a warehouse, and there was a

6    similar exchange of a duffle bag like you just explained,

7    correct?

8    A    He backed the truck into the warehouse.  I don't think

9    there was an exchange.

10   Q    Okay.  Who's Special Agent Bayliss?

11   A    He's a retired ATF agent.

12   Q    And back in 2010, did you work with Special Agent Bayliss

13   on this investigation?

14   A    I did.

15   Q    And after that investigation, did you write a report?

16   A    I did.

17   Q    And that report is often called an ROI; is that correct?

18   A    Correct.

19   Q    And that's a short report investigation?

20   A    Yes.

21   Q    And on January 18, 2010, you prepared a report of

22   investigation?

23   A    I did.

24   Q    And that was done contemporaneous -- about the same time

25   that you made these observations of Mr. Muñoz, correct?

1  A   Yes.

2  Q   And after you saw the report and reviewed it, you signed

3  off on it, correct?

4  A   Yes.

5  Q   And if I show you a portion of that ROI, would it help

6  refresh your recollection about the exchange of a duffle bag?

7  A   It would.

8  Q   Okay.  Officer, would it refresh your recollection of what

9  happened that January 8th date?

10 A   Yes.

11      MR. LEGUTKI:  May I approach, Your Honor?

12      THE COURT:  Oh, sure.  Yes.

13 BY MR. LEGUTKI:

14 Q   Have you had a chance to review that?

15 A   I did.

16 Q   Has your recollection been refreshed?

17 A   Yes.

18 Q   And the January 18, 2010, episode, did someone, a male

19 Hispanic, appear to remove something from the truck?

20 A   You said when he backed into the warehouse.  It didn't

21 occur there.  It happened in the parking lot in Shorewood.

22 Q   But at that point, did Mr. Muñoz remove something from the

23 truck?

24 A   It says he removed something from the truck at that point.

25      MR. LEGUTKI:  Okay.  Your Honor, may I please have

1  five minutes?  My contact is bothering me.  I had to pop it

2  out.  I can't see.

3      THE COURT:  We want you to see, so take whatever you

4  need.

5      (Pause in the proceedings.)

6      THE COURT:  Are you all set, then?

7      MR. LEGUTKI:  Yes, sir.

8      THE COURT:  I should tell you guys I do need to break

9  about 11:55 today, because I have a 12 o'clock date.

10  BY MR. LEGUTKI:

11  Q   And, Officer, during this investigation regarding Mr. Muñoz

12  back in 2009, you employed a confidential informant as part of

13  your investigation; isn't that correct, sir?

14  A   Yes.

15  Q   If I say confidential informant No. 772000-1112, does that

16  sound approximately familiar to you?

17  A   Yes, if that's what's in the report.

18  Q   Okay.  And at that point, sometime December 2009, did Mr.

19  Muñoz make a statement that was reported to you that he drove a

20  semi truck to Mexico with loads of narcotics once or twice per

21  month?

22  A   That's what the informant told me he said.  I don't know

23  what he said.

24  Q   Okay.  So the informant told you that Mr. Muñoz was running

25  semis back and forth to Mexico once or twice per month in 2009,

1  correct?

2  A  Yes.

3  Q  Okay.  And in May 25th, 2010, did -- as part of your

4  investigation, was there another semi run from Shorewood,

5  Illinois, to Falfurrias, Texas, that was driven by Mr. Muñoz?

6  A  No, it was not driven by Mr. Muñoz.

7  Q  But it was his truck?

8  A  Correct.

9  Q  Okay.  And March 25th of 2014 -- this is also -- this is

10 jumping ahead a few years in the investigation -- was there an

11 incident where Mr. Muñoz was looking to sell a handgun for

12 $250, and that was included in your report?

13 A  Yes.

14 Q  And in April of 2014, you reported that Mr. Muñoz wanted to

15 sell eight balls for $100, correct?

16 A  Yes.

17 Q  And what is an eight ball?

18 A  An eight ball is an eighth of an ounce of cocaine.

19 Q  And was that transaction consummated?

20 A  Yes.

21 Q  Officer, jumping ahead of this investigation, when did you

22 first contact Mr. Muñoz to work as your confidential informant?

23 A  It was in the spring of 2014.

24 Q  And with respect to Mr. Garcia, when did you first mention

25 Mr. Garcia to Mr. Muñoz?

Karceski - cross by Legutki

1   A   I don't know if I mentioned it to him or he mentioned it to

2   me.  We debriefed the informant about members of the gang,

3   hierarchy in the gang.

4   Q   And when did that take place?

5   A   I don't recall.  It would have been around that same time,

6   in April.

7   Q   Was Mr. Garcia part of a larger investigation?

8   A   This investigation was part of a Latin King investigation

9   for the Joliet faction of the Latin Kings, yes.

10   Q   Was that Operation King Kong or something to that effect?

11   A   It was.

12   Q   And you identified Mr. Garcia as a leader in the Latin

13   Kings street gang organization?

14   A   Yes.

15   Q   And Mr. Garcia wasn't -- had just left Joliet prison -- or

16   excuse me, Stateville Penitentiary in about 2012, correct?

17   A   Correct.

18   Q   Excuse me for one moment.

19         THE COURT:  Sure.

20   BY MR. LEGUTKI:

21   Q   Now, again, as part of this investigation, you --

22         Well, let me ask this:  In November 2010, did you have

23   a meeting with Mr. Muñoz regarding Ralph Garcia?

24   A   November of 2010?

25   Q   I take that back.  November 10, 2014.

Karceski - cross by Legutki

1  A    I don't -- I'm not sure of the date.  I think I received a

2  call around that time from Mr. Muñoz saying he had run into

3  Mr. Garcia and they had talked.

4  Q    Okay.  And then you set up a meeting with Mr. Muñoz; is

5  that correct?

6  A    Correct.

7  Q    And this is on or shortly before November 2014, correct?

8  A    Yeah, sometime around that time.

9  Q    And where did you meet -- was that your initial meeting

10  with Mr. Muñoz with respect to Mr. Garcia?  Is that the first

11  time you talked to Joey Muñoz about Ralph Garcia?

12  A    Like I said, his name may have come up in conversation

13  prior to that, between the spring of 2014 and November of 2014.

14  We talked about, like I said, the gang, the hierarchy of the

15  gang.  So his name may have come up before that in

16  conversation, but in November was the first time specifically

17  related to Mr. Garcia selling drugs and guns at that time.

18  Q    Okay.  And at that meeting you showed Mr. Muñoz a picture

19  of an individual known as Magoo?

20  A    Correct.

21  Q    And did Mr. Muñoz have a picture of the person known as

22  Magoo or did you have that picture on your person?

23  A    I had the picture.

24  Q    So you had the picture on you.  After you met with Mr.

25  Muñoz sometime on or prior to November 10, 2014, did you have

Karceski - cross by Legutki

1    other meetings with Mr. Muñoz regarding Mr. Garcia?

