UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No.   16 CR 109 |
| | ) | Judge Robert M. Dow, Jr. |
| RALPH GARCIA | ) | |

**<u>GOVERNMENT'S POST-TRIAL BRIEF</u>**

THE UNITED STATES OF AMERICA, by its attorney, JOHN R. LAUSCH, JR., United States Attorney for the Northern District of Illinois, and respectfully submits its Post-Trial Brief.

The evidence presented during the trial of defendant, Ralph Garcia, in this case established, beyond a reasonable doubt that, as charged in Counts One through Six of the superseding indictment:

(1) On or about November 17, 2014, at Joliet, in the Northern District of Illinois, defendant knowingly and intentionally distributed a controlled substance, namely, 5 grams or more of methamphetamine (actual), a Schedule II Controlled Substance; in violation of Title 21, United States Code, Section 841(a)(1) (Count One).

(2) On or about November 24, 2014, at Joliet, in the Northern District of Illinois, defendant knowingly and intentionally distributed a controlled substance, namely, 50 grams or more of methamphetamine (actual), a

Schedule II Controlled Substance; in violation of Title 21, United States Code, Section 841(a)(1) (Count Two).

(3) On or about December 15, 2014, at Joliet, in the Northern District of Illinois, defendant knowingly and intentionally distributed a controlled substance, namely, 50 grams or more of methamphetamine (actual), a Schedule II Controlled Substance; in violation of Title 21, United States Code, Section 841(a)(1) (Count Three).

(4) On or about January 23, 2015, at Joliet, in the Northern District of Illinois, defendant, knowing that he had previously been convicted of a crime punishable by a term of imprisonment exceeding one year, did knowingly possess, in and affecting interstate commerce a firearm, namely a Taurus Revolver, model 856, .38 caliber, bearing serial number DW62612, which firearm had traveled in interstate commerce prior to the defendant's possession of the firearm; in violation of Title 18, United States Code, Section 922(g)(1) and 924(e) (Count Four).[1]

(5) On or about January 23, 2015, at Joliet, in the Northern District of Illinois, defendant knowingly and intentionally distributed a controlled substance,

---

[1] The grand jury returned an indictment in this case, and this case proceeded to a bench trial, prior to the Supreme Court's decision in *Rehaif v. United States*, 139 S. Ct. 2191, 2200 (2019), in which the Supreme Court held that the government must prove that a defendant knew of his or her felony status. As such, the original indictment in this case did not allege that the defendant knew of his felony status, but only that he knowingly possessed a firearm. Following *Rehaif*, the parties agreed to re-open the evidence and the parties stipulated that the defendant knew of his felony status prior to the alleged possession of a firearm on January 23, 2015. R. 105 (Stipulation #4).

namely, 50 grams or more of methamphetamine (actual), a Schedule II Controlled Substance; in violation of Title 21, United States Code, Section 841(a)(1) (Count Five).

(6) On or about March 4, 2015, at Joliet, in the Northern District of Illinois, defendant knowingly and intentionally distributed a controlled substance, namely, 5 grams or more of methamphetamine (actual), a Schedule II Controlled Substance; in violation of Title 21, United States Code, Section 841(a)(1) (Count Six).

R. 49 (Superseding Indictment).

## I. **Applicable Law**

*A. Distribution of a Controlled Substance.*

In order for the court to find that the defendant is guilty of distribution of a controlled substance as charged in Counts One, Two, Three, Five and Six, the government must prove the following elements beyond a reasonable doubt: (1) the defendant knowingly distributed the controlled substance, namely 50 grams or more of actual methamphetamine; and (2) the defendant knew the substance was some kind of controlled substance. The government is not required to prove that the defendant knew the substance was actual methamphetamine but only that the defendant knew the substance was some kind of controlled substance. *Seventh Circuit Pattern Federal Jury Instructions – Criminal*, (2012 Ed.) at 910; 21 U.S.C. § 841(a)(1). "A person 'distributes' a controlled substance if he delivers or transfers possession of the controlled substance to someone else." *Id.* at 812.

3

### B. Possession of a Firearm

In order for the court to find that the defendant is guilty of being a felon in possession of a firearm as charged in Count Four, the government must prove the following elements beyond a reasonable doubt: (1) the defendant knowingly possessed a firearm; (2) at the time of the charged act, the defendant was a prohibited person, namely a previously convicted felon; and (3) the firearm had been shipped or transported in interstate or foreign commerce. *Seventh Circuit Pattern Federal Jury Instructions – Criminal*, (2012 Ed.) at 285; 18 U.S.C. § 922(g)(1). Additionally, following the Supreme Court's decision in *Rehaif*, "[t]he [g]overnment must prove both that the defendant knew he possessed a firearm and that he knew he belonged to the relevant category of persons barred from possessing a firearm," namely, the category of previously convicted felons." *Rehaif*, 139 S. Ct. at 2200.

## II.    Facts and Argument

The government called the following witnesses at trial: (1) Special Agent Andrew Karceski of the Bureau of Alcohol, Tobacco and Firearms; (2) the confidential source ("CS")[2] who purchased the narcotics and a firearm from the defendant over five separate occasions; (3) DEA Chemist Sarah Manney; and (4) DEA Chemist Robert Holbrooke. During the course of the trial, Special Agent Karceski testified regarding a series of recorded meetings, telephone calls and text message exchanges between the defendant and the CS, during which the CS purchased

---

[2] While the CS identified himself by name at trial, the government identifies him as only CS herein.

4

methamphetamine and a gun from the defendant in exchange for United States currency. Throughout the course of the trial, Special Agent Karceski also provided his interpretation of coded words and language used by the defendant and the CS with regards to drugs, guns and gang activity. Special Agent Karceski based his interpretation on over 25 years of law enforcement; his extensive training in firearms, narcotics and street gangs; and the hundreds of investigations he has conducted in this field. Tr. 10-15.

