IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| UNITED STATES OF AMERICA | No. 16 CR 109 |
|---|---|
| *v.*, | Judge Robert M. Dow |
| RALPH GARCIA | |

## POST TRIAL BRIEF OF RALPH GARCIA

Ralph John Garcia, defendant, through his attorney, John C. Legutki, respectfully submits his post-trial brief.

### Introduction.

On June 5, 2018, the government filed an *in limine* motion seeking to prohibit the testimony of the confidential source in connection with Mr. Garcia's entrapment defense. The government also argued that Mr. Garcia did not meet his threshold burden in support of entrapment. By Memorandum Opinion and Order dated November 26, 2019, the government's motion was denied, and the matter proceeded by way of bench trial. Post-trial briefs were ordered, the government submitting its initial filing on October 18, 2019.

Once entrapment is established, the burden of proof shifts to the government to prove beyond a reasonable doubt that defendant was predisposed to commit the crime or that there was no government inducement. *United States v. Mayfield*, 771 F.3d 417, 440 (7th Cir., 2014). As presented below, Mr. Garcia respectfully submits that the government did not overcome its burden of proof and that he should be found not guilty by way of entrapment.

**<u>Argument.</u>**

> ***Evidence Elicited at Trial Reinforced this Court's Earlier Determination that Ralph Garcia " … proffered enough evidence to demonstrate the existence of an entrapment issue for trial …".  Upon Conclusion of Trial, the Government Failed Meet its Burden of Proof to Overcome that Finding.***

In its November 26, 2019, Memorandum Opinion and Order (Opinion), this Court noted that the defense of entrapment requires a defendant to prove that he was (1) induced by someone working for or on behalf of the government to commit a crime that (2) he was not predisposed to commit.  Opinion at p. 4.  Upon examination of the defendant's affidavit and applying case law, the Court concluded that Mr. Garcia met his burden and allowed the entrapment defense to proceed.  Opinion at 9.   Ultimate determination of the entrapment issue, of course, was to be made at the trial conclusion.  *Id*.

The government did not overcome its burden of proof.  Evidence established that the confidential source, Joey Munoz was a drug dealer, weapons merchant, convicted felon, admitted soldier for the Almighty Latin King Nation (Latin King or ALKN), was paid $60,000 cash by law enforcement, awarded immunity from prosecution, who, to save his own skin, exploited his relationship with Ralph Garcia and entrapped him and satisfy law enforcement.

    1)  *Munoz induced Mr. Garcia's participation.*

As noted in *United States v. Mayfield,* 771 F.3d 417, "inducement means government solicitation of the crime plus some other government conduct that creates a risk that a person who would not commit the crime if left to his own devices will do so in response to the government's efforts." *Id.* at 434–35.  The "other conduct" used to induce may include "repeated attempts at persuasion, fraudulent representations, threats, coercive tactics, harassment, promises of reward beyond that inherent in the customary execution of the crime, pleas based on need, sympathy, or friendship, or any other conduct by government agents that creates a risk that a

person who would not commit the crime if left alone will do so in response to the government's offers." *Id.* at 435, emphasis supplied. Facts presented at trial support Court's earlier finding regarding entrapment and thwart the government's effort to overcome its burden of proof.

Testifying as the government's confidential source, Joey Munoz, in order avoid the consequences of his own criminal activities, exploited his relationship with Ralph Garcia and induced Mr. Garcia to participate in events leading to charges.

Munoz was well-known to law enforcement as a dangerous and industrious criminal. Dating back to 2009, Munoz was running his semitrailer truck down to a Texas/Mexico border town for wholesale illegal drug deliveries back to Chicago. As testified to by ATF Agent Karceski, a confidential source (in another case) identified Munoz to Agent Karceski as someone who "… drove a semi-truck to Mexico with loads of narcotics once or twice per month". Tr. at 194. Munoz himself admitted driving his truck between Texas, North Carolina Atlanta and Chicago in order to deliver drugs. Tr. at 223. Munoz was paid about $10,000 per trip for his efforts. Munoz is also a convicted felon and was a narcotics distributor. Tr. at 223. In March 2014, Munoz attempted to sell a handgun for $250. Tr. At 195. Looking to expand his criminal exploits, Munoz sold cocaine in April 2014. Tr. at 195.

Munoz admitted was an ALKN soldier (Tr. at 231). He also admitted that he sold narcotics (Tr. at 235) and was illegally in possession of ammunition (Tr. at 229). Munoz, who did not possess a FOID card, concealed a weapon in his home and knowingly permitted the weapon to remain in his possession and control even when he learned that the weapon was used in a murder (Tr. at 230, 231). Contradictory with Agent Karceski's testimony, Munoz denied trying to sell a handgun for $250 back in 2014 (Tr. at 235) but admitted to his previous narcotics dealings. *Id*.

