| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No.   16 CR 109 |
| v. | ) | |
| | ) | Honorable Robert M. Dow, Jr. |
| RALPH GARCIA | ) | |

## GOVERNMENT'S REPLY TO DEFENDANT RALPH GARCIA'S POST TRIAL BRIEF

THE UNITED STATES OF AMERICA, by its attorney, JOHN R. LAUSCH, JR., United States Attorney for the Northern District of Illinois, and respectfully submits its reply to defendant Ralph Garcia's post trial brief and states as follows:

On November 18, 2019, defendant Ralph Garcia filed his post-trial brief in the above-captioned matter. In his brief, the defendant contends that the government entrapped him into committing the charged offenses. In support of that argument, the defendant asserted that the government induced him into committing the charged crimes by preying on the defendant's friendship with the confidential source ("CS") and through the CS contacting and soliciting the defendant to sell guns and drugs to the CS.[1] The defendant further argued that the government cannot establish that he was predisposed to commit the charged offenses because he was "not in this this for profit, [but] he was doing this for his friend [the CS]." (R.108, at 9). The defendant

---

[1] The defendant referred to the CS by name in his post-trial brief, but the government will refer to him as the CS.

1

further noted the penalties he faces if convicted, and again argued that the CS initiated and solicited the contact between him and the CS. (R.108, at 8-9).

Entrapment is a defense to criminal liability when the defendant was not predisposed to commit the charged crime before the intervention of the government's agents and the government's conduct induced him to commit it. *United States v. Mayfield*, 771 F.3d 417, 420 (7th Cir. 2014) (*en banc*). "An entrapment defense contains two related elements: (1) government inducement of the crime; and (2) the defendant's lack of predisposition to engage in the crime." *United States v. Plowman*, 700 F.3d 1052, 1057 (7th Cir. 2012). If the defendant raises a colorable entrapment defense, the government must then prove beyond a reasonable doubt that the defendant was not entrapped. *See United States v. Theodosopoulos*, 48 F.3d 1438, 1444 (7th Cir. 1995). To establish that the defendant was not entrapped, the government must prove either, as noted above, that the defendant was predisposed to the commit the crime or the absence of government inducement. *United States v. Blassingame*, 197 F.3d 271, 280 (7th Cir. 1999).

As a threshold and procedural matter, the defendant appears to contend that, based on the pretrial filings and the Court's November 26, 2019 Memorandum Opinion and Order ("Order"), the burden of proof has shifted to the government to rebut the entrapment defense and the Court has already so found. *See* R. 108 (citing the Court's November 26, 2019 Order in support of his contention that the defendant has met his threshold burden and that the burden shifts to the government). The government disagrees. The Court found in its Order that, drawing all reasonable

inferences in defendant's favor, the defendant "has proffered enough evidence to demonstrate the existence of an entrapment issue for trial." Order, at 6. *See* Order at 3 (providing that the issue before the Court is "whether Defendant has proffered sufficient evidence to allow Defendant to present his entrapment defense at trial"). Accordingly, the Court's Order merely found that the defendant met the pretrial standard to present an entrapment defense to the factfinder, which, in this case, happens to be the Court. In point of fact, the Court stated that it "express[ed] no opinion on whether Defendant ultimately will be successful with an entrapment defense at trial." Order, at 9. Accordingly, and as set forth below, the government contends that the defendant has not proffered sufficient evidence to shift the burden, and regardless, the defendant was predisposed to committing the instant offense, as borne out in the recordings, and there was no inducement.

Additionally, and before turning to the merits of the entrapment defense, the government notes that the defendant's argument of entrapment appears to apply equally to the charged offenses of drug distribution (Counts One through Three, and Counts Five and Six), and possession of a firearm (Count Four). In other words, the defendant appears to contend that the government entrapped him into committing all of the charged offenses.

Inducement

The defendant contends that the government, through the use of a CS who was friends with him, induced him to commit the charged offenses. (R.108, at 2-8).

The government does not "induce" a defendant to commit a crime for purposes of an entrapment defense merely because it offers a defendant the opportunity to commit a crime. To the contrary, there is no government "inducement" where the government does "nothing more than offer a standard market deal in a sting." *Plowman*, 700 F.3d at 1057 (quoting *United States v. Pillado*, 656 F.3d 754, 764–65 (7th Cir. 2011)). *See also United States v. Stallworth*, 656 F.3d 721, 726 (7th Cir. 2011); *United States v. Blassingame*, 197 F.3d 271, 281 (7th Cir. 1999) ("A person who takes advantage of an ordinary opportunity to commit criminal acts . . . is not entrapped.").

