**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Case No. 16-cr-109-1 |
| v. | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| RALPH GARCIA | ) | |

**MEMORANDUM OPINION AND ORDER**

In this criminal case, the Government has charged Defendant Ralph Garcia with five drug offenses that allegedly took place between November 2014 and March 2015, as well as unlawfully possessing a firearm after a prior felony conviction. At a bench trial, the Government presented the testimony of an ATF agent, two DEA chemists, and a confidential source ("CS") who purchased the narcotics and firearm from Defendant that are the subject of the allegations in the superseding indictment. Defendant essentially concedes that he committed the offenses, but interposes an entrapment defense. For the reasons explained below, the Court finds that (1) the evidence presented at trial establishes beyond a reasonable doubt that Defendant is guilty as charged on all six counts of the superseding indictment and (2) Defendant's entrapment defense cannot be sustained. Accordingly, the Court will enter a separate order denying Defendant's motion for judgment of acquittal [113] and entering a judgment of guilty on Counts 1, 2, 3, 4, 5, and 6 of the superseding indictment. Counsel are directed to jointly contact the Courtroom Deputy to determine a sentencing date and deadlines for the filing of sentencing memoranda.

**I.    Statement of Facts**

On March 5-6, 2019, the Court took testimony in a bench trial[1] on the six-count superseding indictment [49] in this case. The Government called four witnesses in its case-in-

---

[1] Prior to trial, Defendant executed a signed waiver [55] of his right to a jury trial.

chief: (1) Special Agent Andrew Karceski of the Bureau of Alcohol, Tobacco and Firearms; (2) the confidential source who purchased the narcotics and a firearm from the defendant over five separate occasions; (3) DEA Chemist Sarah Manney; and (4) DEA Chemist Robert Holbrooke. The Defendant was advised of his rights, and after consultation with his lawyer, he chose not to testify or present any witnesses of his own.

### A.    Charges in the Superseding Indictment

Count One charges that on or about November 17, 2014, at Joliet, in the Northern District of Illinois, defendant knowingly and intentionally distributed a controlled substance, namely, 5 grams or more of methamphetamine (actual), a Schedule II Controlled Substance; in violation of Title 21, United States Code, Section 841(a)(1).

Count Two alleges that on or about November 24, 2014, at Joliet, in the Northern District of Illinois, defendant knowingly and intentionally distributed a controlled substance, namely, 50 grams or more of methamphetamine (actual), a Schedule II Controlled Substance; in violation of Title 21, United States Code, Section 841(a)(1).

In Count Three, the Government charges that on or about December 15, 2014, at Joliet, in the Northern District of Illinois, defendant knowingly and intentionally distributed a controlled substance, namely, 50 grams or more of methamphetamine (actual), a Schedule II Controlled Substance; in violation of Title 21, United States Code, Section 841(a)(1).

In Count Four, the Government alleges that on or about January 23, 2015, at Joliet, in the Northern District of Illinois, defendant, knowing that he had previously been convicted of a crime punishable by a term of imprisonment exceeding one year, did knowingly possess, in and affecting interstate commerce a firearm, namely a Taurus Revolver, model 856, .38 caliber, bearing serial number DW62612, which firearm had traveled in interstate commerce prior to the defendant's

possession of the firearm; in violation of Title 18, United States Code, Section 922(g)(1) and 924(e).[2]

According to Count Five, on or about January 23, 2015, at Joliet, in the Northern District of Illinois, defendant knowingly and intentionally distributed a controlled substance, namely, 50 grams or more of methamphetamine (actual), a Schedule II Controlled Substance; in violation of Title 21, United States Code, Section 841(a)(1).

Finally, Count Six charges that on or about March 4, 2015, at Joliet, in the Northern District of Illinois, defendant knowingly and intentionally distributed a controlled substance, namely, 5 grams or more of methamphetamine (actual), a Schedule II Controlled Substance; in violation of Title 21, United States Code, Section 841(a)(1).

## B.    Testimony at Trial

During the course of the trial, Special Agent Karceski testified regarding a series of recorded meetings, telephone calls, and text message exchanges between Defendant and the CS, during which the CS purchased methamphetamine and a gun from Defendant.  At various times, Karceski provided his interpretation of coded words and language used by Defendant and the CS to refer drugs, guns, and gang activity.  Karceski explained that his interpretations rested on more than 25 years of law enforcement, which included extensive training in firearms, narcotics and street gangs and hundreds of field investigations. [95, at 10-15.]  He then went through each of the transactions alleged in the superseding indictment.

---

[2] After the return of the indictment and the presentation of evidence at the bench trial, the Supreme Court's issued its decision in *Rehaif v. United States*, 139 S. Ct. 2191, 2200 (2019), in which the Court held that the government must prove that a defendant knew of his or her felony status.  The original indictment in this case did not allege that Defendant knew of his felony status, but only that he knowingly possessed a firearm. Following *Rehaif*, the parties agreed to re-open the evidence and placed on the record a stipulation [105] that Defendant knew of his felony status prior to the alleged possession of a firearm on January 23, 2015.

*Testimony as to Count One*

According to Karceski, on or around November 15, 2014, the CS informed him Defendant was selling drugs. [96, at 8-9.] Defendant was known to law enforcement as a leader of the Joliet faction of the Latin Kings street gang. [97, at 54.] Karceski directed the CS to make a recorded call to Defendant's phone in an effort to arrange a meeting with Defendant. [95, at 18-21]; Government Exhibit ("G. Ex.") 1. Before the CS left to meet with Defendant, Karceski followed his standard protocol for controlled meetings with a target. Karceski searched the CS and his car and verified that the CS had no contraband in his possession; he provided the CS with a recording device; and he maintained surveillance of the CS until he met with Defendant. [95, at 21-22.]

Later that same day, the CS met with Defendant in the CS's car at Garcia's residence. [*Id.* at 22]; G. Ex. 2. During the meeting, Defendant told the CS that, "This guy got the white [China white heroin] though, though, it's not the mud [black tar heroin], they want the mud." G. Ex. 2; G. Ex. 2 Transcript ("Trans.") 45-47; [96, at 11-12].[3] The CS told Defendant that the last time his ostensible out-of-town customer was looking for narcotics, he was looking for "damn near 50 grams" of narcotics. G. Ex. 2; G. Ex. 2 Trans. 52-56. Defendant responded that his supplier "got a boatload [a lot of heroin]." G. Ex. 2; G. Ex. 2 Trans. 68; [96, at 12]. Defendant further explained that his supplier was "cutting it [the narcotics] with some shit," which Karceski explained involved the mixing of narcotics with other substances to dilute the product and increase the volume of narcotics. G. Ex. 2; G. Ex. 2 Trans. 85-86; [96, at 12-13]. Defendant stated that the supplier would give Defendant "10 grams [of heroin]" at a price of "a hundred dollars a gram." G. Ex. 2; G. Ex. 2 Trans. 86-88. Defendant said he refused to pay his supplier "no hundred dollars" because the heroin was diluted. G. Ex. 2; G. Ex. 2 Trans. 90-92. When asked by the CS how much the heroin

---

[3] Karceski's interpretations of statements made on recorded calls and meetings appear in brackets.

sold for on the street, Defendant responded that it went for "a hundred dollars a gram." G. Ex. 2; G. Ex. 2 Trans. 94- 102. But, Defendant explained, if the CS bought large quantities of "the dope [heroin]," he could buy it for $50 or $60 a gram. G. Ex. 2; G. Ex. 2 Trans. 108-119; [96, at 14].[4]

Later in the conversation, the CS asked Defendant if he had "them things," in reference to firearms. G. Ex. 2; G. Ex. 2 Trans. 134-137, [96, at 15]. Defendant responded that his brother had "a friend who's gotta whole house full of 'em [firearms]" and who brings them "on the train." G. Ex. 2; G. Ex. 2 Trans. 160-166, [96, at 16-17]. However, Defendant explained that the train service started using metal detectors and now "they ain't letting them on the train with 'em [firearms]." G. Ex. 2; G. Ex. 2 Trans. 143-145, 174-175, [96, at 17]. Defendant also explained that there was a "[member of the P] Stone [Nation street gang who] got like six guns. Wants like [$]200 for like a .357 [caliber firearm] ...he showed me the guns last night." G. Ex. 2; G. Ex. 2 Trans. 188- 192, [96, at 17-18].

