1                    IN THE UNITED STATES DISTRICT COURT

                FOR THE NORTHERN DISTRICT OF ILLINOIS

2                          EASTERN DIVISION

3  UNITED STATES OF AMERICA,     )  Docket No. 16 CR 109

                           )

4                Plaintiff,  )  Chicago, Illinois

                           )  November 17, 2020

5           v.              )  10:42 A.M.

                           )

6  RALPH GARCIA,              )

                           )

7                Defendant.  )

8

9         TRANSCRIPT OF PROCEEDINGS - SENTENCING HEARING

           BEFORE THE HONORABLE ROBERT M. DOW, JR.

10

11  APPEARANCES:

12  For the Plaintiff:      HON. JOHN R. LAUSCH, JR.

                          UNITED STATES ATTORNEY

13                      BY:  MR. TIMOTHY J. STURINO

                          ASSISTANT UNITED STATES ATTORNEY

14                      219 South Dearborn Street, Fifth Floor

                          Chicago, Illinois 60604

15                      tim.sturino@usdoj.gov

16

17  For the Defendant:      LAW OFFICES OF JOHN LEGUTKI

                          BY:  MR. JOHN C. LEGUTKI

18                      53 West Jackson Boulevard, Suite 920

                          Chicago, Illinois 60604

19                      jlegutki@sbcglobal.net

20  Also Present:           MS. KELLY KWONG

                          United States Probation Officer

21

22  Court Reporter:        KRISTIN M. ASHENHURST, CSR, RDR, CRR

                          Official Court Reporter

                          219 S. Dearborn Street, Room 2304-A

23                      Chicago, IL 60604

                          (312) 818-6549

24                      kristin_ashenhurst@ilnd.uscourts.gov

25

1          (The following proceedings were had via video.)

2          THE CLERK:  16-CR-109-1, United States of America

3     versus Ralph Garcia, and this is for sentencing.

4          THE COURT:  Okay.  Thank you.  So let me just make

5     sure Kris is still there.  Kris, are you still there?

6          THE COURT REPORTER:  I am.  Thank you.

7          THE COURT:  Okay.  Great.  So I can take attendance

8     off my video here.  I have Mr. Sturino here for the government.

9          MR. STURINO:  Good morning, your Honor.

10         THE COURT:  Good morning.  You're coming in loud and

11    clear.  Beautiful.

12         Mr. Legutki is here for the defendant.  Mr. Legutki,

13    good morning.

14         MR. LEGUTKI:  Good morning, sir.  How are you today?

15         THE COURT:  I am well.  Thank you very much.  Thank

16    you for your patience.

17         Ms. Kwong is here.  She's stepping in here.

18    Mr. McKechnie is retired apparently, so we'll wish him well on

19    the record and express our jealousy, but we'll also thank

20    Ms. Kwong for stepping in.  Good morning.

21         PROBATION OFFICER KWONG:  Good morning.

22         THE COURT:  And, Mr. Garcia, good morning.  Can you

23    hear us okay?

24         THE DEFENDANT:  Yes, I can, your Honor.

25         THE COURT:  We can hear you okay as well, so thank you

1     for your patience as well, sir.

2             Okay.  Well, good morning, everybody.  Is the

3     government ready to proceed today?

4             MR. STURINO:  Yes, your Honor, we are.

5             THE COURT:  Okay.  And defense is ready to proceed as

6     well?

7             MR. LEGUTKI:  Yes, sir.  Thank you.

8             THE COURT:  Okay.  Very well.  Carolyn, can you please

9     swear in Mr. Garcia?

10            THE CLERK:  Sure.  Mr. Garcia, can you please raise

11    your right hand?

12        (Defendant sworn.)

13            THE COURT:  Thank you, Carolyn.  Mr. Garcia, good

14    morning, again.  And are you ready to proceed with sentencing

15    today, sir?

16            THE DEFENDANT:  Yes, I am.

17            THE COURT:  Okay.  Great.  Thank you.

18            Well, I want to start -- I want to thank Mr. McKechnie

19    in absentia for preparing the PSR.  And, counsel, I think you

20    both have received a copy of Mr. McKechnie's recommendations;

21    is that right?

22            MR. STURINO:  Yes, your Honor.

23            MR. LEGUTKI:  Yes, sir.

24            THE COURT:  Okay.  Very good.  I also want to thank

25    counsel for the sentencing memoranda.  And I know there were

1   some letters.  Mr. Garcia, your mom wrote me a really nice

2   letter.  I got a lot of nice letters from your nieces and

3   nephews.  And yesterday Mr. Legutki filed your letter.  So I

4   thank you guys for all of that.  You've got a very nice family.

5   And I appreciate Mr. Legutki and Mr. Garcia, both of you, I'm

6   sure, did a lot of legwork to get those letters on the docket,

7   so thank you.

8               THE DEFENDANT:  Thank you.

9               THE COURT:  I think Mr. McKechnie gave me the honor of

10  attaching the entire trial transcript to the PSR.  I won't say

11  I read every word of it, but I did go back and read my ruling

12  at the end, so that's what I have.  Is there anything that I'm

13  missing?  Government, is that everything I am supposed to have

14  from your perspective, Mr. Sturino?

15              MR. STURINO:  Yes, your Honor.

16              THE COURT:  And, Mr. Legutki, is that everything that

17  the defense wanted me to have to review as well?

18              MR. LEGUTKI:  Yes, sir.  Thank you.

19              THE COURT:  Okay.  Wonderful.  Thank you.

20              So let's start with the PSR then.  Mr. Legutki, did

21  you have a chance to review it with Mr. Garcia?

22              MR. LEGUTKI:  Yes, sir.  Mr. Garcia did receive his

23  PSR, as well as the disclosure of the sentencing

24  recommendation.  Obviously because of the COVID restrictions

25  that we have experienced over the last several months,

1    Mr. Garcia and my communication has been limited to audio,

2    telephonic and some video communication.  But I -- we have

3    the -- both of those documents, and as well as the statement

4    that Mr. Garcia produced.  We discussed that.  I will just

5    note -- and I will get into it later.  When Ralph and I spoke,

6    I think the day before yesterday, there was a slight change to

7    what I initially gave Ralph, and I incorporated some changes

8    when I submitted it to the Court, so, yes, we have had an

9    opportunity to review those documents.

10           THE COURT:  Okay.  Great.  And I know you have

11   a -- you articulated in your memorandum an objection on the

12   acceptance of responsibility.  Did you have any other

13   objections, comments, or corrections.  There were a few

14   objections to the conditions of supervision, which we'll go

15   over, too.  Anything else besides those?

16           MR. LEGUTKI:  No, sir.  I think -- I tried to be

17   inclusive, but concise, in my sentencing memorandum.

18           THE COURT:  Okay.  And I do appreciate that.  And

19   we'll go over both the acceptance of responsibility point, as

20   well as the objections to the conditions of supervision in a

21   couple of minutes here, but I just wanted to see if you had any

22   other objections, comments, or corrections.

23           MR. LEGUTKI:  That is it, sir.

24           THE COURT:  Okay.  Mr. Garcia, I know Mr. Legutki told

25   us you have had a chance to go over the PSR on the video and

1    also on the phone with him.  Did you have any objections,

2    comments, or corrections, in addition to the ones that he has

3    raised in the sentencing memorandum?

4         THE DEFENDANT:  No, not at this time, no.

5         THE COURT:  Okay.  Very good.  Thank you.  And

6    Mr. Sturino, does the government have any objections, comments,

7    or corrections to the PSR?

8         MR. STURINO:  No, your Honor.

9         THE COURT:  Okay.  Very good.  So why don't we start,

10   then, with acceptance of responsibility point.  And I will tell

11   you my own take on it is that it's kind of a partial-credit

12   situation.  I read what you all said in the memoranda, and I

13   think Mr. Garcia deserves some credit for not contesting the

14   factual basis of offense of conviction.  His argument was

15   really a legal one and it was based on a defense of entrapment,

16   and I explained in my memorandum the reason I didn't think it

17   was successful legally, but I do think -- so I think as

18   a -- first of all, because he went to trial, he wouldn't be

19   eligible for the third point anyway, so what we're talking

20   about is two points.  And my take on it is, I don't think when

21   you contest the facts on the basis of shifting the blame from

22   yourself to the informant, that you get full credit, so I don't

23   think I can give him the two points under the guidelines.  But,

24   you know, he certainly simplified matters considerably by not

25   contesting the factual basis.  The trial was probably one-fifth

1    of the trial it would have been if we had to put every witness

2    on, and so I'm going to give him substantial partial credit,

3    like my old calculus professor used do when my answers weren't

4    quite right, but I was on the right track at least.  My

5    professor was very generous with partial credit, and I will be

6    as well because I think Mr. Garcia got a considerable distance

7    toward where you have to be to get the two points.

8            Now, at the end of the day, the guidelines are really

9    long in this case.  I don't think I will be inclined to give a

10   guideline sentence because of the length of the guidelines and

11   Mr. Garcia's age.  And, you know, what he pointed out in his

12   letters is also -- I mean, his criminal history is really long,

13   serious.  It's one of the longer and more serious ones I have

14   seen.  But when he was -- his last trip to custody, when he

15   came out, he did some things that should have put him in good

16   shape to carry on, and unfortunately he got caught back up in

17   drugs and guns.  I guess it's a long-winded way of saying the

18   partial credit and my disinclination to give him a sentence of

19   292 months is going to narrow down to his benefit in the end on

20   this, but I don't think I can give him the two points as a

21   technical guideline matter.