2    A    After November?

3    Q    After November 10, 2014.

4    A    Yes.

5    Q    And as a matter of fact, on November 15, 2014, you met with

6    Mr. Muñoz and you directed Mr. Muñoz to meet with Mr. Garcia at

7    or near Mr. Garcia's house, correct?

8    A    Yes.

9    Q    Now, on November -- excuse me.  These questions relate to

10   the November 17, 2014, transaction you testified to yesterday.

11         So November 15, 2014, you met with Mr. Muñoz, and Mr.

12   Muñoz after that -- after your meeting called Mr. Garcia; is

13   that correct?

14   A    I believe so, yes.

15   Q    And they discussed the price for certain narcotics at that

16   point?

17   A    At the meeting, yes.

18   Q    And Mr. Garcia told Mr. Muñoz that he would -- he could

19   sell the narcotics obtained for 900, but that Mr. Muñoz could

20   sell the drugs for $1,200, correct?

21   A    I believe so.  Those were the numbers, yes.

22   Q    And so Mr. Garcia was, in essence, selling drugs to Mr.

23   Muñoz for wholesale?

24   A    Well, the way it works, Mr. Garcia would have been charging

25   900 to Mr. Muñoz, but he was probably paying 700 or 800.  I'm

1    speculating, but that's how it is.  It goes down the line.  So

2    he makes his money and then so on and so forth.

3    Q    But you don't know how much Mr. Garcia paid for those?

4    A    I don't.

5    Q    But you do know that Mr. Garcia forgoes some profit maybe

6    of $300 or more when he provided the drugs to Mr. Muñoz?  He

7    could have sold them for more?

8    A    If he had a customer on the street, but higher level --

9    Q    My question is:  Mr. Garcia could have sold the drugs for

10   more, correct?

11   A    Not necessarily.

12   Q    He told Mr. Muñoz that he could sell the drugs for $1,200;

13   is that correct?

14   A    He told Mr. Muñoz that Mr. Muñoz could sell it for $1,200.

15   The way it works --

16   Q    But he didn't charge Mr. Muñoz $1,200?

17   A    No.  He charged Mr. Muñoz $900.

18   Q    Okay.  And there were some series of texts when we referred

19   to Government Transcript No. 3, Government Transcript No. 4,

20   and Government Transcript No. 6.  In each of those

21   communications, the confidential informant, Joey Muñoz,

22   communicated with Ralph Garcia at your direction; is that

23   correct?

24   A    I would have to see my reports.

25   Q    Well, let me ask this.  When you talk about Government

Karceski - cross by Legutki

1   Transcript No. 3, November 15, 2014, you testified and you

2   established the foundation for the Government

3   Transcript -- Government Transcript No. 3.  You testified

4   yesterday; is that correct?

5   A   I did.

6   Q   Okay.  Officer, I'm going to show you what's been marked as

7   Government Transcript No. 3.  My question pending to you is:

8   Who initiated that -- who initiated that text on Saturday,

9   November 15, 2014?

10          MR. LEGUTKI:  May I approach, Your Honor?

11          THE COURT:  Mm-hmm.

12  BY MR. LEGUTKI:

13  Q   Showing you Government Exhibit No. 3 Transcript on

14  November 15, 2014, where it says "need to holler at you."

15          Who initiated that text?

16  A   Confidential informant.

17  Q   And also Monday, November 17, 2014, who initiated that

18  call, "give me a call"?

19  A   The confidential informant.

20  Q   On November 15, 2014, there was a consensually recorded

21  telephone call between the confidential informant and Ralph

22  Garcia.  Do you recall who initiated that phone call?

23  A   I don't know who initiated it.

24          MR. LEGUTKI:  May I, your Honor?

25          THE COURT:  Sure.

Karceski - cross by Legutki

1  BY MR. LEGUTKI:

2  Q    Showing you what's been marked Government Exhibit 4

3  Transcript, November 15, 2014.  Who initiated this consensually

4  recorded telephone call?

5  A    Mr. Garcia.

6  Q    Mr. Garcia -- so the consent was -- you got Mr. Garcia's

7  consent for this call?

8  A    I got his consent?

9  Q    No.  Did you get Mr. Garcia's consent?

10  A    No.

11  Q    You got Mr. Muñoz's consent to make this call, correct?

12  A    Correct.

13  Q    It makes sense that Mr. Muñoz initiated this call, doesn't

14  it?

15  A    No.

16  Q    If it's a consensual call?  No?

17       November 17, 2014.  That was the first video recording

18  of a transaction between Mr. Muñoz and Mr. Garcia; isn't that

19  correct?

20  A    Of a transaction, yes.

21  Q    And the day of that transaction, you met with Mr. Muñoz?

22  A    Yes.

23  Q    And you went through what was going to be done, correct?

24  A    Yes.

25  Q    Patted him down, and you did your litany of events to

Karceski - cross by Legutki

1   ensure a proper foundation; isn't that correct?

2   A   Yes.  Myself or another agent, yes.

3   Q   And when -- and that meeting was set up by Mr. Muñoz with

4   Mr. Garcia, correct?

5   A   Yeah.  I don't remember who set it up or who initiated it.

6   Q   Did you direct Mr. Muñoz to set up that meeting?

7   A   I don't recall.  I know they set it up on the November 15th

8   meeting.  They agreed.  I don't remember who set up or who

9   called and said, "I'm coming over," or who said, "I have it.

10  I'm coming over."  I don't recall.  If you showed me, I

11  would...

12  Q   On November 24, 2014, there was another consensually

13  recorded telephone call between Joe Muñoz and Ralph Garcia,

14  correct?

15  A   Yes.

16  Q   And do you recall whether or not Mr. Muñoz initiated that

17  call?

18  A   I'm sorry, I don't know who initiated.  If you show me, I

19  can...

20  Q   And you -- you prepared an ROI with respect to that

21  particular episode, correct?

22  A   Yes.

23          MR. LEGUTKI:  May I approach, your Honor?

24          THE COURT:  Sure.

25  BY MR. LEGUTKI:

1    Q    Would you look at the second line of the first paragraph.

2    A    Okay.

3    Q    Who initiated that call to Mr. Garcia?

4    A    The confidential source called him.

5    Q    Okay.  Is it fair to say that in the majority of the

6    conversations between Mr. Garcia and Joey Muñoz during the

7    course of this investigation, Mr. Muñoz initiated most of the

8    telephone calls or texts or other communications?

9    A    I would think it would be fair to characterize the person

10   purchasing the narcotics calls the seller of the narcotics to

11   tell him he's interested in purchasing some.  I would have to

12   go through each phone call to see who initiated them, but

13   that's usually how it works.

14   Q    Okay.  We can do that.

15            I wanted to turn your attention to Government Exhibit

16   No. 11 Transcript that was in relation to the November 24,

17   2014, transaction.  And in that particular transaction, again,

18   you met with Mr. Muñoz.  You went through your litany of

19   events, and Mr. Muñoz then contacted Mr. Garcia, correct?

20   A    I believe so.  If you would show me either the report or

21   the transcript, I can tell you for sure.