### a. November 17, 2014: Defendant Distributed 27.4 Grams of Methamphetamine to the CS [Count One]

*A. November 15, 2014: Defendant and CS Meet to Discuss Methamphetamine Distribution.*

Agent Karceski testified that on or around November 15, 2014, the CS informed him that the defendant was selling drugs. Tr. 16, 36-37. Law enforcement had previously identified the defendant as a leader of the Joliet faction of the Latin Kings street gang. Tr. 196. On the same day, at the direction of Agent Karceski, the CS made a recorded call to the defendant at (815) 641-1437 (the "Garcia Phone") and arranged to meet with the defendant. Tr. 18-21; G. Ex. 1.

Before the CS left to meet with the defendant, Agent Karceski followed his standard protocol for controlled meetings with a target (here, the defendant): he searched the CS and his car and verified that the CS had no contraband in his possession; he provided the CS with a recording device; and he maintained surveillance of the CS from his meeting with Agent Karceski to his meeting with the defendant. Tr. 21-22.

On November 15, 2014, the CS met with the defendant in the CS's car at 702 Vista Lane in Joliet, Illinois ("Garcia Residence"). Tr. 22; G. Ex. 2. During the meeting, defendant told the CS that, "This guy got the white [China white heroin]3 though, though, it's not the mud [black tar heroin], they want the mud." G. Ex. 2; G. Ex. 2 Trans. 45-47; Tr. 39-40.4 The CS told the defendant that the last time his ostensible out-of-town customer5 was looking for narcotics, he was looking for "damn near 50 grams" of narcotics. G. Ex. 2; G. Ex. 2 Trans. 52-56. Defendant responded that his supplier "got a boatload [a lot of heroin]." G. Ex. 2; G. Ex. 2 Trans. 68; Tr. 40.

As the conversation continued, defendant explained that his supplier was "cutting it [the narcotics] with some shit," which Agent Karceski explained involved the mixing of narcotics with other substances to dilute the product and increase the volume of narcotics. G. Ex. 2; G. Ex. 2 Trans. 85-86.; Tr. 40-41. Defendant stated that the supplier would give defendant "10 grams [of heroin]", but was charging defendant "a hundred dollars a gram." G. Ex. 2; G. Ex. 2 Trans. 86-88. Agent Karceski testified that at that time, heroin cost approximately $100 per gram on the street. Tr. 41.

---

3 Agent Karceski's interpretations of statements made on recorded calls and meetings appear in brackets.
4 When citing to testimony that appeared on recording, the government's citations herein are to the actual exhibit of the recorded call or meeting ("G. Ex. __"), the transcript of the recorded call or meeting followed by the page number of the transcript ("G. Ex. __ Trans. __"), and then the trial transcript where the relevant portion appeared ("Tr. __").
5 As part of this investigation and at the direction of law enforcement, the CS advised the defendant that he had a narcotics customer from outside Joliet who was interested in purchasing narcotics.

Defendant said he refused to pay his supplier "no hundred dollars" because the heroin was diluted. G. Ex. 2; G. Ex. 2 Trans. 90-92.

When asked by the CS how much the heroin went for on the street, defendant responded that it went for "a hundred dollars a gram." G. Ex. 2; G. Ex. 2 Trans. 94-102. Defendant explained that if the CS bought large quantities of "the dope [heroin]," he could buy it for $50 or $60 a gram. G. Ex. 2; G. Ex. 2 Trans. 108-119; Tr. 42.

Later in the conversation, the CS asked defendant if he had "them things," in reference to firearms. G. Ex. 2; G. Ex. 2 Trans. 134-137, Tr. 43. Defendant responded that his brother had "a friend who's gotta whole house full of 'em [firearms]" and who brings them "on the train." G. Ex. 2; G. Ex. 2 Trans. 160-166, Tr. 44-45. However, defendant explained that the train service started using metal detectors and now "they ain't letting them on the train with 'em [firearms]." G. Ex. 2; G. Ex. 2 Trans. 143-145, 174-175, Tr. 45. Defendant also explained that there was a "[member of the P] Stone [Nation street gang who] got like six guns. Wants like [$]200 for like a .357 [caliber firearm]…he showed me the guns last night." G. Ex. 2; G. Ex. 2 Trans. 188-192, Tr. 45-46.

Defendant also told the CS that he had a reliable source of "yae [cocaine]," who was selling the cocaine "a little chop at a time" to keep the demand for the cocaine high. G. Ex. 2; G. Ex. 2 Trans. 298-318, Tr. 46-47. Defendant told the CS that defendant was "selling the shit [cocaine]" the previous day. G. Ex. 2; G. Ex. 2 Trans. 299-300, Tr. 46. Defendant said that another source was diluting the cocaine and selling "[eight] balls [1/8 an ounce of cocaine] for 180 bucks." G. Ex. 2; G. Ex. 2 Trans.

331-335, Tr. 48. When the CS asked defendant about buying a quarter kilogram of narcotics from the defendant, defendant responded that he "made, like nice bags [for street level distribution]." G. Ex. 2; G. Ex. 2 Trans. 371-372, Tr. 49.

Defendant then proposed that CS "try to get rid of [sell] some of that ice [crystal methamphetamine] I got." G. Ex. 2; G. Ex. 2 Trans. 390-391, Tr. 49. Agent Karceski testified that the defendant was the person who brought up the subject of crystal methamphetamine; the CS had never asked to buy crystal methamphetamine from the defendant. Tr. 50. The CS responded by asking defendant how much an ounce of the methamphetamine cost, to which the defendant responded that his source was selling them "9 deep [$900 for an ounce of methamphetamine], they getting 'em like [$]250 [for] an eight ball [1/8th an ounce of methamphetamine]." G. Ex. 2; G. Ex. 2 Trans. 400-401, Tr. 51. When the CS asked the defendant if he could get the methamphetamine for him "ASAP," the defendant responded, "Yeah real quick." G. Ex. 2; G. Ex. 2 Trans. 415-418, Tr. 51.