After being apprehended with illegal possession of ammunition, Munoz, rather than facing criminal prosecution, opted to work for law enforcement. This was a lucrative win-win for Munoz. He got a "get-out-of-jail-free card" and, for instigating some illegal transactions, pocketed more in cash than average American earned in an entire year[1]. This payout was even more than Munoz earned running illegal drugs to and from Mexico. (Tr. 223, 225, 228, 229 and 231.)

To escape the consequences of his own criminal escapades, Munoz repeatedly met with law enforcement, given game plan and contacted Mr. Garcia. ATF agent Andrew Karceski testified that he was the investigation "quarterback" dictating the investigation and controlling informants. Tr. at 16. For his well-rewarded efforts, Munoz was expected to cooperate with law enforcement - admitting that he was only involved in "…this one case", meaning Ralph Garcia. (Tr. at 229). In other words, Ralph Garcia was the intended target of law enforcement, and Munoz, from the onset (if not before) of Munoz involvement.

Munoz was the absolute perfect "Judas goat" to entrap Ralph Garcia. Munoz, like Mr. Garcia, was Latin King. Munoz was also a convicted felon who had been caught with illegal ammunition, cocaine and marijuana. Tr. at 225 and 231. Law enforcement had deep hooks into Munoz. Munoz was also an ALKN soldier familiar with the rituals and symbols of the Latin Kings. At the beginning of their various meetings, Munoz and Mr. Garcia exchanged the Latin King handshake. As Munoz testified, that symbolic gesture means "I love you". Tr. at 232. Munoz also testified that organization members would be disciplined if they collaborated with police. Tr. at 233. Munoz knew and pretended to depend on this creed in his dealings with Mr. Garcia; but Munoz, for his self-serving sake of trickery and profit, exploited this relationship.

---

[1] According to the Brookings Institution, in 2014, the average full-time American worker earned an annual salary of $50,383. See, https://www.brookings.edu/opinions/the-typical-male-u-s-worker-earned-less-in-2014-than-in-1973/

4

In 2012, Ralph Garcia was released from prison. With no money, no work and isolated from society for several years, Mr. Garcia turned to his friend Munoz for help. Mr. Garcia was friends with Munoz's father who had passed away. Munoz introduced Mr. Garcia to Adan Fiero who owned a trucking company. After Munoz's introduction, Mr. Garcia was hired by Mr. Fiero at a legitimate job earning around $3,000 - $4,000 per month. Tr. at 235, 236. When he approached Munoz, Mr. Garcia's only concern was to get a legitimate job. There was no discussion about selling guns or drugs – at least on the part of Mr. Garcia. Tr. at 243.

The relationship between Munoz and Ralph Garcia was important, reciprocal and, in Munoz's case, lifesaving. In November 2014, Munoz got into a fight with a ranking member of the Latin Kings at an organization hangout, "The Spanish". Munoz punched a Latin King Inca (a gang boss, or commander-in-chief) at The Spanish. Instead of Munoz being beaten or killed for this serious transgression, Mr. Garcia stepped in and diffused the situation. Tr. at 237. Also, in 2014, again at The Spanish, Munoz had an encounter with a Latin King named LaMarr. Ralph Garcia was also at the location. LaMarr was six foot five inches weighing about 350 pounds. During an altercation, Munoz punched LaMarr's girlfriend. Munoz received a few punches in return (from LaMarr) but otherwise walked out relatively unscathed. Munoz could only speculate but reluctantly admitted that Ralph could have stopped LaMarr from taking vengeance. Tr. at 238 – 239.

Sometime in 2014, Agent Karceski and Munoz targeted Ralph Garcia. Mr. Garcia, who was in the Latin King hierarchy before going to prison, was an attractive target for law enforcement. Transcript at 197, testimony of Agent Karceski "… his [Ralph Garcia's] name may have come up in conversation [with Munoz] prior to that, between the spring of 2014 and November of 2014. We talked about, like I said, the gang, the hierarchy of the gang. So his name may have

come up before that in conversation…". After purchasing the assistance of his gang informant, Agent Karceski regularly met with Munoz, briefed him and set out to entrap Ralph Garcia[2].

- On November 10, 2014. **Munoz was directed by Agent Karceski to meet with Ralph Garcia. Tr. at 198**.