As an initial matter, when discussing inducement, the defendant spends time and effort castigating the CS for his background as a gang member and drug dealer. (R.108, at 2-4). The government elicited the CS's shady and criminal past, and motivation for cooperating, on direct examination. The defendant's criminal past and motivation for cooperating with the government, while relevant to the CS's credibility, is not relevant to whether the government improperly induced the defendant into committing the charged offenses. In fact, the defendant's status as a seasoned drug dealer, as portrayed by the defendant, and also a close friend of the defendant, again as portrayed by the defendant, only reinforces the defendant's predisposition to committing the charged offenses.

Here, defendant Garcia has offered insufficient evidence to show government inducement beyond the standard offer or opportunity by the government through the CS to sell drugs and a gun. First, the defendant points to the fact that the CS

contacted the defendant on several occasions. (R.108, at 6-7). This is unremarkable and not enough to show government inducement. *See United States v. Mayfield*, 771 F.3d 417, 434 (7th Cir. 2014) (providing that "inducement means more than mere government solicitation of the crime; the fact that government agents initiated contact with the defendant, suggested the crime, or furnished the ordinary opportunity to commit it is insufficient to show inducement").

Coupled with the government's solicitation however, the defendant argues that the friendship between the CS and him induced him to commit the charged offenses. *Mayfield* instructed that inducement meant "government solicitation of the crime *plus* some other government conduct that creates a risk that a person who would not commit the crime if left to his own devices will do so in response to the government's efforts." *Id*. at 434-35 (emphasis in original). The Seventh Circuit then defined "other conduct" as, among other things, "friendship, or any other conduct by government agents that creates a risk that a person who otherwise would not commit the crime if left alone will do so in response to the government's efforts." *Id*. at 435. The government nonetheless contends that the purported friendship between the CS and Garcia fell short of inducement required for entrapment.

As evidence of this purported friendship, Garcia highlights two points: one, the fact that the CS assisted the defendant in obtaining employment; and two, that the defendant assisted the CS on one occasion when the defendant got into a fight.[2]

---

[2] The defendant also detailed an incident in his response memorandum where, in 2014 at a bar, the CS got into a fight with another Latin King. (R.108, at 5). The CS however

(R.108, at 5). First, the mere fact that a government cooperator has a prior relationship with a defendant does not demonstrate undue inducement or support a claim of entrapment. *See United States v. Evans*, 924 F.2d 714, 716 (7th Cir. 1991) (affirming district court's refusal to give an entrapment instruction notwithstanding that government informant was a high school classmate of the defendant who allegedly approached defendant six times over three months to offer to sell the defendant marijuana). While "government exploitation of friendship can constitute improper inducement," *United States v. McGill*, 754 F. 3d 452, 459 (7th 2014), the instant facts are far from what occurred in *McGill*. There, the Seventh Circuit found the district court erred where it disallowed the defendant from presenting an entrapment defense. The facts however were unique: (1) the defendant was a "loner with few other friends, living in near isolation;" (2) the defendant had social anxiety; and (3) the cooperating source "traded on McGill's insecurities to make the number of telephone calls he did in a brief period of time," during which "whenever McGill innocently turned the discussion to one of many subjects unrelated to child pornography, as he often did, Elliott would do his best to steer McGill back to the single objective of the FBI's investigation: convincing him to download child pornography for Elliott, his friend." *Id*. at 459. No such similar facts exist here.

---

"speculate[d]" as to whether the defendant had any role in stopping violence that day or in the future. (R. 108, at 5). The defendant moreover has offered no evidence that he interceded on behalf of the CS on this occasion.

6

Furthermore, the record evidence does not reflect the picture of a trusted friendship as portrayed by the defendant in his post-trial brief. The CS testified that he met the defendant in 2012 at a bar, and that "[m]aybe [his] mother and father" knew the defendant as well. Tr. 224. The CS testified that he/she recommended Garcia for a job to the CS's boss at the time. Tr. 235-36. Based on the record evidence, recommending a person for a job who he or she has known for a few years is not the type of "plus" factor that rises to the level of government inducement, and the defendant has set forth no legal precedent to establish the same.