Defendant also told the CS that he had a reliable source of "yae [cocaine]," who was selling the cocaine "a little chop at a time" to keep the demand for the cocaine high. G. Ex. 2; G. Ex. 2 Trans. 298-318, [96, at 18-19]. Defendant told the CS that Defendant had been "selling the shit [cocaine]" the previous day. G. Ex. 2; G. Ex. 2 Trans. 299-300, [96, at 18]. Defendant said that another source was diluting the cocaine and selling "[eight] balls [1/8 an ounce of cocaine] for 180 bucks." G. Ex. 2; G. Ex. 2 Trans. 331-335, [96, at 20]. When the CS asked Defendant about buying a quarter kilogram of narcotics from the Defendant, Defendant responded that he "made, like nice bags [for street level distribution]." G. Ex. 2; G. Ex. 2 Trans. 371-372, [96, at 21].

Defendant proposed that the CS "try to get rid of [sell] some of that ice [crystal methamphetamine] I got." G. Ex. 2; G. Ex. 2 Trans. 390-391, [96, at 21]. According to Karceski,

---

[4] According to Karceski, heroin cost approximately $100 per gram on the street at that time. [96, at 13].

Defendant brought up the subject of crystal methamphetamine, as the CS had never asked to buy crystal methamphetamine from Defendant. [96, at 22]. The CS responded by asking the cost of an ounce of the methamphetamine, to which Defendant responded that his source was selling them "9 deep [$900 for an ounce], they getting 'em like [$]250 [for] an eight ball [1/8th an ounce]." G. Ex. 2; G. Ex. 2 Trans. 400-401, [96, at 23]. When the CS asked Defendant if he could get the methamphetamine for him "ASAP," Defendant responded, "Yeah real quick." G. Ex. 2; G. Ex. 2 Trans. 415-418, [96, at 23].

The CS then reiterated that he was trying to get firearms. G. Ex. 2; G. Ex. 2 Trans. 523. Defendant stated, "When I had all that shit [firearms], I was passing it out." G. Ex. 2; G. Ex. 2 Trans. 546-547; [96, at 24]. Defendant then recounted a time when police executed a search warrant at his house and recovered a gun he kept upstairs. G. Ex. 2; G. Ex. 2 Trans. 546-610; [96, at 25-26]. Defendant also recounted how in the "old days we used to just have 'em [the firearms] anchored" in "hiding spots," like "a little box or something." G. Ex. 2; G. Ex. 2 Trans. 636-658; [96, at 26-27]. Karceski testified that street gangs commonly stashed guns in easily accessible locations without carrying them on their person. [96, at 27-28.]

Before the end of the meeting, Defendant agreed that it would be "[$]9 [hundred] for that ice [methamphetamine]." G. Ex. 2; G. Ex. 2 Trans. 614-617; [96, at 27]. The CS said he would talk to his ostensible customer and get back to Defendant later in the week. G. Ex. 2; G. Ex. 2 Trans. 619-627. Defendant also agreed to call his source for "yae [cocaine]," explaining that his source had "two [qualities of cocaine for sale], he got fifteen [a higher quality cocaine for sale for $1,500 an ounce] and he got the eight [lower quality cocaine for sale for $800 an ounce]." G. Ex. 2; G. Ex. 2 Trans. 707-722; [96, at 28]. After the meeting, consistent with standard protocol, Agent

Karceski maintained surveillance of the CS; met with the CS; and retrieved the recording devices from the CS. [95, at 23-34].

Two days later, on November 17, 2014, at 10:15 a.m., the CS texted Defendant that his ostensible customer was in town and he "want to grab one of those yellow ones [methamphetamine]." G. Ex. 3; G. Ex. 3 Trans.; [96, at 29-30]. The CS sent a follow up text clarifying that his customer was looking to buy "just 1 [ounce of methamphetamine." *Id.* At approximately 3:26 p.m., Defendant texted, "I'm back at house now...I'm ready now." G. Ex. 3; G. Ex. 3 Trans.; [96, at 32]. Before the CS left to meet with Defendant, Karceski searched the CS and his car and verified that the CS had no contraband in his possession. He then provided the CS with a recording device and $900 in buy money and maintained surveillance of the CS until he met with Defendant. [96, at 32.]. The CS then met with the defendant in the CS's car in the driveway of Garcia's residence. [96, at 38]; G. Ex. 6. Upon entering the car, Defendant told the CS, "this [methamphetamine] is fire [high quality]." G. Ex. 6; G. Ex. 6 Trans. 25; [96, at 40]. Defendant also told the CS, "I left a little, uh, about a gram, they got two bags, don't' let the bag, the shit [methamphetamine] touch your skin so you'll get high." G. Ex. 6; G. Ex. 6 Trans. 34-42 ; [96, at 32]. Karceski explained that crystal methamphetamine can be absorbed through the skin to the touch and get someone high. [96, at 41]. He also explained that methamphetamine users commonly use two bags for their product as a result. *Id.* Defendant re-emphasized that "there's two bags on there" and advised the defendant "the way they test it [crystal methamphetamine], put it in bleach...The one that floats on the top is good...This one's fire [high quality]." G. Ex. 6; G. Ex. 6 Trans. 34-42; [96, at 41]. Karceski explained that a street test to determine the strength of methamphetamine is to put the methamphetamine in bleach and see if it floats. [96, at 41-42.]

A video-recording showed the CS counting out $900 in cash to pay Defendant. G. Ex. 6; G. Ex. 6 Trans. 55-63; [96, at 42]. Defendant advised the CS not to sell it to his customer "for 9 [hundred dollars], though, you give it to him for like 12 [hundred dollars], 15 [hundred dollars]." G. Ex. 6; G. Ex. 6 Trans. 564-65; [96, at 42-43]. At the end of the transaction, Defendant told the CS to "try and get a picture of the dude [the ostensible customer] so in case we gotta chase his ass down." G. Ex. 6; G. Ex. 6 Trans. 94-95; [96, at 43]. According to Karceski, Defendant was advising the CS to identify his customer so Defendant and the CS could collect from him if the customer failed to pay for the methamphetamine. [96, at 44.] Karceski identified the voice on the video-recording of the person distributing the suspect methamphetamine to the CS as Defendant Garcia. [96, at 39.] The CS also testified that the person who sold methamphetamine to him on between November 2014 and March 2015 was Defendant Garcia. [97, at 40-41.] After the meeting, Karceski maintained surveillance of the CS. He then met with the CS and collected the plastic bag containing methamphetamine that the CS had obtained from Defendant. [96, at 34-36]; Ex. 5. Karceski also retrieved the recording devices from the CS and searched the CS and his vehicle and located no additional contraband. *Id.* DEA forensic chemist Sarah Manney tested the product the defendant provided to the CS on November 17, 2014, and found it to be 27.4 grams of d-methamphetamine hydrochloride that had a purity of 100%. [96, at 83]; G. Ex. 5; G. Ex. 36.