22           Is there anything else the government would like to

23   say on this issue just to create a full record?

24           MR. STURINO:  No, your Honor.  We laid out our

25   arguments in our sentencing memo.  I understand your Honor's

1    ruling, so I have nothing more to add.

2         THE COURT:  Okay.  Mr. Legutki, anything more you

3    wanted to add to the record?

4         MR. LEGUTKI:  Your Honor, you touched upon one thing

5    that I was going to discuss a little bit later, but now there

6    is a nice way to segue way, certainly since we have the audio

7    and visual, who knows what's going to happen in two minutes

8    with that, so allow me to get that in.

9         This case has gone on for a long time.  I have had an

10   opportunity, probably unlike any other federal defender case,

11   to get to know Mr. Garcia.  I've had many, many discussions

12   with him in person and in video, telephonically.  And one of

13   the things he added, just the other night -- or the other day

14   when I spoke with him, and he wanted it included in his

15   statement and I did include it to the Court, but maybe not in

16   the version that Ralph has.  When I was talking to him, he

17   said, "John, you know, when I got out, I really did want to do

18   things differently.  And I had an opportunity to get a job

19   driving a truck going out of state.  Going out of state would

20   have been a game changer for me.  I would have gotten out of

21   the neighborhood, gotten away from people.  He did mention --

22   he did not mention the CI by name, but I'm sure there's others

23   as well.  But because he was on parole, he was unable to leave

24   the state.  He was unable to get that job.  So that was just an

25   important consideration that Ralph wanted me to convey to you.

1    And when I last spoke with Ralph in writing, getting things

2    back and forth, they kind of got cut off, but Ralph asked me to

3    stress that to the Court and asked you to make that part of

4    your consideration, please.

5         THE COURT:  And when he was in state custody

6    previously; is that right?

7         MR. LEGUTKI:  Yes, sir.

8         THE COURT:  And that's, in a way, too bad, because the

9    fact is if you were in federal custody or federal supervision,

10   I have signed off on people getting a long-haul trucking job

11   when they're on supervised release because it's actually a good

12   job.  It pays really well and, you know, the trucks and the

13   cows and whatever you're hauling in the back don't care about

14   your record, and a lot of employers don't either.  It's a

15   shame, actually, that you weren't in federal supervision

16   because we would have signed off on that.

17        And I've said to many people over the year, you know,

18   I know where you are from, Mr. Garcia, much better than I know

19   most defendants because you don't live too far from me.  But

20   when I have defendants who come in and they have grown up their

21   entire life in Englewood.  And I say, "Do you know what the

22   unemployment rate is in Englewood for African-American men with

23   felony convictions?  It's really high."  And then I say to

24   them, "Do you know what the unemployment rate is in Iowa?"  And

25   this is pre-pandemic.  It was almost zero.  And there were lots

1    of really good jobs.  They're hard jobs.  Working in a

2    meat-packing plant is a hard job, but they pay very well.  The

3    cost of living in Iowa is a fraction of what it is in Chicago.

4    The public schools are excellent.  And I've had a few people

5    take me up on that and they've moved.  I had one guy out on

6    pretrial release, and he wanted to get a job in Iowa, and by

7    the time his case came up for a plea, it was about a year and a

8    half in.  He had a good job that paid well.  His wife had a job

9    teaching in Iowa.  They wanted to stay in Iowa.  And I cut his

10   sentence in half because he proved to me that he could do it.

11   His guidelines were like three years and I gave him a year and

12   a half because he proved to me that he was on the right track.

13   And, unfortunately, the state system isn't as good as the

14   federal system in flexibility, so I hear the argument and I

15   averred to it myself because I understand it.

16          The balance against that is everything I heard at the

17   trial.  And everything I heard at the trial was -- it's someone

18   who really still knew where all of the drugs were and all of

19   the different kind of drugs you could get.  And where all of

20   the guns were and how you could get all of the guns, too.  And

21   that's the balance here.  You have to take the bitter with the

22   sweet at sentencing.  I am well aware of the argument you just

23   made, Mr. Legutki, and I referenced myself five minutes ago.

24          And, you know, if I had to rank the defendants who

25   come in in terms of their demeanor in the courtroom and how

1    pleasant they were to deal with, Mr. Garcia would be near the

2    top.  He's actually -- you know, I have enjoyed him.  There's a

3    lot of defendants I don't enjoy because they're sullen and they

4    feel sorry for themselves and they're bitter.  And it's easy to

5    get bitter after you've been in the system as many times as

6    Mr. Garcia has, and he's not.  He doesn't look bitter.  He

7    doesn't sound bitter.  I actually have enjoyed having him.  I

8    think there's something there and I'm really rooting for him.

9    And this time when you come out, you'll be on federal

10   supervised release, and we'll work with you in a way that the

11   state court doesn't really have the ability to work with you,

12   but we will keep working with you.  We don't give up on people

13   who don't give up on themselves.  And that's what I can tell,

14   Mr. Garcia, you haven't given up on yourself, and your mother

15   hasn't given up on you either.

16          Okay.  Thanks, Mr. Legutki.  On the PSR I think we

17   have covered all of the ground, and on the guidelines, I am

18   going to end up accepting the guideline calculation, but I am

19   going to give substantial partial credit for the way the case

20   has unfolded in the end and the fact that Mr. Garcia did

21   basically admit to all of the factual basis of the offense, and

22   it was just a legal question that we had to sort out at the

23   trial.

24          So let me turn this over to the lawyers, then,

25   Mr. Garcia, if that's okay.  I'll let the lawyers have their

1    say, and then when they're all done, I will let you have your

2    say.  Okay?

3             THE DEFENDANT:  Okay.

4             THE COURT:  Okay.  Mr. Legutki, I'll give you the

5    first and last word, so you can start out and then Mr. Sturino

6    can say the government's piece, and then if he says anything

7    that offends you, you can turn around and come back on him.

8    Okay?

9             MR. LEGUTKI:  Thank you.  I doubt Mr. Sturino would

10   say anything offensive.  Throughout this ordeal he has been

11   courteous and professional just to the nth degree, and the same

12   goes for Mr. Vandenberg.

13            Your Honor, your Honor touched upon something that

14   it's really the -- a lot of times I don't go into because it's

15   personal, almost nonobjective standard, but it's my

16   relationship with Mr. Garcia.  You can see from the picture, he

17   is in one of those holding rooms.  Your Honor, I don't know if

18   you've ever been in a holding room with a defendant.  They lock

19   the door behind you and the guards walk down the hallway.  It

20   can be a very difficult experience.  I'm 6'2" and about 210

21   pounds, and that's a little bit of a lie in my weight, but I'm

22   a big guy.  There are many times I have felt threatened -- you

23   can't show it, of course.  There is a lot of menacing, a lot of

24   difficulty.

25            Mr. Garcia from the first day has been a straight

1    shooter.  What you see is very straight and honest and

2    forthcoming.  What you see in court is just a continuation of

3    his overall demeanor.  It's not an act, your Honor.  Ralph, he

4    is -- to use common language, he knew the jig was up, but there

5    were certain circumstances he wanted to bring forward to the

6    Court, and there was never a dispute as to anything else.  So

7    just what you said, your Honor, that is Mr. Garcia and has been

8    from the beginning of the minute one, the minute I met him.  I

9    never felt threatened by him.  He was never menacing or

10   accusatory.  He was very businesslike and gracious, and that is

11   his demeanor.

12           Your Honor, the dialogue today I think is unique to

13   the circumstance, and it really should be.  And the

14   circumstances where we find Ralph with his age and the 15-year

15   mandatory minimum as to Count Four.

16           If the circumstances were different, and what I mean

17   by that is Mr. Garcia's advanced age, it might be a different

18   presentation to the Court.  But I think unless and until

19   Congress revests the sentencing discretion where it belongs,

20   with the trial court, we are stuck with the 15-year mandatory

21   minimum.

22           I looked at a lot of cases, spoke with a lot of my

23   colleagues about the mandatory minimum, how we could approach

24   it?  Again, unless Congress revests the Court with the

25   sentencing discretion where it belongs, we're stuck with it.

1      That said, 15 years is a long time.  It's a long time

2   for anyone under any circumstances, but I think it's made

3   harsher given the fact that Mr. Garcia is going to be spending

4   15 years in prison.  It's made harsher and more difficult, more

5   dangerous, given his age.

6      3553(a) says we should impose -- the Court should

7   impose a sentence that is sufficient but not greater than

8   necessary.  Your Honor, I ask this Court to please consider

9   that the 15 years, it is more than sufficient.  It is -- it

10   gets to the heart of what an appropriate sentence is.

11      As I pointed out in my sentencing memorandum,

12   Mr. Garcia is going to be over 70 years old when he gets out.

13   There's going to be a hard -- it's going to be hard to adjust

14   to life.  I don't know if Ralph -- I hate to say this, but if

15   Ralph makes it, I sense from this Court, from your Honor, that

16   it would be hard to sentence someone to the rest of their life

17   in prison, and it's not something any of us likes to hear,

18   likes to encounter, but that's the reality that we're facing

19   here with Mr. Garcia's situation.

20      Ralph, when he got out of prison on the state

21   side -- your Honor is right.  He knew where the guns were.  He

22   knew where the drugs were.  That was his life.  Ralph didn't

23   grow up on the right side of town.  Didn't grow up -- more

24   opportunities that I have had, he didn't have those.  When he

25   got out, yes, he knew where the illegal activities took place,

1   but he also knew how to get a job.