22   Q    All right.  Well, it's the same report, ROI No. 001-000012.

23            Can you read the second line where I just --

24   A    The November 24th one?

25   Q    Yep, November 24th.  Did the CI call Mr. Garcia?

1   A    Yes.

2   Q    And there was a meeting with Mr. Garcia and Mr. Muñoz in

3   Mr. Muñoz's -- what is it, an Astro van?

4   A    I'm not sure what kind of car he was driving at that time,

5   but yes.

6   Q    Now, there was some discussion -- you were questioned by

7   the government at about lines 139 through 146 about Mr. Garcia

8   being offered a leadership position as part of the Latin Kings;

9   is that correct?

10  A    Mr. Garcia being offered a position?

11  Q    Yes.  The quote was that you testified to:  "Yeah, he tried

12  to get me over to go there.  We put your brother or one of them

13  out there."

14          Do you recall that?

15  A    Yes.

16  Q    And you -- my understanding is or my recollection is that

17  Mr. Garcia was being considered for a leadership position

18  within the Latin Kings, correct?

19  A    He was being offered -- from what I understand, that he was

20  being offered to run a crew on the north side.

21  Q    But he did not accept that position, to your knowledge?

22  A    To my knowledge, no.

23  Q    Okay.  All right.  On December 15, 2014, there

24  was -- referring to Government Exhibit 12 Transcript, Mr. -- do

25  you know who initiated a text communication between the

Karceski - cross by Legutki

1    confidential informant and Mr. Garcia?

2    A    I don't recall.

3    Q    Giving No. 12 for -- Government Exhibit 12 Transcript.

4         Do you know who initiated that text communication?

5    A    The confidential informant did.

6    Q    December 15, 2015, there was another video recording

7    episode between Mr. Garcia and Mr. Muñoz, correct?

8    A    Yes.

9    Q    And in that, as usual, you met with Mr. Muñoz ahead of

10   time?

11   A    Yes.

12   Q    And you went over the game plan with Mr. Muñoz?

13   A    Yes.

14   Q    What's going to happen?

15   A    Yes.

16   Q    And so I remember you testifying yesterday that you were

17   the lead agent on this case, correct?

18   A    I was.

19   Q    You're the quarterback?

20   A    Correct.

21   Q    You're more than a quarterback.  You were calling all the

22   plays, correct?

23   A    No.  I have bosses.

24   Q    Out on the street when things were happening, you were

25   calling the shots, correct?

Karceski - cross by Legutki

1    A    Yeah, depending on if there was a boss out there.

2    Q    All right.  So on December 15, 2014, you met with Mr. Muñoz

3    and you went over the game plan with his upcoming meeting with

4    Mr. Garcia, right?

5    A    Correct.

6    Q    And who placed the initial call from -- to eventually meet?

7    Was it the CI or was it Mr. Garcia?

8    A    I would have to see the report.  I'm sorry.

9              MR. LEGUTKI:  May I approach, your Honor?

10             THE COURT:  Sure.

11   BY MR. LEGUTKI:

12   Q    Showing you what is an ROI on December 17, 2014, paragraph

13   1, I think the second sentence, would you please refer to that.

14   A    Yeah.  The CI sent Mr. Garcia a text message.

15   Q    So it was the CI who initiated this communication again?

16   A    It was.

17   Q    January 23, 2015, is another meeting between the CI and

18   Mr. Garcia, correct?

19   A    Yes.

20   Q    And in that particular meeting, according to your

21   testimony, both methamphetamine and a firearm were sold by

22   Mr. Garcia, correct?

23   A    Correct.

24   Q    And in that meeting, January 23, 2015, there was a usual

25   meeting between you and Mr. Muñoz, correct?

Karceski - cross by Legutki

1    A    Yes.

2    Q    And what I mean by "usual," you met with Mr. Muñoz and

3    discussed what's going to happen?

4    A    Right.

5    Q    You sat with Mr. Muñoz and you told him that you're going

6    to meet with Mr. Garcia, you patted Mr. Muñoz down, and Mr.

7    Muñoz went on his way to meet with Mr. Garcia, correct?

8    A    Yes.

9    Q    Before going to the meeting with Mr. Garcia, there was some

10   communication between Mr. Muñoz and Mr. Garcia; isn't that

11   correct?

12   A    Yes, I believe so.

13   Q    And who initiated that call?

14   A    If you show me my report, I would be happy to tell you.

15           MR. LEGUTKI:  Your Honor, may I?

16           THE COURT:  Sure.

17   BY MR. LEGUTKI:

18   Q    Showing you what's been marked ROI_001-000037, and it's the

19   second paragraph down at approximately 12:28 p.m.

20   A    The CI called Mr. Garcia.

21   Q    So, once again, it was the CI who initiated communication

22   between Mr. Garcia and the CI?

23   A    Yes.

24   Q    Now, as part of this investigation -- as a result --

25   well, as part of this investigation or was it the result of

Karceski - cross by Legutki

1  this investigation, Muñoz was given certain considerations for

2  his testimony; isn't that correct?

3  A   Yes.

4  Q   He agreed to cooperate with law enforcement?

5  A   He did.

6  Q   And as part of that cooperation, he was hoping or he was

7  advised that he would -- I'm sorry.

8           He was paid for his testimony; isn't that correct?

9  A   No, he was not paid for his testimony.  No.

10 Q   He was paid for his cooperation?  Thank you, sir.

11 A   Yes.

12 Q   And he was compensated almost $60,000?

13 A   Yes.

14 Q   Did you pay him that, or who paid him that money?

15 A   Sometimes I paid him.  If my partner was paying him -- it

16 just depended at the time and the place.

17 Q   Was it cash or check?

18 A   Cash.

19 Q   And when was the first payment given to Mr. Muñoz?

20 A   I don't recall when the first payment was made.

21 Q   Was it before he met with Mr. Garcia or after he met with

22 Mr. Garcia?  And what I mean by that, on November 2014.

23 A   I honestly do not recall when he received his first

24 payment.

25 Q   And was it a lump sum or was it made over time?

1    A    Oh, it was made over time.

2    Q    And if he didn't cooperate, he wouldn't be paid anymore,

3    correct?

4    A    Fair to say.

5    Q    And that's not all he received in exchange for his

6    cooperation.  Mr. Muñoz was given immunity for his testimony

7    today; is that correct?

8    A    I don't know if I can say that.  He hasn't testified yet,

9    so I don't know.

10            THE COURT:  There's a motion pending to that effect.

11            MR. LEGUTKI:  There's a motion pending.  I withdraw

12    the question.  Thank you.

13    BY MR. LEGUTKI:

14    Q    Now, you say back in 2014, November of 2014, Mr. Garcia was

15    the target of an investigation, and that came out of Joliet?

16    A    Yeah.  It was an investigation into the Joliet Latin Kings.

17    Q    Was the Joliet Police Department involved?

18    A    Yes.

19    Q    And on November 17, 2014, after the first transaction,

20    was -- Mr. Garcia was not put under arrest, correct?