The CS then reiterated that he was trying to get firearms. G. Ex. 2; G. Ex. 2 Trans. 523. Defendant stated, "When I had all that shit [firearms], I was passing it out." G. Ex. 2; G. Ex. 2 Trans. 546-547; Tr. 52. Defendant then recounted a time when police executed a search warrant at his house and recovered a gun he kept upstairs. G. Ex. 2; G. Ex. 2 Trans. 546-610; Tr. 53-54. Defendant also recounted how in the "old days we used to just have 'em [the firearms] anchored" in "hiding spots," like "a little box or something." G. Ex. 2; G. Ex. 2 Trans. 636-658; Tr. 54-56. Agent Karceski

testified that this was consistent with a common method used by street gangs to stash guns in easily accessible locations without carrying them on their person. Tr. 55-56.

Before the end of the meeting, defendant agreed that it would be "[$]9 [hundred] for that ice [methamphetamine]." G. Ex. 2; G. Ex. 2 Trans. 614-617; Tr. 55. The CS said he would talk to his ostensible customer and get back to the defendant later in the week. G. Ex. 2; G. Ex. 2 Trans. 619-627. Defendant also agreed to call his source for "yae [cocaine]," explaining that his source had "two [qualities of cocaine for sale], he got fifteen [a higher quality cocaine for sale for $1,500 an ounce] and he got the eight [lower quality cocaine for sale for $800 an ounce]." G. Ex. 2; G. Ex. 2 Trans. 707-722; Tr. 56.

After the meeting, consistent with standard protocol, Agent Karceski maintained surveillance of the CS; met with the CS; and retrieved the recording devices from the CS. Tr. 23-34.

### B. November 17, 2014: Defendant Distributed 27.4 Grams of Methamphetamine.

On November 17, 2014, at 10:15 a.m., the CS texted the defendant that his ostensible customer was in town and he "want to grab one of those yellow ones [methamphetamine]." G. Ex. 3; G. Ex. 3 Trans.; Tr. 57-59. The CS sent a follow up text clarifying that his customer was looking to buy "just 1 [ounce of methamphetamine." *Id.* At approximately 3:26 p.m., defendant indicated he was ready to distribute the methamphetamine to the defendant, texting, "I'm back at house now…I'm ready now." G. Ex. 3; G. Ex. 3 Trans.; Tr. 60.

Before the CS left to meet with the defendant, Agent Karceski searched the CS and his car and verified that the CS had no contraband in his possession; he provided the CS with a recording device and $900 in buy money; and he maintained surveillance of the CS from his meeting with Agent Karceski to his meeting with the defendant. Tr. 60.

On November 17, 2014, the CS met with the defendant in the CS's car in the driveway of the Garcia Residence. Tr. 66; G. Ex. 6. When defendant came in the car, defendant told the CS, "this [methamphetamine] is fire [high quality]." G. Ex. 6; G. Ex. 6 Trans. 25; Tr. 68. Defendant also told the CS, "I left a little, uh, about a gram, they got two bags, don't' let the bag, the shit [methamphetamine] touch your skin so you'll get high." G. Ex. 6; G. Ex. 6 Trans. 27-32; Tr. 69. Agent Karceski explained that crystal methamphetamine can be absorbed through the skin to the touch and get someone high. Tr. 69. Agent Karceski explained that methamphetamine users commonly use two bags for their product as a result. *Id.* Defendant re-emphasized that "there's two bags on there" and advised the defendant "the way they test it [crystal methamphetamine], put it in bleach…The one that floats on the top is good…This one's fire [high quality]." G. Ex. 6; G. Ex. 6 Trans. 34-42; Tr. 69. Agent Karceski explained that a street test to determine the strength of methamphetamine is to put the methamphetamine in bleach and see if it floats. Tr. 69-70.

The video-recording showed the CS counting out $900 in cash to pay the defendant. G. Ex. 6; G. Ex. 6 Trans. 55-63; Tr. 70. Defendant advised the CS not to sell it to his customer "for 9 [hundred dollars], though, you give it to him for like 12

[hundred dollars], 15 [hundred dollars]." G. Ex. 6; G. Ex. 6 Trans. 564-65; Tr. 70-71. At the end of the transaction, defendant told the CS to "try and get a picture of the dude [the ostensible customer] so in case we gotta chase his ass down." G. Ex. 6; G. Ex. 6 Trans. 94-95; Tr. 71. As Agent Karceski explained, the defendant was advising the CS to identify his customer so the defendant and the CS could collect from him if the customer failed to pay for the methamphetamine. Tr. 72. Agent Karceski identified the voice on the video-recording of the person distributing the suspect methamphetamine to the CS as the defendant, Ralph Garcia. Tr. 67. Likewise, the CS testified that the person who sold methamphetamine to him on between November 2014 and March 2015 was the defendant, Ralph Garcia. Tr. 226-227. Defendant also said that "if he [the ostensible customer] smoke that [crystal methamphetamine, a stimulant,], he will be up for days." G. Ex. 6; G. Ex. 6 Trans. 102; Tr. 72.

After the meeting, Agent Karceski maintained surveillance of the CS; met with the CS; and obtained from the CS the plastic bag containing methamphetamine that the CS had obtained from the defendant. Tr. 62-64; Ex. 5. Agent Karceski also retrieved the recording devices from the CS and searched the CS and his vehicle and located no additional contraband. *Id.*

DEA forensic chemist Sarah Manney tested the product the defendant provided to the CS on November 17, 2014, and found it to be 27.4 grams of d-methamphetamine hydrochloride that had a purity of 100%. Tr. 111; G. Ex. 5; G. Ex. 36.