- Again, Agent Karceski and Munoz met on November 15 after which time Mr. **Munoz, at Agent Karceski's direction, contacted Mr. Garcia. Tr. at 198**.

- Tr. at 200, Q Showing you Government Exhibit No. 3 Transcript on November 15, 2014, where it says "need to holler at you." **Who initiated that text? A Confidential informant.**

- Tr. at 200, Q And also Monday, November 17, 2014, **who initiated that call, "give me a call"? A The confidential informant**.

- Tr. at 202, Q On November 24, 2014, there was another consensually recorded telephone call between Joe Muñoz and Ralph Garcia, correct? A Yes. Q And do you recall whether or not Mr. Muñoz initiated that call? A I'm sorry, I don't know who initiated. If you show me, I can... Q And you -- you prepared an ROI with respect to that particular episode, correct? A Yes. [transcript continues]. **Q Who initiated that call to Mr. Garcia? A The confidential source called him**.

- Tr. at 203, I wanted to turn your attention to Government Exhibit No. 11 Transcript that was in relation to the November 24, 2014, transaction. And in that particular transaction, again, you met with Mr. Muñoz. You went through your litany of events, and Mr. Muñoz then contacted Mr. Garcia, correct? A I believe so. If you would show me either the report or the transcript, I can tell you for sure. Q All right. Well,

---

[2] All emphasis is supplied.

it's the same report, ROI No. 001-000012. Can you read the second line where I just --A The November 24th one? Q Yep, November 24th. **Did the CI call Mr. Garcia A Yes**.

- Tr. at 204 – 205, Q … Government Exhibit 12 Transcript. **Do you know who initiated that text communication? A The confidential informant did**.

- Tr. at 206, Q Showing you what is an ROI on December 17, 2014, paragraph 1, I think the second sentence, would you please refer to that. **A Yeah. The CI sent Mr. Garcia a text message. Q So it was the CI who initiated this communication again? A It was.**

- Tr. at 206, [With respect to the January 23, 2015 meeting involving bot methamphetamine and a firearm] Q You sat with Mr. Muñoz and you told him that you're going to meet with Mr. Garcia, you patted Mr. Muñoz down, and Mr. Muñoz went on his way to meet with Mr. Garcia, correct? A Yes. Q Before going to the meeting with Mr. Garcia, there was some communication between Mr. Muñoz and Mr. Garcia; isn't that correct? A Yes, I believe so. Q And who initiated that call? If you show me my report, I would be happy to tell you. … Q Showing you what's been marked ROI_001-000037, and it's the second paragraph down at approximately 12:28 p.m. A The CI called Mr. Garcia. Q So, **once again, it was the CI who initiated communication between Mr. Garcia and the CI? A Yes**.

The investigation against Mr. Garcia was initiated and quarterbacked by ATF. Joey Munoz, a long-time target of law enforcement and friend of Ralph Garcia was recruited by the ATF to entrap Mr. Garcia. Munoz was paid $60,000 cash, granted immunity and carefully coached by ATF. Munoz initiated contact with Mr. Garcia, sent him repeated text messages and phone calls.

7

The only certain contact initiated by Mr. Garcia with Munoz was to obtain legitimate employment.

Mr. Garcia established the threshold burden requirement to proceed with the affirmative defense of entrapment. See, this Court's Memorandum Opinion and Order, Pacer # 74. As such the burden of proof shifts to the government. The facts presented support the finding of inducement and, therefore, the government cannot meet its burden beyond a reasonable doubt. The same facts overlap and point to the lack of Mr. Garcia predisposition to engage in Munoz's scheme.

### 2) *Mr. Garcia's Previously Established Lack of Predisposition was Not Overcome Beyond a Reasonable Doubt.*

In *United States v. Stallworth*, 656 F.3d 721,725-26 (7th Cir. 2011) (quoting *United States v. Hall*, 608 F.3d 340, 343 (7th Cir. 2010)) the Court noted: "When analyzing a defendant's predisposition to commit a crime, we consider: (1) the defendant's character or reputation; (2) whether the government initially suggested the criminal activity; (3) whether the defendant engaged in the criminal activity for profit; (4) whether the defendant evidenced a reluctance to commit the offense that was overcome by government persuasion; and (5) the nature of the inducement or persuasion by the government. No individual factor controls the issue of predisposition, but the most important factor is whether the defendant was reluctant to commit the offense." *Id.*

The government cannot sustain its burden to overcome Mr. Garcia's previously established lack of predisposition. There is no question that Ralph Garcia is a fifty something year old convicted felon. This cannot be changed. What changed, dramatically, was the direction in life Mr. Garcia elected upon release from prison. Upon discharge, Mr. Garcia had no money, no job skills and no one to turn to but Joey Munoz, the son of an old friend. Tr. at 224 and 235. Mr.