Additionally, the defendant recommended the defendant for a job in 2012, when Garcia got out of prison. Tr. 235-236. The CS did not begin to cooperate with the government until well after that in 2014. Tr. 224-25. To the extent that the CS's recommending Garcia for a job serves as the basis of the alleged inducement, it fails because there is no defense of private entrapment. *United States v. Morris*, 549 F.3d 548, 551 (7th Cir. 2008). The CS was not working for the government at the time he/she recommended the defendant for a job, and the CS did not do so at the government's direction or instruction. If the inducement resulted from a private citizen, which the CS was at the time of the alleged inducement, entrapment must fail. *United States v. Barnett*, 197 F.3d 138, 143 (5th Cir. 1999). In *Barnett*, the defendant discussed plans with Rushiel Bevans ("Bevans") to kill one or possibly two individuals. *Barnett*, 197 F.3d at 140–141. Bevans secretly tape recorded the conversation. *Id*. Bevans then contacted the Drug Enforcement Administration ("DEA"), who subsequently contacted the FBI. *Id*. at 141. On appeal, the defendant

in *Barnett* contended that the district court erred in not granting his request for an entrapment instruction, arguing that Bevans was a government agent who induced his participation in the murder for hire scheme. *Id.* at 142. The Fifth Circuit held that "[t]he district court did not abuse its discretion in concluding that [the defendant's] evidence was insufficient to establish a jury question as to Bevans' status as a government agent prior to July 13, the time [the defendant] alleges Bevans induced him to participate in the murder for hire scheme." *Id.* at 143. Although Bevans spoke with the DEA, the DEA only informed Bevans to keep them informed of future developments—there was no agreement that Bevans would work on behalf of the government. *Id.* The Fifth Circuit found that Bevans could not "be characterized as a 'paid government informer' or 'active government informer'" as "[t]he record contain[ed] no evidence that the government made it [his] 'job' to be the instigator of similar prosecutions." *Id.* at 143–44 (emphasis added). The same holds true here – at the time of the alleged inducement, that is, the recommendation of the job, the CS was not a government agent and not acting on behalf of the government.

Second, the fact that the defendant interceded on the CS's behalf on one occasion in an alleged bar fight does not support a finding of inducement. If anything, this story shows that it was the CS, not the defendant, who felt an obligation thereafter to repay a debt. Stated another way, the fact that the defendant stepped in to assist the CS would not impart a sense of obligation on behalf of the defendant to buy drugs from the CS.

As set forth in *Mayfield*, the inducement for purposes of entrapment must consist of solicitation "plus." The alleged "plus" here – the friendship between the CS and Garcia – stemmed from the actions of a then-private citizen and, regardless, does rise to the level of improper inducement. Instead, the government solicited Garcia, suggested a crime, and furnished him with the ordinary opportunity to commit the crime, which is insufficient to establish inducement. *Mayfield*, 771 F.3d at 434.

Predisposition

The defendant contends that he was not predisposed to committing the charged offenses. (R.108, 8-10). In support, the defendant argues that he merely sought a legitimate job and help from the CS, that he was not selling drugs for a profit but trying to help a friend, and that his criminal background does not support a finding of predisposition. (R.108, 8-10). The defendant's arguments ignore the facts and circumstances borne out in the recordings, especially from the first recorded meeting between the defendant and the CS, which establish Garcia as a seasoned drug trafficker who had trafficked in drugs before and suggested the sale of methamphetamine to the CS.

The Seventh Circuit has set for the standard for predisposition:

> When analyzing a defendant's predisposition to commit a crime, [courts] consider: (1) the defendant's character or reputation; (2) whether the government initially suggested the criminal activity; (3) whether the defendant engaged in the criminal activity for profit; (4) whether the defendant evidenced a reluctance to commit the offense that was overcome by government persuasion; and (5) the nature of the inducement or persuasion by the government.