2. *Testimony as to Count 2*

A week later, on November 24, 2014, the CS called Defendant and told him that his ostensible customer liked "what he grabbed" during the previous deal and wanted to order "the same thing but probably another, an extra one [two ounces of crystal methamphetamine]." G. Ex. 7; G. Ex. 7 Trans. 20-31; [96, at 47.] Defendant agreed to provide the 2 ounces, responding that he could meet with the CS "later on today," but explaining that "they [defendant's source] don't

get off [work] til 3." G. Ex. 7; G. Ex. 7 Trans. 84-125; [96, at 47-48.] Later that same day, at approximately 3:26 p.m., Defendant texted the CS that he was on his way back to his house and told the CS to meet him there. G. Ex. 8; G. Ex. 8 Tr. 1. At approximately 4:13 p.m., the CS called and texted Defendant to tell him that he had arrived at his house. G. Ex. 8; G. Ex. 9.

Before the CS left to meet with Defendant, Karceski searched the CS and his car and verified that the CS had no contraband in his possession. He then provided the CS with a recording device and $1,800 in buy money and maintained surveillance of the CS until he met with Defendant. [96, at 50-51.] As before, the CS and Defendant met in the CS's car in the driveway of Defendant's residence. [96, at 57-58]; G. Ex.11. Karceski identified Defendant as the person in the car depicted in the video-recording of the November 24 transaction. [96, at 59.] Additionally, the CS testified that that the person who sold methamphetamine to him between November 2014 and March 2015 was Defendant. [97, at 40-41.] As Defendant entered the car, he and the CS exchanged a handshake used by the Latin Kings. G. Ex. 11; [96, at 60]. After the CS stated that "dude [the ostensible customer] say he like that shit [the methamphetamine defendant distributed on November 17]," defendant responded that "it'll [the methamphetamine] stop ya in your tracks [was high quality]." G. Ex. 11; G. Ex. 11 Trans. 23-23; [96, at 60]. Defendant then stuck his left hand into his jacket pocket, retrieved a plastic baggie containing suspect methamphetamine and passed it to the CS. G. Ex. 11; [96, at 60-61]. When the CS asked "is it the same shit [high quality crystal methamphetamine]," Defendant responded, "Yeah." G. Ex. 11; G. Ex. 11 Trans. 32- 34; [96, at 62]. Defendant advised the CS to "put another bag on there so you don't get sick [do not absorb the crystal methamphetamine through your skin." G. Ex. 11; G. Ex. 11 Trans. 39-40; [96, at 62]. The recording of the transaction then shows the CS counting out

$1,800 in cash and handing that cash over to Defendant. G. Ex. 11; G. Ex. 11 Trans. 42-53; [96, at 62].

After the CS and Defendant completed the drug transaction, Defendant told the CS that he knew about a guy and his dad who have "all kind of guns." G. Ex. 11; G. Ex. 11 Trans. 72-79. When the CS asked if the guns were registered, Defendant responded "it don't matter." G. Ex. 11; G. Ex. 11 Trans. 81-84. Defendant suggested that they "just get 'em [the guns] and go, man, get 'em and go. We'll sell off half of 'em we can sell. Everybody is asking for guns." G. Ex. 11; G. Ex. 11 Trans. 88-90; [96, at 63]. Later in the conversation, Defendant stated that they "got everything [all types of firearms]," including "AK [47 assault rifles]." G. Ex. 11; G. Ex. 11 Trans. 376-386; [96, at 66]. Defendant suggested, "I figure we'll grab the son...get the old man...just tie 'em, we ain't gotta kill 'em, just load up [steal their guns] ...by the time they get loose we'll be gone." G. Ex. 11; G. Ex. 11 Trans. 386-396; [96, at 67].

Defendant also told the CS, "I might be able to get some more of the other one [heroin], but it's white [heroin, as opposed to black tar heroin]." G. Ex. 11; G. Ex. 11 Trans. 96-98; [96, at 63]. Defendant then explained that he had a source who was selling "ounces on the white [heroin]," but that the source was charging $18,000 for nine ounces. G. Ex. 11; G. Ex. 11 Trans. 108-119; [96, at 64]. Defendant further explained to the CS that there was a Latin King member who was trying to get Defendant to take a position in the Pontiac faction of the Latin Kings that dealt primarily in heroin. G. Ex. 11; G. Ex. 11 Trans. 130-150; [96, at 65-66]. Defendant proposed to the CS that if they placed someone in a position to sell heroin on the north side, then they could obtain a cut of the profits. G. Ex. 11; G. Ex. 11 Trans. 150-169; [96, at 66].

After the meeting, Karceski maintained surveillance of the CS until he was able to meet with him. At that time, Karceski took custody of the plastic bag containing methamphetamine that

the CS had obtained from Defendant. [96, at 55-56]; Ex. 10. Karceski also retrieved the recording devices from the CS and searched the CS and his vehicle to ensure that no additional contraband was present. *Id*. DEA forensic chemist Sarah Manney tested the substance the defendant provided to the CS on November 24, 2014, and found it to be 56.3 grams of d-methamphetamine hydrochloride that had a purity of 100%. [96, at 83-84]; G. Ex. 10; G. Ex. 37.

3.      *Testimony as to Count 3*

Approximately a month later, on December 15, 2014, the CS and Defendant exchanged a series of text messages between 11:37 a.m. and 3:10 p.m. G. Ex. 12; [96, at 67-69]. During the course of these texts, the CS texted Defendant that "my guy [the CS's ostensible customer] is in town trying to do something- can I get the same as last time." *Id*. Defendant responded, "Okay." *Id*. Defendant and the CS then arranged to meet that afternoon. *Id*.

Before the CS left to meet with Defendant, Karceski searched the CS and his car and verified that the CS had no contraband in his possession. Karceski then provided the CS with a recording device and $1,800 in buy money and maintained surveillance of the CS until he met with Defendant. [96, at 69-71]. Again, Defendant and the CS met in the CS's car, which was parked in Defendant's driveway. [96, at 70, 96-99]; G. Ex. 14. Karceski identified Defendant as the person depicted in the video-recording of the December 15 meeting. [96, at 97, 99.] The CS also testified that that the person who sold methamphetamine to him between November 2014 and March 2015 was Defendant. [97, at 40-41.] When Defendant entered the car, he exchanged the Latin Kings handshake with the CS and removed something from his right pocket and passed it toward the CS. G. Ex. 14; [96, at 99-100]. The CS then counted out $1,800 in cash and handed it to Defendant. G. Ex. 14; G. Ex. 14 Trans. 36-79; [96, at 100]. Before Defendant left the CS's car, he commented, "You see how that shit [the crystal methamphetamine] got me too, man I shouldn't

have grabbed that shit with my hands...look at my eyeball...I double bagged it, but I pulled it out of there with my hand cause it was a chunk." G. Ex. 14; G. Ex. 14 Trans. 322- 333; [96, at 105].