2          Ralph -- I think the PSR indicates that Ralph was

3   making a pretty good buck.  He was able to secure a pretty good

4   job.  He got job training.  He reached out to people, but I

5   guess that's a two-edge sword reaching out to people.

6          Given the opportunity, I think Ralph could have and

7   will, if he lives -- if he lives -- set the record straight for

8   himself.  As Mr. Garcia said to me, and as I tried to

9   articulate to the Court, maybe not as well as Ralph did, but if

10  he just has a chance to get out of state, get away from his

11  circumstances, this wouldn't have happened.  Yeah, he would

12  still know where the people are with the guns.  Yeah, he would

13  still know where the people are with the drugs.  But he would

14  have been out of state away from it.

15          I ask the Court, please, to consider that the 180

16  months on the 15-year man. min. on Count Four is sufficient,

17  but not greater than necessary in the sentence for Ralph

18  Garcia, and I ask the Court to, of course, give him credit for

19  the time served that Ralph has already put in and I ask that a

20  below-guideline sentence consistent with that be imposed by

21  this Court.

22          Thank you.

23          THE COURT:  Okay.  Thank you.  And, Ms. Kwong, I just

24  want to confirm, by my calculation here it looks like

25  Mr. Garcia has already been in custody for the last 57 months.

1    Does that sound right to everybody?  From February of 2016?

2         MR. STURINO:  Yes, your Honor.  This is Tim Sturino on

3    behalf of the United States.

4         MR. LEGUTKI:  Yes, sir.  And John Legutki on behalf of

5    Ralph Garcia.  I have -- Tim, I have February 23, 2016.

6         THE COURT:  Okay.  So that's almost exactly 57 months

7    already in custody.

8         Well, thanks, Mr. Legutki, I appreciate it.

9         Mr. Sturino.

10        MR. STURINO:  Thank you, your Honor.  Just one

11   housekeeping matter I wanted to make clear for the record.

12   Your Honor indicated that you were adopting the guidelines in

13   the PSR, and so I just wanted to make clear that it does not

14   appear that either party has an objection to the guidelines.

15   The guideline range, as calculated by the probation officer was

16   292 to 327 months.  That is based on a Criminal History of VI,

17   and a total offense level of 35 when we do the grouping rules.

18   And so I just wanted to make sure that that was the Court's

19   ruling and the Court's finding at the outset.

20        THE COURT:  Yes.  So this is the way I would look at

21   it, Mr. Sturino.  I think the defendant did object to the

22   guidelines in terms of acceptance of responsibility, and I'm

23   overruling that objection as a guideline matter, but taketh

24   away with one hand and giveth much of it back with the other

25   hand under 3553(a).  And I understood that to be the only

1    objection, so with that objection being overruled, I will adopt

2    the offense level of 35.  Criminal history of VI and all the

3    career offender and grouping calculations, and I think it's 292

4    to 365 is what I have here.  Does that sound right?

5            MR. STURINO:  Excuse me.  Yes, you're correct.  Yes,

6    the Court is right.

7            THE COURT:  Is that an accurate recitation of the

8    defense position, Mr. Legutki?

9            MR. LEGUTKI:  Yes, sir.

10           THE COURT:  Okay.  So I will adopt that guideline, and

11    I think that calculation out to 24 in a full year and a

12    guideline sentence therefore would, you know, Mr. Garcia

13    was -- he's 60 now.  So he was 56, I guess, 55 or 56 when he

14    went into custody.  55?

15           THE DEFENDANT:  Yes.

16           THE COURT:  Okay.  Let me just -- oh, you just had a

17    birthday about a month ago.  So October 19 of -- yes, you're

18    55, 55 and a half almost when you went in.  So

19    24-and-a-third-year sentence would put you just on the verge of

20    80.  And with good time, you would subtract 15 percent of 24

21    and a third, so that would put you maybe at 77 or something

22    like that; that's pretty old.

23           MR. LEGUTKI:  I'm sorry, sir.  We just had an

24    interesting seminar on that, calculation of good time.

25    Mr. Hefler at the Federal Defender's Office gave a very

1    detailed explanation of that.

2             THE COURT:  Yes.  Here's the thing, Mr. Legutki.  I

3    think that stats would tell you that Mr. Garcia at age 55 was

4    unlikely to be committing drug and gun crimes, so it's a little

5    bit of a double-edged sword.  But I think there's a big

6    difference between 55, which is what I am right now, and 70 or

7    80.  I mean, I think you fall off the shelf in terms of drug

8    and gun crimes when you hit 70. I have yet to see a 70-year-old

9    who I was sentencing for a drug or gun crime.  I have never

10   seen one.  I've seen fraudsters in his 70s.  I just had a guy

11   plead guilty in his early 80s, but he wasn't dealing -- his

12   drug crime was prescription opioids, and he was a doctor.  So I

13   guess it's not unheard of, but it's really unlikely at age 70

14   or 75 or 77.  It's a big difference between 55 and 75 in that

15   respect.  So -- but I do appreciate everybody helping.  Doing

16   all of the math here, so it's not as daunting.

17            Mr. Sturino, thank you for cinching up the guidelines.

18            MR. STURINO:  And thank you, your Honor.  I appreciate

19   it.

20            So, your Honor, I'll talk first about the

21   circumstances of the offense a little bit, and I'll talk about

22   Mr. Garcia's criminal history.  At the outset, I do acknowledge

23   that the amount of time that Mr. Garcia is facing is

24   extraordinary.  That's not lost on the government.  It is a lot

25   of time that he is looking at under the guidelines and it's a

1   lot of time he is looking at under the statute.

2          I do think, as the Court just calculated, it is all

3   correct.  It is all correct under the guidelines and correct

4   legally under the statute.  And when I look through

5   Mr. Garcia's PSR, outside of his age, your Honor, I struggle to

6   see the mitigation with respect to his background.  I do

7   acknowledge that he's, you know, currently, I believe, 59 years

8   old and that, as your Honor just said, it is unlikely that he

9   would return to a life of crime.  The statistics make it fairly

10  unlikely that he would return to a life of crime even after a

11  15-year sentence.  However, as your Honor has pointed out, it

12  was unlikely that he would have committed this crime according

13  to the statistics at the age of 55.  And so statistics

14  obviously only tell us so much about what a person will do in

15  the future.

16         And it's a really hard, almost impossible thing to

17  gauge.  And, unfortunately, I don't know Mr. Garcia.  I haven't

18  had the opportunity to sit with him or talk to him.  So I make

19  my analysis and my future predictions based on what I see in

20  the paper.  And that's not entirely fair to Mr. Garcia.  I get

21  that.  That's why we have defense attorneys and we have

22  prosecutors, but that is where I come from and that's what I

23  see.  And I see a person who has the criminal history

24  Mr. Garcia does, and, unfortunately, that drives my

25  recommendation of a guideline sentence.

1      Your Honor, with respect to the circumstances of the

2  offense, I don't wasn't to go back through what happened on

3  those six occasions.  Mr. Garcia sold one firearm, as well as

4  220 grams of methamphetamine to a confidential source.  Your

5  Honor sat through the trial and knows the evidence as well as

6  anyone here.  What I want to talk a little bit about was the

7  circumstances of those offenses, and other things that

8  Mr. Garcia said that shows that his criminal conduct at that

9  time at the age of 55 was not limited to just these

10  interactions with the source.

11      And Mr. Legutki said a moment ago that Mr. Garcia knew

12  where the drugs and the guns were, and that is a fair

13  representation.  I think it's more than that, though.  I think

14  he knew not only where the guns and the drugs were, but I think

15  he had access to the guns and the drugs and he was selling

16  other drugs to other persons at this time.

17      Your Honor, if you look at the -- if you look at the

18  circumstance of the offense and the recordings between

19  Mr. Garcia and the source -- and a lot of what I'm going to

20  talk about, your Honor, was in the government's reply to the

21  post-trial motions related to pre-disposition.  And it shows

22  that when this offense began on November 15th between the

23  source and Mr. Garcia, Mr. Garcia was not a person who was

24  taking orders from the source or was sitting back and waiting

25  for the source to direct him.  Mr. Garcia talked about his

1    cocaine sources at the time and that he could get the source

2    cocaine.  Mr. Garcia was talking about how he has reliable

3    sources for different types of narcotics.  They talked about

4    heroin.  They talked about the white or the black or the mud,

5    which refers to different types of heroin.

6         Mr. Garcia was not shocked or appalled by the source's

7    questions.  Instead, it was a lively and engaging conversation

8    that Mr. Garcia fully participated in and offered alternatives

9    to what the source was asking for.

10        On one occasion, I believe it was November 17th, your

11   Honor, Mr. Garcia even indicated that he had sold narcotics the

12   day before.  He said, "I was 'selling the shit,'" a reference

13   to cocaine according to the government, the previous day.

14   That's in the transcript on page 299 to 300.

15        On another occasion he indicated how he could get

16   eight-balls for $900.  And, in fact, your Honor, it was

17   Mr. Garcia who recommended to the confidential source that he

18   obtain ice -- methamphetamine.  It was not the source's idea.

19   And after Mr. Garcia recommended methamphetamine, he then talks

20   about pricing and quality and potency and things like that

21   which shows that he hadn't just learned of it that day.  He was

22   in the game, so to speak, and he knew and had access to these

23   items.