21    A    After the first transaction?

22    Q    On the November 17, 2014, transaction, Mr. Garcia was not

23    put under arrest?

24    A    No, he was not.

25    Q    As a matter of fact, he was not put under -- well, he was

1    not put under arrest until all five of these transactions to

2    which you testified to yesterday occurred, sometime thereafter?

3    A   Yeah.  He wasn't arrested for a while after that.

4         MR. LEGUTKI:  Okay.  Thank you.

5         No further questions.

6         THE COURT:  All right.  Thank you.

7         MR. VANDENBERG:  May I proceed, your Honor?

8         THE COURT:  Yes, please.

9                   REDIRECT EXAMINATION

10   BY MR. VANDENBERG:

11   Q   Defense counsel asked you about a transaction involving

12   $250 for a handgun and Mr. Muñoz.  Do you remember him asking

13   you those questions?

14   A   I do.

15   Q   Can you share for the Court what exactly happened during

16   the course of that transaction?

17   A   Nothing.  We attempted to buy a firearm through an

18   informant from Mr. Muñoz, and it never occurred.

19   Q   Defense counsel asked you about showing Mr. Muñoz a picture

20   of someone named "Magoo."  Do you recall him asking those

21   questions?

22   A   Yes.

23   Q   Just for the sake of clarification, who do you understand

24   Magoo to be in reference to?

25   A   That's Mr. Garcia's nickname, is Magoo.

1    Q    And did you show a picture of Mr. Garcia to Muñoz?

2    A    I did.

3    Q    And did Mr. Muñoz confirm that this was the person who was

4    engaged in narcotics trafficking?

5    A    Yes.

6    Q    Defense counsel asked you some questions about the relative

7    price of what Mr. Garcia sold the drugs to Mr. Muñoz for and

8    what Muñoz could have sold those drugs for on the street.  Do

9    you recall those questions?

10   A    I do.

11   Q    Can you explain why the price of drugs increases as it goes

12   through the chain?

13   A    It starts from the top, and, like, the kilo-level dealers

14   will only deal with a few subjects, and they're selling it

15   wholesale.  And the price goes up as it goes down.  And then

16   when you get to the street-level dealers, they can make more

17   money by breaking it down.  For lack of a better description,

18   getting their hands dirty.  They're going to deal with more

19   customers.  Their exposure is going to be greater.  They're

20   dealing with smaller quantities of the drug, whereas --

21            So everyone down the line is making money.  The kilo

22   dealers are making money on what they're selling it to the next

23   guy for and the next guy and the next guy.  Everybody's making

24   money as it goes down the line.

25   Q    Defense counsel asked you about a consensually recorded

1  call.  What does it mean when a call is consensually recorded?

2  A   It means one of the parties has given us consent to record

3  that call.

4  Q   Can a person answering a call be the person who gives

5  consent?

6  A   Absolutely.

7  Q   During the course of your investigation of -- I think you

8  said hundreds and hundreds of narcotics cases, have you

9  observed communications between drug suppliers and drug

10  customers?

11  A   Yes.

12  Q   And based on your experience, is it more common during the

13  course of these transactions for the customers to contact the

14  suppliers or the suppliers to contact the customers?

15  A   The customers are contacting the suppliers.

16  Q   Why does that happen?

17  A   They're the ones that need it.  That's why a drug dealer's

18  phone is going off all the time.  When pagers first came out,

19  the drug dealers carried the pagers.  The customers are always

20  calling the drug dealers to tell them they're in need of more

21  drugs.

22         MR. VANDENBERG:  No further questions.

23         THE COURT:  Okay.  Thank you.

24                    RECROSS EXAMINATION

25  BY MR. LEGUTKI:

1 Q   Agent, you testified to communications between Mr. Muñoz

2 and Mr. Garcia, correct?

3 A   Yes.

4 Q   On my direct examination.

5        And during my cross-examination, I showed you copies

6 of your ROIs, correct?

7 A   Yes.

8 Q   Are you saying your ROIs are wrong?

9        MR. VANDENBERG:  Objection.  What's the --

10 BY MR. LEGUTKI:

11 Q   With respect to who initiated the communication?

12 A   No, my ROIs are correct.

13 Q   So when I showed you your ROIs and I questioned who

14 initiated communication when it went from Mr. Muñoz to

15 Mr. Garcia, that is correct?

16 A   Yes.

17 Q   When you met -- when you first met with Mr. Muñoz sometime

18 on or prior to November 10, 2014, you had a photograph of

19 Mr. Garcia with you, correct?

20 A   Yes.

21 Q   Did you just happen to have that photograph with you, or

22 did you prepare to have that photograph with you?

23 A   No, Mr. -- the confidential informant told me he had talked

24 to Mr. Garcia at a bar.  He knew him as Magoo.  So I pulled the

25 picture.  I then went and met with the confidential informant

1   and showed him the picture, and I said, "Is this the subject

2   you know as Magoo?"

3        And he said, "Yeah."

4   Q   So there's some sort of time lapse, correct?

5   A   I don't know if it was that day, the day after.  I don't

6   know when.

7   Q   So was it you who brought up Mr. Garcia to Mr. Muñoz, or

8   did Mr. Muñoz first bring up Mr. Garcia to you?

9   A   Again, there were conversations from the spring of 2014

10  until November about the gang.  Mr. Magoo -- or I'm sorry.

11  Mr. Garcia held a leadership position in that gang, so his name

12  had probably come up prior to that.  I do not recall exactly

13  when that conversation took place or whatever.  So I'm sure his

14  name had come up before that.

15       But as far as making a transaction with Mr. Garcia,

16  the CI had called me and said he ran into him in a bar in

17  November and that he was selling drugs.

18  Q   So when you say position of leadership, was that before

19  Mr. Garcia went into the Illinois State Penitentiary for 20

20  years?

21  A   I believe it was when he came out.  I don't know what his

22  position was 20 years ago.  I was not there 20 years ago.

23  Q   When you talk about -- the government asked you about the

24  pricing of narcotics, correct?

25  A   Yes.

Karceski - recross by Legutki

1    Q    And the pricing of narcotics seemed to be when you go from

2    retail to wholesale to supplier, go upstream, greater quantity

3    is available to those individuals so they can price it

4    differently when they go down the chain, correct?

5    A    Correct.

6    Q    Do you know if Mr. Garcia had -- was -- Mr. Garcia, when he

7    sold drugs to Mr. Muñoz, Mr. Garcia had to go purchase those

8    drugs.  In other words, he did not have his own inventory; is

9    that correct?

10   A    I don't know if he did or did not.

11   Q    You don't know?

12   A    I don't know.

13   Q    So you don't know if he bought for less or -- if he bought

14   the drugs for more or for less or the same price when he sold

15   it to Mr. Muñoz?

16   A    It wouldn't be smart if he bought for more and sold for

17   less, but I do not know.

18   Q    You don't know?

19   A    I don't know.

20   Q    But you do know from the testimony that Mr. Garcia -- there

21   was a potential profit that Mr. Garcia gave up when he sold the

22   drugs to Mr. Muñoz?  You could sell them for 1200 --

23   A    I don't know that.  I don't know if he had the customer

24   base where he could have sold it for that.  I don't know.