*C. Application of law to facts*

The above facts establish beyond a reasonable doubt that the defendant Ralph Garcia distributed methamphetamine to the CS on November 17, 2014. First, the CS identified the defendant as the person who sold him narcotics, and Agent Karceski identified the defendant's voice as the person who sold narcotics to the CS on November 17, 2014. While the government always retains the burden of proof, the defendant did not challenge identity on cross-examination of the Agent or the CS in any meaningful way. Second, the substance distributed by the defendant to the CS tested positive for 26 grams of methamphetamine hydrochloride with a purity of 100%, and the defendant clearly knew he was distributing a controlled substance: the defendant referred to the substance as "fire" or high-quality narcotics, the defendant explained how he put two bags on the substance, and the defendant warned the CS not let the substance touch his skin or else he would get "high." These statements reflect the defendant's knowledge of the substance he distributed as a controlled substance. The evidence establishes the defendant guilt beyond a reasonable doubt as to Count One.

## b. November 24, 2014: Defendant Distributed 56.3 Grams of Methamphetamine to the CS [Count Two]

*A. November 24, 2014: Pre-Deal Communications.*

On November 24, 2014, the CS called the defendant and told him that his ostensible customer liked "what he grabbed" during the previous deal and wanted to order "the same thing but probably another, an extra one [two ounces of crystal

methamphetamine]." G. Ex. 7; G. Ex. 7 Trans. 20-31; Tr. 75. The defendant agreed to provide the 2 ounces, responding that he could meet with the CS "later on today," but explaining that "they [defendant's source] don't get off [work] til 3." G. Ex. 7; G. Ex. 7 Trans. 84-125; Tr. 75-76.

That same day, at approximately 3:26 p.m., defendant texted the CS that he was on his way back to his house and told the CS to meet him there. G. Ex. 8; G. Ex. 8 Tr. 1. At approximately 4:13 p.m., the CS called and texted the defendant to tell him that he had arrived at his house. G. Ex. 8; G. Ex. 9.

### B. November 24, 2014: Defendant Distributed 56.3 Grams of Methamphetamine.

Before the CS left to meet with the defendant, Agent Karceski searched the CS and his car and verified that the CS had no contraband in his possession; he provided the CS with a recording device and $1,800 in buy money; and he maintained surveillance of the CS from his meeting with Agent Karceski to his meeting with the defendant. Tr. 78-79.

On November 24, 2014, the CS met with the defendant in the CS's car in the driveway of the Garcia Residence. Tr. 85-87; G. Ex.11. Agent Karceski positively identified the defendant, Ralph Garcia, as the same person in the car meeting with the CS on November 24, 2014 as depicted in the video-recording. Tr. 87. Additionally, the CS testified that that the person who sold methamphetamine to him between November 2014 and March 2015 was the defendant, Ralph Garcia. Tr. 226-227. As the defendant entered the car, the defendant and the CS exchanged a handshake

13

used by the Latin Kings. G. Ex. 11; Tr. 88. After the CS stated that "dude [the ostensible customer] say he like that shit [the methamphetamine defendant distributed on November 17]," defendant responded that "it'll [the methamphetamine] stop ya in your tracks [was high quality]." G. Ex. 11; G. Ex. 11 Trans. 23-23; Tr. 88.

Defendant then stuck his left hand into his jacket pocket, retrieved a plastic baggie containing suspect methamphetamine and passed it to the CS. G. Ex. 11; Tr. 89-90. When the CS asked "is it the same shit [high quality crystal methamphetamine]," defendant responded, "Yeah." G. Ex. 11; G. Ex. 11 Trans. 32-34; Tr. 90. Defendant advised the CS to "put another bag on there so you don't get sick [do not absorb the crystal methamphetamine through your skin." G. Ex. 11; G. Ex. 11 Trans. 39-40; Tr. 90. The recording of the transaction then shows the CS counting out $1,800 in cash and handing that cash over to defendant. G. Ex. 11; G. Ex. 11 Trans. 42-53; Tr. 90.

After the CS and the defendant exchanged the methamphetamine and the cash, the defendant told the CS that he knew about a guy and his dad who have "all kind of guns." G. Ex. 11; G. Ex. 11 Trans. 72-79. When the CS asked if the guns were registered, defendant responded "it don't matter." G. Ex. 11; G. Ex. 11 Trans. 81-84. Defendant suggested that they "just get 'em [the guns] and go, man, get 'em and go. We'll sell off half of 'em we can sell. Everybody is asking for guns." G. Ex. 11; G. Ex. 11 Trans. 88-90; Tr. 91. Later in the conversation, defendant stated that they "got everything [all types of firearms]," including "AK [47 assault rifles]." G. Ex. 11; G. Ex.

14

11 Trans. 376-386; Tr. 94-95. Defendant suggested, "I figure we'll grab the son…get the old man…just tie 'em, we ain't gotta kill 'em, just load up [steal their guns]…by the time they get loose we'll be gone." G. Ex. 11; G. Ex. 11 Trans. 386-396; Tr. 95.

Defendant told the CS, "I might be able to get some more of the other one [heroin], but it's white [heroin, as opposed to black tar heroin]." G. Ex. 11; G. Ex. 11 Trans. 96-98; Tr. 91. Defendant then explained that he had a source who was selling "ounces on the white [heroin]," but that the source was charging $18,000 for nine ounces. G. Ex. 11; G. Ex. 11 Trans. 108-119; Tr. 92.

Defendant also explained to the CS that there was a Latin King member who was trying to get defendant to take a position in the Pontiac faction of the Latin Kings that dealt primarily in heroin. G. Ex. 11; G. Ex. 11 Trans. 130-150; Tr. 93-94. Defendant proposed to the CS that if they placed someone in a position to sell heroin on the north side, then they could obtain a cut of the profits. G. Ex. 11; G. Ex. 11 Trans. 150-169; Tr. 94.

After the meeting, Agent Karceski maintained surveillance of the CS; met with the CS; and obtained from the CS the plastic bag containing methamphetamine that the CS had obtained from the defendant. Tr. 83-84; Ex. 10. Agent Karceski also retrieved the recording devices from the CS and searched the CS and his vehicle to ensure that no additional contraband were present. *Id.*

DEA forensic chemist Sarah Manney tested the substance the defendant provided to the CS on November 24, 2014, and found it to be 56.3 grams of d-

methamphetamine hydrochloride that had a purity of 100%. Tr. 111-112; G. Ex. 10; G. Ex. 37.