Garcia did not approach Munoz about selling guns or drugs – Mr. Garcia simply wanted a legitimate job and sought Munoz's help. Tr. at 224 and 243. Mr. Garcia secured legitimate job earning around $3,000 - $4,000 per month. Tr. at 235, 236. Working at a legitimate job would certainly spare Mr. Garcia from dying in prison.

The record established that it was Munoz - acting at the direction of ATF - who contacted Mr. Garcia about purchasing contraband - this was not Mr. Garcia's plan. It was Munoz who repeatedly urged and cajoled Mr. Garcia engage in this illegal activity. When he did, Mr. Garcia sold drugs to Munoz at a price that would potentially allow for additional profit to Munoz. Tr. at 214, 215. In other words, Mr. Garcia was not in this for profit, he was doing this for his friend Munoz.

Mr. Garcia is charged with possession of a firearm by a convicted felon, in violation of 18 USC 922(g) and 924(e) - that carries a maximum sentence of life imprisonment, and a statutory mandatory minimum sentence of 15 years. Conviction on this charge would virtually guarantee that Mr. Garcia would never see the outside of jail. But Mr. Garcia was working at a legitimate job (thanks to Munoz) and trying to reintegrate into society. If law enforcement wanted to put the virtual "final nail" in Mr. Garcia's coffin and put him away for good – the felon in possession charge would certainly accomplish this. But the facts frustrate this scenario, it was Munoz, at the direction of law enforcement, who initiated the meeting leading up to the January 23, 2015 firearm transaction, not Ralph Garcia. Tr. at 206, 207. Mr. Garcia had every incentive to avoid such a situation - Munoz had every incentive to promote it.

The significance, and weight, of a defendant's criminal background with respect to evidence of predisposition is analyzed in this Court's June 12, 2017 Memorandum Opinion and Order in *US v., Thompson*, Case Number 13 cr 583, PACER # 95. There, the court rejected defendant's

9

predisposition, despite his lengthy criminal background. Mr. Garcia concedes his past criminal history, but "[a] prior conviction for a similar offense is relevant but not conclusive evidence of predisposition." *Mayfield*, 771 F.3d at 437.

Like *Thompson*, Mr. Garcia's past criminal background does not translate to a predisposition to commit the instant offenses. As this Court noted in its November 26, 2019 Memorandum Opinion and Order, at pages 8 and 9:

> Finally, although Defendant does have prior convictions, the convictions identified by the Government took place more than two decades before the conduct alleged in the superseding indictment against Defendant. Thus, "these prior convictions are not conclusive evidence of predisposition." *Thompson*, 2017 WL 2536589, at *5 (citing *Mayfield*, 771 F.3d at 437); see also *Sherman*, 356 U.S. at 375 (concluding that a nine-year-old conviction for the sale of narcotics and a five-year-old conviction for possession of narcotics were insufficient to prove that petitioner had a readiness to sell narcotics at the time government informant approached him).

Mr. Garcia did not initiate the transactions which led to this indictment – it was the Munoz. Mr. Garcia acted because the Munoz helped him in his time of need and because of their numerous and deep-rooted social connections. Mr. Garcia did take affirmative steps at rehabilitation and had considerable motivation to stay out of trouble. With the Munoz's help, Mr. Garcia worked at a regular job and was trying to set his life straight. As noted in the *Thompson* Order, trying to do positive things negates the notion of predisposition, given a defendant's criminal past, "…[t]hus, a reasonable jury could conclude that Defendant was not ready and willing to sell drugs or merely waiting for an opportunity to do so; in other words, he was not predisposed to commit the crime. See *Evans*, 924 F.2d at 717 ('[A] person is predisposed to crime in the sense that the ordinary profits of crime are incentive enough to him to commit crimes; he is ready and waiting; all that is wanting is the opportunity.')". *Thompson* Order at p. 11. Mr. Garcia was not ready, waiting or wanting to engage in criminal activity. Rather he had opportunity, reason and means to avoid such conduct.

10

**Conclusion.**

Mr. Garcia respectfully asks that this Court return findings of NOT GUILTY on each of the counts contained in the superseding indictment.

>Respectfully submitted,
>
>s/John C. Legutki
>Attorney for Ralph Garcia

Date: Monday, November 18, 2019

John C. Legutki
53 West Jackson Boulevard
Suite 920
Chicago, Illinois 60604

Phone: (312) 939-8747
Fax: (312) 939-0054

jlegutki@outlook.com