*Stallworth*, 656 F.3d at 725 (quoting *United States v. Hall*, 608 F.3d 340, 343 (7th Cir. 2010)). "No individual factor controls the issue of predisposition, but the most important factor is whether the defendant was reluctant to commit the offense." *Id.* at 726. Here, as demonstrated by the recordings between the CS and the defendant, the defendant, far from being reluctant, was a willing and eager participant in the charged criminal conduct. Assuming for the sake of argument the defendant has established that the government induced him to commit the charged offenses, a review of the recorded meetings between the defendant and CS – and in particular the first recorded meeting on November 17, 2014 – demonstrates the defendant's enthusiastic participation in the offense, the fact that the defendant has trafficked narcotics before as shown through his detailed knowledge of the drug trade and admission to selling cocaine in the past, and, in fact, that it was the defendant who suggested the sale of methamphetamine, not the CS.

The defendant's statements during the recordings establish his predisposition to commit the charged offenses, and the Court may properly consider such statements for the same purpose. *See Jacobson v. United States*, 503 U.S. 540, 542 (1992) (noting that the government offered two categories of predisposition evidence at trial: "evidence developed prior to the Postal Service's mail campaign, and that developed during the course of the investigation," and analyzing both categories of evidence); *Mayfield*, 771 F.3d at 437 (providing that "the defendant's response to the government's offer may be important evidence of his predisposition"); *id.* at 438 (providing that "[t]he defendant's predisposition is measured at the time the

government first proposed the crime, but the nature and degree of the government's inducement and the defendant's responses to it are relevant to the determination of predisposition"); *United States v. Kaminski*, 703 F.2d 1004, 1008 (7th Cir. 1983) ("As stated previously, predisposition exists prior to contact with the Government. In many cases, however, there is little direct evidence of the defendant's state of mind prior to interaction with Government agents and we must instead rely upon indirect proof available through examination of the defendant's conduct after contact with the agents."); *United States v. Nguyen*, 413 F.3d 1170, 1176 (10th Cir. 2005) ("The defendant's predisposition is viewed at the time the government agent first approaches the defendant, but inferences about that predisposition may be drawn from events occurring after the two parties came into contact."); *United States v. Squillacote*, 221 F.3d 542, 565-566 (4th Cir. 2000) ("While *Jacobson* requires that the defendant's disposition to commit the crime must be independent of the Government's acts . . . *Jacobson* does not prohibit the consideration of actions occurring after the defendant was contacted by the government when determining whether the defendant was predisposed to commit the crime.").

The first recorded meeting best exemplifies the defendant's predisposition to sell narcotics. On November 15, 2014, the defendant and the CS met to discuss drug trafficking and the defendant demonstrated his interest in selling narcotics to the CS. During the meeting, the defendant told the CS that his source "got the white [China white heroin] though, though, it's not the mud [black tar heroin], they want the mud," referring the CS's customers who wanted heroin. G. Ex. 2; G. Ex. 2 Trans. 45-47; Tr.

39-40. Later in the conversation, Garcia, not the CS, offered to sell different types of narcotics. The defendant told the CS that he had a reliable source of "yae [cocaine]," who was selling the cocaine "a little chop at a time" to keep the demand for the cocaine high. G. Ex. 2; G. Ex. 2 Trans. 298-318, Tr. 46-47. The defendant acknowledged to the CS that he – the defendant, Ralph Garcia – was "selling the shit [cocaine]" the previous day. G. Ex. 2; G. Ex. 2 Trans. 299-300, Tr. 46. It is difficult to find a better example of predisposition than a defendant who sold narcotics to a third person – not the government agent – the day before.

The defendant went on to show his knowledge of narcotics amounts and prices, which further solidifies his predisposition to sell the same. The defendant advised the CS that another source was diluting the cocaine and selling "[eight] balls [1/8 an ounce of cocaine] for 180 bucks." G. Ex. 2; G. Ex. 2 Trans. 331-335, Tr. 48. When the CS asked defendant about buying a quarter kilogram of narcotics from the defendant, the defendant responded that he "made, like nice bags [for street level distribution]." G. Ex. 2; G. Ex. 2 Trans. 371-372, Tr. 49. The defendant's familiarity with drug pricing, amounts, and different types of narcotics demonstrates that the drug transactions with the CS were clearly not his first ones. *See United States v. Johnson*, 32 F.3d 304, 308 (7th Cir. 1994) (affirming rejection of entrapment defense where defendant demonstrated knowledge of cocaine pricing and drug-dealing terminology); *United States v. Theodosopoulos*, 48 F.3d 1438, 1446 (7th Cir. 1995) (using terminology that indicates experience in the drug trade in discussions with government agent is relevant in examining character and reputation); *United States*

*v. Cervante*, 958 F.2d 175, 179 (7th Cir. 1992) (using drug dealing jargon in telephone conversations with government agent indicates a defendant's predisposition to engage in drug deals).