While the CS and Defendant were meeting, the CS told Defendant that he was looking for a gun source. G. Ex. 14; G. Ex. 14 Trans. 157. Defendant told the CS that his sister's boyfriend "got good shit [high quality firearms]." G. Ex. 14; G. Ex. 14 Trans. 198-199; [96, at 103]. Defendant explained that he had previously bought a "40 cal[iber]" from this source and "we came right here and tried to shoot the sign, and shit [the firearm] didn't work." G. Ex. 14; G. Ex. 14 Trans. 208-242; [96, at 103]. Defendant pointed out the sign near his house that he had shot with the .40 caliber firearm. *Id.* Defendant stated that if his source would "let me grab 'em [the firearms], I'll grab some, and we'll do it like that." G. Ex. 14; G. Ex. 14 Trans. 250-52; [96, at 103]. Defendant said, "If I get something [a firearm ] ...I'll probably hang on to it." G. Ex. 14; G. Ex. 14 Trans. 305-306; [96, at 104]. Defendant also told the CS how he was trying to get more structure in the Joliet faction of the Latin Kings. G. Ex. 14; G. Ex. 14 Trans. 84-107; [96, at 100]. Defendant complained that he couldn't "keep giving [the gang members] stuff [narcotics or firearms] for free." G. Ex. 14; G. Ex. 14 Trans. 264-269; [96, at 104].

After the meeting, Karceski maintained surveillance of the CS. He then met with the CS and obtained from the CS the plastic bag containing methamphetamine that the CS had received from Defendant. [96, at 71-72]; Ex. 13. Agent Karceski also retrieved the recording devices from the CS and searched the CS and his vehicle and located no additional contraband. *Id.* DEA forensic chemist Sarah Manney tested the substance Defendant provided to the CS on December 15, 2014 and found it to be 55.6 grams of d- methamphetamine hydrochloride that had a purity of 100%. [96, at 83-84], G. Ex. 13, G. Ex. 38.

Later that same day, Defendant called the CS and told him, "I was thinking about that, that one [firearm] over by Mario's, I forgot about that one." G. Ex. 15; G. Ex. 15 Trans. 20-22; [96, at 106-108]. Defendant explained, "I just keep it there in case I need it." G. Ex. 15; G. Ex. 15 Trans. 31-33; [96, at 108]. Later that night, Defendant followed up again, texting the CS that "he [the supplier] has a couple of nice ones [firearms]. But he wants top dollar. And some one with a [FOID] card." G. Ex. 16; G. Ex. 16 Trans.; [96, at 109-110]. Defendant then suggested, "what about that shorty [younger member of the gang], don't one of them have one [a FOID card]?" G. Ex. 16; G. Ex. 16 Trans.; [96, at 110-111].

Two days later, on December 17, 2014, Defendant sent the CS text messages indicating that the previously identified source didn't want to talk, but that, "I'm working on something else [another firearm source] right now." G. Ex. 17; G. Ex. 17 Trans.; [96, at 111-113]. The next day, on December 18, 2014, Defendant called the CS and told him that he knew "somebody that got one of them, them [FOID] cards." G. Ex. 18; G. Ex. 18 Trans. 38- 39; [96, at 114-115]. Defendant suggested to the CS that "as long as we're gonna pay top dollar for that shit [the firearms], we might as well have her [the FOID card holder] go get it [a firearm], and then, you know, just play like she lost it or something." G. Ex. 18; G. Ex. 18 Trans. 43-46; [96, at 117]. Defendant suggested that they go to the store to buy a nice gun to sell to someone else and then "later on we'll get one [firearm]" to keep. G. Ex. 18; G. Ex. 18 Trans. 60-83; [96, at 117]. Defendant offered to "holler at her [the person with the FOID card] and try to convince her [to make the straw purchase]. This way if they [law enforcement] come we'll just leave the [firearm] case and all that there...and then we'll open up the case and be like, oh my god, it's gone." G. Ex. 18; G. Ex. 18 Trans. 91-97; [96, at 118]. Defendant reasoned that it made more sense to straw purchase the firearm because "if I'm going to pay this guy [the firearm supplier], this guy want like four [hundred dollars] for [firearms].

They were nice, you know, I ain't gonna lie...and they're brand new, but...if I can get a brand new one [firearm]...I can get two of them." G. Ex. 18; G. Ex. 18 Trans. 116-126; [96, at 119-20]. During the December 18, 2014, phone conversation, Defendant also mentioned that he "had that 40 cal[iber firearm]." G. Ex. 18; G. Ex. 18 Trans. 255-256; [96, at 119-20]. Defendant told the CS, "that shit [firearm] you could slide in the side of your pants right there and wouldn't even know you had it." G. Ex. 18; G. Ex. 18 Trans. 260-262; [96, at 120.]

On December 31, 2014, the CS texted Defendant asking if there had been any progress on obtaining the firearms. G. Ex. 19; G. Ex. 19 Trans.; [96, at 120-22]. Defendant responded that he was "waiting on an answer from two different people [sources of firearms]. One is Aaron's guy. The other one is in jail and his wife is supposed to let me know something today." G. Ex. 19; G. Ex. 19 Trans.; [96, at 122]. On January 12, 2015, the CS texted Defendant, asking if Defendant wanted "to get rid of that old dirty Harry [firearm] you were telling me about?" G. Ex. 20; G. Ex. 20 Trans.; [96, at 124]. Defendant responded, "No, I am going to hang on to it until I get something else." *Id*.

4.      *Testimony as to Counts 4 and 5*

On January 21, 2015, Defendant texted the CS, "I found one maybe two [firearms]." G. Ex. 21; G. Ex. 21 Trans.; [96, at 125-26]. On January 23, 2015, the CS made a recorded call to Defendant to order additional methamphetamine and to inquire about the firearm. G. Ex. 22; G. Ex. 22 Trans.; [96, at 126-28]. During the call, the CS said that his "guy [ostensible customer was] coming to town....I'll see if you can get me something together [methamphetamine]...just probably one [ounce of methamphetamine], one and then...if you got that [firearm], what we talked about yesterday, man, we can kill two birds with one stone." G. Ex. 22; G. Ex. 22 Trans. 28-38; [96, at

128-29]. Defendant agreed to meet with the CS "like the last time [defendant provided methamphetamine to the CS]." G. Ex. 22; G. Ex. 22 Trans. 55; [96, at 129].

Later that day, at approximately 2:40 p.m., the CS called Defendant, who relayed to the CS that he was "getting it together [the firearm and the methamphetamine] right now...shouldn't be that long." G. Ex. 23; G. Ex. 23 Trans. 21; [96, at 1129-31]. The CS asked if "for that thing [the firearm] you wanted four [hundred dollars]," and Defendant replied, "yeah." G. Ex. 23; G. Ex. 23 Trans. 28- 31; [96, at 132]. The CS also told Defendant that his ostensible customer now wanted "two of those [two ounces of methamphetamine]," to Defendant replied, "Alright, alright, tell 'em I'll be ready." G. Ex. 23; G. Ex. 23 Trans. 33-49; [96, at 132].