24        And just as an aside, your Honor, I think it's also

25   important that the methamphetamine that Mr. Garcia obtained and

1   sold to the confidential source was pure methamphetamine, 99

2   percent, if not 100 percent pure, an extremely dangerous

3   narcotic.  It was so dangerous that Mr. Garcia himself would

4   explain to the confidential source how dangerous it was, how

5   (inaudible) it was.  He would tell him not to touch it or not

6   to rub his eyes.  And he would double baggy the drugs when he

7   provided it to the source.  That is the type of narcotic we are

8   talking about that Mr. Garcia was selling to the source, and

9   ostensibly to the source's customers, is the story that the

10  source gave Mr. Garcia.

11       Your Honor, in addition to what the government

12  contends was other drug trafficking and other access to drugs

13  that Mr. Garcia had, Mr. Garcia and the source also had long

14  conversations about firearms, and a lot of this is in our

15  predisposition session in our reply brief beginning on page 15

16  of that reply.  And I'll highlight a few.

17       Mr. Garcia talked about how he had gang member

18  friends, P-Stone gang member friends, who had six guns and they

19  could get them.  He talked about how they could kidnap someone

20  and obtain that person's guns.  He indicated they wouldn't kill

21  the person, but they could kidnap him and take that person's

22  guns.  He provided other alternatives.  That they could get

23  younger gang members to straw purchase firearms for them, and

24  then they could use the guns for their purpose.

25       Your Honor, on a few occasions Mr. Garcia indicated

1    that he had possession of a firearm at that time, but he was

2    unwilling to give it to the source.  For example, your Honor,

3    in the transcript at pages 20 to 22, Mr. Garcia talks about how

4    he had a firearm "over by Mario's."  He had forgotten about

5    that one.  He explained to the source that he wanted to keep it

6    there just in case he needed it.  That's also at transcript 30

7    to 33, the latter part.

8          On another occasion, your Honor, Mr. Garcia mentioned

9    to the source that he had a 40 cal.  That's in the transcript

10   at pages 255 to 256.

11         On another occasion, your Honor, the transcript -- it

12   looks like page 152, I believe, the source asks Mr. Garcia if

13   he wanted to get rid of that old Dirty Harry that he was

14   telling him about, and he said, "No.  I'm going to hang on to

15   it until I get something else."  Of course, Mr. Garcia knew he

16   was a felon.  Of course, Mr. Garcia knew he couldn't have these

17   items.

18         So I think the important point is, you know, contrary

19   to Mr. Garcia's suggestion, it wasn't just the source -- he

20   wasn't just doing this for the confidential source.  I don't

21   believe that is accurate.  When you look at all of these

22   discussions, and they're lengthy discussions and long

23   transcripts, you see that Mr. Garcia was involved in criminal

24   activity.  He had a job as well and he was willing to work.

25   There's no doubt about that, but he was also involved in

1   criminal activity, deeply involved in criminal activity, and I

2   believe that is reflected in the transcripts, and I would ask

3   the Court to consider.

4        Your Honor, turning next to Mr. Garcia's criminal

5   history.  Mr. Garcia's criminal history, I think, as described

6   by the probation officer, was quite extensive, and I think the

7   seriousness of his criminal history and the extensive nature of

8   his criminal history, including the violent nature of his

9   criminal history, makes it very difficult, at least from my

10  perspective, for the government to recommend a sentence below

11  the guidelines range.

12       Your Honor mentioned that this is one of the more

13  serious criminal histories you've seen.  I don't believe I have

14  seen one more serious in 10 years.  Mr. Garcia has convictions

15  for attempted armed robbery and that was one case.  He stabbed

16  a victim with a knife.  Albeit, your Honor, that was in 1979

17  and he was 19 years old.  He then had a conviction for

18  attempted murder.  He shot two persons with a handgun, that's

19  in paragraph 77 of the PSR.  Again, he's 21 at that point.  He

20  then has a conviction for aggravated battery, that's paragraph

21  78.  At this point he is 29.  These aren't youthful

22  indiscretions anymore.  Frankly, I don't think shooting someone

23  can ever be considered a youthful indiscretion, but regardless,

24  he's growing up, and in that instance he kicks a police officer

25  in the head, and he only got two years for that.

1    Paragraph 80, your Honor, he has another aggravated

2    battery with a firearm conviction.  However, the important

3    thing to note there is he's again charged with attempted

4    murder.  He essentially has two attempted murder convictions in

5    his background, your Honor.  That is something I have never

6    seen.

7    And, your Honor, he doesn't have that many

8    convictions.  He really doesn't.  Just about a handful.  But he

9    has received serious and long sentences from the Illinois

10   Department of Corrections.  Yet when he is paroled in 2012 and

11   then discharged in 2015, he is, again, based on my prior

12   comment, deeply involved in criminal activity again, selling

13   guns and selling pure methamphetamine, as well as obtaining

14   other drugs, or the ability to do so.

15   So, your Honor, I understand.  When Mr. Garcia is

16   released, whenever that is, he is likely not hopefully going to

17   shoot anyone.  That's not what I'm saying.  He is not going to

18   stab anyone, I hope not, when he's 70 or whatever age he is

19   going to be when he is released, that's not what's going to

20   happen.  However, what you see in his criminal history and what

21   you see in this offense is he adapted.  He was dangerous when

22   he was 20, there's no doubt about it.  He was dangerous when he

23   was 55.  He just changed a little.  He just adapted to the

24   time.  Selling pure methamphetamine, putting firearms on the

25   street in the hands of other gang members is dangerous.

1     I don't know what he'll do at 70, hopefully he will be

2   done.  But, again, as I started, your Honor, I have these

3   papers as a guide for me, and I don't see, absent his age --

4   and those statistics were wrong with Mr. Garcia the first time.

5   I don't see a whole lot of mitigation.  And I don't enjoy

6   saying that, your Honor, but unfortunately it's what I see in

7   his background.  It's a violent background and an extensive

8   background, and I think it justifies a lengthy sentence.

9     Your Honor, I don't have anything else.  I can address

10  the objections for supervised release conditions.  A few, I

11  agree with Mr. Legutki; one or two, I would I disagree with,

12  but we can do that now or at the end.

13     THE COURT:  Why don't I let Mr. Legutki finish his

14  3553(a) presentation, and then let Mr. Garcia offer any

15  comments he would like, and then we'll go over the terms of

16  supervision if that's okay.

17     So, Mr. Legutki, any further rebuttal?

18     MR. LEGUTKI:  Yes, thank you, your Honor.  Thank you,

19  Mr. Sturino.  I think when the government looks back in time

20  and it sees what cannot be changed -- even God can't change the

21  past.  But what the government does is improperly enhance that,

22  it discusses and suggests a lot of uncharged, unproven conduct

23  that is -- I don't think makes it into the allegation phase, so

24  I think that's inappropriate.

25     Yes, Mr. Garcia grew up in a different world than I

1    think all of us have grown up in or have experienced.  And I

2    guess we can read a rap sheet and if we live in the world where

3    there is violence, if we live in the world where there are

4    drugs, I have a feeling that we are no -- we would know where

5    the violence is, we would know where those guns are, we would

6    know where the drugs are.

7            The government stresses about the purity of the meth,

8    and I don't think there's any allegation -- there wasn't even

9    allegation that Mr. Garcia was the manufacturer of this.  He

10   gets -- he gets it where he gets it.  It is wrong to have it.

11   It is wrong to sell it.  It is illegal.  But Mr. Garcia was not

12   the manufacturer.

13           You know, it's not like you go to the 7-11 and say,

14   "I'll have 100 percent pure meth or 50 percent pure

15   methamphetamine."  That's what's available on the street.

16           As far as 3553 factors, your Honor, I would stress

17   that we have -- the Court needs to formulate a sentence that's

18   sufficient but not greater than necessary.  I think we're all

19   understanding that Mr. Garcia gets out when he's 70-something

20   years old, the likelihood of recidivism, the likelihood of

21   being involved in this kind of conduct greatly diminishes.  The

22   government says they don't see any mitigation to that.

23           Your Honor, I think age, in and of itself, is a

24   mitigating factor in Mr. Garcia's situation.  There were

25   glimmers of Mr. Garcia's willingness to get a real job, try to

1    avoid going back to jail.  Your Honor heard all of the evidence

2    regarding -- during trial regarding the issue of entrapment,

3    and took all of the factors that the government just read off

4    into consideration in rendering his verdict, but I think that's

5    water under the bridge, your Honor.

6         What we're looking at now is sentencing, and I think

7    Mr. Garcia's sentence, 180 months, which is 15 years, and I'm

8    looking at a chart that was just given to us a few days ago,

9    that would come out to be 810 days of good time, and the actual

10   time served would be 12 years, nine months, and 11 days,

11   according to Mr. Hepler's chart that was just provided to us at

12   the recent seminar at the Federal Defender.  So I, again, ask

13   this Court for a below-guideline sentence for Mr. Garcia, no

14   greater than the 180 months, 15 years as to Count Four, and any

15   sentences with the remaining count to run concurrent with Count

16   No. Four.

17        THE COURT:  Okay.  Thank you very much.  Thank you for

18   all of your arguments, and thanks to both counsel.

19        So, Mr. Garcia, at sentencing a defendant has an

20   opportunity to say anything you would like.  I did get your

21   letter last night, which I do appreciate.  If there's anything

22   else you would like to say, though, you are welcome to do so at

23   this time, sir.