25   Q    Okay.  Well, let's do it this way.  If the potential is to

1   sell drugs for $1,200 but you sell them for $900, is there a

2   potential for a $300 difference?

3   A   If I knew somebody that would buy it for $1,200.  But if I

4   don't know that person that will buy it -- it's why Costco

5   sells at wholesale.

6   Q   What's the difference between 1,200 and 900?

7   A   $300.

8           MR. LEGUTKI:  Thank you.

9           THE COURT:  Anything else?

10          MR. LEGUTKI:  No, sir.

11          MR. VANDENBERG:  No, your Honor.

12          THE COURT:  Okay.  Thank you, Agent.  Appreciate it.

13      (Witness excused.)

14          THE COURT:  Okay.  So I've got about 25 minutes here

15  to work through what we can with Mr. Muñoz, and if that's not

16  sufficient, then we'll pick up at 1:30 and finish it off.

17          MR. STURINO:  And, your Honor, should we start before

18  the witness takes the stand with the government's motion?

19          THE COURT:  Yeah.  You can go ahead and present the

20  motion.  And I have read the bench book here on how to deal

21  with grants of immunity.  I think I told you guys I've had one

22  grant of immunity that I can remember so far, and it was a

23  memorable testimony, shall we say, during the trial of Mr.

24  Boender, who was the person who was convicted of bribing

25  Alderman Carothers.  But I do remember it.

1          You guys have followed the procedure that the bench

2    book lays out, which includes getting authorization from Main

3    Justice, which is attached to your motion.  And essentially

4    this is a lot of legalese for the fact that Mr. Muñoz will

5    receive immunity for any testimony that he gives today and he

6    can't be prosecuted for anything except for lying today.

7    Right?

8              MR. STORINO:  Correct, your Honor.

9              MR. VANDENBERG:  Correct.

10             THE COURT:  Did you have a chance to review the

11   motion?

12             MR. LEGUTKI:  Yes, sir, I did.

13             THE COURT:  Did you see any issues with it?

14             MR. LEGUTKI:  I think the immunity goes to the

15   testimony, but that's all it goes to.  It goes to his

16   testimony.  Other evidence for other -- even for the same

17   crimes is not eliminated; it's just his testimony can't be used

18   against him, as I read that.

19             THE COURT:  Okay.  Does the government --

20             I mean, this is what it says here in the order:

21             "No testimony or evidence provided by the witness

22   compelled under this order may be used against him in any

23   criminal case except for prosecution for perjury, giving a

24   false statement, or otherwise failing to comply with this

25   order."

1        So that seems to me it's testimony or evidence today.

2        MR. LEGUTKI:  Today?

3        THE COURT:  Provided by the witness, which is only

4    being provided today.

5        MR. LEGUTKI:  Right.

6        MR. STURINO:  That's correct, your Honor.

7        MR. LEGUTKI:  That's my understanding.

8        THE COURT:  Everybody is under that understanding.

9    Are you Mr. Muñoz?

10       MR. MUÑOZ:  Yes, I am.

11       THE COURT:  Okay.  Good morning, sir.  So we're

12   talking about your order here.

13       So my understanding is that you're willing to provide

14   testimony today as long as you receive a grant of immunity; is

15   that right, sir?

16       MR. MUÑOZ:  That's correct.

17       THE COURT:  Have you consulted with a lawyer on this?

18       MR. MUÑOZ:  No, I haven't.

19       THE COURT:  You haven't.  Have you worked with the

20   government on this?

21       MR. MUÑOZ:  Yes, I have.

22       THE COURT:  Obviously, you've spoken to Mr. Storino or

23   Mr. Vandenberg or both of them?

24       MR. MUÑOZ:  Yes, I have.

25       THE COURT:  Okay.  Do you have any questions for any

1    of us about the scope of what the order is, the testimony you

2    need to provide, and the immunity that you've received?

3            MR. MUÑOZ:  Yes.  I just -- you know, I don't want to

4    be held accountable for things that's going on in this case as

5    I step up there on the podium.

6            THE COURT:  Okay.  So let me read you the terms of

7    this to make sure we're all on the same page here.  Okay?

8            So this is the order that the government has asked me

9    to enter in this case.

10           And I've read the government's motion, and I know

11   defense counsel has read it, too.  And the motion has to state

12   that your testimony is necessary to the public interest, and

13   that's the prosecution in this case, and that you have refused

14   to provide this testimony, invoking your Fifth Amendment right

15   against self-incrimination, which is essentially what you just

16   said, unless you're given immunity.

17           And the government, the Assistant U.S. Attorneys in

18   this case have asked their colleagues at main Justice in

19   Washington to approve this deal, and they have provided a

20   letter for me under the statutory authority that they have to

21   approve that.  So the government has signed off on this deal,

22   and these are the terms.  So I would enter this order.  Okay?

23           MR. MUÑOZ:  Yes.

24           THE COURT:  It would say:  "It is hereby ordered that

25   Jose Muñoz shall not be excused from testifying and giving

1  evidence in the proceedings before this Court on the grounds

2  that the testimony and evidence required of him may tend to

3  incriminate him, and that Jose Muñoz shall appear before this

4  Court and testify and provide evidence without further

5  asserting there his privilege against self-incrimination."

6      And then this is the deal -- the part that's of most

7  interest to you:  "It is further ordered that no testimony or

8  evidence provided by the witness, Jose Muñoz, compelled under

9  this order or any information directly or indirectly derived

10 from such testimony or evidence may be used against him in any

11 criminal case, except a prosecution for perjury, giving a false

12 statement, or otherwise failing to comply with this order in

13 accordance with the provisions of Section 6002, Title 18 U.S.

14 Code."

15     So the only exception is that if you were to lie,

16 basically.  That's what perjury and false statement, all that

17 is -- and otherwise failing to comply with this order.  I'm

18 compelling you to give truthful testimony, and as long as you

19 do that, you have immunity.  If you don't do that, you could be

20 prosecuted.

21     Do you understand all that?

22     MR. MUÑOZ:  Yes, I do.

23     THE COURT:  Okay.  Any other questions for us?

24     MR. MUÑOZ:  No.  That's it, your Honor.

25     THE COURT:  Okay.

1    Mr. Legutki, any concerns about the procedures here?

2    MR. LEGUTKI:  No, sir.  Thank you.

3    THE COURT:  Okay.

4    I have signed the order and dated it today.  I will

5    hand it to Carolyn to put on the docket.

6    And with that, Mr. Muñoz, you've got the deal here.

7    Okay?

8    And if you could take the witness, Kris will swear you

9    in.  Okay, sir?  If you can just remain standing when you get

10   around the corner there.  Thank you, sir.

11   Can you please raise your right hand, sir?

12   (Witness sworn.)

13   THE COURT:  Please be seated, sir.  And if you can,

14   speak loudly enough in the microphone.  The court reporter has

15   to type up everything you say.  Okay?