### C. *Application of law to facts*

The above facts establish beyond a reasonable doubt that the defendant Ralph Garcia distributed methamphetamine to the CS on November 24, 2014. First, the CS identified the defendant as the person who sold him narcotics, and Agent Karceski positively identified the defendant on the video recording as the person who sold narcotics to the CS on November 24, 2014. Further, the Court, having viewed the recording and viewed the defendant, may make the same identification. Similar to Count One, the defendant did not challenge identity on cross-examination of the Agent or the CS in any meaningful way. Second, the substance tested positive for more than 50 grams of methamphetamine hydrochloride with a purity of 100%, and the defendant clearly knew he was distributing a controlled substance: in response to the CS's question of whether the substance was the "same shit" or high quality crystal methamphetamine from the last transaction on November 17, the defendant responded, "Yeah." The defendant further advised the CS to "put another bag on there so you don't get sick," further demonstrating that the defendant knew the substance he was distributing to the CS was a dangerous, controlled substance. The evidence establishes the defendant guilt beyond a reasonable doubt as to Count Two.

### c. December 15, 2014: Defendant Distributed 55.6 Grams of Methamphetamine to the CS [Count Three]

*A. December 15, 2014: Pre-Deal Communications.*

On December 15, 2014, the CS and the defendant exchanged a series of text messages between 11:37 a.m. and 3:10 p.m. G. Ex. 12; Tr. 95-97. During the course of these texts, the CS texted the defendant that "my guy [the CS's ostensible customer] is in town trying to do something- can I get the same as last time." *Id.* The defendant responded, "Okay." *Id.* The defendant and the CS then arranged to meet that afternoon. *Id.*

*B. December 15, 2014: Defendant Distributed 55.6 Grams of Methamphetamine.*

Before the CS left to meet with the defendant, Agent Karceski searched the CS and his car and verified that the CS had no contraband in his possession; he provided the CS with a recording device and $1,800 in buy money; and he maintained surveillance of the CS from his meeting with Agent Karceski to his meeting with the defendant. Tr. 97-99.

On December 15, 2014, the CS met with the defendant in the CS's car in the driveway of the Garcia Residence. Tr. 98, 124-127; G. Ex. 14. Agent Karceski positively identified the defendant, Ralph Garcia, as the same person in the car meeting with the CS on December 15, 2014 as depicted in the video-recording. Tr. 125, 127. Additionally, the CS testified that that the person who sold methamphetamine to him between November 2014 and March 2015 was the defendant, Ralph Garcia. Tr. 226-227. When defendant entered the car, he exchanged

the Latin Kings handshake with the CS, and then removed something from his right pocket and passed to towards the CS. G. Ex. 14; Tr. 127-128. The CS then counted out $1,800 in cash and handed it to the defendant. G. Ex. 14; G. Ex. 14 Trans. 36-79; Tr. 128. Before the defendant left the CS's car, the defendant commented, "You see how that shit [the crystal methamphetamine] got me too, man I shouldn't have grabbed that shit with my hands…look at my eyeball...I double bagged it, but I pulled it out of there with my hand cause it was a chunk." G. Ex. 14; G. Ex. 14 Trans. 322-333; Tr. 133.

While the CS and the defendant were meeting, the CS told the defendant that he was looking for a gun source who could sell firearms to the CS. G. Ex. 14; G. Ex. 14 Trans. 157. Defendant told the CS that his sister's boyfriend "got good shit [high quality firearms]." G. Ex. 14; G. Ex. 14 Trans. 198-199; Tr. 131. Defendant explained that he had previously bought a "40 cal[iber]" from this source and "we came right here and tried to shoot the sign, and shit [the firearm] didn't work." G. Ex. 14; G. Ex. 14 Trans. 208-242; Tr. 131-132. Defendant pointed out the sign near his house that he had shot with the .40 caliber firearm. *Id.* Defendant stated that if his source would "let me grab 'em [the firearms], I'll grab some, and we'll do it like that." G. Ex. 14; G. Ex. 14 Trans. 250-52; Tr. 131. Defendant said, "If I get something [a firearm]…I'll probably hang on to it." G. Ex. 14; G. Ex. 14 Trans. 305-306; Tr. 132. Defendant also told the CS how he was trying to get more structure in the Joliet faction of the Latin Kings. G. Ex. 14; G. Ex. 14 Trans. 84-107; Tr. 128. Defendant complained that he couldn't "keep giving [the gang members] stuff [narcotics or firearms] for free." G. Ex.

18

14; G. Ex. 14 Trans. 264-269; Tr. 132.

After the meeting, Agent Karceski maintained surveillance of the CS; met with the CS; and obtained from the CS the plastic bag containing methamphetamine that the CS had obtained from the defendant. Tr. 99-100; Ex. 13. Agent Karceski also retrieved the recording devices from the CS and searched the CS and his vehicle and located no additional contraband. *Id.*

DEA forensic chemist Sarah Manney tested the substance the defendant provided to the CS on December 15, 2014, and found it to be 55.6 grams of d-methamphetamine hydrochloride that had a purity of 100%. Tr. 111-112, G. Ex. 13, G. Ex. 38.

### C.  December 15, 2014: Post-Deal Communications.

On December 15, 2014, after meeting with the CS, the defendant called the CS and told him, "I was thinking about that, that one [firearm] over by Mario's, I forgot about that one." G. Ex. 15; G. Ex. 15 Trans. 20-22; 133-135. Defendant explained, "I just keep it there in case I need it." G. Ex. 15; G. Ex. 15 Trans. 31-33; 136. Later that night, defendant texted the CS, "he [the supplier] has a couple of nice ones [firearms]. But he wants top dollar. And some one with a [FOID] card." G. Ex. 16; G. Ex. 16 Trans.; 137-138. Defendant then suggested, "what about that shorty [younger member of the gang], don't one of them have one [a FOID card]?" G. Ex. 16; G. Ex. 16 Trans.; 138-139.