Most significantly, the defendant, not the CS, raised the idea of selling "ice" or methamphetamine. In particular, the defendant proposed that the CS "try to get rid of [sell] some of that ice [crystal methamphetamine] I got." G. Ex. 2; G. Ex. 2 Trans. 390-391, Tr. 49. It is crucial to note that the CS had never asked to buy methamphetamine from the defendant, nor has the defendant even alleged as much. Tr. 50. The CS, clearly unfamiliar with methamphetamine, asked questions, such as how much for an ounce of the methamphetamine, to which the defendant responded quickly that his source was selling them "9 deep [$900 for an ounce of methamphetamine], they getting 'em like [$]250 [for] an eight ball [1/8th an ounce of methamphetamine]." G. Ex. 2; G. Ex. 2 Trans. 400-401, Tr. 51. When the CS asked the defendant if he could get the methamphetamine for him "ASAP," the defendant responded, "Yeah real quick." G. Ex. 2; G. Ex. 2 Trans. 415-418, Tr. 51. The defendant proposed selling methamphetamine to the CS, knew the prices and quantities off-hand, and stated that he could provide the drugs "ASAP" – these are not the actions of a reluctant, "unwary innocent" but merely an "unwary criminal." *See Sherman v. United States*, 356 U.S. 369, 372 (1958) ("To determine whether entrapment has been established, a line must be drawn between the trap for the unwary innocent and the trap for the unwary criminal.").

What followed was the defendant's sale of approximately 27.4 grams of methamphetamine to the CS on November 17, 2014. During the transaction, the defendant even bragged about the quality, stating "this [methamphetamine] is fire [high quality]." G. Ex. 6; G. Ex. 6 Trans. 25; Tr. 68. The defendant, again showing his familiarity and predisposition in the field of drug trafficking, offered the CS some advice. Specifically, the defendant advised the CS not to sell it to his customer "for 9 [hundred dollars], though, you give it to him for like 12 [hundred dollars], 15 [hundred dollars]." G. Ex. 6; G. Ex. 6 Trans. 564-65; Tr. 70-71. The defendant then advised the CS to "try and get a picture of the dude [the ostensible customer] so in case we gotta chase his ass down," meaning if the customer did not pay, the CS would have the customer identified. G. Ex. 6; G. Ex. 6 Trans. 94-95; Tr. 71.

The second transaction occurred on November 24, 2014, and the defendant sold approximately 56.3 grams of methamphetamine on this occasion. Relevant here, the defendant, after the transaction but during the recorded meeting, re-raised the possibility of obtaining heroin for the CS: "I might be able to get some more of the other one [heroin], but it's white [heroin, as opposed to black tar heroin]." G. Ex. 11; G. Ex. 11 Trans. 96-98; Tr. 91. Garcia then explained that he had a source who was selling "ounces on the white [heroin]," but that the source was charging $18,000 for nine ounces. G. Ex. 11; G. Ex. 11 Trans. 108-119; Tr. 92. The defendant again proved himself to be experienced in selling drugs, and also proved himself to be anything but reluctant.

Contrary to the defendant's suggestion that he sold drugs to the CS to help a friend, (R.108, at 9), the defendant also engaged in drug trafficking for profit, which supports his predisposition. The defendant, without citing any evidence, asserts that he "sold drugs to [the CS] at a price that would potentially allow for additional profit to [the CS]." The defendant does not support this argument with any citation to the record, and argument of counsel is not evidence. Instead, the record evidence reflects that the CS paid the defendant the following: (1) $900 for 27.4 grams of methamphetamine on November 17, 2014; (2) $1,800 for 56.3 grams of methamphetamine on November 24, 2014; (3) $1,800 for 55.6 grams of methamphetamine on December 15, 2014; (4) $2,200 for a firearm and 57.4 grams of methamphetamine on January 23, 2015; and (5) $900 for 27.9 grams of methamphetamine on March 4, 2015. Accordingly, the record evidence shows the defendant to be a seasoned drug dealer with access to, and detailed knowledge of, varying types and quantities of narcotics, who engaged in criminal activity for profit, and who was far from reluctant but instead who actually suggested the idea of selling methamphetamine to the CS.