Before the CS left to meet with Defendant, Karceski searched the CS and his car and verified that the CS had no contraband in his possession. Karceski then provided the CS with a recording device and $2,200 in buy money -- $1,800 for the methamphetamine and $400 for the firearm. [96, at 132-33]. Karceski maintained surveillance of the CS as he drove to meet with Defendant. [96, at 135.] As before, on January 23, 2015, the CS met with Defendant in the CS's car in the driveway of Defendant's residence. [96, at 135]; G. Ex. 28. Before entering the car, Defendant passed a plastic bag containing a firearm and firearm accessories through the car window and advised the CS "you might not want to get rid of this one [the firearm]...look at it before you get rid of it...it's a bad boy [high quality]." G. Ex. 28; G. Ex. 28 Trans. 15-34; [96, at 142-43]. Defendant then asked the CS, "Think he [the CS's ostensible customer] gonna want this speed loader and [gun] case?" G. Ex. 28; G. Ex. 28 Trans. 55-56; [96, at 143]. Karceski identified Defendant, as the individual depicted in the video-recording of the January 23, 2015 transaction. [96, at 141]. Additionally, the CS testified that that the person who sold methamphetamine and a firearm to him between November 2014 and March 2015 was Defendant. [97, at 40-41.] After

receiving the firearm and accessories from the defendant, the CS asked Defendant, "You got those two [ounces of methamphetamine], right?" G. Ex. 28; G. Ex. 28 Trans. 68-70; [96, at 144]. The defendant responded "Yeah." *Id.* The CS then counted out $2,200 in cash and gave it to Defendant to pay for the firearm and the methamphetamine. G. Ex. 28; G. Ex. 28 Trans. 71-92; [96, at 144]. Later in the conversation, the CS asked Defendant if he had given him "those two [ounces of methamphetamine]," Defendant reached into his shirt pocket, retrieved a baggie containing methamphetamine and gave the baggie to the CS. G. Ex. 28; G. Ex. 28 Trans. 134-142; [96, at 145-46]. As during previous deals, Defendant explained, "I put two bags on there" to prevent the methamphetamine from touching the hands of the defendant or the CS. G. Ex. 28; G. Ex. 28 Trans. 144-148; [96, at 146]. When the CS asked Defendant about the "one guy" Defendant knew with "ten guns," Defendant explained that he was "trying to get a hold of him too right now." G. Ex. 28; G. Ex. 28 Trans. 92-98; [96, at 144]. Defendant explained that he would use the cash from this deal to purchase guns from that firearms source. G. Ex. 28; G. Ex. 28 Trans. 97-103; [96, at 144-45].

After the meeting, Karceski maintained surveillance of the CS. He then met with the CS and obtained the plastic bag containing methamphetamine that the CS obtained from the defendant; and a second plastic bag containing a gun and various gun accessories. [96, at 135-36]; G. Ex. 25; G. Ex. 26; G. Ex. 27. The firearm was a Taurus .38 caliber revolver bearing serial number 62612. Ex. 26; [96, at 138]. The firearm accessories included a speed loader that allowed the user to load six rounds of ammunition at once, a leather holster, a gun box, and earplugs. Ex. 27; [96, at 138-40]. Karceski also retrieved the recording devices from the CS and searched the CS and his vehicle and located no additional contraband. [96, at 135-36, 140-41]. DEA forensic chemist Sarah Manney tested the substance the defendant provided to the CS on January 23, 2015, and found it

to be 57.4 grams of d- methamphetamine hydrochloride that had a purity of 100%. [96, at 84-85]; G. Ex. 25;6 G. Ex. 39. As the parties stipulated, prior to January 23, 2015, Defendant knew that he was a convicted felon and that he had been convicted in court of a crime punishable by a term of imprisonment exceeding one year. [105.] As the parties further stipulated, the Taurus revolver, model 856, .38 caliber, bearing serial number DW62612 was manufactured outside of Illinois, and had traveled in interstate commerce, prior to January 23, 2015. [82]; [98, at 5].

5.      *Testimony as to Count 6*

On March 4, 2015, the CS made a recorded call to Defendant, advising that "my guy [the CS's ostensible customer] came back in... he's looking for one [ounce of methamphetamine]." G. Ex. 29; G. Ex. 29 Trans. 1; [96, at 147-48]. Defendant responded that he would be ready to meet with the CS at 3:30 that afternoon. *Id.* As before, Karceski searched the CS and his car and verified that the CS had no contraband in his possession. He then provided the CS with a recording device and $900 in buy money. [96, at 149]. Karceski maintained surveillance of the CS as he drove to meet with Defendant. [96, at 149-50.] Again, Defendant and the CS met in the CS's car, which was parked in the driveway at Defendant's residence. [96, at 150-52]; G. Ex. 33. Karceski again positively identified Defendant as individual depicted in the video-recording of the March 4 meeting. [96, at 152.]

During that meeting, the CS asked Defendant, "Nine [hundred dollars for the ounce of methamphetamine] still right?" Defendant confirmed the price. G. Ex. 33; G. Ex. 33 Trans. 39-41; [96, at 153-54]. The CS then instructed Defendant to put the methamphetamine in a glove on the floor of his car, which he did. G. Ex. 33; [96, at 154]. The CS then counted out $900 in cash and gave it to Defendant, who placed the cash in his pocket. G. Ex. 33; G. Ex. 33 Trans. 53-58; [96, at 154]. During the meeting, Defendant mentioned an individual who "sells weed for me." G.

Ex. 33; G. Ex. 33 Trans. 207-210; [96, at 155]. Defendant also told the CS that the "Vice Lords [street gang members] took it from him, took like a half ounce [of cannabis] from him." G. Ex. 33; G. Ex. 33 Trans. 214-215; [96, at 155]. Defendant added that he saw two of the Vice Lords that stole the marijuana drunk and by themselves on the street. G. Ex. 33; G. Ex. 33 Trans. 219-259; [96, at 156]. Defendant related that he called another Latin King member and told him to inform other Latin Kings patrolling the area about the theft and the location of the Vice Lords, since they would be easy targets for the Latin Kings. G. Ex. 33; G. Ex. 33 Trans. 254-276; [96, at 155-56]. Defendant also told the CS that he had a firearms source who "just wants some money," and who was willing to "back date 'em, like he sold [the firearms] ...a couple years ago." G. Ex. 33; G. Ex. 33 Trans. 373-388; [96, at 155.] Karceski explained that backdating the sale of gun allows individuals to claim that they sold the gun long before the gun was used in a crime. [96, at 157.]

After the meeting, Agent Karceski maintained surveillance of the CS until he was able to meet with the CS to collect the glove containing methamphetamine that the CS had obtained from Defendant. [96, at 150-51, 154]; G. Ex. 32. Karceski also retrieved the recording devices from the CS and searched the CS and his vehicle and located no additional contraband. [96, at 150.] DEA forensic chemist Robert Holbrook tested the product Defendant provided to the CS on March 4, 2015 and found it to be 27.9 grams of d- methamphetamine hydrochloride that had a purity of 99%. [96, at 94-95], G. Ex. 32, G. Ex. 40.

## II.  Applicable law

In order for the Court to find Defendant guilty of distribution of a controlled substance as charged in Counts One, Two, Three, Five and Six, the Government must prove the following elements beyond a reasonable doubt: (1) Defendant knowingly distributed the controlled substance, namely 50 grams or more of actual methamphetamine; and (2) Defendant knew the

substance was some kind of controlled substance. The Government is not required to prove that Defendant knew the substance was actual methamphetamine but only that Defendant knew the substance was some kind of controlled substance. SEVENTH CIRCUIT PATTERN FEDERAL JURY INSTRUCTIONS – CRIMINAL, (2012 Ed.) at 701; 21 U.S.C. § 841(a)(1).[5] "A person 'distributes' a controlled substance if he delivers or transfers possession of the controlled substance to someone else." *Id*. at 702.

To find that Defendant guilty of being a felon in possession of a firearm as charged in Count Four, the Government must prove the following elements beyond a reasonable doubt: (1) Defendant knowingly possessed a firearm; (2) at the time of the charged act, Defendant was a prohibited person, namely a previously convicted felon; and (3) the firearm had been shipped or transported in interstate or foreign commerce. SEVENTH CIRCUIT PATTERN FEDERAL JURY INSTRUCTIONS – CRIMINAL, (2012 Ed.) at 234; 18 U.S.C. § 922(g)(1). Additionally, following the Supreme Court's decision in *Rehaif*, "[t]he [g]overnment must prove both that the defendant knew he possessed a firearm and that he knew he belonged to the relevant category of persons barred from possessing a firearm"—namely, the category of previously convicted felons. *Rehaif v. United States*, 139 S. Ct. 2191, 2200 (2019).