24        THE DEFENDANT:  The only thing I would say, your Honor

25   is that in the beginning I really tried hard.  It's not until I

1    got some more hurdles, which made it I didn't know where to go,

2    so I went back to the people that always helped me before and

3    that's how I found myself in this situation.  You know, a lot

4    of those things we talked about, a lot of those discussions we

5    had were just that, discussions.  Nothing.  Especially when I

6    started to realize that he wanted me to do it.  He didn't want

7    to do it.  He wanted me to do it.  So that's how -- there's no

8    way I can prove none of this or anything, but that's the way it

9    goes.

10          And thank you for everything you have done and thank

11   you, Mr. Sturino, for leaving me out there as long as you did.

12          THE COURT:  Okay.

13          Is that all you wanted to say, sir?

14          THE DEFENDANT:  Yes.

15          THE COURT:  Thanks, Mr. Garcia.  Thank you for your

16   letter and the letters from your family members.  I really

17   appreciate getting those, too.

18          MR. LEGUTKI:  Your Honor, if I can just add one more

19   thing.  Because of the newness of the situation, does the

20   record have to be made that everyone agrees to have this by

21   video under the CARES Act?

22          THE COURT:  Yeah, we should do that orally, too, and I

23   will just confirm that it has been put on there.  You guys did

24   send me the order.  There is an order that I signed last week

25   that has written consent to proceeding under the CARES Act, but

1    we might as well orally confirm that as well.

2          So, Mr. Garcia, I probably should have started out

3    today by asking you this, but you probably know about the order

4    we've entered.  You have no problem proceeding by video today,

5    sir?

6          THE DEFENDANT:  No, no.  Not at all.

7          THE COURT:  Thank you, Mr. Legutki, for reminding me

8    of that.  And it just gave me the opportunity to check and make

9    sure that we have put the signed order on the docket, which we

10   have, so we're good to go here.

11         Okay.  In terms of the conditions of supervised

12   release, I would like to go over those now because there were a

13   few objections and I want to make sure that you all end up

14   with --

15         (Phone ringing.)

16         So it looks to me, Mr. Legutki, like you guys had

17   objection to a couple of the discretionary conditions and a

18   couple of the special conditions, but no objections to the

19   mandatory conditions; is that right?

20         MR. LEGUTKI:  No, your Honor.  The mandatory, as far

21   as I know, are mandatory.

22         THE COURT:  Thanks.  Okay.  Well, let me go over the

23   mandatory conditions, then, with Mr. Garcia.  Mr. Garcia, if

24   there's any questions you have about any of the conditions

25   we're going to go over, if you ask me now, I can try to explain

1    them.  But I'm going to end up giving you in terms of

2    supervised release the statutory mandatory minimum amount of

3    time.  So it ends up being five years of supervised release

4    because that's the minimum on Counts Two, Three, and Five.

5    There's a four-year minimum on Counts One and Six and a

6    three-year minimum on Count Four, but if I impose them all

7    concurrently, it ends up being five years of supervised

8    release.  So you will have to adhere to these conditions after

9    the first five years after you're released.  I would consider

10   terminating them early if it turns out that you are in complete

11   compliance for the first half of that period.  Okay,

12   Mr. Garcia?

13            THE DEFENDANT:  Yes, sir.

14            THE COURT:  Okay.  So here are the mandatory

15   conditions.  Number 1 is you shall not commit another federal,

16   state, or local crime; that's pretty self-explanatory.

17   Number 2 is you shall not unlawfully possess a controlled

18   substance.  Number 6 is you shall cooperate in the collection

19   of a DNA sample, if the collection of such a sample is required

20   by law.  And No. 6 is a drug-testing condition that says you

21   shall refrain from any unlawful use of a controlled substance,

22   and submit to one drug test within 15 days of release.  And

23   then at least two periodic tests thereafter up to 104 periodic

24   tests for use of controlled substance during each year of

25   supervised release.  So a maximum of two tests a week, and the

1    probation officer will coordinate that with you.  All of that

2    clear, Mr. Garcia?

3              THE DEFENDANT:  Yes, sir.

4              THE COURT:  Okay.  Great.  Let's move on to the

5    discretionary conditions, then.  Number 4 is you shall speak

6    and work conscientiously at lawful employment, or if you're not

7    gainfully employed, you should pursue conscientiously a course

8    of study or vocational training that will equip you for

9    employment.  That makes sense no matter what your age is,

10   because you're going to have to support yourself, but I don't

11   expect that you're going to, like, go back to college or

12   something like that.  You might end up doing a truck-driving

13   course, though.  And if you did that, the probation officer

14   might be able to help hook you up with that and maybe even pay

15   for it if that's something you're interested in.  And just know

16   that this time around there will be a lot more flexibility than

17   last time in terms of things you might want to do that would

18   require travel outside of the district, as long as you're in

19   compliance with all of these terms.  Okay, sir?

20             THE DEFENDANT:  Yes.

21             THE COURT:  Number 6 is one to which there was an

22   objection here.  And, Mr. Sturino, I will ask you your views on

23   that.

24             MR. STURINO:  Your Honor, our position is that No. 6

25   should be imposed.  I think if you hear from Mr. Garcia, he

1    indicated that, you know, when he got out in 2015, he tried to

2    do it the right way.  He got a job.  He attempted to stay away,

3    and at a certain point, he couldn't.  And when I say stay away,

4    I mean stay away from the Latin Kings.  And when he got back

5    involved with the Latin Kings, when he associated with the

6    confidential source and others, all of a sudden he was -- had

7    access to dealing the drugs and firearms.  And so I think this

8    is a relatively innocuous condition, but I do think it is

9    important especially for a gang case and for a defendant who

10   has had life-long membership in a gang.

11          THE COURT:  Okay.  Mr. Legutki, anything else you

12   wanted to say beyond what you said in the memo?

13          MR. LEGUTKI:  Your Honor, when you go back to the

14   neighborhood that you grow up in -- he grew up in and people

15   are in gangs, what do you do?  I mean, if you're surrounded by

16   this, you're in this environment, how can you not help but

17   communicate with these people?  I think one of the mandatory

18   conditions was not to engage in criminal activity.  I think

19   that does it.  If you're put in a neighborhood environment you

20   grew up in you know all of these people and they are in gangs

21   and Latin Kings in these neighborhoods or GDs or whatever but

22   that's the only people around, how is this practical?

23          THE COURT:  Well, I think it requires a practical

24   construction by the judge.  And I have had this come up in

25   other cases that are pretty similar to Mr. Garcia's.  And what

1    I would say to that is, look, if you have family members who
2    are in this type of activity, there's a difference between
3    going to Thanksgiving at your mother's house where you're
4    communicating with people about the turkey dinner and the Bears
5    game and the kind of conversations that were recorded and
6    played at the trial.  And I do think that this is the kind of
7    thing that should give someone like Mr. Garcia an added
8    incentive to actually stay away from people who he knows he
9    shouldn't be associating with them.  And he said himself, "I
10   tried really hard.  And for a while I was doing it.  And then I
11   went back to all of the people who had helped me before."  And
12   all of that help that he's gotten before has left him in IDOC
13   for about 25 years of his life.  That's not the kind of help he
14   should be looking for.
15         So I am going to impose it, but I want you to
16   understand, Mr. Garcia, I have a practical construction and
17   it's what I just said.  If you end up at your mother's house or
18   a relative's house and there happen to be people who are gang
19   members there, you know, I can't choose your family for you.
20   And I can't control all of the other people in your family
21   either, or your friends, for that matter.
22         What this is really the idea is when someone asks you
23   to reassociate with criminal activity, and you know that's what
24   they're doing, this is another reason to say no.  Because not
25   only is it a violation if you get caught, you could get charged

1    again, but you also would be in violation of the terms of your

2    supervision, so you have to refrain from -- and, again, listen

3    to the word "knowingly," any person who you know to be engaged

4    in criminal activity.  If you know they want to sell guns or

5    drugs, that should be like kryptonite for you.  You should get

6    away as fast as you can, because you don't want to spend any

7    more time than you have to in prison.  And I'm cognizant of

8    your age.  I'm cognizant of the glimmers of hope that

9    Mr. Legutki was averring to, but I do think you really have to

10   make the effort, and you have to make it stick this time.

11          I believe you when you say you were looking for

12   legitimate work.  There's pay stubs and there's reports of

13   salary -- and it looks like you were making about 50 grand,

14   which isn't so bad for somebody with no dependents; that's

15   pretty good.  That's where we want you to be on your way out.

16   And just know this time, too, that we work with people.  The

17   federal system has resources.  We work with people, so please

18   let us help you help yourself.  Okay?

19          Okay.  Number 7, I agree with Mr. Legutki.  I suspect

20   you do, too, Mr. Sturino, that no alcohol is an imposition that

21   we don't need to have here, and so instead we'll change it to

22   no excessive use of alcohol.  Is the government comfortable

23   with that?

24          MR. STURINO:  I am, your Honor.  I agree with that.

25          THE COURT:  Okay.  So No. 7 is going to say you shall

1   refrain from any excessive use of alcohol, defined as a blood

2   alcohol concentration greater than .08.  And from any use of a

3   narcotic drug or other controlled substance, as defined in

4   Section 102 of the Controlled Substances Act, which is a

5   federal law, without a prescription by a licensed medical

6   practitioner.  So that just means you've got to -- used in

7   moderation, okay, Mr. Garcia?