16   All right.  Mr. Vandenberg.

17   And just a reminder.  I know the witness doesn't know

18   this, but I have to take a break at 11:55 for lunchtime.  So if

19   you're not finished by 11:55, we'll start again at 1:30.

20   Okay, sir?

21   THE WITNESS:  Okay.

22   THE COURT:  All right.  Thank you.

23   Okay.  Go ahead, Mr. Vandenberg.

24   JOSE MUÑOZ, PLAINTIFF'S WITNESS HEREIN, SWORN

25   DIRECT EXAMINATION

1   BY MR. VANDENBERG:

2   Q   Can you please state your name for the record, spelling

3   your last name.

4   A   Jose Muñoz.  Last name spelled M-U-N-O-Z.

5   Q   Have you been granted immunity in exchange for your

6   testimony today?

7   A   Yes, I have.

8   Q   What is your understanding as to what that means?

9   A   That anything that I say -- or anything that I say won't be

10   accounted for, as long as it's the truth.

11   Q   Do you understand what happens if you lie while testifying?

12   A   Yes, I do.

13   Q   And what happens in that case?

14   A   Could be possibly prosecuted.

15   Q   Have you ever been a member of a street gang?

16   A   Yes, I have.

17   Q   What street gang is that?

18   A   The Latin Kings.

19   Q   And where was that?

20   A   Joliet, Illinois.

21   Q   And when were you a member of that street gang?

22   A   From '99 to 2016.

23   Q   In 1998, were you convicted of a misdemeanor weapons

24   offense?

25   A   Yes, I was.

1 Q   And were you sentenced to 116 days in jail?

2 A   Yes, I was.

3 Q   From late 2009 to early 2010, did you drive a semi-trailer

4 truck containing drugs?

5 A   Yes, I did.

6 Q   What kind of drugs were in that truck?

7 A   Marijuana.

8 Q   Approximately how many times did you do that?

9 A   Four times.

10 Q   And where did you drive those drugs from?

11 A   From the Valley of Texas to North Carolina; Atlanta,

12 Georgia; and Chicago.

13 Q   And that Valley of Texas, is that near the Mexican border?

14 A   Yes, it is.

15 Q   Approximately how much were you paid for each of these

16 trips?

17 A   About $10,000 a trip.

18 Q   In 2010 were you convicted of felony possession of a

19 controlled substance?

20 A   Yes, I was.

21 Q   And were you sentenced to 18 months in jail?

22 A   Yes, I was.

23 Q   Between 2012 and 2015, did you periodically sell cocaine?

24 A   Yes, I did.

25 Q   Do you know Ralph Garcia?

1  A   Yes, I do.

2  Q   And when did you meet Mr. Garcia?

3  A   Around 2012.

4  Q   To your knowledge, did any member of your family know

5  Mr. Garcia before 2012?

6  A   Maybe my mother and father did, yes.

7  Q   Do you see Mr. Garcia in the courtroom here today?

8  A   Yes, I do.

9  Q   Can you identify him here in this courtroom by where he is

10  and what he is wearing?

11  A   He's sitting at the table over there in the orange suit.

12      MR. VANDENBERG:  Let the record reflect that the

13  witness has correctly identified the defendant.

14      THE COURT:  The record will so reflect.

15  BY MR. VANDENBERG:

16  Q   How did you meet the defendant, personally?

17  A   Just in the neighborhood at a bar.

18  Q   Did the defendant ever discuss looking for work with you?

19  A   We talked about him having a CDL license, and I told him

20  that maybe I could get him a job.

21  Q   And did you do anything to that effect?

22  A   Yeah.  I referenced him to my boss and gave him his number,

23  and they worked out a job -- a job opportunity.

24  Q   And approximately -- was that before you were cooperating

25  in this case?

1   A   Yes, it was.

2   Q   Approximately how long did the defendant work at that job?

3   A   I would say a few months.

4   Q   Drawing your attention to 2014, around that time did law

5   enforcement find cocaine -- sorry.

6           Around that time, did law enforcement execute a search

7   warrant at your house?

8   A   Yes, they did.

9   Q   And did they find cocaine, marijuana, and a bullet there?

10  A   Yes, they did.

11          MR. LEGUTKI:  Excuse me.  What was that?

12          MR. VANDENBERG:  Cocaine, marijuana, and a bullet

13  there.

14          MR. LEGUTKI:  Okay.

15  BY MR. VANDENBERG:

16  Q   After that, were you approached by an ATF agent?

17  A   Yes, I was.

18  Q   And is that agent present in the courtroom today?

19  A   Yes, he is.

20  Q   And can you identify him by where he's sitting?

21  A   Yeah.  He's sitting at the table with a gray suit on.

22          MR. VANDENBERG:  Let the record reflect that the

23  witness has identified Agent Karceski.

24          THE COURT:  Okay.  The record will so reflect.

25  BY MR. VANDENBERG:

1    Q    Did you agree to provide cooperation with law enforcement?

2    A    Yes, I did.

3    Q    Did you agree to wear a wire?

4    A    Yes, I did.

5    Q    Was it your understanding that you were cooperating in

6    exchange for consideration with regards to your prior criminal

7    conduct?

8    A    Yes, I was.

9    Q    Were you also paid for your cooperation?

10    A    Yes, I was.

11    Q    Were you ever promised anything by ATF in exchange for your

12    cooperation?

13    A    No, I wasn't.

14    Q    Were you ever promised anything by the U.S. Attorney's

15    office?

16    A    No, I wasn't.

17    Q    Were you ever promised anything by me or my co-counsel with

18    regards to your testimony or cooperation?

19    A    No, I wasn't.

20    Q    Have you ever been threatened into cooperating?

21    A    No.

22    Q    Between November 2014 and March 2015, did you meet with the

23    defendant while wearing a wire?

24    A    Yes, I did.

25    Q    About how many times?

Muñoz - direct by Vandenberg

1   A   Six times.

2   Q   And what did you do during the course of those meetings?

3   A   Make transactions, drug transactions.  A gun transaction.

4   Q   When you say gun transactions and drug transactions, were

5   you the person buying or selling in those transactions?

6   A   I was the person buying.

7   Q   And who were you buying them from?

8   A   Ralph.

9   Q   And by Ralph, do you mean the defendant?

10  A   Yes.

11  Q   Where did you get the money for those transactions?

12  A   ATF agent.

13  Q   And did you meet with ATF before and after each of these

14  buys?

15  A   Yes, I did.

16          MR. VANDENBERG:  Okay.

17          Nothing further, your Honor.

18          THE COURT:  Okay.  Thank you, sir.

19          Mr. Legutki.

20                    CROSS-EXAMINATION

21  BY MR. LEGUTKI:

22  Q   So, Mr. Muñoz, no promises were made to you, correct?

23  A   Correct.

24  Q   You were paid pretty well for this, weren't you, for your

25  cooperation?