Two days later, on December 17, 2014, defendant sent the CS text messages indicating that that source didn't want to talk, but that, "I'm working on something

else [another firearm source] right now." G. Ex. 17; G. Ex. 17 Trans.; 139-142. The next day, on December 18, 2014, defendant called the CS and told him that he knew "somebody that got one of them, them [FOID] cards." G. Ex. 18; G. Ex. 18 Trans. 38-39; 142-144. Defendant suggested to the CS that they engage in a straw purchasing scheme. G. Ex. 18; G. Ex. 18 Trans. 43-230; Tr. 144-145. Specifically, defendant explained that "as long as we're gonna pay top dollar for that shit [the firearms], we might as well have her [the FOID card holder] go get it [a firearm], and then, you know, just play like she lost it or something." G. Ex. 18; G. Ex. 18 Trans. 43-46; 145. Defendant suggested that they go to the store to buy a nice gun to sell to someone else and then "later on we'll get one [firearm]" to keep. G. Ex. 18; G. Ex. 18 Trans. 60-83; Tr. 145. Defendant offered to "holler at her [the person with the FOID card] and try to convince her [to make the straw purchase]. This way if they [law enforcement] come we'll just leave the [firearm] case and all that there…and then we'll open up the case and be like, oh my god, it's gone." G. Ex. 18; G. Ex. 18 Trans. 91-97; Tr. 146. Defendant reasoned that it made more sense to straw purchase the firearm because "if I'm going to pay this guy [the firearm supplier], this guy want like four [hundred dollars] for [firearms]. They were nice, you know, I ain't gonna lie…and they're brand new, but…if I can get a brand new one [firearm]…I can get two of them." G. Ex. 18; G. Ex. 18 Trans. 116-126; Tr. 146-147.

During the December 18, 2014, phone conversation, defendant also mentioned that he "had that 40 cal[iber firearm]." G. Ex. 18; G. Ex. 18 Trans. 255-256; Tr. 147-148. Defendant told the CS, "that shit [firearm] you could slide in the side of your

pants right there and wouldn't even know you had it." G. Ex. 18; G. Ex. 18 Trans. 260-262; Tr. 148.

On December 31, 2014, the CS texted the defendant asking if there had been any progress on obtaining the firearms. G. Ex. 19; G. Ex. 19 Trans.; Tr. 148-150. Defendant responded that he was "waiting on an answer from two different people [sources of firearms]. One is Aaron's guy. The other one is in jail and his wife is supposed to let me know something today." G. Ex. 19; G. Ex. 19 Trans.; Tr. 150.

On January 12, 2015, the CS texted the defendant, asking if defendant wanted "to get rid of that old dirty Harry [firearm] you were telling me about?" G. Ex. 20; G. Ex. 20 Trans.; Tr. 152. Defendant responded, "No, I am going to hang on to it until I get something else." *Id.*

### D. Application of law to facts

The above facts establish beyond a reasonable doubt that the defendant Ralph Garcia distributed methamphetamine to the CS on December 15, 2014. First, the CS identified the defendant as the person who sold him narcotics, and Agent Karceski positively identified the defendant on the video-recording as the person who sold narcotics to the CS on December 15, 2014. Further, the Court, having viewed the recording and viewed the defendant, may make the same identification. Similar to Counts One and Two, the defendant did not challenge identity on cross-examination of the Agent or the CS in any meaningful way. Second, the substance tested positive for more than 50 grams of methamphetamine hydrochloride with a purity of 100%, and the defendant, once again, clearly knew he was distributing a controlled

substance: before the defendant left the CS's car, the defendant commented he "shouldn't have grabbed that shit [bag of methamphetamine] with [his] hands" and further noted that he "double bagged it, but [he] pulled it out of there with my hand cause it was a chunk." In doing so, the defendant explained how he took precaution by double-bagging the dangerous substance but then "grabbed" it with his hand, which he acknowledged he should not have done. The defendant's statements reflect his knowledge and understanding that the substance inside the bag was a controlled substance so potent that the defendant felt the effects of the same by merely holding the bag. The evidence establishes the defendant's guilt beyond a reasonable doubt as to Count Three.

### d. January 23, 2015: Defendant Distributed a Firearm and 57.4 Grams of Methamphetamine to the CS [Counts Four and Five]

*A. January 21-23, 2015: Pre-Deal Communications.*

On January 21, 2015, defendant texted the CS, "I found one maybe two [firearms]." G. Ex. 21; G. Ex. 21 Trans.; Tr. 153-154.

On January 23, 2015, the CS made a recorded call to the defendant to order additional methamphetamine and to inquire about the firearm. G. Ex. 22; G. Ex. 22 Trans.; Tr. 154-156. During the call, the CS said that his "guy [ostensible customer was] coming to town….I'll see if you can get me something together [methamphetamine]…just probably one [ounce of methamphetamine], one and then…if you got that [firearm], what we talked about yesterday, man, we can kill two birds with one stone." G. Ex. 22; G. Ex. 22 Trans. 28-38; Tr. 156-157. The defendant

agreed to meet with the CS "like the last time [defendant provided methamphetamine to the CS]." G. Ex. 22; G. Ex. 22 Trans. 55; Tr. 157.

Later that day, at approximately 2:40 p.m., the CS called the defendant, who relayed to the CS that he was "getting it together [the firearm and the methamphetamine] right now…shouldn't be that long." G. Ex. 23; G. Ex. 23 Trans. 21; Tr. 157-159. The CS asked if "for that thing [the firearm] you wanted four [hundred dollars]," and the defendant replied, "yeah." G. Ex. 23; G. Ex. 23 Trans. 28-31; Tr. 160. The CS also told the defendant that his ostensible customer now wanted "two of those [two ounces of methamphetamine]," to which defendant replied, "Alright, alright, tell 'em I'll be ready." G. Ex. 23; G. Ex. 23 Trans. 33-49; Tr. 160.