Turning next to the defendant's sale of a firearm to the CS, the recorded meetings between Garcia and the CS are replete with evidence of the defendant's predisposition to possess and sell firearms, including how Garcia had access to firearms, how Garcia previously possessed and sold firearms, and discussion of where to obtain firearms, including by robbery:

November 15, 2014:

15

- In response to CS's asking about "them things," Garcia responded that his brother had "a friend who's gotta whole house full of 'em [firearms]" and who brings them "on the train," G. Ex. 2; G. Ex. 2 Trans. 160-166, Tr. 44-45;

- The defendant explained that there was a "[member of the P] Stone [Nation street gang who] got like six guns. Wants like [$]200 for like a .357 [caliber firearm]…he showed me the guns last night," G. Ex. 2; G. Ex. 2 Trans. 188-192, Tr. 45-46;

- In response to the CS asking about firearms, the defendant stated, "When I had all that shit [firearms], I was passing it out," G. Ex. 2; G. Ex. 2 Trans. 546-547; Tr. 52;

- The defendant recounted a time when police executed a search warrant at his house and recovered a gun he kept upstairs, G. Ex. 2; G. Ex. 2 Trans. 546-610; Tr. 53-54;

- The defendant recounted how in the "old days we used to just have 'em [the firearms] anchored" in "hiding spots," like "a little box or something," G. Ex. 2; G. Ex. 2 Trans. 636-658; Tr. 54-56;

November 24, 2014:

- The defendant told the CS that he knew about a guy and his dad who have "all kind of guns," G. Ex. 11; G. Ex. 11 Trans. 72-79, and the Defendant suggested that they steal the guns and "sell off half of 'em we

16

can sell. Everybody is asking for guns," G. Ex. 11; G. Ex. 11 Trans. 88-90; Tr. 91;

- The defendant stated that the same father and son mentioned above "got everything [all types of firearms]," including "AK [47 assault rifles]," G. Ex. 11; G. Ex. 11 Trans. 376-386; Tr. 94-95, and the defendant suggested the following: "I figure we'll grab the son…get the old man…just tie 'em, we ain't gotta kill 'em, just load up [steal their guns]…by the time they get loose we'll be gone," G. Ex. 11; G. Ex. 11 Trans. 386-396; Tr. 95;

December 15, 2014:

- In response to the CS asking the defendant that he was looking for a gun source, the defendant advised that his sister's boyfriend "got good shit [high quality firearms]," G. Ex. 14; G. Ex. 14 Trans. 198-199; Tr. 131, and the defendant further explained that he had previously bought a "40 cal[iber]" from this source and "we came right here and tried to shoot the sign, and shit [the firearm] didn't work," G. Ex. 14; G. Ex. 14 Trans. 208-242; Tr. 131-132;

- The defendant stated that if his firearms source would "let me grab 'em [the firearms], I'll grab some, and we'll do it like that," G. Ex. 14; G. Ex. 14 Trans. 250-52; Tr. 131, and defendant further explained, "If I get something [a firearm]…I'll probably hang on to it," G. Ex. 14; G. Ex. 14 Trans. 305-306; Tr. 132;

17

- The defendant advised the CS that he had possession of a firearm, specifically "that one [firearm] over by Mario's, I forgot about that one," G. Ex. 15; G. Ex. 15 Trans. 20-22; 133-135, but the defendant explained he just kept "it there in case [he] needed it," G. Ex. 15; G. Ex. 15 Trans. 31-33; 136;

- The defendant suggested to the CS that they find a younger gang member or shorty with a Firearm Owner's Identification Card and ask him/her to purchase the firearm, G. Ex. 16; G. Ex. 16 Trans.; 138-139;

December 17, 2014:

- The defendant and the CS discussed at length about how to obtain a firearm, and discussed having a person straw purchase a firearm for them instead of purchasing from a firearm source: "if I'm going to pay this guy [the firearm supplier], this guy want like four [hundred dollars] for [firearms]. They were nice, you know, I ain't gonna lie…and they're brand new, but…if I can get a brand new one [firearm]…I can get two of them," G. Ex. 18; G. Ex. 18 Trans. 116-126; Tr. 146-147;