## III.    Application of law to facts

As noted at the outset, the principal thrust of Defendant's cross-examination and arguments—before, during, and after trial—has focused on his defense of entrapment. He has not mounted a vigorous attack on the Government's affirmative case on the factual basis for the drug and gun charges. And for good reason, for at trial the Government presented an overwhelming case, including video recordings, showing that Defendant committed each of the charged offenses.

---

[5] This version includes the 2015-2019 changes and is available at http://www.ca7.uscourts.gov/pattern-jury-instructions/Pattern_Criminal_Jury_Instructions_2012ed_includes_2015-2019_changes.pdf.

As to Count One specifically, the evidence establishes beyond a reasonable doubt that Defendant distributed methamphetamine to the CS on November 17, 2014. First, the CS identified Defendant as the person who sold him narcotics. Agent Karceski, who was familiar with Defendant, also identified Defendant's voice from the video recording as the person who sold narcotics to the CS on November 17, 2014. Second, the substance distributed by Defendant and turned over to the Agent by the CS tested positive for 26 grams of methamphetamine hydrochloride with a purity of 100%. This is wholly consistent with Defendant's own statements, which showed that he clearly knew that he was distributing a controlled substance, and a very pure one at that. Defendant referred to the substance as "fire" or high-quality narcotics, explained how and why he put two bags on the substance, and warned the CS not let the substance touch his skin or else he would get "high." These statements reflect the defendant's knowledge of the substance he distributed as a controlled substance. Together, this evidence establishes Defendant's guilt beyond a reasonable doubt on Count One.

In regard to Count Two, the evidence establishes beyond a reasonable doubt that the Defendant distributed additional methamphetamine to the CS on November 24, 2014. Again, both the CS and Agent Karceski positively identified Defendant as the seller of the narcotics recovered on that date. Those witness identifications were corroborated by the Court's own opportunity to view both the videotape and the Defendant, confirming that Defendant was in fact the individual who engaged in the transaction in question. Second, the substance tested positive for more than 50 grams of methamphetamine hydrochloride with a purity of 100%. Again, Defendant clearly knew he was distributing a controlled substance. Defendant responded affirmatively to the CS's question of whether the substance was the "same shit" or high-quality crystal methamphetamine from the last transaction on November 17. Defendant again advised the CS to take precautions,

including that he "put another bag on there so you don't get sick." All of this evidence establishes Defendant's guilt beyond a reasonable doubt as to Count Two.

The evidence as to Count Three follows the same pattern and establishes beyond a reasonable doubt that Defendant distributed methamphetamine to the CS on December 15, 2014. The CS, the Agent, and the Court by viewing the video recording all were able to see that Defendant again sold narcotics to the CS in the CS's car outside Defendant's home. The substance tested positive for more than 50 grams of methamphetamine hydrochloride with a purity of 100%. Defendant again commented on the potency of his merchandise, stating that he "shouldn't have grabbed that shit [bag of methamphetamine] with [his] hands" and further noting that he "double bagged it, but [he] pulled it out of there with my hand cause it was a chunk." These statements reflect Defendant's knowledge and understanding that the substance inside the bag was a controlled substance so potent that the defendant felt the effects of the same by merely holding the bag. This evidence establishes Defendant's guilt beyond a reasonable doubt as to Count Three.

The evidence also establishes beyond a reasonable doubt that on January 23, 2015, Defendant committed the gun and drug offenses charged in Counts Four and Five. Once again, the CS and the Agent identified Defendant as the sources of the narcotics and the firearm, and the video recording provided the Court an opportunity to confirm the accuracy of their testimony. As to Count Four, Defendant stipulated [see 82, 105] that (1) he knew he had been convicted of a crime punishable by a term of imprisonment of more than one year and (2) the firearm had traveled in interstate commerce prior to January 23, 2015. And, as to the first element, the video-recording showed Defendant approaching the CS's car and handing a plastic bag to the CS through an open window. Defendant then entered the car and asked if the CS's ostensible customer wanted the "speed loader and [gun] case" that accompanied the gun, providing additional evidence that the

item Defendant had just handed the CS through the window was a firearm. As to Count Five, the substance distributed by the defendant to the CS tested positive for more than 50 grams of methamphetamine hydrochloride with a purity of 100%. And Defendant clearly knew he was distributing a controlled substance, as he advised the CS that he "put two bags on there" in order to avoid getting high through contact with the controlled substance in the bag. This evidence establishes Defendant's guilt beyond a reasonable doubt as to Counts Four and Five.

Finally, as to Count Six, the evidence establishes beyond a reasonable doubt that Defendant distributed methamphetamine to the CS one more time, on March 4, 2015. Again, both the CS and the Agent identified Defendant as the seller of the narcotics, which the video-recording confirmed. The substance tested positive for more than 5 grams of methamphetamine hydrochloride with a purity of 99%. And the telephone call prior the deal, during which Defendant and the CS discussed the terms of the transaction, coupled with the delivery of the narcotics as planned, confirms Defendant's knowledge that he was distributing a controlled substance. This evidence establishes Defendant's guilt beyond a reasonable doubt as to Count Six.

## IV.  Entrapment defense

Prior to trial, the Court issued a memorandum opinion and order [74] denying the Government's motion in limine seeking to prohibit the testimony of the CS, which would have had the effect of denying Defendant an opportunity to present an entrapment defense. To present a triable issue on entrapment and shift the burden of disproving entrapment to the government, a defendant must proffer evidence on both elements of the defense: inducement and lack of predisposition. *United States v. Mayfield*, 771 F.3d 417, 440 (7th Cir. 2014) (en banc). The initial burden of production is "not great," and an entrapment issue is presented if the defendant proffers "some evidence" that the government induced him to commit the crime and he was not predisposed

to commit it. *Id.* In other words, "[a]lthough more than a scintilla of evidence of entrapment is needed before instruction on the defense becomes necessary, the defendant need only point to evidence in the record that would allow a rational jury to conclude that he was entrapped." *United States v. McGill*, 754 F.3d 452, 457 (7th Cir. 2014). In its pre-trial order, the Court concluded that—after drawing all reasonable inferences in defendant's favor—Defendant "has proffered enough evidence to demonstrate the existence of an entrapment issue for trial." [74, at 6.] At the same time, the Court "express[ed] no opinion on whether Defendant ultimately will be successful with an entrapment defense at trial." [*Id.* at 9.]

Defendant's post-trial brief confirmed what his response to the Government's pre-trial motion suggested—namely, his insistence that he should be found not guilty at trial on the ground that the Government induced him into committing all six of the charged offenses. According to Defendant, the Government improperly induced him to commit the crimes by taking advantage of his pre-existing friendship with the CS, who initiated the contact that led to the narcotics and firearm transactions. Defendant further contends that he was not predisposed to commit the offenses, and that he did so to help his friend, the CS, and not to make a profit in illegal trafficking.