8           THE DEFENDANT:  Yes, your Honor.

9           THE COURT:  Okay.  Most people by the time they get to

10  your age and my age are trying to get moderation.  It's the bar

11  fights when you're 22 that we're worried about.  Okay?

12          THE DEFENDANT:  Yes.  Thank you.

13          THE COURT:  Number 8, you know about.  You shall not

14  possess a firearm, destructive device, or other dangerous

15  weapon.

16          Number 9 is you shall participate at the direction of

17  a probation officer in a substance abuse treatment program,

18  which may include urine testing, up to a maximum of 104 tests

19  per year.  And that's really just a way to give you some better

20  coping mechanisms and to make sure you don't get yourself back

21  into trouble.  Okay, sir?

22          THE DEFENDANT:  Yes, sir.

23          THE COURT:  Okay.  Then 14 through 18 are all of the

24  conditions that allow the probation officer to do his or her

25  job.

1          So 14 is you shall not knowingly leave from the

2     federal judicial district where you're being supervised, unless

3     granted permission to leave by the Court or a probation

4     officer.  And then it says that the geographic area of our

5     district, which is the Northern District of Illinois, currently

6     consists of the Illinois counties of Cook, DuPage, Grundy,

7     Kane, Kendall, Lake, LaSalle, Will, Boone, Carroll, Dekalb, Jo

8     Davies, Lee, McHenry, Ogle, Stephenson, Whiteside, and

9     Winnebago Counties.

10         Now, as I said before, if you come to me with a job

11    you want to drive a truck or if you want to go all of the way

12    from New York to California and back, if you're in compliance

13    with all of these terms, and it's a legitimate company that

14    pays you legitimate good money, we're very open to that.  I

15    would encourage you to think about that since it's something

16    you've been interested in before.  So think about that, but

17    just know that you have to ask.  But we're pretty liberal about

18    giving you permission as long as you ask and you're in

19    compliance with everything.  Okay, sir?

20         THE DEFENDANT:  Yes, sir.

21         THE COURT:  Okay.  15 is you have to report to the

22    probation office in the Federal Judicial District to which

23    you're released from imprisonment, and you have to report to

24    the probation officer at reasonable times as directed by the

25    Court or the probation officer.  That's just so they can check

1    in on you, see how you're doing.  They might ask you for a

2    paystub or a letter of employment, how's everything going, that

3    kind of stuff, okay?

4                THE DEFENDANT:  All right.

5                THE COURT:  All right.  Number 16.  I have sort of a

6    practice of checking only a few boxes here.  I think Ms. Kwong

7    knows that from all of our other cases.  So we are going to

8    check here, "You shall permit a probation officer to visit you

9    at any reasonable time," and we'll just leave the "at work or

10   other reasonable locations specified by a probation officer,"

11   checked.  The rest of them are really backups.  And if that

12   turns out to be the best place to visit, it is covered by other

13   locations.  But generally speaking, home is the best place, or

14   you could meet at the Starbucks or the McDonald's, or whatever,

15   that's pretty -- but this gives the maximum flexibility without

16   directing anybody necessarily to your school or your work or

17   something like that.  Okay?  And we are going to permit the

18   probation officer to confiscate any contraband observed in

19   plain view.  Okay, Mr. Garcia?

20               THE DEFENDANT:  Yes, sir.

21               THE COURT:  Okay.  And then you have to notify the

22   probation officer within 72 hours after becoming aware of any

23   change in residence, employer, or workplace.  And absent a

24   constitutional or other legal privilege, you have to answer any

25   questions from the probation officer.  And you have to answer

1    truthfully any questions unless you have a constitutional or

2    other legal privilege.  Okay, sir?

3             THE DEFENDANT:  Yes.

4             THE COURT:  And then the last one is you have to

5    notify the probation officer within 72 hours after being

6    arrested, charged with a crime, or questioned by law

7    enforcement.  Okay?

8             THE DEFENDANT:  Yes, sir.

9             THE COURT:  Okay.  And then we're on to -- so we have

10   23 here, and that's a search condition here.  Any comments on

11   that, Mr. Legutki?

12            MR. LEGUTKI:  Number 3 of the special conditions, your

13   Honor?

14            THE COURT:  23 of the discretionary conditions.

15            MR. LEGUTKI:  No, sir.

16            THE COURT:  Okay.  So, Mr. Garcia, No. 23 is you have

17   to submit your person, property, house, residence, or vehicle,

18   or papers or computers to a search conducted by the

19   U.S. Probation Officer.  Failure to submit to a search may be

20   grounds for revocation of release.  You should warn other

21   occupants that the premises may be subject to searches pursuant

22   to this condition.  And an officer may conduct a search

23   pursuant to this condition only when reasonable suspicion

24   exists that the defendant has violated a condition of his

25   supervision, and the area to be searched contains evidence of

1    this violation, and any search must be conducted at a

2    reasonable time in a reasonable manner.

3    So if they get wind that you might be involved in

4    either narcotics or gun activities, they're going to have

5    permission to search your house during this time.  Okay?

6    MR. STURINO:  And, your Honor -- I'm sorry to

7    interrupt.  And, your Honor, I just wanted to add to that

8    condition.  I think there's a factual basis to support it as

9    well.  These transactions occurred in the driveway of

10   Mr. Garcia's home.  Mr. Garcia would exit his home and enter a

11   vehicle, and then do the deals with the source there, so I do

12   think there's a factual basis to support this condition.

13   THE COURT:  I appreciate your making a record on that,

14   and that's what I assumed that you were going to say, and the

15   reason I think Mr. McKechnie put this condition in the first

16   place.  It's the same thing as some of these other conditions.

17   It's just an extra incentive and motivation for Mr. Garcia to

18   do what he says he want to do, which is to stay out of this and

19   keep himself out of prison.  Because at this point, Mr. Garcia,

20   I hope this is the last time you're ever in -- under a

21   sentence, because if there's another one after this, it's

22   almost certainly going to be a life sentence, and we don't want

23   that for you.  Okay?

24   MR. LEGUTKI:  Your Honor, excuse me, Mr. Sturino, your

25   Honor, to me the critical issue was the reasonableness of this.

1    Mr. Garcia has had difficulties in the past with the

2    probation/state parole.  The whole reasonableness needs to be

3    expressed in that, and I think that's covered by your Honor.

4           THE COURT:  Yes, I agree with that exactly,

5    Mr. Legutki.  You know, I don't know the experience of

6    probation in the state system, but I do know, because our

7    probation officers -- I always say they're out doing the Lord's

8    work because it's hard when you come out of prison.  And you

9    know this, Mr. Garcia.  It's hard to make the transition.  And

10   nothing makes me happier than someone successfully completing

11   their probation.  I tell people all of the time when I have

12   them in on probation issues.  I always say, "Look, I hope that

13   I only see you one time again, and it's when you finish your

14   probation.  I hope you walk through my courtroom doors and sit

15   through my call, and at the end of the call I get to shake your

16   hand," because that's what we want.  We want you to succeed,

17   and we work very hard for people to succeed.

18          And we give second chances and third chances because

19   we know it's hard.  It's a lot harder to give a second and a

20   third chance when you do something really seriously wrong, but,

21   you know, there are people who are on electronic monitoring and

22   they don't -- they struggle with it at first because they don't

23   realize their back porch is outside the monitor.  We don't

24   revoke people for that.  We work with them.  We have people who

25   have had substance abuse problems their whole life.  If they

1    fall off the wagon once, we work with them.  We don't revoke

2    them.  We want you to succeed.  So that's my goal there.  Our

3    probation officers aren't out to harass you, they're out to

4    help you.

5         And I'm confident that you will have a better

6    experience in federal probation than you had before, because we

7    want to work with you, okay, and that just reinforces

8    Mr. Legutki's point, which is, they're only going to search if

9    it's reasonable to do so and that's if they have a real

10   suspicion that you're falling off the wagon so to speak.  Okay?

11             THE DEFENDANT:  Okay.

12             THE COURT:  The third condition and the second

13   condition, Mr. Sturino, what do you think of that one?

14             MR. STURINO:  Your Honor, this is the one about

15   community service, 20 hours of community service.

16             THE COURT:  Yes.

17             MR. STURINO:  Your Honor, I do sympathize with

18   Mr. Legutki's objection.  My position would be that this could

19   be something that we can revisit when Mr. Garcia is released.

20   The concern, I think, is, you know, if a person does not

21   otherwise have employment and otherwise keeping himself busy,

22   bad things happen.  I think that's the point of 20 hours of

23   community service.  But if Mr. Garcia is not in good health or

24   not physically able to do community service, then I would fully

25   agree that he should not be doing so.  I don't have a strong

1    position, your Honor, but I guess my feeling is this is

2    something that can be revisited when he is released from

3    custody.

4         THE COURT:  Okay.  Let me tell you my case on this

5    one, which is really sometimes it is an opportunity for people

6    because an internship, if people like you it can lead to a

7    paying job or volunteer work, but I think Mr. Garcia's at least

8    going to be 70 no matter what happens here, and so I'm inclined

9    to think it's unlikely that we would ever put him into

10   community service, but it may depend on the circumstances, if

11   there's, you know, an opportunity to volunteer somewhere that

12   may turn into a paying job.  I just don't know.  I am very

13   sympathetic to your point which is once you're past the

14   retirement age, pressing you into service is a hard thing to

15   do.  But if he doesn't have any other way to support himself,

16   there's going to have to be something to move him in that

17   direction.  So I don't feel strongly about it either.