1    A    I was given money, yes.

2    Q    Lots of money?

3    A    Yeah.  I was paid, yes.

4    Q    Almost $60,000?

5    A    Probably.  So I'm not sure about the amount, but yeah,

6    possibly.

7    Q    Was that in cash?

8    A    Yes, cash.

9    Q    Who paid you cash?

10    A    ATF agent.

11    Q    When did they start paying you?

12    A    Just cash for every -- I mean, every time I, you know, went

13    to go make a drug buy or a gun buy.

14    Q    With Ralph?

15    A    Yes.

16    Q    Mr. Garcia?

17         So as a reward for your cooperation, you were paid a

18    certain amount of cash?

19    A    I wouldn't say --

20         MR. VANDENBERG:  Objection to that characterization.

21         THE COURT:  Well, I mean, I suppose it's -- it's in

22    the eye -- I'll keep your objection on the record, and I will

23    let the question be answered, though.

24         MR. LEGUTKI:  I will withdraw the question, Judge.

25    I'll rephrase it.

Muñoz - cross by Legutki

1  BY MR. LEGUTKI:

2  Q   If you didn't meet with Ralph, did you expect to get paid

3  from the government?

4  A   No, I didn't.

5  Q   So it was only if you met with Ralph you got paid by the

6  government?

7  A   No.  That's not true.

8  Q   So if you didn't meet with Ralph, would you still get paid?

9  A   I mean, if I was doing other things, yes, but...

10  Q   Well, how many cases were you involved in with the

11  government?

12  A   Just this one.  Just this one case.  I mean, not just him,

13  but other individuals that were on the case, yes.

14  Q   You said that ATF found a bullet in your possession, and

15  that prompted your cooperation with the government, correct?

16  A   I wouldn't say that, but they did find a bullet in my

17  house.

18  Q   And after they found that bullet in your house, you began

19  cooperating with ATF, correct?

20  A   I began cooperating, yes.

21  Q   That's not the only time you had firearms in your house, is

22  it?

23  A   No.  I've never had a firearm in my house.

24  Q   You never had firearms in your house?

25  A   No, I haven't.

1  Q   No one ever dropped off firearms in your house and you just

2  let it sit there?

3  A   Oh, maybe, yes.

4  Q   Maybe.  Let's talk about that maybe.  Sometime -- did you

5  tell the government that at some time, three people came into

6  your house and dropped off a firearm at your house?

7  A   Yes, I did.

8  Q   And you knew it was a gun?

9  A   Yes, I did.

10  Q   And that was not your gun?

11  A   Right.  It wasn't.

12  Q   You didn't have an F O I D card, correct?

13  A   Correct.

14  Q   You had no legal reason to be in possession of a gun,

15  correct?

16  A   Correct.

17  Q   But these three people came in, gave you a handgun, and

18  said, "Watch it," correct?

19  A   Yes.  They just said they were going to leave it there, and

20  I said, "Yes, okay."

21  Q   Entirely comfortable having a handgun in your house?

22  A   At the time, I didn't think nothing of it.

23  Q   But you found out that that firearm was involved in a

24  murder, correct?

25  A   Later on, yes.

1   Q   And what did you do with that firearm then?

2   A   I didn't do anything with that firearm.

3   Q   Okay.  You said on direct testimony that no promises were

4   made to you in connection with your cooperation?

5   A   Yes, that's correct.

6   Q   But you just got immunity for your cooperation, correct?

7   A   Yes.  That was today.

8   Q   And when did you first learn you'd get immunity for your

9   cooperation?

10  A   Maybe a week ago.

11  Q   Okay.  What is the Almighty Latin King Nation?

12  A   It's a street gang.

13  Q   It's a national street gang, correct?

14  A   Yes.

15  Q   And you were part of the Joliet chapter, correct?

16  A   Yes, I was.

17  Q   What, if any, rank did you have in the Almighty Latin King

18  Nation Joliet Chapter?

19  A   I didn't have a title.

20  Q   You weren't an Inca or Cacique?

21  A   No, I wasn't.

22  Q   Cacique is C-a-c-i-q-u-e.

23       So you were just a soldier, correct?

24  A   Yes.

25  Q   And a soldier is more of the rank-and-file member, correct?

1   A   Correct.

2   Q   And as part of the Almighty Latin King Nation, did you have

3   any tattoos signifying your membership in that street gang?

4   A   No, I don't.

5   Q   And are you familiar with the manifesto of the Almighty

6   Latin King Nation?

7   A   Not all of it.

8   Q   Do you know what it is to respect the crown?

9   A   Yes, I do.

10   Q   And that's -- when you respect the crown -- when you meet

11   another Latin King member, there's a handshake exchange between

12   the two, correct?

13   A   Yes, there is.

14   Q   And that handshake, as we saw in a video, is a handshake

15   and you go into a hand symbol, correct?

16   A   Yes.

17   Q   And the hand symbol, for the record, is I'm extending my

18   thumb, forefinger, and pinky.  Would you please tell the Court

19   what this symbol means?

20   A   That means I love you.

21   Q   And when you met with Mr. Garcia and you showed this

22   symbol, that means "I love you"?

23   A   Yes.

24   Q   Doesn't it also mean "I'd die for you"?

25   A   Yes, it does.  When you bring it to your chest, it does

1  mean that.

2  Q   As part of the Latin Kings, did you ever engage in any SOS

3  or KOS?

4  A   No.  No, I didn't.

5  Q   SOS means shota -- smash on sight, correct?

6  A   Yes.

7  Q   And KOS means kill on sight.  You never engaged in that?

8  A   No, never.

9  Q   Are you familiar with any of the rules of the Almighty

10  Latin King Nation?

11  A   Some, not all.

12  Q   Is one of the rules that no member shall use his position

13  or membership to exploit anyone inside or outside the nation.

14  Are you familiar with that rule?

15  A   No.

16  Q   Are you aware that any member found guilty of being a

17  traitor or a police collaborator will lose his membership and

18  be subject to discipline?

19  A   Yes.

20  Q   So you knew that, and you were willing to abide by that

21  when you were a Latin King, correct?

22  A   Yes, I was.

23  Q   And it's your opinion, as a member of the Latin Kings, that

24  other members would be likewise bound to that?

25  A   Yes.

Muñoz - cross by Legutki

1  Q   Let's talk about Overhill Transportation, please.  2009.
2  What is Overhill Transportation?
3  A   It's a truck company.
4  Q   And who was its registered agent in 2009?  Were you the
5  registered agent?
6  A   Oh, for the truck?
7  Q   Yes.
8  A   Yes.
9  Q   And as part of that, with that truck, going back to 2009,
10 did you make trips to Mexico to pick up drugs?
11 A   No, I didn't.
12 Q   Did you go down to the border near Mexico to pick up drugs?
13 A   Close to.
14 Q   Close to.  And did you -- that happened in December of
15 2009.  December 22, 2009 to December 29, 2009; isn't that
16 correct, to the best of your recollection?
17 A   I don't recall.
18 Q   Several times in 2009 you made those trips, correct?
19 A   Yes.
20 Q   And did you at one time boast that you were making these
21 trips down to the border of Mexico a couple of times per month?
22 A   I don't recall.
23 Q   Okay.  Let me get back to the Latin Kings.  You're part of
24 the Joliet faction, correct?
25 A   Yes.