> B. *January 23, 2015: Defendant Distributed 57.4 Grams of Methamphetamine and a Firearm to the CS.*

Before the CS left to meet with the defendant, Agent Karceski searched the CS and his car and verified that the CS had no contraband in his possession; he provided the CS with a recording device and $2,200 in buy money -- $1,800 for the methamphetamine and $400 for the firearm. Tr. 160-161. Agent Karceski then maintained surveillance of the CS as he drove to meet with the defendant. Tr. 163.

On January 23, 2015, the CS met with the defendant in the CS's car in the driveway of the Garcia Residence. Tr. 163; G. Ex. 28. Before entering the car, the defendant passed a plastic bag containing a firearm and firearm accessories through the car window, and advised the CS "you might not want to get rid of this one [the firearm]…look at it before you get rid of it…it's a bad boy [high quality]." G. Ex. 28;

G. Ex. 28 Trans. 15-34; Tr. 170-171. Defendant then asked the CS, "Think he [the CS's ostensible customer] gonna want this speed loader and [gun] case?" G. Ex. 28; G. Ex. 28 Trans. 55-56; Tr. 171.

Agent Karceski positively identified the defendant, Ralph Garcia, as the same person in the car meeting with the CS on January 23, 2015 as depicted in the video-recording. Tr. 169. Additionally, the CS testified that that the person who sold methamphetamine and a firearm to him between November 2014 and March 2015 was the defendant, Ralph Garcia. Tr. 226-227. After receiving the firearm and accessories from the defendant, the CS asked the defendant, "You got those two [ounces of methamphetamine], right?" G. Ex. 28; G. Ex. 28 Trans. 68-70; Tr. 172. The defendant responded "Yeah." *Id.* The CS then counted out $2,200 in cash and gave it to the defendant to pay for the firearm and the methamphetamine. G. Ex. 28; G. Ex. 28 Trans. 71-92; Tr. 172. Later in the conversation, the CS asked defendant if he had given him "those two [ounces of methamphetamine]," defendant reached into his shirt pocket, retrieved a baggie containing methamphetamine and gave the baggie to the CS. G. Ex. 28; G. Ex. 28 Trans. 134-142; Tr. 173-174. As during previous deals, defendant explained, "I put two bags on there" to prevent the methamphetamine from touching the hands of the defendant or the CS. G. Ex. 28; G. Ex. 28 Trans. 144-148; Tr. 174.

When the CS asked defendant about the "one guy" defendant knew with "ten guns," defendant explained that he was "trying to get a hold of him too right now." G. Ex. 28; G. Ex. 28 Trans. 92-98; Tr. 172. Defendant explained that he would use the

cash from this deal to purchase guns from that firearms source. G. Ex. 28; G. Ex. 28 Trans. 97-103; Tr. 172-173.

After the meeting, Agent Karceski maintained surveillance of the CS; met with the CS; and obtained the following from the CS: (1) the plastic bag containing methamphetamine that the CS obtained from the defendant; and (2) a plastic bag containing a gun and various gun accessories. Tr. 163-164; G. Ex. 25; G. Ex. 26; G. Ex. 27. The firearm the CS obtained from the defendant was a Taurus .38 caliber revolver, bearing serial number 62612. Ex. 26; Tr. 166. The firearm accessories the CS obtained from the defendant included: a speed loader that allowed the user to load six rounds of ammunition at once, a leather holster, a gun box, and earplugs. Ex. 27; Tr. 166-168. Agent Karceski also retrieved the recording devices from the CS and searched the CS and his vehicle and located no additional contraband. Tr. 163-164, 168-169.

DEA forensic chemist Sarah Manney tested the substance the defendant provided to the CS on January 23, 2015, and found it to be 57.4 grams of d-methamphetamine hydrochloride that had a purity of 100%. Tr. 112-113; G. Ex. 25;[6] G. Ex. 39.

As the parties stipulated, prior to January 23, 2015, the defendant knew that he was a convicted felon and that he had been convicted in court of a crime punishable by a term of imprisonment exceeding one year. R. 105. As the parties further

---

[6] The transcript reflects the narcotics distributed on January 23, 2015 as being marked as government exhibit 5, (Tr. 112), but the correct exhibit number is government exhibit 25.

stipulated, the Taurus revolver, model 856, .38 caliber, bearing serial number DW62612 was manufactured outside of Illinois, and had traveled in interstate commerce, prior to January 23, 2015. R. 82; Tr. 245.

### C. Application of law to facts

The above facts establish beyond a reasonable doubt that the defendant Ralph Garcia distributed methamphetamine to the CS and possessed a firearm, both on January 23, 2015. First, the CS identified the defendant as the person who sold him narcotics and a firearm, and Agent Karceski positively identified the defendant on the video-recording as the person who met with the CS on January 23, 2015. Further, the Court, having viewed the recording and viewed the defendant, may make the same identification. Similar to other counts discussed above, the defendant did not challenge identity on cross-examination of the Agent or the CS in any meaningful way. Second, and as to the distribution-of-methamphetamine offense (Count Five), the substance distributed by the defendant to the CS tested positive for more than 50 grams of methamphetamine hydrochloride with a purity of 100%, and the defendant, clearly knew he was distributing a controlled substance: the defendant advised the CS that he "put two bags on there" in order to avoid getting high through contact with the controlled substance in the bag.

Next, as to the possession-of-a-firearm offense (Count Six), the defendant stipulated that he knew he had been convicted of a crime punishable by a term of imprisonment of more than one year, and further stipulated that the firearm had traveled in interstate commerce prior to January 23, 2015. R. 82 & 105. Those

stipulations leave only the first element in dispute: whether the defendant possessed the firearm. As to that element, the video-recording reflected how a person subsequently identified as the defendant approached the CS's car and handed a plastic bag to the CS through a window. The defendant then entered the CS's car, at which point the defendant asked the CS if the CS's ostensible customer wanted the "speed loader and [gun] case" that accompanied the gun, reflecting what the defendant had just handed the CS through the window was a firearm. The CS moreover identified the defendant Ralph Garcia as the person who sold a firearm to the CS in January 2015. Tr. 226-227.