December 18, 2014:

- During a recorded telephone conversation, the defendant mentioned that he "had that 40 cal[iber firearm]," G. Ex. 18; G. Ex. 18 Trans. 255-256; Tr. 147-148;

December 31, 2014:

- In response to the CS texting the defendant asking if there had been any progress on obtaining the firearms, the defendant responded that he was "waiting on an answer from two different people [sources of firearms]. One is Aaron's guy. The other one is in jail and his wife is supposed to let me know something today," G. Ex. 19; G. Ex. 19 Trans.; Tr. 150;

January 12, 2015:

- In response to a text message from the CS, asking if defendant wanted "to get rid of that old dirty Harry [firearm] you were telling me about?" the defendant responded, "No, I am going to hang on to it until I get something else," G. Ex. 20; G. Ex. 20 Trans.; Tr. 152;

All of the above discussions regarding firearms culminated in the sale of a firearm from Garcia to the CS on January 23, 2015. That day, Garcia sold one Taurus .38 caliber revolver, bearing serial number 62612, to the CS in exchange for $400. Ex. 26; Tr. 166. The defendant bragged about the quality of the firearm and advised the CS to "look at it before you get rid of it." G. Ex. 28; G. Ex. 28 Trans. 15-34; Tr. 170-171. Even during the transaction, the defendant expressed a desire and ability to obtain more firearms, explaining that he was "trying to get a hold of [the firearm source] too right now," G. Ex. 28; G. Ex. 28 Trans. 92-98; Tr. 172, and further explaining that he would use the cash from this deal to purchase guns from that firearms source, G. Ex. 28; G. Ex. 28 Trans. 97-103; Tr. 172-173.

The aforementioned conversations establish the defendant's predisposition to possess and sell firearms. In addition, with respect to Count Four, the defendant proffered[3] inadmissible and irrelevant evidence in support of his argument against predisposition, specifically pointing out the statutory penalties he faces if convicted of Count Four, that is, the violation of Title 18, United States Code, Sections 922(g)(1) and 924(e). (R.108, at 9). The punishment is irrelevant to entrapment, the Seventh Circuit has held unequivocally that "arguing punishment to a jury is taboo." *See*, *e.g.*, *United States v. Richardson*, 130 F.3d 765, 778 (7th Cir. 1997); *United States v. Lewis*, 110 F.3d 417, 422 (7th Cir. 1997); *see also United States v. McKenzie*, 922 F.2d 1323, 1327 (7th Cir. 1991) (holding that "the sixth amendment requires that a jury determine questions of guilt or innocence; punishment is the province of the Court"). Under well-settled law, such argument or evidence is improper because the potential penalties faced by a defendant are irrelevant to the determination of guilt or innocence. *See*, *e.g.*, *Shannon v. United States*, 512 U.S. 573, 579 (1994) ("It is well established that when a jury has no sentencing function, it should be admonished to reach its verdict without regard to what sentence might be imposed") (internal citation and quotation marks omitted)). While the risk of prejudice here is lessened as the Court (not a jury) is the factfinder, the government requests that the Court not consider the potential punishment faced by the defendant in deciding the defendant's guilt or whether the entrapment defense applies.

---

3 There was no evidence introduced at trial as to what penalties the defendant faced, if convicted.

Accordingly, the defendant's words and actions show that he was ready to commit the crime, was a seasoned drug dealer with access to drugs and guns, and he "likely would have committed [the charged offenses] without the government's intervention, or [at least] actively wanted to but hadn't found the means yet." *Mayfield*, 771 F.3d at 438.

## CONCLUSION

Based on the foregoing, in addition to the reasons set forth in the government's post-trial brief, (R.106), the government contends that the evidence presented during trial established beyond a reasonable doubt that the defendant is guilty of all counts, as charged in the superseding indictment. The government respectfully asks that this Court return verdicts of guilty on each of the counts contained in the superseding indictment.

Respectfully submitted,

JOHN R. LAUSCH, JR.
United States Attorney

By:    */s/ Timothy J. Storino*
TIMOTHY J. STORINO
CORNELIUS A. VANDENBERG
Assistant United States Attorney
219 S. Dearborn Street
Chicago, Illinois 60604
(312) 353-5300

DATED: December 9, 2019.