### A.     Legal Standard

"Entrapment is a defense to criminal liability when the defendant was not predisposed to commit the charged crime before the intervention of the government's agents and the government's conduct induced him to commit it." *Mayfield*, 771 F.3d at 420. The defense of entrapment requires a defendant to prove that (1) he was induced by someone working for or on behalf of the government to commit a crime that (2) he was not predisposed to commit. *United States v. Evans*, 924 F.2d 714, 716 (7th Cir. 1991). If the defendant raises a colorable entrapment defense, "the government must prove predisposition or the lack of government inducement beyond

a reasonable doubt in order to defeat it." *United States v. Blitch*, 773 F.3d 837, 844 (7th Cir. 2014), as amended on denial of reh'g and reh'g en banc (Jan. 27, 2015).

In *Mayfield*, the Seventh Circuit clarified that the two elements of the entrapment defense are "conceptually related but formally and temporally distinct," 771 F.3d at 4442, and resolved "some conflicting strains in [Seventh Circuit] caselaw about the relationship between them." 771 F.3d at 420. Inducement means "more than mere government solicitation of the crime; the fact that government agents initiated contact with the defendant, suggested the crime, or furnished the ordinary opportunity to commit it is insufficient to show inducement." *Id*. at 434. Rather, "inducement means government solicitation of the crime plus some other government conduct that creates a risk that a person who would not commit the crime if left to his own devices will do so in response to the government's efforts." *Id*. at 434-35. The "other conduct" used to induce may include "repeated attempts at persuasion, fraudulent representations, threats, coercive tactics, harassment, promises of reward beyond that inherent in the customary execution of the crime, pleas based on need, sympathy, or friendship, or any other conduct by government agents that creates a risk that a person who would not commit the crime if left alone will do so in response to the government's efforts." *Id*. at 435.

In regard to the second element of entrapment—a lack of predisposition—a defendant is predisposed to commit the charged crime "if he was ready and willing to do so and likely would have committed it without the government's intervention, or actively wanted to but hadn't yet found the means." *Mayfield*, 771 F.3d at 438; see also *Jacobsen v. United States*, 503 U.S. 540, 553-54 (1992) (entrapment is "the apprehension of an otherwise law-abiding citizen who, if left to his own devices, likely would have never run afoul of the law"). Predisposition is measured at the time the government first proposed the crime. *Mayfield*, 771 F.3d at 438. However, because there

often is "little direct evidence of the defendant's state of mind prior to interaction with Government agents," it is appropriate to consider "the defendant's conduct after contact with the agents" as indirect proof of his state of mind at the inception. *Mayfield*, 771 F.3d at 437 (quoting *United States v. Kaminski*, 703 F.2d 1004, 1008 (7th Cir. 1983)). Evidence of the defendant's reluctance to commit the crime is an importance consideration when evaluating predisposition. *Mayfield*, 771 F.3d at 437. "A prior conviction for a similar offense is relevant but not conclusive evidence of predisposition." *Id*. at 438. Finally, the two elements of entrapment are related in the sense that inducement is "evidence bearing on predisposition: the greater the inducement, the weaker the inference that in yielding to it the defendant demonstrated that he was predisposed to commit the crime in question." *United States v. Hollingsworth*, 27 F.3d 1196, 1200 (7th Cir. 1994).

This doctrine follows from the animating principles of the entrapment doctrine. See *Mayfield*, 771 F.3d at 436. The purpose of the doctrine is to prevent the police from turning a law-abiding person into a criminal. *Evans*, 924 F.2d at 717. A legitimate sting operation takes an actual criminal off the streets and thus reduces the crime rate. *Mayfield,* 771 F.3d at 436. The entrapment defense guards against government overreaching, "reflect[ing] the view that the proper use of the criminal law in a society such as ours is to prevent harmful conduct for the protection of the law abiding, rather than to purify thoughts and perfect character." *Hollingsworth*, 27 F.3d at 1203. When a government agent tempts a person to commit a crime that he would not otherwise have committed, "punishing him will not reduce the crime rate; it will merely deflect law enforcement into the sterile channel of causing criminal activity and then prosecuting the same activity." *United States v. Manzella*, 791 F.2d 1263, 1269 (7th Cir. 1986).

1. *Inducement*

Turning first to Defendant's charge of improper inducement, Defendants contends that the Government took improper advantage of Defendant's friendship with the CS, who was himself a gang member and drug dealer. Defendant points out the CS's motivation to curry favor with the Government. But the CS's shady past acts as a double-edge sword. On the one hand, his incentive to lure Defendant into the trap set by the Government provides a reason for both the Government and the Court to approach the CS's words and actions with caution. On the other hand, as the recorded conversations played at trial made clear, Defendant shared the same dubious history as a gang member and drug dealer, which might explain both his relationship with the CS and his predisposition to provide a quick hook-up for someone like the CS looking for drugs and/or guns.

Defendant is correct in arguing that "[g]overnment exploitation of friendship can constitute improper inducement." *McGill*, 754 F.3d at 459 (collecting cases); see also *Sherman v. United States*, 356 U.S. 369, 371 (1958) (concluding that there was entrapment as a matter of law even though defendant was offered little more than reimbursement for his costs if he would obtain heroin because the inducement consisted of repeated requests from an informant posing as a fellow recovering addict who had fallen off the wagon); *United States v. Sorrells*, 287 U.S. 435, 441 (1932) (holding that an entrapment instruction was warranted even though defendant was promised no extravagant profit because informant's persistent appeal to military camaraderie qualified as a potentially entrapping inducement). At the same time, friendship alone is not enough to establish the inducement element of entrapment. See, *e.g.*, *United States v. Young*, 78 F.3d 758, 761 (1st Cir. 1996) ("We cannot find, and [defendant] does not cite authority for, the proposition that friendship, without a plea predicated upon friendship, suffices legally as inducement").

One problem with Defendant's reliance on the friendship angle as unlawful inducement is the dearth of evidence that actually establishes a close relationship with the CS. There is no dispute

that the two men knew each other, but the evidence of the depth of their relationship is lacking. The CS testified that he and the Defendant did not meet until 2012 and that his mother and father may also have known Defendant. In his pre-trial filing, Defendant noted only that the CS assisted him in obtaining employment in 2012—two years before the drug and gun deals in question[6]— and that Defendant bailed the CS out of trouble after he got into fights with other gang members.[7] Interestingly, the recorded transactions do not evidence any familiar banter between Defendant and the CS that might reflect a close relationship. Nobody asks about the family, any other mutual friends, any past shared experiences, or anything else of that nature. Instead, the talk is purely business — quantity, quality, price, safety precautions for handling the drugs. There is precious little evidence from which the Court could infer the kind of close relationship that Defendant insists made him especially vulnerable to the CS's entreaties.

Defendant attempts to bolster his "friendship" argument by pointing out that the CS contacted Defendant to initiate the transactions. But the government does not "induce" a defendant to commit a crime for purposes of an entrapment defense merely because it offers a defendant the opportunity to commit a crime. To the contrary, there is no government "inducement" where the government does "nothing more than offer a standard market deal in a sting." *United States v. Plowman*, 700 F.3d 1052, 1057 (7th Cir. 2012) (quoting *United States v. Pillado*, 656 F.3d 754, 764–65 (7th Cir. 2011)). See also *Mayfield*, 771 F.3d at 434 (providing that "inducement means more than mere government solicitation of the crime; the fact that government agents initiated contact with the defendant, suggested the crime, or furnished the ordinary opportunity to commit

---

[6] To the extent that the CS's recommending Garcia for a job serves as the basis of the alleged inducement, it fails because there is no defense of private entrapment. *United States v. Morris*, 549 F.3d 548, 551 (7th Cir. 2008).