18        Any further thoughts you have, Mr. Legutki?

19        MR. LEGUTKI:  Yes, your Honor.  I am older than all of

20   you, and at 63, if someone told me I had to do 20 hours of

21   community service, it would be a burden.  I mean, it's

22   different in your 50s and your 40s.  And I hope I will still be

23   complaining about these things when I'm 70, but I think it

24   makes a big difference, your Honor.  I think there's a time

25   value in this that cannot be quantified, but yet needs to be

1     recognized.  We don't know who the probation officer is going

2     to be at that time.  Your Honor, I hope you're still on the

3     bench making great rulings at the end of the time, but we don't

4     know.  I would hate to have this be a catchall, oh, let's trip

5     him up anyhow.  Not that you would do it or the current

6     probation officer would do it.  I'm just trying to think ahead.

7     I just don't think this is a reasonable condition to impose on

8     Mr. Garcia when he gets out.

9            THE COURT:  Okay.  You win.

10           Discretionary Condition No. 4 is already there.  It

11    requires him to seek employment.  You know, I don't know what

12    the circumstances are going to be.  But I'm not going to -- I

13    don't feel strongly about it mostly because of the realities of

14    this situation, and I do think it's unlikely that it would ever

15    come into play.  If I'm still around on the bench at this time,

16    we'll see.  I don't know.  When I turn 65, it's going to be

17    awfully tempting to go do something else where I could get paid

18    10 or 20 times what I get paid right here.

19           MR. LEGUTKI:  I've got my application in for that job.

20           THE COURT:  I left it 13 years ago.  So my wife always

21    reminds me that between the age of 42 and 55 I've minimized my

22    income potential by about $40 million, but that's okay.

23           We'll waive that one.  I'll use No. 4 if I'm still

24    making all of the good rulings you're hoping for to make sure

25    that Mr. Garcia is doing the best he can in the circumstances.

1    So we'll leave No. 3 out, Kelly, and we'll move on to the next

2    one, which is -- it's the one about the credit charges.

3            Now -- here, I'll give you a preview of coming

4    attractions here.  The only financial penalty in this case is

5    going to be the $600 special assessment.  There will be no

6    fine.  The potential fine in this case is a staggering amount

7    of money.  But Mr. Garcia doesn't have the wherewithal to pay

8    any fine at all.  So we're only talking about $600 here, and

9    it's going to be imposed at 10 percent of net monthly income.

10   So it makes it almost impossible for Mr. Garcia not to be in

11   compliance.  We're only going to shave off a few bucks a month.

12   And in the space of a year, if he has any job at all, he'll be

13   able to pay off the $600.

14           PROBATION OFFICER:  Excuse me, your Honor.  I'm sorry

15   for interrupting.

16           There -- I think there's an issue of buy money.

17           THE COURT:  Oh, there is buy money.  Oh, okay.  I

18   missed that.  Thank you for reminding me.

19           PROBATION OFFICER:  Yes, that's Special Condition

20   No. 12.

21           THE COURT:  There it is.  $7,600.  So, $8,200.  Well,

22   that's more money, but, you know, I've had restitution where

23   it's been millions of dollars in restitution owed for some

24   massive fraud.  So even at $7,600 at 10 percent of your net

25   monthly income, it's not going to be an impossible thing to pay

1    off over time.  We're only going to take 10 percent of your net

2    monthly income.  And so as long as you're letting the

3    government take 10 percent of your net monthly income, you'll

4    be in compliance with the financial conditions imposed by the

5    judgment, in which case you can incur new credit charges.  So I

6    don't think there's too much to object to in No. 5 here because

7    the reality is it's not very hard to stay in compliance,

8    whatever it would be, 20 bucks, 40 bucks a month, is a small

9    amount.  So I'm going to overrule the objection to No. 5 just

10   to make sure.

11         The problem I have sometimes is people blow off the

12   restitution, and that's not right.  I have no reason to think

13   you're going to do that, Mr. Garcia, because you want to be in

14   compliance.  We're not asking much here.  And if you're in

15   compliance, we might even let you go early from these

16   conditions.  So it's a small price to pay to perhaps get your

17   full freedom back sooner.  So No. 5 is you shall not incur new

18   credit charges or open additional lines of credit without the

19   approval of the probation officer, unless you are in compliance

20   with the financial obligations imposed by the judgment.  And

21   those obligations will be $600 special assessment and the

22   $7,600 in buy money.  We're talking about $8,200 total.

23         Number 6 is you shall provide the probation officer

24   access to any requested financial information necessary to

25   monitor compliance with the conditions of supervision.  That's

1    probably a pay stub or a letter from your employer or a tax

2    return.  Some way that they know what you're making so they can

3    collect that 10 percent.  Okay, sir?

4              THE DEFENDANT:  Yes, sir.

5              THE COURT:  Okay.  And then we're down to No. 10,

6    which is the 10 percent.  So you have to pay to the clerk of

7    the court any financial obligation ordered that remains unpaid

8    at the commencement of the term of supervised release, at a

9    rate of not less than 10 percent of the total of your gross

10   earnings, minus federal and state income tax withholding, so

11   once your employer takes your taxes out, whatever that gross

12   number is that's left, 10 percent of that goes to the

13   government until you pay of the 8200.  Okay, Mr. Garcia?

14             THE DEFENDANT:  Yes, sir.

15             THE COURT:  Number 11, you shall not enter into any

16   agreement to act as an informer or special agent of law

17   enforcement without the permission of the Court.  So if anybody

18   approaches you about that, you have to come and talk to me

19   about that first. Okay?

20             THE DEFENDANT:  All right.

21             THE COURT:  Okay.  And the last one is you have to pay

22   to the Clerk of the Court $7600 as repayment for the government

23   funds you received during the investigation, and those funds

24   will be remitted to the ATF, which I believe is the government

25   agency that advanced those funds listed here in the PSR.  Okay,

1    Mr. Garcia?

2              THE DEFENDANT:  Yes, sir.

3              THE COURT:  Okay.  Five years on that, and if you're

4    doing well after two and a half, come and ask me to let you go

5    for the other two and a half, okay?

6              THE DEFENDANT:  All right.

7              THE COURT:  Okay.  So I've got to make my statement

8    now and go through the 3553(a) factors, so if you'll bear with

9    me for a few minutes.

10             I think it was April 3rd of 2020 that I entered the

11   order finding the defendant guilty on all six counts in this

12   case.  There were five narcotics counts and Count Four is the

13   gun count, and that's all laid out in the PSR.  And then so I

14   asked for the PSR to be prepared to help with sentencing.  And

15   as I have already done the guideline findings for you guys, but

16   my recollection is that the total offense level is 35, a

17   Criminal History of VI.  That results in an advisory guideline

18   range of 292 to 365 months.

19             The statutory max for Counts Two through Five is life.

20   For Counts One and Six, it's 40 years.  The mandatory minimum

21   for Count Four is 15 years.  Counts Two, Three, and Five is 10

22   years.  Counts One and Six is 5 years.  Fortunately for

23   Mr. Garcia, those do not stack on top of each other because

24   that's a lot of mandatory sentences.  So it's 15 years is the

25   mandatory minimum in this case.

1       The supervised release on all but the gun count, the

2  statutory max is life.  I have already gone through the

3  minimums and the guidelines for that, so I'm pretty much tied

4  by the minimums to give a five-year period of supervised

5  release, with all of the periods running concurrently.  The

6  fine, as I said before, is astronomical.  Counts Two, Three,

7  and Five contain a maximum fine of 10 million.  Counts One and

8  Six is 5,000,000.  Count Four, it's only 250,000.

9       The guideline for the fine is between 20,000 and

10  10,000,000.  For the reasons I previously stated, there will be

11  no fine.  The special assessment of $600, which is a hundred

12  dollars a count, is mandatory, and you add that to the buy

13  money and that's where we get the 8200.

14       My job as a sentencing judge is to impose a sentence

15  that is sufficient but not greater than necessary to serve all

16  of the Section 3553(a) purposes.  So I would like to make a few

17  comments for the record about how I see those factors applying

18  in this case.

19       We start out with the nature and circumstances of the

20  offense.  As Mr. Sturino pointed out, trafficking in firearms

21  and very potent narcotics is a very dangerous thing for the

22  community.  These drugs are so potent, they had to be

23  double-bagged with special instructions for handling.  And, you

24  know, obviously, if you buy this stuff, you're trusting the

25  person who's distributing it to give you something that isn't

1    going to kill you, and that doesn't always happen.  People also

2    get addicted.  It creates a lot of bad secondary effects in the

3    community, and that's why it's illegal.  It is a serious

4    offense.

5           And when we go to the history and characteristics of

6    the defendant.  So I'm going to start with the bad and turn to

7    the good here.  Okay?

8           The bad, it's a bad criminal history.  There's a lot

9    of violence.  There's people being shot.  I understand from

10   Mr. Garcia's PSR, and also from his mother's letter, that he

11   was a gunshot victim as well and it was very serious.  And he

12   barely made it, according to his mother's letter.  You know,

13   that's a very difficult life, and a lot of people don't make it

14   living that life, and Mr. Garcia was pretty close to being one

15   of those people who didn't make it.  So it's a serious record.

16          And Mr. Sturino pointed out there's not a lot of

17   crimes in number here.  I've seen much longer records in that

18   respect, but there was one sentence of 40 years, in which he

19   served 20.  Well, if you're going to be in IDOC for 20 years,

20   it's going to take you out of commission to commit further

21   crimes.