1  Q   And your dad was a Latin King, correct?

2  A   I'm not sure if he was.  I know he hung around with them,

3  but I don't know if he was actually a Latin King member.

4  Q   Was Ralph a Latin King when your dad was alive?

5  A   I didn't know Ralph at the time, so...

6  Q   You didn't know Ralph at the time?  Okay.

7       And in January of 2014, did you attempt to sell a

8  handgun for $250?

9  A   No, I didn't.

10 Q   Did you have a handgun that you were -- that was -- that

11 you discussed with a confidential informant in 2014?

12 A   I don't recall.

13 Q   You don't recall.  All right.

14       In April 2014, did you attempt to sell eight balls of

15 narcotics for $100?

16 A   I don't recall that specific transaction, but I was dealing

17 cocaine at the time.

18 Q   You were dealing cocaine?

19 A   Yes, at the time.

20 Q   Were you also dealing in firearms?

21 A   No, I wasn't.

22 Q   In 2012, when Ralph Garcia got out of prison, you helped

23 him find a job with a trucking company, correct?

24 A   Yes.

25 Q   Adan Fiero, A-D-A-N F-I-E-R-O, correct?

1  A   Yes, that's correct.

2  Q   And that was a legitimate job?

3  A   Yes, it was.

4  Q   And Ralph was making about 3- to $4,000 a month, to the

5  best of your knowledge?

6  A   I'm not sure what he was making.

7  Q   He was making a legitimate salary?

8  A   I mean, he was getting paid to drive, yes.

9  Q   Okay.  Now, your testimony is that you were not that

10 familiar with Ralph up until 2014, correct?

11 A   No.  That's 2012.

12 Q   2012.  And in 2012, you befriended Ralph Garcia?

13 A   Yes, I did.

14 Q   As a matter of fact, -- tell me what The Spanish is.

15 A   It's just a bar everybody goes and hangs out at.

16 Q   That's in Joliet, correct?

17 A   Yes, it is.

18 Q   Was that Munchen Street?

19 A   No.  It's Meeker Street.

20 Q   Meeker Street.  Sorry.  You're right.  My handwriting is

21 bad.

22        During November of 2014, did you get in an altercation

23 or fistfight with a ranking member of the Latin Kings?

24 A   In what year was that?

25 Q   I think it was 2014.

1   A   I don't recall that, but -- I don't think so.

2   Q   Did you ever get in a fight?  Did you punch anybody in the

3   nose at The Spanish?

4   A   Possibly, yes.  I did get in a fight at The Spanish.

5   Q   With an Inca?

6   A   That was his title at the time, yes.

7   Q   What is an Inca in the Latin Kings?

8   A   He's the commander in chief.

9   Q   He's a boss?

10  A   Right.

11  Q   And so punching an Inca in the nose could lead to

12  significant trouble for you, correct?

13  A   Correct.

14  Q   So you were nobody in the gang?

15  A   At the time, yes.

16  Q   Who stepped in to help you with that Inca?  Was it Ralph?

17  A   There was a few people at the time.

18  Q   Ralph was there, though, right?

19  A   Yes, he was.

20  Q   And he stepped in to prevent harm happening to you after

21  you punching that Inca in the nose, correct?

22  A   I mean, he defused the situation, yes.

23  Q   Okay.  There was another altercation you were involved in

24  at The Spanish involving an individual named LaMarr.  Do you

25  recall that?

1   A   Yes, I do.

2   Q   And at the time, your wife was named Karen?

3   A   Yes.

4   Q   And that was also 2014?

5   A   I don't think it was 2014.

6   Q   What year was it?

7   A   2015.  Somewhere around there.

8   Q   Okay.  And LaMarr -- LaMarr is a big guy, right?

9   A   Yes, he is.

10  Q   6-5, 350, pretty much muscle, right?

11  A   I wouldn't say muscle, but he's a big guy, yes.

12  Q   Big guy.  And he was also a King?

13  A   Yes, he was.

14  Q   Was he an enforcer within the Kings?

15  A   I'm not sure what his title was at the time.

16  Q   He was a bad guy?  I mean, he's a tough guy?

17  A   Oh, yeah.  He's a pretty big guy, yes.

18  Q   So LaMarr's sister was a woman named Asia, correct?

19  A   That's his niece.

20  Q   That's his niece; you're right.  So Asia and Karen began

21  fighting?  There was an altercation between the two, right?

22  A   Yes, they did.

23  Q   And you kind of stepped in, and you threw a punch and you

24  hit Valerie, correct?

25  A   Yes.

1   Q   And Valerie was a girlfriend of LaMarr?

2   A   Yes, she was.

3   Q   And LaMarr got mad at you?

4   A   Yes, he did.

5   Q   So you punched his girlfriend and hurt her?

6   A   Yes.

7   Q   Who stepped in to save you?

8   A   Nobody at the time.

9   Q   Was Ralph there?

10  A   I mean, yes, he was.

11  Q   Did Ralph step in to intercede?

12  A   No.  The fight just happened.  Nobody interfered to stop

13  anything.

14  Q   Did Ralph stop LaMarr from taking vengeance out on you?

15  A   He could have, yes.

16  Q   And he did?

17  A   I'm not sure what was said or anything like that.

18  Q   Well, let me put it this way:  Did LaMarr beat you that

19  night?

20  A   He hit me a few times, yes.

21  Q   Didn't kill you?

22  A   No, he didn't kill me.

23          THE COURT:  Mr. Legutki, I hate to tell you this, but

24  I need to run.  I don't want to cut you short.

25          MR. LEGUTKI:  I have about five more questions, Judge.

1          THE COURT:  I'm already late.

2          MR. LEGUTKI:  Okay.  Thank you.

3          THE COURT:  So we'll pick up at 1:30, and then I will

4  go to whatever we need this afternoon.

5          MR. LEGUTKI:  Very good, Judge.

6          THE COURT:  Thank you very much, everybody.  See you

7  at 1:30.

8          Anything else before I run?

9          MR. STORINO:  Well, the only question was if you had

10  any evidence to put on?

11          MR. LEGUTKI:  No.

12          MR. STORINO:  You're not expecting any?

13          MR. LEGUTKI:  No.

14          MR. STORINO:  Okay.  Thank you, your Honor.  Sorry to

15  make you late.

16          THE COURT:  No problem.  We're good.  Thank you.  See

17  you at 1:30.

18      (Proceedings concluded at 12:00 p.m.)

19                    * * * * * * * * * *

20                    C E R T I F I C A T E

21      I certify that the foregoing is a correct transcript from

22  the record of proceedings in the above-entitled matter.

23

24  /s/Kristin M. Ashenhurst, CSR, RDR, CRR  September 12, 2019
    Kristin M. Ashenhurst, CSR, RDR, CRR     Date
25  Federal Official Court Reporter