The evidence establishes the defendant's guilt beyond a reasonable doubt as to Counts Four and Five.

### e. March 4, 2015: Defendant Distributed 27.9 Grams of Methamphetamine to the CS [Count Six]

*A. March 4, 2015: Pre-Deal Communications.*

On March 4, 2015, the CS made a recorded call to the defendant and advised the defendant, "my guy [the CS's ostensible customer] came back in…he's looking for one [ounce of methamphetamine]." G. Ex. 29; G. Ex. 29 Trans. 1; Tr. 175-177. The defendant responded that he would be ready to meet with the defendant at 3:30 that afternoon. *Id.*

*B. March 4, 2015: Defendant Distributed 27.9 Grams of Methamphetamine to the CS.*

Before the CS left to meet with the defendant, Agent Karceski searched the CS and his car and verified that the CS had no contraband in his possession; he provided

the CS with a recording device and $900 in buy money. Tr. 177. Agent Karceski then maintained surveillance of the CS as he drove to meet with the defendant. Tr. 177-178.

On March 4, 2015, the CS met with the defendant in the CS's car in the driveway of the Garcia Residence. Tr. 178-180; G. Ex. 33. Agent Karceski positively identified the defendant, Ralph Garcia, as the same person in the car meeting with the CS on March 4, 2015 as depicted in the video-recording. Tr. 180. Additionally, the CS testified that that the person who sold methamphetamine to him between November 2014 and March 2015 was the defendant, Ralph Garcia. Tr. 226-227. During the meeting in the car on March 4, the CS asked the defendant, "Nine [hundred dollars for the ounce of methamphetamine] still right?" The defendant confirmed the price. G. Ex. 33; G. Ex. 33 Trans. 39-41; Tr. 181-182. The CS then instructed the defendant to put the methamphetamine in a glove on the floor of his car, which the defendant did. G. Ex. 33; Tr. 182. The CS then counted out $900 in cash, the CS gave the cash to the defendant, and defendant placed the cash in his pocket. G. Ex. 33; G. Ex. 33 Trans. 53-58; Tr. 182.

During the meeting, the defendant mentioned an individual who "sells weed for me." G. Ex. 33; G. Ex. 33 Trans. 207-210; Tr. 183. The defendant told the CS that the "Vice Lords [street gang members] took it from him, took like a half ounce [of cannabis] from him." G. Ex. 33; G. Ex. 33 Trans. 214-215; Tr. 183. The defendant told the CS that he saw two of the Vice Lords that stole the marijuana drunk and by themselves on the street. G. Ex. 33; G. Ex. 33 Trans. 219-259; Tr. 184. The defendant

said that he called another Latin King member and told him to inform other Latin Kings patrolling the area about the theft about the location of the Vice Lords, since they would be easy targets for the Latin Kings. G. Ex. 33; G. Ex. 33 Trans. 254-276; Tr. 183-184. Defendant also told the CS that he had a firearms source who "just wants some money," and who was willing to "back date 'em, like he sold [the firearms]...a couple years ago." G. Ex. 33; G. Ex. 33 Trans. 373-388; Tr. 183. As Agent Karceski explained, the process of backdating the sale of gun is used so individuals could claim that they sold the gun long before the gun was used in a crime. Tr. 185.

After the meeting, Agent Karceski maintained surveillance of the CS; met with the CS; and obtained the glove containing methamphetamine that the CS had obtained from the defendant. Tr. 178-179, 182; G. Ex. 32. Agent Karceski also retrieved the recording devices from the CS and searched the CS and his vehicle and located no additional contraband. Tr. 178.

DEA forensic chemist Robert Holbrook tested the product the defendant provided to the CS on March 4, 2015, and found it to be 27.9 grams of d-methamphetamine hydrochloride that had a purity of 99%. Tr. 122-123, G. Ex. 32, G. Ex. 40.

### C. Application of law to facts

The above facts establish beyond a reasonable doubt that the defendant Ralph Garcia distributed methamphetamine to the CS on March 4, 2015. First, the CS identified the defendant as the person who sold him narcotics, and Agent Karceski positively identified the defendant on the video-recording as the person who sold

narcotics to the CS on March 4, 2015. Further, the Court, having viewed the recording and viewed the defendant, may make the same identification. Similar to the first five counts, the defendant did not challenge identity on cross-examination of the Agent or the CS in any meaningful way. Second, the substance tested positive for more than 5 grams of methamphetamine hydrochloride with a purity of 99%. The call before the deal, during which the defendant and the CS discussed the terms of the transaction, coupled with the delivery of the narcotics by the defendant, which matched those aforementioned terms, establishes that the defendant knew he was distributing a controlled substance. The evidence establishes the defendant's guilt beyond a reasonable doubt as to Count Six.

## CONCLUSION

The evidence presented during the trial established, beyond a reasonable doubt that the defendant: (1) distributed 5 grams or more of methamphetamine on November 17, 2014 (Count One); (2) distributed 50 grams or more of methamphetamine on November 24, 2014 (Count Two); (3) distributed 50 grams or more of methamphetamine on December 15, 2014 (Count Three); (4) possessed a firearm on January 23, 2015, knowing that he was a previously convicted felon (Count Four); (5) distributed 50 grams or more of methamphetamine on January 23, 2015 (Count Five); and (6) distributed 5 grams or more of methamphetamine on March 4, 2015 (Count Six); as charged in the superseding indictment. The United States

respectfully asks that this Court return verdicts of guilty on each of the counts contained in the superseding indictment.[7]

Respectfully submitted,

JOHN R. LAUSCH, JR.
United States Attorney

By:  */s/ Timothy J. Storino*
TIMOTHY J. STORINO
CORNELIUS A. VANDENBERG
Assistant United States Attorney
219 S. Dearborn Street
Chicago, Illinois 60604
(312) 353-5300

DATED: October 18, 2019.

---

[7] The government reserves the right to address any defense raised by the defendant in his response brief, including entrapment, in the government's reply brief.