[7] If anything, Defendant's intercession on behalf of the CS after the bar fight suggests an obligation running from the CS to Defendant, not the other way around, as Defendant's argument implies.

it is insufficient to show inducement"); *United States v. Blassingame*, 197 F.3d 271, 281 (7th Cir. 1999) ("A person who takes advantage of an ordinary opportunity to commit criminal acts * * * is not entrapped."). To be sure, repeated contact that amounts to harassment can support a case for improper inducement. See *United States v. Barta*, 776 F.3d 931, 937 (7th Cir. 2015) (the FBI's frequent emails and calls to defendant, with no response from defendant, amounted to "repeated attempts at persuasion"); *Mayfield*, 771 F.3d at 420-21, 441-42 (where informant pestered defendant "over the course of several weeks," a reasonable trier of fact could find that "this persistent pressure amounted to harassment"). Here, however, the CS's inquiries were not met with silence or reluctance; rather, Defendant proved to be ready, willing, and able to deal, and at market prices. Indeed, as the Government points out, it was Defendant—not the CS—who proposed what became the drug of choice for their transactions, crystal methamphetamine. (That fact goes to both elements, as it indicates lack of improper inducement, with Defendant offering his own preferred produce, as well as predisposition to engage in drug dealing, even for drugs in which the CS had not indicated an interest.)

In sum, even assuming that Defendant has raised more than a scintilla of evidence in support of his entrapment defense—such that the question is properly put to the trier of fact—the Court finds that the Government has proven beyond a reasonable doubt that it did not engage in improper inducement of Defendant's participation in the illegal activity charged in the superseding indictment. As the evidence overwhelmingly shows, Defendant's relationship with the CS was more in the nature of acquaintances than friends; Defendant readily accepted the invitation to participate in the proposed drug and gun transactions; Defendant had been dealing drugs prior to the initial contact by the CS; Defendant possessed wide knowledge across the range of available

narcotics on the market.  In short, Defendant and the CS formed a business relationship that was normal in every respect except the illegal nature of the items sold and purchased.

### 2. *Predisposition*

In any event, even if Defendant could prevail on the inducement prong, the evidence in the case also demonstrates overwhelmingly that he was predisposed to committing the charged offenses.  At best, Defendant has suggested that upon his release from prison in 2012, he did seek (and obtain) the CS's assistance in obtaining legitimate employment.  But that does not negate the compelling evidence indicating that, by 2014, Defendant had returned to the drug trade in a big way and that he also had ample and ready connections with firearm suppliers as well.

The Seventh Circuit has instructed that when analyzing a defendant's predisposition to commit a crime, courts are to consider: "(1) the defendant's character or reputation; (2) whether the government initially suggested the criminal activity; (3) whether the defendant engaged in the criminal activity for profit; (4) whether the defendant evidenced a reluctance to commit the offense that was overcome by government persuasion; and (5) the nature of the inducement or persuasion by the government." *United States v. Stallworth*, 656 F.3d 721, 725 (7th Cir. 2011) (quoting *United States v. Hall*, 608 F.3d 340, 343 (7th Cir. 2010)).  "No individual factor controls the issue of predisposition, but the most important factor is whether the defendant was reluctant to commit the offense." *Id*. at 725-26.

Here, the recordings between the CS and Defendant reveal Defendant to have been a willing participant in the charged criminal conduct.  Time and again, Defendant displayed his deep knowledge of a wide range of illegal narcotics—not only the methamphetamine that he actually sold, but also two different kinds of heroin, cocaine, and even marijuana.  See *United States v. Johnson*, 32 F.3d 304, 308 (7th Cir. 1994) (affirming rejection of entrapment defense where

defendant demonstrated knowledge of cocaine pricing and drug-dealing terminology); *United States v. Theodosopoulos*, 48 F.3d 1438, 1446 (7th Cir. 1995) (using terminology that indicates experience in the drug trade in discussions with government agent is relevant in examining character and reputation); *United States v. Cervante*, 958 F.2d 175, 179 (7th Cir. 1992) (using drug dealing jargon in telephone conversations with government agent indicates a defendant's predisposition to engage in drug deals). Defendant had ready sources, understood the wholesale and retail markets, and consistently provided safety tips on how to handle the product. None of the recorded calls or buys reveals even a moment of hesitation or reluctance on Defendant's part. Nor is there any evidence that the CS spurred Defendant to return to a trade that he had given up— and would have stayed clear of absent the CS's solicitation. To the contrary, the record shows that Defendant had sold cocaine the day before the CS contacted him to arrange the first of the five deals charged in the superseding indictment. G. Ex. 2; G. Ex. 2 Trans. 299-300, [96, at 18]. And perhaps most damningly, it was Defendant—not the CS—who suggested the sale of methamphetamine. G. Ex. 2; G. Ex. 2 Trans. 390-391, [96, at 21].[8]

The same is true for Defendant's sale of the firearm. Defendant's recorded conversations with the CS revealed a great deal of experience over many years with firearms. More to the point, he discussed several potential sources of various guns, showed a familiarity with their prices, and

---

[8] As noted above, Defendant's recorded statements may be considered in considering his predisposition (or lack thereof) to commit the charged offenses. See *Jacobson v. United States*, 503 U.S. 540, 542 (1992) (noting that the government offered two categories of predisposition evidence at trial: "evidence developed prior to the Postal Service's mail campaign, and that developed during the course of the investigation," and analyzing both categories of evidence); *Mayfield*, 771 F.3d at 437 (providing that "the defendant's response to the government's offer may be important evidence of his predisposition"); *id.* at 438 (stating that "[t]he defendant's predisposition is measured at the time the government first proposed the crime, but the nature and degree of the government's inducement and the defendant's responses to it are relevant to the determination of predisposition"); *United States v. Kaminski*, 703 F.2d 1004, 1008 (7th Cir. 1983) ("As stated previously, predisposition exists prior to contact with the Government. In many cases, however, there is little direct evidence of the defendant's state of mind prior to interaction with Government agents and we must instead rely upon indirect proof available through examination of the defendant's conduct after contact with the agents.").

quickly was able to procure a Taurus .38 caliber revolver (and accessories) for sale to the CS. He also plainly knew ways in which to structure firearms transactions to make them look legal. Alternatively, he discussed ways of obtaining guns through robbery. In short, the recorded meetings between Defendant and the CS are replete with evidence of Defendant's predisposition to possess and sell firearms. As with the drug transactions, the gun deal revealed Defendant to be an "unwary criminal," not an "unwary innocent." See *Sherman*, 356 U.S. at 372 ("To determine whether entrapment has been established, a line must be drawn between the trap for the unwary innocent and the trap for the unwary criminal.").[9]

## V.    Conclusion

For the reasons stated above, the Court finds that (1) the evidence presented at trial establishes beyond a reasonable doubt that Defendant is guilty as charged on all six counts of the superseding indictment and (2) Defendant's entrapment defense cannot be sustained. Accordingly, the Court will enter a separate order denying Defendant's motion for judgment of acquittal [113] and entering a judgment of guilty on Counts 1, 2, 3, 4, 5, and 6 of the superseding indictment. Counsel are directed to jointly contact the Courtroom Deputy to determine a sentencing date and deadlines for the filing of sentencing memoranda.

Dated:  April 3, 2020

_____
Robert M. Dow, Jr.
United States District Judge

---

[9] Although Defendant proffered evidence of the statutory penalties he may face if convicted of Count Four, the Court does not believe it would be proper to consider that evidence (or any other evidence relating to potential punishment) in determining whether the Government has proven its case beyond a reasonable doubt or whether the entrapment defense applies.