22          You know, the unfortunate piece here, really, is that

23   those glimmers of hope that Mr. Legutki referred to and that

24   Mr. Garcia's referred to and that his mother gave in great

25   detail in her letter didn't stick.  That's the problem here is

1    that there was a chance when Mr. Garcia was in his early 50s to

2    turn this around after he was paroled in 2012.  There is a

3    history of some gainful employment.  I can't say that for all

4    of my armed career offenders, so that is a positive.  But, you

5    know, the tapes I listened to at the trial actually are

6    concerning in the sense that there wasn't a lot of resistance

7    there.  There was a great detail of knowledge about where you

8    can get drugs and where you can get guns in the community, of

9    great variety that was being offered for sale.  That's

10   concerning.

11         And that leads me to the other 3553(a) factors.  Just

12   punishment and deterrence, and those are troubling, too,

13   because if 20 years in IDOC doesn't deter you, I'm not sure

14   what could.  People don't like IDOC.  If you had a choice

15   between IDOC and federal, you would take federal every time.

16   IDOC is harder time.  So that's all concerning to me.

17         I am cognizant of Mr. Garcia's age, and I do think

18   that that is a factor that I can take into account that will

19   reduce his sentence.  I have to look at unwarranted sentencing

20   disparities, and this is something that Mr. Sturino averted to

21   as well.  If Mr. Garcia had toted up this record by age 35, and

22   some people do, it would be an argument for a longer sentence,

23   not a shorter sentence because somebody who's engaged in that

24   level of crime and that level of violent crime may be somebody

25   who needs to be taken out of society for a legitimate guideline

1    sentence here, like 25 years.  That's the guideline sentence
2    here, 24 and a third years.
3             I think Mr. Garcia's age actually cuts against that in
4    this circumstance, because he's -- you know, he's 60 now.  He
5    turned 60 a month ago.  And so I think that's a factor that I
6    will take into account, and take that into account in his
7    favor.
8             The other things I would say in his favor, really, are
9    those glimmers, and the idea that he can do this.  I think
10   you're going to have to resist the lure to go back to, as
11   you've said, people who have helped you out before, because
12   they really haven't helped you out in a way that has netted you
13   out very well.  I mean, you've spent way too much time of your
14   life in prison.  And the sentence in this case is just going to
15   increase the percentage of your life that you spend in prison.
16   But I can't see giving you a guideline sentence here, even
17   though but for your age and those glimmers of hope, it would be
18   completely justifiable to give you a guideline sentence here
19   because this record is a really disturbing record with a lot of
20   violence and people getting shot.  That's really dangerous and
21   scary.
22            But, you know, Mr. Garcia, I know you have got it in
23   you.  I know you do.  You just have to work with us on the
24   other end of the sentence.  But I can't blind my eye to
25   everything that Mr. Sturino said as well about the record.

1    There's only so much of a break I can give you for your age and

2    those glimmers of hope.  And for my own -- I don't know you any

3    better than Mr. Sturino does, except that you've been coming in

4    my courtroom for five years, and this is where I'm going to

5    give you credit for acceptance of responsibility, too.

6            You wanted to go to trial to test a legal question.

7    But you admitted to all of the conduct, and the question was is

8    there a legal defense to this conduct.  I give you credit for

9    that.  You could have made this a lot more difficult for the

10   government.  In the end would they have convicted you, yeah, I

11   think they would have convicted you, but you could have made

12   this a lot more difficult.  You know, I have hope for your

13   future, Mr. Garcia, if you work with us.  You have got to work

14   with us.  You have to take advantage of what we're going to

15   offer you, which is a probation officer who will actually check

16   in on you and be positive with you, and try to get you on the

17   right path.  And if you need help finding employment, if you

18   need flexibility, as you said before, if it turns out what you

19   really want to do is drive a truck across the state lines,

20   we'll work with you on that.  Okay?

21           THE DEFENDANT:  Okay.

22           THE COURT:  So, Mr. Legutki, have I addressed all of

23   your principal arguments?

24           MR. LEGUTKI:  Yes, sir, you have.  Thank you.

25           THE COURT:  Mr. Sturino, have I addressed all of your

1    principal arguments as well?

2              MR. STURINO:  Yes, your Honor.  I have nothing else.

3              THE COURT:  Okay.  Very good.  So the question in this

4    case really comes down to how much of a discount can I give you

5    off of the guidelines and still give you a sentence that is

6    sufficient but not greater than necessary.  And in my judgment,

7    and pursuant to the Sentencing Reform Act of 1984, the sentence

8    is going to be 210 months, which is 82 months off the low end

9    of the guidelines, but still a little bit above the mandatory

10   minimum, and that will be on Count Four, concurrent with all of

11   the other counts.  So it's one sentence of 210 months.  Five

12   years of supervised release, basically giving you the mandatory

13   minimum on all of the counts for supervised release, and the

14   minimum financial imposition I can give you as well.

15             And so the only other thing I know that I have to

16   cover is two things.  One is, Mr. Legutki, if you all have a

17   recommendation for a facility, I would be happy to recommend

18   that.

19             MR. LEGUTKI:  Your Honor, somewhere -- Mr. Garcia, as

20   evidenced by his letters submitted by his mom, family members

21   and significant other, closest and nearest Chicago -- excuse

22   me -- as close to Chicago as possible would be the request.

23             THE COURT:  Do you want me to recommend the RDAP?  He

24   may be ineligible based on the conviction, but do you want me

25   to recommend it anyway?

1       MR. LEGUTKI:  Well, your Honor, that was in my notes,

2   actually.  Given the fact that there is drug and alcohol

3   counseling that is part of supervised release conditions that

4   was talked about extensively during the sentencing, I would ask

5   that RDAP be recommended by this Court.

6       THE COURT:  Okay.  And I'll be happy to do that.  So,

7   Mr. Garcia, I'm going to recommend you for the Residential Drug

8   Abuse Program.  If they'll let you in it and you complete it

9   successfully, you can get out sooner.  It will give you a

10  reduction in your sentence.  And I think it might help you. I

11  read your mom's letter and that's really what triggered in my

12  mind to suggest this, because I think your mom feels confident

13  that you can stay sober, and if you do, it will enhance the

14  likelihood that you'll be able to be successful.  So are you

15  okay with that, sir?

16      THE DEFENDANT:  Yes, sir.

17      THE COURT:  Okay.  So I will put the facility closest

18  to Chicago that offers the RDAP.

19      And, then, Mr. Garcia, I have to advise you that if

20  you want to appeal either the conviction or the sentence, you

21  would have to do that within 14 days of the date the judgment

22  and conviction order appears on the docket.  That probably

23  won't be until next week because every time I give a sentence

24  that's below the guidelines, I have to write up a statement of

25  reasons for why I did that.  So it's going to take me a couple

1    of days for me to get that typed up and sent off to Carolyn

2    because we're not coming to the office these days.  But you

3    have 14 days from that date to file a Notice of Appeal if you

4    wish to do so.  Okay, sir?

5              THE DEFENDANT:  Yes, sir.

6              MR. LEGUTKI:  Your Honor, if I might ask, just from

7    personal experience, when the J&C is issued, sometimes it is

8    backdated to today.  I've had this experience before over the

9    years.  Let's say it comes out in a week, it's backdated to

10   today.  If it's just dated the day it comes out, it would be

11   helpful.

12             THE COURT:  Yes.  We certainly will date it from the

13   day it comes out, especially because of the Thanksgiving

14   holiday, and you need to have a chance to consult with

15   Mr. Garcia on whether he wishes to appeal.  So we'll make sure

16   we put the date that it's actually on the docket, and then you

17   will get an electronic notice of that, okay?

18             MR. LEGUTKI:  Just one less headache to deal with,

19   Judge.

20             THE COURT:  Yes, I agree.  I know how that can happen

21   because sometimes the judges aren't careful about not signing

22   the right date on it because they know the date that they

23   sentenced, but they don't know the date it's being processed,

24   but we'll make sure we are careful about that.

25             MR. LEGUTKI:  Thank you, sir.

1          THE COURT:  Okay.  Very good.  Anything else for the

2     defense today, Mr. Legutki?

3          MR. LEGUTKI:  No, sir.  Thank you.

4          THE COURT:  Kelly, did I leave anything out?

5          PROBATION OFFICER:  I do not believe so, your Honor.

6          THE COURT:  Okay.  Thank you.

7          Mr. Sturino, anything else for the government?

8          MR. STURINO:  No, your Honor.  Thank you very much.

9          THE COURT:  Very well.  Okay.  Mr. Garcia, I wish you

10    good luck, and I hope I am still around here and you're still

11    around here, too, and I can work with you to make sure this is

12    the last time you ever get sentenced in a courthouse.  Okay?

13          THE DEFENDANT:  Okay.  Thank you, your Honor.

14          THE COURT:  Okay.  Thank you, everybody.  Take care.

15          MR. LEGUTKI:  Thank you.

16          MR. STURINO:  Thank you.

17          THE COURT:  Bye-bye.

18        (Proceedings concluded.)

19                    * * * * * * * * *

20                  C E R T I F I C A T E

21        I certify that the foregoing is a correct transcript from

22    the record of proceedings in the above-entitled matter.

23

24    /s/Kristin M. Ashenhurst, CSR, RDR, CRR   February 9, 2021
      Kristin M. Ashenhurst, CSR, RDR, CRR      Date
      Federal Official Court Reporter

25